## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HARRIET GOLDSTEIN, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>vs.<br><br>PUDA COAL, INC., MING ZHAO, LIPING ZHU, QIONG "LABY" WU, YAO ZHAO, BREAN MURRAY, CARRET & CO., LLC and MACQUARIE CAPITAL (USA) INC.,<br><br>        Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

JUDGE JONES

CIVIL ACTION NO.

**11 CIV 2598**

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

RECEIVED
APR 1 5 2011
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, Harriet Goldstein ("Plaintiff"), alleges the following upon the investigation of Plaintiff's counsel, which included, among other things, a review of defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Puda Coal, Inc. ("Puda" or the "Company") and securities analysts' reports and advisories about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of the securities of Puda, who purchased or otherwise acquired Puda securities between November 13, 2009 and April 11, 2011, inclusive (the "Class Period"),  including purchasers of the Company's securities who acquired their securities pursuant or traceable to the Company's equity offering (the "Offering") on or about December 8, 2010, seeking to pursue remedies under the Securities

Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act").

2.      Puda is a supplier of premium cleaned coal used to produce coke for steel manufacturing in China.  The Company states that its "operations are conducted exclusively by an entity in China, Shanxi Puda Coal Group Co., Ltd ("Shanxi Coal"), which we control through 90% indirect equity ownership."  That is to say that, at relevant times, Shanxi Coal was Puda's only Chinese operating entity.

3.      On April 8, 2011, investors were astounded when a report surfaced detailing illicit and unreported transactions by the Company's Chairman, Ming Zhao ("Zhao").  Specifically, the report revealed that in 2009, Zhao transferred ownership of Shanxi Coal to himself without obtaining shareholder approval.  Zhao accomplished this with the help of his brother, Yao Zhao ("Yao Zhao").  Then in 2010, Zhao sold 49% of Shanxi Coal to a Chinese private equity firm for $37.2 million, and pledged the remaining 51% of Shanxi Coal to the private equity fund as security for a $379 million loan (which was subsequently increased to $530 million) at a 14.5% annual interest rate, in order to finance the development of coal mines.  At no time were the Company's shareholders ever informed or made aware of these occurrences.  Therefore, during the Class Period, Puda became nothing more than a shell corporation with no operating entity. Moreover, at no time during the Class Period did Puda have the stake in Shanxi Coal that it continuously told investors that it owned.

4.      Upon the release of these revelations, shares of the Company's stock fell $3.10 per share, or over 34 percent, to close on April 8, 2011 at $6.00 per share, on unusually heavy trading volume.  Trading of the Company's shares was subsequently halted on April 11, 2011 (the next trading day).

5.      Also on April 11, 2011, Puda announced that it had commenced an investigation regarding these unauthorized transactions.   The Company disclosed that although the investigation was still "in its preliminary stages," there was evidence to support the allegations that "there were transfers by Mr. Zhao in subsidiary ownership that were inconsistent with disclosure made by the Company in its public securities filings."  Further, Puda disclosed that Zhao had agreed to a "voluntary" leave of absence as Chairman of the Board of the Company until the investigation is completed.

6.      The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships and operations.  Specifically, defendants failed to disclose or indicate the following: (1) that the Company's Chairman had engaged in unauthorized transfers of the ownership of Puda subsidiary Shanxi Coal; (2) that such transfers were not disclosed to investors, and in fact ran counter to the statements made by defendants; (3) that the Company's ownership stake in Shanxi Coal was substantially less than what it detailed to investors; (4) that the Company had improperly consolidated Shanxi Coal's financial results into Puda's financial results; (5) that the Company lacked adequate internal controls; (6) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times; and (7) that, as a result of the foregoing, the materials disseminated in connection with the Offering were materially misleading when issued.

7.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members suffered damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.     Venue is proper in this District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, Macquarie Capital (USA) Inc. maintains its principal executive offices within this District, and at relevant times Puda's stock traded on the NYSE Amex exchange.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

**PARTIES**

12.     Plaintiff, Harriet Goldstein, as set forth in the accompanying certification, incorporated by reference herein, purchased Puda securities at artificially inflated prices during the Class Period and has been damaged thereby.

13.     Defendant Puda is a Delaware corporation with its executive offices located at 462 Xuefu Street, Taiyuan, Shanxi Province, the People's Republic of China ("PRC").

14.     Defendant Ming Zhao was, at relevant times, the Chairman of the Company's Board of Directors.  Zhao previously served as the Company's President and Chief Executive

Officer ("CEO"), has been the Chairman of Shanxi Coal since 1995, and was CEO of Shanxi Coal from 1995 until 2008.

15.     Defendant Liping Zhu ("Zhu") was, at relevant times, the Company's President and CEO, as well as a director.

16.     Defendant Qiong "Laby" Wu ("Wu") was, at relevant times, the Company's Chief Financial Officer ("CFO") and Secretary.

17.     Defendant Yao Zhao was, at relevant times, a manager of Puda and a beneficial owner of 5% or more of its outstanding common shares.  Yao served as the legal representative of Shanxi Putai Resources Limited ("Putai"), a wholly owned foreign enterprise ("WOFE") registered under the wholly foreign-owned enterprises laws of the PRC.  Yao Zhao is the brother of Ming Zhao.

18.     Defendants Zhao, Zhu, Wu and Yao Zhao are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Puda's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-

published" information, the result of the collective actions of the Individual Defendants.

19.     Defendant Brean Murray, Carret & Co., LLC ("Brean") was an underwriter of the Company's December 8, 2010 stock offering.  Brean maintains an address for service of process, care of CSC, at 80 State Street, Albany, New York.

20.     Defendant Macquarie Capital (USA) Inc. ("Macquarie") was an underwriter of the Company's December 8, 2010 stock offering.  Macquarie's principal executive offices are located at 125 West 55th Street, 22nd Floor, New York, New York.

21.     Defendants Brean and Macquarie are collectively referred to hereinafter as the "Underwriter Defendants."   The Underwriter Defendants served as financial advisors, and assisted in the preparation and dissemination of the Offering Materials for Puda's public stock offering.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Puda is a supplier of premium cleaned coal used to produce coke for steel manufacturing in China.  The Company states that its "operations are conducted exclusively by an entity in China, [Shanxi Coal], which we control through 90% indirect equity ownership."

### Materially False and Misleading
### Statements Issued During the Class Period

23.     The Class Period begins on November 13, 2009.  On this day, the Company filed a Form 10-Q with the SEC.  The Form 10-Q was signed by Zhu, and in relevant part stated:

> Puda Coal, Inc. (formerly Purezza Group, Inc.) (the "Company" or "Puda") is a corporation organized under Delaware Law and headquartered in Shanxi Province, China.  The Company was originally incorporated on August 9, 2001 in Florida.

> On July 15, 2005, the Company acquired all the outstanding capital stock and ownership interests of Puda Investment Holding Limited ("BVI") and BVI

became a wholly-owned subsidiary of the Company.  In exchange, Puda issued to the BVI members 1,000,000 shares of its Series A convertible preferred stock, par value $0.01 per share, of the Company, which are convertible into 678,500,000 shares of Puda's common stock. . . .

Effective on July 30, 2009 (the "Effective Date"), the Company completed a reincorporation from a Florida corporation to a Delaware corporation.  . . .

BVI is an International Business Company incorporated in the British Virgin Islands on August 19, 2004 and it has a registered capital of $50,000.  BVI did not have any operating activities from August 19, 2004 (inception) to September 30, 2009.

BVI, in turn, owns all of the registered capital of Shanxi Putai Resources Limited (formerly, Taiyuan Putai Business Consulting Co., Ltd.) ("Putai"), a wholly foreign owned enterprise ("WFOE") registered under the wholly foreign-owned enterprises laws of the People's Republic of China ("PRC"). Putai was incorporated on November 5, 2004 and has a registered capital of $20,000. ***Putai owns 90% of Shanxi Puda Coal Group Co., Ltd. (formerly, Shanxi Puda Resources Co. Ltd.)("Shanxi Coal"), a company with limited liability established under the laws of the PRC.***

Shanxi Coal was established on June 7, 1995.  Shanxi Coal mainly processes and washes raw coal and sells from its plants in Shanxi Province, high-quality, low sulfur refined coal for industrial clients mainly in Central and Northern China. Shanxi Coal has a registered capital of RMB22,500,000 ($2,717,000) which is fully paid-up. ***The owners of Shanxi Coal were Putai (90%), Mr. Ming Zhao (8%) and Mr. Yao Zhao (2%).  Ming Zhao is the chairman and was the president and chief executive officer of Puda until his resignation on June 25, 2008.*** Yao Zhao was the chief operating officer of Puda until his resignation became effective on November 20, 2006. Ming Zhao and Yao Zhao are brothers.

\*     \*     \*

The accompanying unaudited consolidated financial statements as of September 30, 2009 and for the three and nine month periods ended September 30, 2009 and 2008 have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and of Regulation S-X.

\*     \*     \*

***In the opinion of management, these unaudited consolidated interim financial statements include all adjustments and disclosures considered necessary to a fair statement of the results for the interim periods presented.***

\*     \*     \*

In connection with the preparation of this quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2009, an evaluation was performed by our management, with the participation of CEO and CFO, of the effectiveness of the

design and operation of our disclosure controls and procedures as of the end of the period covered by this quarterly report.

***Our management concluded that our disclosure controls and procedures were effective as of September 30, 2009.***

*       *       *

During the period covered by this quarterly report on Form 10-Q, with the assistance of our internal control compliance consultant, we improved the internal control function throughout our company and our culture regarding control consciousness. We have (i)set policies to make sure that account reconciliations and analyses for significant financial statement accounts are reviewed for completeness and accuracy by the Chief Financial Officer,(ii) redesigned control procedures with standard documentation for review and authorization in the purchase, sales and payroll transactions cycles, (iii) implemented a process that ensures the timely review and approval of complex accounting estimates by =qualified accounting personnel and subject matter experts, where appropriate, and (iv) established better monitoring controls at the corporate accounting, factory operation and anti-fraud levels. We believe that the actions we have taken have improved our internal control over financial reporting, as well as our disclosure controls and procedures such that, as of September 30, 2009, no material weakness exists in our disclosure controls and procedure or internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.  [Emphasis added.]

24.     The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by defendants Zhu and Wu, which stated:

I, [Liping Zhu/Qiong Wu], certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Puda Coal, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as

defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designated under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b)        Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.
>
> *        *        *

Pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, each of the undersigned officers of Puda Coal, Inc. (the "Company"), does hereby certify that:

This Quarterly Report on Form 10-Q for the fiscal quarter ended September 30 , 2009 of the Company fully complies with the requirement of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in this Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

25.    On March 24, 2010, the Company issued a press release announcing its financial results for the fourth quarter and full year 2009.  For the full year, the Company reported the following financial results:

> ***Net revenue was $214.1 million for the year ended December 31, 2009,*** down 11.7% compared to $242.3 million for the year ended December 31, 2008.  . . . ***Net income was $5.5 million, or $0.36 per fully diluted share, for the year ended December 31, 2009, down 67.9% from $17.1 million, or $1.12 per fully diluted share, for the year ended December 31, 2008. Adjusted net income excluding non-cash gains or losses in the fair value of derivative warrants was $10.5 million, or $0.68 per diluted share, compared to $16.7 million, or $1.09 per diluted share in 2008.*** Diluted earnings per share were calculated using weighted average shares of 15,593,201 and 15,228,950 for the year ended December 31, 2009 and December 31, 2008, respectively.

**Financial Condition**

As of December 31, 2009, Puda Coal had $19.9 million in cash and cash equivalents and $51.6 million in working capital and a current ratio of 3.5:1.  As a response to the economic downturn, management extended its credit terms to 60 days. Many customers deferred the settlement of their purchases within these credit terms, which resulted in accounts receivable increasing to $25.3 million at year-end 2009 from $14.6 million at year-end 2008. Long-term debt, excluding the current portion, was $6.5 million.  At year end, shareholders' equity was $84.0 million, an increase from $72.3 million at the end of 2008.

***The Company generated $1.4 million in cash from operating activities for the year ended December 31, 2009, compared to cash generated from operating activities of $26.5 million in 2008.*** Net cash used in investing activities was

10

$20.9 million for prepayments for purchases of mining assets and investments in coal mines. [Emphasis added.]

26.   On March 31, 2010, the Company filed its 2009 Annual Report with the SEC on Form 10-K.  The Company's Form 10-K was signed by defendants Zhao, Zhu and Wu, and reaffirmed the financial results announced on March 24, 2010.  The Form 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, *supra*.  Additionally, the Form 10-K stated:

> We are a supplier of high-grade metallurgical coking coal to the industrial sector in the People's Republic of China (the "PRC" or "China"). Our processed coking coal is primarily purchased by coke and steel producers for the purpose of making the coke required for the steel manufacturing process. ***Our operations are conducted exclusively by an entity in China, Shanxi Puda Coal Group Co., Ltd ("Shanxi Coal"), which we control through 90% indirect equity ownership.***
>
> \*     \*     \*
>
> Prior to our acquisition of 90% of the capital stock of Shanxi Coal on November 8, 2007, the owners of Shanxi Coal were Mr. Ming Zhao (80%) and Mr. Yao Zhao (20%). Ming Zhao is the chairman and chief executive officer of Puda before June 2008. Yao Zhao was the chief operating officer of Puda until his resignation became effective on November 20, 2006. Ming Zhao and Yao Zhao are brothers.
>
> On September 13, 2007, pursuant to an Exclusive Option Agreement between Putai and Shanxi Coal, Putai exercised the Option to acquire 90% of the total registered capital of Shanxi Coal at an acquisition price of RMB20,250,000 (approximately $2,692,000). Upon the Option exercise, Putai entered into a Share Transfer Agreement with the owners of Shanxi Coal, Ming Zhao and Yao Zhao, respectively. The acquisition price of $2,692,000 was fully paid as of December 31, 2008. ***After the acquisition, Putai became a 90% owner of Shanxi Coal,*** and the Exclusive Option Agreement, Exclusive Consulting Agreement, Operating Agreement, Technology License Agreement and Authorization, each entered into on June 24, 2005, among Putai, Shanxi Coal, Ming Zhao and Yao Zhao, were terminated.
>
> ***As of December 31, 2009, the percentages owned by Mr. Ming Zhao and Mr. Yao Zhao in the Group companies are as follows:***
>
> - ***Puda Coal, Inc.: Mr. Ming Zhao (approximately 48%); Mr. Yao Zhao (approximately 12%) held directly.***

- Puda Investment Holding Limited: Mr. Ming Zhao (approximately 48%); Mr. Yao Zhao (approximately 12%) held indirectly through Puda.
- Shanxi Putai Resources Limited: Mr. Ming Zhao (approximately 48%); Mr. Yao Zhao (approximately 12%) held indirectly through Puda and BVI.
- ***Shanxi Puda Coal Group Co., Ltd.: Mr. Ming Zhao (8%); Mr. Yao Zhao (2%) held directly, Mr. Ming Zhao (approximately 43%); Mr. Yao Zhao (approximately 11%) held indirectly through Puda, BVI and Putai.***

\*     \*     \*

Our management, including the Chief Executive Officer and Chief Financial Officer, assessed as of December 31, 2009 the effectiveness of the Company's internal control over financial reporting. In making this assessment, management used the criteria set forth in the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on the results of this evaluation, management has concluded that the Company's internal control over financial reporting as of December 31, 2009 was effective.  [Emphasis added.]

27.     On May 17, 2010, Puda filed its Quarterly Report with the SEC on Form 10-Q for the quarter ended March 31, 2010.  The Form 10-Q was signed by Defendant Zhu, and contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, *supra*.  Additionally, the Form 10-Q stated, in relevant part:

Putai owns 90% of Shanxi Puda Coal Group Co., Ltd. . . .

\*     \*     \*

***As of March 31, 2010, the percentages owned by Mr. Ming Zhao and Mr. Yao Zhao in the companies are as follows:***

- ***Puda Coal, Inc.: Mr. Ming Zhao (approximately 39%); Mr. Yao Zhao (approximately 10%) held directly.***
- Puda Investment Holding Limited: Mr. Ming Zhao (approximately 39%); Mr. Yao Zhao (approximately 10%) held indirectly through Puda.
- Shanxi Putai Resources Limited: Mr. Ming Zhao (approximately 39%); Mr. Yao Zhao (approximately 10%) held indirectly through Puda and BVI.
- ***Shanxi Puda Coal Group Co., Ltd.: Mr. Ming Zhao (8%); Mr. Yao Zhao (2%) held directly, Mr. Ming Zhao (approximately 35%); Mr. Yao Zhao (approximately 9%) held indirectly through Puda, BVI and Putai.***

\*     \*     \*

The accompanying unaudited consolidated financial statements as of March 31, 2010 and for the three month periods ended March 31, 2010 and 2009 have been prepared in accordance with generally accepted accounting principles for interim

financial information and with the instructions to Form 10-Q and of Regulation S-X.

\*       \*       \*

In the opinion of management, these unaudited consolidated interim financial statements include all adjustments and disclosures considered necessary to a fair statement of the results for the interim periods presented.

\*       \*       \*

In connection with the preparation of this quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2010, an evaluation was performed by our management, with the participation of our CEO and CFO, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this quarterly report.

Based upon that evaluation, our CEO and CFO concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective and provided reasonable assurance that the information required to be disclosed in reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and are designed to ensure that information required to be disclosed in those reports is accumulated and communicated to management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

\*       \*       \*

During the period covered by this quarterly report on Form 10-Q, there was no change in our internal controls over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.  [Emphasis added.]

28.     On August 16, 2010, Puda filed its Quarterly Report with the SEC on Form 10-Q for the quarter ended June 30, 2010.  The Form 10-Q was signed by Defendant Zhu, and contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, *supra*.  Additionally, the Form 10-Q stated, in relevant part:

Putai owns 90% of Shanxi Puda Coal Group Co., Ltd. . . .

\*       \*       \*

In September, 2009, the Shanxi provincial government appointed Shanxi Coal as a consolidator of eight coal mines in Pinglu County, Shanxi Province. In March 2010, Shanxi Coal received an approval from the Shanxi provincial government to acquire and consolidate four additional coking coal mines in Huozhou County, Shanxi Province. As of June 30, 2010, Shanxi Coal has completed the acquisition of two coal mines in Pinglu County (see Note 5). The initial registered capital of Shanxi Coal was RMB 22.5 million ($2,717,000) which was increased to RMB

500 million ($73,129,000) in May 2010, as a result of the new guidelines enacted by the Shanxi provincial government, that require the registered paid-in-capital of coal mine consolidators to be at least RMB 200 million. ***The owners of Shanxi Coal were Putai (90%), Mr. Ming Zhao (8%) and Mr. Yao Zhao (2%). In May 2010, Mr. Yao Zhao transferred his 2% ownership to Mr. Ming Zhao.*** Mr. Ming Zhao is the chairman and was the president and chief executive officer of Puda until his resignation on June 25, 2008. Mr. Yao Zhao was the chief operating officer of Puda until his resignation became effective on November 20, 2006. Mr. Ming Zhao and Mr. Yao Zhao are brothers.

***As of June 30, 2010, the percentages owned by Mr. Ming Zhao and Mr. Yao Zhao in the companies are as follows:***

- ***Puda Coal, Inc.: Mr. Ming Zhao (approximately 37%); Mr. Yao Zhao (approximately 9%) held directly.***
- Puda Investment Holding Limited: Mr. Ming Zhao (approximately 37%); Mr. Yao Zhao (approximately 9%) held indirectly through Puda.
- Shanxi Putai Resources Limited: Mr. Ming Zhao (approximately 37%); Mr. Yao Zhao (approximately 9%) held indirectly through Puda and BVI.
- ***Shanxi Puda Coal Group Co., Ltd.: Mr. Ming Zhao (10%) held directly, Mr. Ming Zhao (approximately 33%) held indirectly through Puda, BVI and Putai.***

\*     \*     \*

The accompanying unaudited consolidated financial statements as of March 31, 2010 and for the three month periods ended March 31, 2010 and 2009 have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and of Regulation S-X.

\*     \*     \*

In the opinion of management, these unaudited consolidated interim financial statements include all adjustments and disclosures considered necessary to a fair statement of the results for the interim periods presented.

\*     \*     \*

The accompanying unaudited consolidated financial statements as of June 30, 2010 and for the [three] and six month periods ended June 30, 2010 and 2009 have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and of Regulation S-X.

\*     \*     \*

In the opinion of management, these unaudited consolidated interim financial statements include all adjustments and disclosures considered necessary to a fair statement of the results for the interim periods presented.

\*     \*     \*

In connection with the preparation of this quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2010, an evaluation was performed by our

management, with the participation of our CEO and CFO, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this quarterly report.

Based upon that evaluation, our CEO and CFO concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective and provided reasonable assurance that the information required to be disclosed in reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and are designed to ensure that information required to be disclosed in those reports is accumulated and communicated to management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

During the period covered by this quarterly report on Form 10-Q, there was no change in our internal controls over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

29.     On November 15, 2010, Puda filed its Quarterly Report with the SEC on Form 10-Q.  The Form 10-Q was signed by Defendant Zhu, and contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, *supra*.  Additionally, the Form 10-Q stated, in relevant part:

Putai owns 90% of Shanxi Puda Coal Group Co., Ltd. . . .

\*       \*       \*

**As of September 30, 2010, the percentages owned by Mr. Ming Zhao and Mr. Yao Zhao in the companies are as follows:**

- **Puda Coal, Inc.: Mr. Ming Zhao (approximately 37%); Mr. Yao Zhao (approximately 9%) held directly.**
- Puda Investment Holding Limited: Mr. Ming Zhao (approximately 37%); Mr. Yao Zhao (approximately 9%) held indirectly through Puda.
- Shanxi Putai Resources Limited: Mr. Ming Zhao (approximately 37%); Mr. Yao Zhao (approximately 9%) held indirectly through Puda and BVI.
- **Shanxi Puda Coal Group Co., Ltd.: Mr. Ming Zhao (10%) held directly, Mr. Ming Zhao (approximately 33%) held indirectly through Puda, BVI and Putai.**

\*       \*       \*

The accompanying unaudited consolidated financial statements as of September 30, 2010 and for the three and nine month periods ended September 30, 2010 and

2009 have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and of Regulation S-X.

*          *          *

In the opinion of management, these unaudited consolidated interim financial statements include all adjustments and disclosures considered necessary to a fair statement of the results for the interim periods presented.

*          *          *

On May 7, 2010, Putai and Mr. Ming Zhao signed a loan agreement, pursuant to which, Putai borrowed from Mr. Ming Zhao RMB 240 million ($35,872,000) . The loan is unsecured and bears a 6% annual interest rate, in which the interest is payable on a quarterly basis, subject to certain adjustments to be agreed upon by the parties if such adjustments are necessary in light of the official interest rate of the PRC, as specified in the agreement.. The term of the loan is 18 months from May 7, 2010. If Putai does not pay off the principal and interest of the loan on time in accordance with the agreement, Mr. Ming Zhao may require Putai to pay off the loan immediately and charge an additional 5% interest on the amount of loan that is not paid off on time. In addition, if the interest rate under the agreement is adjusted according to the agreement and Putai fails to pay interest at the adjusted rate, Mr. Ming Zhao may require Putai to pay off the loan immediately.  The loan was used by Putai to increase the registered paid-in capital of Shanxi Coal.  In the three and nine months ended September 30, 2010, interest accrued on the loan amounted to $538,000 and $858,000, respectively. As of September 30, 2010, the balance of interest payable of $669,000 was included in other payables

*          *          *

In connection with the preparation of this quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2010, an evaluation was performed by our management, with the participation of our CEO and CFO, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this quarterly report.

Based upon that evaluation, our CEO and CFO concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective and provided reasonable assurance that the information required to be disclosed in reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and are designed to ensure that information required to be disclosed in those reports is accumulated and communicated to management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

During the period covered by this quarterly report on Form 10-Q, there was no change in our internal controls over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that has materially

16

affected, or is reasonably likely to materially affect, our internal control over financial reporting.

*        *        *

On May 14, 2009, Shanxi Coal entered into an agreement of share transfer with two unrelated individuals to purchase their equity, constituting 18% ownership, in Shanxi Jianhe Coal Industry Limited Company ("Jianhe Coal") for an aggregate purchase price of $14,947,000. The governmental registration of the share transfer was completed on December 3, 2009 and the purchase price was fully paid. In addition, under the agreement, the individual owning the other 82% of Jianhe Coal, guaranteed Shanxi Coal first priority in the right to purchase other shares of Jianhe Coal within the 24-month period following execution of the agreement.  Shanxi Coal will not take part in the operational management of the coal mine but will be paid dividends semiannually based on its 18% ownership in Jianhe Coal, and the dividends declared each year will be no less than 80% of the annual net profits of Jianhe Coal.  No dividend was declared by Jianhe Coal for the nine months ended September 30, 2010.

The investment was recorded at cost and there was no impairment in the value of investment for the three and nine months ended September 30, 2010.

*        *        *

In May 2010, the registered capital of Shanxi Coal was increased from RMB 22.5 million ($2,717,000) to RMB 500 million ($73,129,000) as a result of the new guidelines enacted by the Shanxi provincial government that require the registered paid-in-capital of coal mine consolidators to be at least RMB 200 million.  RMB 430 million ($63,371,000), or 90%, of the increased capital was made by Putai, Shanxi Coal's 90% shareholder and the Company's wholly-owned subsidiary. *The remaining RMB 48 million ($7,041,000), or 10% of the increased capital was made by Mr. Ming Zhao, who is Shanxi Coal's 10% shareholder.* [Emphasis added.]

30.    The statements contained in ¶¶ 23-29 were materially false and misleading when made because defendants failed to disclose or indicate the following:  (1) that the Company's Chairman had engaged in unauthorized transfers of the ownership of Puda subsidiary Shanxi Coal; (2) that such transfers were not disclosed to investors, and in fact ran counter to the statements made by defendants; (3) that the Company's ownership stake in Shanxi Coal was substantially less than what it detailed to investors; (4) that the Company had improperly consolidated Shanxi Coal's financial results into Puda's financial results; (5) that the Company lacked adequate internal controls; and (6) that, as a result of the foregoing, the Company's

17

financial statements were materially false and misleading at all relevant times.

31.     On or about December 8, 2010, defendants conducted the Offering.   In connection with the Offering, defendants filed with the SEC a series of Registration Statements and Prospectuses (collectively, the "Offering Materials").   The Offering was a financial success for defendants, as they sold 9 million shares of Puda stock to investors at a price of $12.00 per share, for proceeds of $108 million.   The Offering Materials set forth, in relevant part:

> Since the Zhaos are equity owners of Resources Group they may have a conflict of interest with the Company. If the lien is enforced after a default, the secured assets would be transferred to an entity which is owned by them. ***Ming Zhao and Yao Zhao may have, or may develop in the future, conflicts of interest with us. As the equity owners of 10% of the registered capital of Shanxi Coal,*** they might personally profit if Shanxi Coal's benefits of operation are not directed to us. In addition, the loan used to finance our facility expansions are held by Resources Group, a company which is owned by the Zhaos and their family. It could be in their economic interest to cause us to default on the payment of the loan with Resources Group since Resources Group could acquire the assets which are subject to the lien as a result of enforcement of the lien after a default. With their combined ownership of us, they can largely control the actions which we take. Ming Zhao is our Chairman of the board of directors. In addition, the Zhao brothers also control the mine, Jucai, of which is one of our suppliers. By limiting or eliminating our supply, they could adversely impact our production and revenue, which in turn could cause us to default on our loan to Resources Group.
>
> *       *       *
>
> The SEC allows us to "incorporate by reference" certain of our publicly-filed documents into this prospectus, which means that information included in those documents is considered part of this prospectus. Information that we file with the SEC subsequent to the date of this prospectus will automatically update and supersede this information. ***We incorporate by reference the documents listed below and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act of 1934 for so long as this Registration Statement remains effective.***
>
> ***The following documents filed with the SEC are incorporated by reference in this prospectus:***
>
> > ***1. Our Annual Report on Form 10-K for the fiscal year ended December 31, 2009.***

***2. Our Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2010 and June 30, 2010***

3. Our current Reports on Form 8-K, filed with the SEC on May 12, May 13, May 17, May 25, July 1, August 5 and August 16, 2010.

4. The description of our common stock set forth in our Registration Statement on Form 8-A filed with the SEC on September 16, 2009. [Emphasis added.]

32.    The Offering Materials were materially misleading when issued for the reasons set forth in ¶ 30.

33.    On March 14, 2011, the Company issued a press release announcing its fourth quarter and full year 2010 financial results.  Therein, the Company reported its 2010 full year financial results as follows:

***Net revenue was $324.8 million for the year ended December 31, 2010, up 51.7% compared to $214.1 million for the year ended December 31, 2009.*** Gross profit was $41.2 million for the year ended December 31, 2010, up 126.8% compared to $18.2 million for the year ended December 31, 2009. Gross margin increased to 12.7% from 8.5% a year ago primarily due to an increase in average selling price of cleaned coal which exceeded an increase in raw coal purchase price. ***Operating income was $34.1 million, as compared to $14.5 million for the year ended December 31, 2009. Net income was $23.5 million, or $1.15 per fully diluted share, for the year ended December 31, 2010, up from $5.5 million, or $0.36 per fully diluted share, for the year ended December 31, 2009. Adjusted net income excluding non-cash gains or loss in the fair value of derivative warrants was $23.3 million, or $1.15 per diluted share, compared to $10.5 million, or $0.68 per diluted share in 2009.*** Diluted earnings per share were calculated using weighted average shares of 20,228,792 and 15,593,201 for the year ended December 31, 2010 and December 31, 2009, respectively.

**Financial Condition**

As of December 31, 2010, Puda Coal had $156.2 million in cash and cash equivalents, compared to $19.9 million at the end of 2009.  Working capital was $151.1 million and a current ratio of 3.3:1. Long-term debt, including the current portion, was $42.9 million.  At year end, shareholders' equity was $250.9 million, an increase from $84.0 million at the end of 2009.

***The Company generated $19.9 million in cash from operating activities for the year ended December 31, 2010, compared to $1.4 million in 2009.*** Net cash

used in investing activities was $53.4 million for purchase of coal mining rights and assets.

Net cash provided by financing activities was $164.4 million for the year ended December 31, 2010 which included $115.8 million cash proceeds from the sale of common stock, a $35.4 million loan from the Company's significant shareholder and Chairman of the board of directors, Mr. Ming Zhao, $7.4 million from the exercise of warrants and a $7.0 million increase in the registered capital of the Company's 90% subsidiary, Shanxi Coal, to meet new capital requirements for coal consolidators enacted by the Shanxi provincial government earlier in 2010. [Emphasis added.]

34.     On March 16, 2011, Puda filed its 2010 Annual Report with the SEC on Form 10-K.  The Company's Form 10-K was signed by defendants Zhao, Zhu and Wu, and reaffirmed the financial results announced on March 14, 2011.  The Form 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, *supra*. Additionally, the Form 10-K stated, in relevant part:

Our operations are conducted exclusively by an entity in China, Shanxi Puda Coal Group Co., Ltd ("Shanxi Coal"), which we control through 90% indirect equity ownership.

*     *     *

***As of December 31, 2010, the percentages owned by Mr. Ming Zhao and Mr. Yao Zhao in the Group companies are as follows:***

- ***Puda Coal, Inc.: Mr. Ming Zhao (approximately 25%); Mr. Yao Zhao (approximately 6%) held directly.***

- Puda Investment Holding Limited: Mr. Ming Zhao (approximately 25%); Mr. Yao Zhao (approximately 6%) held indirectly through Puda.

- Shanxi Putai Resources Limited: Mr. Ming Zhao (approximately 25%); Mr. Yao Zhao (approximately 6%) held indirectly through Puda and BVI.

- ***Shanxi Puda Coal Group Co., Ltd.: Mr. Ming Zhao (10%) held directly, Mr. Ming Zhao (approximately 23%) held indirectly through Puda, BVI and Putai. Mr. Yao Zhao (approximately 5%) held indirectly through Puda, BVI and Putai.***

*     *     *

Our management, including the Chief Executive Officer and Chief Financial Officer, assessed as of December 31, 2010 the effectiveness of the Company's

internal control over financial reporting. In making this assessment, management used the criteria set forth in the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on the results of this evaluation, management has concluded that the Company's internal control over financial reporting as of December 31, 2010 was effective. [Emphasis added.]

35.     The statements contained in ¶¶ 33-34 were materially false and misleading when made for the reasons set forth in ¶ 30.

### The Truth Begins to Emerge

36.     Beginning on April 8, 2011, the Company's investors were shocked when a published report detailed the significant undisclosed transfers of the Company's assets that had been made by Defendant Zhao.  The report detailed, in relevant part:

> ***Chinese RTO Puda Coal, Inc (PUDA) Chairman Ming Zhao transferred the ownership of PUDA's sole Chinese operating entity, Shanxi Puda Coal Group Co., Ltd ("Shanxi Coal"), to himself in 2009 without shareholder approval according to official government filings. Then, in 2010, Zhao sold 49% and pledged the other 51% of Shanxi Coal to CITIC Trust Co., Ltd ("CITIC"), a Chinese private equity fund, for RMB245 million ($37.1 million).***
>
> ***Zhao then recklessly leveraged Shanxi Coal by borrowing RMB3.5 billion ($530.3 million) from CITIC at an incredibly high 14.5% annual interest rate (including fees) to finance the development of its coal mines. PUDA shareholders are completely unaware of these transactions that decimate the value of its U.S. listed shares.***
>
> **Background – An Industry Facing Government Mandated Consolidation**
>
> According to PUDA's 2010 10-K filing:
>
> In order to improve production efficiency, workplace safety and to reduce coal mine accidents, the Shanxi provincial government issued a policy in 2009 requiring mergers and consolidations of smaller coal mining companies in Shanxi Province. Pursuant to the government policy, the government awarded certain selected larger coal production enterprises the opportunity to acquire, consolidate and restructure smaller coal mines through mergers, acquisitions and asset or share transfers.
>
> The aggressive government mandated consolidation of the coal mining industry beginning in 2009 coincided with the darkest days of the world financial crisis. PUDA management either had to become a consolidator, requiring massive

additional capital, or else dispose of its coal businesses. Management, lead by Chairman Ming Zhao, made the decision to pursue aggressive growth by becoming a consolidator. Unfortunately for PUDA, during the financial crisis, the U.S. capital markets were completely closed. Therefore, in September 2009, Chairman Ming Zhao made a fateful first step to attract Chinese domestic investors: he transferred the ownership of Shanxi Coal to himself.

**PUDA Chairman Ming Zhao Takes Action, Stealing Shanxi Coal from U.S. Shareholders**

In order to raise money domestically, Zhao needed to sever the direct foreign shareholder ownership of Shanxi Coal, PUDA's sole Chinese operating subsidiary. ***On 9/3/09, Yao Zhao (Ming Zhao's brother and the legal representative of PUDA's WFOE, Shanxi Putai Resources Limited, "Putai") illegally authorized Putai to transfer 90% of Shanxi Coal to Ming Zhao, adding to the 8% Ming Zhao already held. Additionally, Yao Zhao divided his own 2% of Shanxi Coal between Ming Zhao and Wei Zhang. . . .***

***The transfers resulted in Ming Zhao owning 99% of Shanxi Coal, leaving U.S. investors with nothing.*** Incredibly, PUDA's auditor, Moore Stephens, failed to catch this theft of an entire company that is clearly documented in government ownership filings that any lawyer can obtain directly from the source.

After stealing Shanxi Coal from U.S. investors, Ming Zhao began looking for domestic investors to fund his aggressive expansion plans. At the same time, Zhao brazenly continued trying to raise money for PUDA in the U.S., despite the fact PUDA (without Shanxi Coal) was just a shell company. As U.S. capital markets recovered, on 2/18/10, PUDA sold 3.284 million shares in a public offering underwritten by Brean Murray and Newbridge Securities raising $14.5 million (8-K here), without disclosing to the investors that PUDA no longer owned Shanxi Coal, its sole operating subsidiary in China. Why did Brean Murray fail to perform any basic legal due diligence on the real ownership of Shanxi Coal?

**Chairman Zhao Sells Half of Shanxi Coal and Borrows $530.3 Million at 14.5%**

***In July 2010, Zhao recklessly accepted a highly leveraged RMB2.745 billion ($416 million) equity and debt investment from the $31.3 billion Chinese private equity arm of China International Trust and Investment Company ("CITIC", website here). On 7/15/10 Zhao sold 49% of Shanxi Coal to CITIC for RMB245 million ($37.1 million) and pocketed the proceeds***. . . .

***On 7/19/10 Zhao and Zhang pledged the other 51% of Shanxi Coal to CITIC as security so that the company could obtain a 3-year loan for RMB2.5 billion ($379 million) at a cost of 14.5% (annual interest plus fees) from CITIC.*** (Note: Zhao pledged 50% and Wei Zhang pledged his 1% of Shanxi Coal to CITIC so

that the entire remaining 51% of the company was thus pledged to CITIC). The loan was subsequently increased to RMB3.5 billion ($530.3 million), bringing the combined investment to RMB 3.745 billion ($567.4 million). . . .

As of 1/26/11, the outstanding principal, interest and fees payable under the 14.5% 3-year loan agreement amounted to RMB5.0225 billion ($761 million). Annual interest and fees on the loan are an incredible RMB507.5 million ($76.9 million USD), over twice the $34 million EBIT shown in PUDA's 2010 10-K filing. Shanxi Coal is now a highly leveraged bet on Ming Zhao's operational ability to dramatically increase coal production and profitability enough to service the company's crushing debt load. Any disruption could lead to default and loss of the pledged shares to CITIC.

*On 12/16/10, PUDA again tapped the U.S. capital markets, this time for $101.5 million by selling 7.85 million shares at $12 per share in a public offering underwritten by Macquarie Capital and Brean Murray . . . PUDA again failed to disclose Chairman Zhao's 9/3/09 illegal transfer of 99% of Shanxi Coal to himself, nor Zhao's illegal sale of 49% of Shanxi Coal to CITIC for $37.1 million, nor the $530.3 million 14.5% loan from CITIC secured by the pledge of the remaining 51% of Shanxi Coal shares. Why did Macquarie Capital also fail to perform basic legal due diligence on the real ownership of Shanxi Coal, half of which had been already sold to CITIC? Furthermore, at $12 per share, Macquarie investors paid over six times the $1.91 valuation CITIC paid for 49% of Shanxi Coal in July . . .*

## Chairman Zhao Secretly Returns a Portion of the Shanxi Coal to the Rightful Owner

In a partial attempt to cover up his theft of the company, Chairman Zhao and Wei Zhang transferred their pledged 51% interest in Shanxi Coal to Shanxi Puda Mining Industry Ltd ("Puda Mining"), a former 100% owned subsidiary of Shanxi Coal that, through suspicious shareholder shuffling, Zhao maneuvered to make it the 51% parent of Shanxi Coal. Puda Mining's 51% interest in Shanxi Coal continues to be completely pledged to CITIC . . .

*According to the government filing . . . Puda Mining shares are now 90% owned by Putai (the WFOE), 8% Ming Zhao and 2% Yao Zhao. Following these transfers, PUDA now owns only 45.9% (90% of 51%) of Shanxi Coal, about half of the 90% PUDA owned before Chairman Zhao began his shenanigans.*

## PUDA's 2009 and 2010 Audited Financials can No Longer be Relied Upon

*Since Ming Zhao stole 99% of Shanxi Coal in 2009, the operating company's 2009 and 2010 financials should not have been consolidated into PUDA's 2009 and 2010 audited financials. PUDA's audited 2009 and 2010 financials can*

*thus no longer be relied upon.* For 2011, even though Zhao recently returned 45.9% of Shanxi Coal to PUDA through its 90% ownership of Puda Mining (the 51% owner of Shanxi Coal), Puda Mining's 51% interest in Shanxi Coal is entirely pledged to CITIC.

**PUDA Cannot Consolidate Shanxi Coal's Financials in 2011 and Beyond**

Since CITIC has 100% control of Shanxi Coal, via its 49% ownership plus 51% share pledge agreement including voting, veto and other control provisions, *PUDA can no longer consolidate the financial results of this subsidiary* . . . PUDA should record its stake in Shanxi Coal as a long-term investment on its balance sheet, valued at cost.

*The damage done cannot be reversed.* There is no way CITIC will give up their 49% of Shanxi Coal, 51% pledged shares, veto rights and other control provisions. Shanxi Coal owes CITIC over $761 million. Until this debt is repaid (if ever), the share pledge and other control provisions will certainly persist. PUDA is now just a holding company with a minority 45.9% investment in a coal operation in China it does not control, with the added overhead of being a public company (for now at least) in the U.S.

**What is PUDA's Investment in Shanxi Coal Worth?**

The book value of PUDA on 12/31/10 was $251 million. Shanxi Coal owns all the mining assets, coal washing plants, cash and receivables and bears the obligation to repay the debt reflected on PUDA's 12/31/10 balance sheet. The 12/31/10 book value of Shanxi Coal is therefore roughly the same as the 12/31/10 book value of PUDA. I need only to deduct an estimated RMB184 million ($27.7 million) in placement fees and accrued interest on the CITIC loan from the book value of Shanxi Coal, bringing its book value down to $223.3 million. Since PUDA shareholders now only own 45.9% of Shanxi Coal, multiplying $223.3 million by 45.9% gives a value of $102.5 million for PUDA's Shanxi Coal investment. *Dividing $102.5 million that by 30.02 million PUDA shares outstanding at 12/31/10 values PUDA at $3.41 per share.*

There is significant risk of default due to the very high leverage and servicing cost of the $530.3 million 14.5% debt of Shanxi Coal. Annual interest and fees on the loan total $76.9 million USD, more than twice times the $34 million EBIT PUDA generated from operations in 2010. Even if Shanxi Coal can grow its profit by 80% in 2011 (as CFO Laby Wu claimed here) to $61.2 million, this growth is insufficient to cover 2011's $76.9 million interest expense implying Shanxi Coal may incur an operating loss in 2011.

Shanxi Coal is now racing to dramatically increase coal production and profitability from its mines before it defaults on the massive debt load. A default could force the transfer of the pledged shares to CITIC and result in a total loss

for PUDA's U.S. investors. Given the risks, I believe PUDA deserves to be valued at a discount to the $3.41 value of its Shanxi Coal investment.

Apparently, CITIC agrees with me, since the $37.12 million price CITIC paid for their 49% of Shanxi Coal divided by 19.82 million PUDA shares outstanding at the end of the third quarter (when the acquisition occurred) equals only a $1.91 per share valuation.

The average of the valuation CITIC paid ($1.91) and the book value of PUDA's investment in Shanxi Coal ($3.41) is $2.66. Considering the 2009 and 2010 audited financials can no longer be relied upon, and more importantly, the complete lack of internal control that allowed Chairman Zhao to first steal the company, then sell half the company (pocketing the proceeds) and then pledge the other half of the company to a Chinese PE fund while piling on $530.3 million of 14.5% debt, I strongly believe $2.66 is the most this stock is worth today. [Emphasis added.]

37.     On this news, shares of the Company's stock fell $3.10 per share, or over 34 percent, to close on April 8, 2011 at $6.00 per share, on unusually heavy trading volume. Trading of the Company's shares was subsequently halted on April 11, 2011 (the next trading day).

38.     Also on April 11, 2011, the Company issued a press release that stated:

Puda Coal, Inc. (NYSE AMEX: PUDA) ("Puda Coal" or the "Company") today announced that its **_Board of Directors has unanimously ratified the Audit Committee's decision to launch a full investigation into the allegations raised in a recent article alleging various unauthorized transactions in the shares of a subsidiary company, Shanxi Coal._** The Audit Committee has retained professionals in the United States and China to assist it in its investigation. The full board, including Mr. Ming Zhao, the Chairman of Puda Coal, has agreed to cooperate in the investigation.

Although the investigation is in its preliminary stages, **_evidence supports the allegation that there were transfers by Mr. Zhao in subsidiary ownership that were inconsistent with disclosure made by the Company in its public securities filings. Mr. Zhao has agreed to a voluntarily leave of absence as Chairman of the Board of the Company_** until the investigation is complete. The New York Stock Exchange has halted trading in the Company's stock. [Emphasis added.]

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Puda securities during the Class Period (the "Class"), including purchasers of the Company's securities pursuant or traceable to the Company's public offering on or about December 8, 2010.  Excluded from the Class are defendants, directors and officers of Puda and their families and affiliates.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  According to the Company's Form 10-K filed with the SEC on March 16, 2011, Puda had over 30 million shares of stock outstanding, owned by thousands of persons.

41.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)     Whether the Securities Act and/or Securities Exchange Act were violated by defendants;

    (b)     Whether defendants omitted and/or misrepresented material facts;

    (c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

    (e)     Whether the prices of Puda securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

42.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

43.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

45.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Puda's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Puda securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

46.     During the Class Period, Puda and the Individual Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, these defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Puda's securities during the Class Period.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

47.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Puda securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

48.     At all relevant times, the market for Puda securities was efficient for the following reasons, among others: (a)     as a regulated issuer, Puda filed periodic public reports with the SEC; and (b) Puda regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

**NO SAFE HARBOR**

49.     Defendants' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

50.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Puda who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**FIRST CLAIM**
**Violation of Section 11 of The Securities Act**
**Against Puda, Zhao, Zhu, Wu and the Underwriter Defendants**

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

52.     This claim is asserted by Plaintiff against Puda, Zhao, Zhu, Wu and the Underwriter Defendants by, and on behalf of, persons who acquired shares of the Company's securities pursuant to or traceable to the false Offering Materials issued in connection with the Company's December 8, 2010 Offering.

53.     This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Materials and within three years of the effective date of the Offering Materials.

54.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages from these defendants and each of them, jointly and severally.

**SECOND CLAIM**
**Violation of Section 12(a)(2) of The Securities Act**
**Against Puda, Zhao, Zhu, Wu and the Underwriter Defendants**

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

56.     Puda, Zhao, Zhu, Wu and the Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Offering Materials.

57.     This action is brought within three years from the time that the securities upon which this Count is brought were sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

**THIRD CLAIM**
**Violation of Section 15 of The Securities Act**
**Against Zhao, Zhu and Wu**

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

59.     Defendants Zhao, Zhu and Wu, by virtue of their positions and specific acts were,

at the time of the wrongs alleged herein and as set forth herein, controlling persons of Puda within the meaning of Section 15 of the Securities Act.  These defendants had the power and influence and exercised the same to cause Puda to engage in the acts described herein.

60.     By virtue of the conduct alleged herein, defendants Zhao, Zhu and Wu are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## FOURTH CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Puda and the Individual Defendants

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     During the Class Period, Puda and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Puda securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each of them, took the actions set forth herein.

63.     Puda and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Puda securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

**FIFTH CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of Puda within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, Puda and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of

the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 15, 2011                                Respectfully submitted,

                              **LAW OFFICES OF CURTIS V. TRINKO, LLP**

                              By: _____
                                   Curtis V. Trinko
                                   ctrinko@trinko.com
                                   Jennifer Traystman
                                   jtraystman@trinko.com
                                   16 West 46th St., 7th Floor
                                   New York, NY 10036
                                   Tel: (212) 490-9550
                                   Fax: (212) 986-0158

**BARROWAY TOPAZ KESSLER**
**MELTZER & CHECK, LLP**
D. Seamus Kaskela
skaskela@btkmc.com
David M. Promisloff
dpromisloff@btkmc.com
Adrienne O. Bell
abell@btkmc.com
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

and

Myron Harris
South 106-Park Towne Place
22nd & Benjamin Franklin Pkwy.
Philadelphia, PA 19130
(215) 567-5333

*Attorneys for Plaintiff*

## CERTIFICATION

I, Harriet Goldstein, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the Complaint, and authorizes its filing.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's purchase and sale transaction(s) in the Puda Coal, Inc. (Nasdaq: PUDA) security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| See Attached |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.     Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.     During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____.

7.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of April, 2011.

_____
HARRIET GOLDSTEIN

## Schedule A

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| Common Stock | 700 | (B) | | 2/15/11 | 11.6798 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |