UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X
                                                   :
IN RE PUDA COAL SECURITIES INC.,                   :
et al. LITIGATION                                  :
                                                   :
                                                   :
                                                   :
This document relates to: ALL ACTIONS              :
----------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **OCT 0 1 2013**

11 Civ. 2598 (KBF)
and all member and
related cases

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

This putative securities class action was commenced on April 15, 2011. (ECF No. 1.) A Consolidated Complaint [Corrected] was filed on February 9, 2012 ("the Complaint"). (ECF No. 47.) The matter was transferred to the undersigned on October 3, 2012. (ECF No. 124.) The Court resolved various pending motions to dismiss on March 18, 2013. (ECF No. 152.)

Plaintiffs allege that defendants engaged in violations of various sections of the securities laws, including Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 and Sections 11 and 12 of the Securities Act of 1933, in connection with the offering, purchase or sale of common stock, put and/or call options of Puda Coal, Inc. ("Puda Coal"). 15 U.S.C. § 78(b) (2010); 17 C.F.R. § 240.10b-5 (2013); 15 U.S.C. § 77k–77l (1998). Plaintiffs purport to represent a putative class of those who purchased or sold common stock, call or put options during the period from November 13, 2009 to October 3, 2011. Plaintiffs also seek to represent those who purchased or otherwise acquired Puda Coal's common stock pursuant to or traceable to its public offering on or around December 8, 2010 ("the December 2010 Offering").

According to plaintiffs, at the time of their purchase, sale or acquisition of securities, they had every reason to believe that Puda Coal owned 90% of an operating company, Shanxi Puda Coal Group Co. Ltd. ("Shanxi"). Shanxi was a supplier of coking coal used for steel manufacturing in China. However, Puda Coal did not in fact own a 90% interest in Shanxi during the time period at issue. It is alleged that its chairman and major shareholder, defendant Ming Zhao ("Zhao"), had improperly transferred Puda Coal's 90% interest in Shanxi to himself, made a second transfer of a portion of that interest to an unrelated investment fund controlled by CITIC, and then pledged the remaining portion to CITIC to secure a loan. (Compl. ¶ 2–3.) Puda Coal is alleged not to have received any consideration for these transactions. (See generally Compl. ¶¶ 1–4.) In April 2011, Alfred Little published a research report ("the Little Report") in which he revealed Zhao's actions vis-à-vis Shanxi and Puda Coal. (Id. ¶ 19.) Puda Coal's security prices predictably decreased as a result. (Id. ¶¶ 20, 25, 28.)

Plaintiffs have sued Puda Coal and its inside officers and directors: Ming Zhao, his brother Y. Zhao, Qiong Wu (Puda Coal's former chief financial officer), and Jianfei Ni. Each has resigned from Puda Coal. (Compl. ¶ 30.) Plaintiffs have also sued two outside directors, C. Mark Tang and Lawrence Wizel (id. ¶¶ 47–48) ("the Outside Director defendants"); the Underwriters of the December 2010 Offering, Macquarie Capital (USA) Inc. and Brean Murray, Carret & Co., LLC ("the

Underwriter defendants"); and Puda Coal's external auditors, Moore Stephens Hong Kong ("MHSK") and Moore Stephens, P.C. ("MSPC") ("the Auditor defendants").[1]

Now before the Court are various motions. The Underwriter defendants have moved for summary judgment as to Counts I and II of the Complaint (ECF No. 188); the Outside Director defendants have moved for summary judgment as to Counts I and III (ECF No. 194); the Auditor defendants have moved for summary judgment as to Count I (ECF Nos. 196, 198, 199); Trellus Management Company, LLC has moved to intervene (ECF No. 176); plaintiffs have moved for class certification and appointment of class representatives and class counsel (ECF No. 216); and, finally, plaintiffs have moved to amend their complaint (ECF No. 258).

For the reasons set forth below, the Court grants each of the summary judgment motions, denies the motion to intervene, appoints lead counsel, and, while certifying two classes, substantially narrows the class definition.

I.    THE SUMMARY JUDGMENT MOTIONS

In ruling on the motions to dismiss, the Court specifically invited targeted discovery and an early summary judgment motion if any party believed that there was an efficient way to narrow the case or resolve certain issues. At the oral argument on the motions to dismiss, the Underwriter defendants' counsel, Greg A. Danilow, made clear his intention to challenge whether Plaintiff Thomas Rosenberger—the only named plaintiff asserting a claim pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k—in fact bought in an offering or could trace his

---

[1] This Court previously dismissed an additional Moore Stephens entity—Moore Stephens International Ltd.—for lack of jurisdiction. (ECF No. 120.)

3

shares to an offering.  (Hr'g Tr. 30–32, 65, 94–95 Mar. 25, 2013.)  Targeted

discovery has occurred, and that motion is now fully briefed and before this Court.

Each of the summary judgment motions asserts that Rosenberger lacks standing to

pursue claims under Sections 11 and 12 of the Securities Act.  The Court therefore

deals with the summary judgment motions together and, because the other motions

largely joined in the Underwriters' motion, refers to the Underwriters' motion for

convenience.

> A.     Facts Relevant to the Underwriters' Summary Judgment Motion

No party disputes on these motions that a fraud occurred in connection with

Puda Coal's transfer through Zhao of its interest in Shanxi.  The issues before the

Court have to do one way or another with whether those defendants presently

before the Court can be held responsible pursuant to the theories on which they

have been sued.

Puda Coal was a publicly traded stock prior to two follow-on offerings that

occurred in 2010.  In February 2010, Puda Coal offered 3.284 million shares; later

that year, in December 2010, it offered 9 million additional shares (the "December

2010 Offering").  (Pls.' Resp. to Defs.' Statement of Material Facts on Mot. Summ. J.

("Pls.' RSOF") ¶ 1, ECF No. 239.)  Macquarie and Brean Murray served as the sole

underwriters for the December 2010 Offering.  (Id. ¶ 2.)  The Underwriters did not

establish a selling group as part of that offering.  (Id. ¶ 3.)  Plaintiff Rosenberger is

4

the sole named plaintiff asserting claims pursuant to Sections 11 and 12 of the Securities Act of 1933 in the operative Consolidated Complaint.[2]  (Id. ¶ 4(a).)

Prior to December 8, 2010, Rosenberger had made nine separate purchases of Puda Coal common stock.  (Id. ¶ 13.)  Rosenberger purchased 1000 shares of Puda Coal common stock on December 8, 2010, through his online Fidelity brokerage account.  (Id. ¶ 5.)  He did not buy his shares in a market containing only shares issued pursuant to the registration statement for the December 2010 Offering (the "Registration Statement").  (Id. ¶ 6.)  The Underwriters did not allocate any of the shares of Puda Coal stock in the December 2010 Offering to Rosenberger, nor did he purchase his shares on December 8, 2010, from Macquarie or Brean Murray.  (Id. ¶ 7.)

The Underwriters did not allocate any of the shares of Puda Coal common stock issued in the December 2010 Offering to Fidelity.[3]  Following notice that the Underwriters intended to file a motion for summary judgment as to Rosenberger's standing under Section 11 (on the basis that he did not buy directly from the Underwriters, which he concedes, and that he cannot trace his shares to the Registration Statement, which he does not concede), Rosenberger asked Fidelity to tell him what the origin of his shares were.  (Id. ¶ 9(a).)  Fidelity was unable to do so.  (Id.)

---

[2] Plaintiffs dispute this fact in part, but it is indisputable.  Their unwillingness to concede the fact relates to the pending motion to intervene by Trellus.  As set forth below, that motion is denied.  It therefore cannot alter the identity of the actual named plaintiffs presently before the Court.

[3] Plaintiffs do not dispute this general proposition, but note that an allocation was made to Fidelity specifically for one of Fidelity's customers, not for Rosenberger, and that—so far as the record in this matter reflects—the allocation was not associated with the events here at issue. (Pls.' RSOF ¶ 8.)

After discovery following defendants' motion for summary judgment, the following facts are undisputed regarding the provenance of Rosenberger's shares. On the day of the December 2010 offering, Brean Murray sold 450,000 shares in the December 2010 Offering to the Richard Strong Rollover IRA ("the Strong Account"); these were the first and only Puda Coal shares that the Strong Account purchased. (Id. ¶ 9(b).)[4]  Rosenberger's Fidelity trade for Puda Coal shares was matched by the NYSE Arca Exchange at 15:19:44 on December 8, 2010 with a sale by the Strong Account.  (Id.)  The clearing firm acting on behalf of Fidelity was National Financial Services ("NFS"); the contrabroker acting on behalf of the Strong Account was Knight Capital. (Id.)  Knight Capital identified the Strong Account as the sub-account that sold the 1000 shares of Puda Coal common stock to Rosenberg.  (Id. ¶ 15(a).)

While it is true that the Strong Account purchased its first-ever Puda Coal shares directly from Brean Murray in the December 2010 Offering (id. ¶ 15(d)), Brean Murray actually held old and new Puda Coal shares on that day.  (Hr'g Tr. 17–18, 24, 32–33, Sept. 27, 2013.)  Logistically, when Knight Capital brokered the Puda Coal shares for the Strong Account, the shares came from an account at the Depository Trust Clearing Corp. ("DTCC") credited with a number of old and new Puda Coal shares owned by different people/entities.  Thus, Brean Murray's DTCC

---

[4] At oral argument on this motion, plaintiffs' counsel conceded that both Underwriters had existing shares of Puda Coal stock in their inventory.  When they sold Puda Coal shares on December 8, 2010, those shares came from a DTCC account that held Puda Coal shares in a fungible manner. (Hr'g Tr. 17–18, 32–33, Sept. 27, 2013.)  Thus, at the outset of the process, it is unclear whether the actual shares the Richard Strong Rollover IRA acquired were in fact part of the preexisting inventory or newly issued shares.

account was debited and Knight was credited with the acquired numbers of Puda

Coal shares; all of this was through book entries. (Hr'g Tr. 7–9, 15–19, 24–33.) In

effect, while the Strong Account assumed it was "purchasing shares" from the

December 2010 Offering, the shares credited to its account (through Knight) were

derived from a fungible group of Puda Coal shares (old and new) at the DTCC.

(Hr'g Tr. 7–9, 17–19.) It is uncontested that prior to its purchase of 450,000 Puda

Coal shares on December 8, 2010, the Strong Account did not hold any Puda Coal

common stock in inventory. (Pls.' RSOF ¶ 15 (e).)

A further trade implicating the fungible DTCC account occurred later that

same day. On December 8, 2010, Andrew Klister of Baraboo Growth LLC

("Baraboo"), an agent of the Strong Account, facilitated the sale of 300,000 Puda

Coal shares in multiple lots. (Id. ¶ 15 (f).) Baraboo's sales were effected through

book entries with shares from the DTCC. (Hr'g Tr. 15–19, 25–33, Sept. 27, 2013.)

(See Decl. of Stephanie D. Venezia, Sept. 19, 2013 ("Venezia Decl."), Ex. B

(McKissick Dep. Tr.), at 12:10–14 ("Q: In fact, the Baraboo shares were in book

entry form at DTC and not identified in any specific way or segregated in any way?

A: Correct."), 26:3–15.)

Neither Knight nor Baraboo ever obtained physical possession of the Puda

Coal shares. Both NFS and Knight confirmed that the Puda Coal shares for which

Baraboo facilitated sales were shares in the DTCC and aggregated with all other

existing Puda Coal shares. The "Richard Strong Rollover IRA shares," bought on

the day of the December 2010 offering, were part of an undifferentiated, fungible

7

mass at the DTCC that had both old and new Puda Coal shares. (See id. at 19:5–12 ("A: Once the physical security goes for deposit into the DTCC, it becomes part of the total aggregated number. It could have been existing shares coming in with other shares. Once they're book entry, they're completely anonymous shares. They're just there."); see also Venezia Decl. Ex. D (Collins Dep. Tr.), at 16:21–17:3.)

When Baraboo is credited with electronic shares—as it was with the Puda Coal shares—the shares are not specifically identifiable. (Venezia Decl. Ex. B (McKissick Dep. Tr.), at 11:11–18 ("[The Puda shares came in electronically.] Q: And when you're credited with shares electronically, are you credited with specific identifiable share certificates? A: Absolutely not. They would come in as an electronic reference only. It does not designate pure identification of what we're getting."), 12:10–14 ("Q: In fact, the Baraboo shares were in book entry form at the DTC and not identified in any specific way or segregated in any way? A: Correct."); 26:6–11.)

When the Strong Account shares were then transferred to Rosenberger's Fidelity account, the trade was effected through book entries out of the DTCC account; they were not distinguishable from any other Puda Coal shares held at the DTCC. (Venezia Decl. Ex. B (McKissick Dep. Tr.), at 12:25–13:4 ("Q: And when these sales were made, did DTC identify the particular shares in connection with those sales? A: Negative."), 15:10–22, 22:22–23:2, 25:23–26:15; see also Venezia Decl. Ex. D (Collins Tr.) at 16:21–17:3 ("Q: Did you purchase identifiable shares [for] Mr. Rosenberger, the actual stock certificates that one could identify? A: No,

it's a trade on the exchange of shares which are very much considered fungible.  It's not a transaction about specific shares."): see also id. Ex. B (McKissick Tr.) at 14:17–22 ("Q: Specifically, what shares is ARCA selling when they sold these thousand shares, whose shares were they selling?  A: Undeterminable.  They could have been shares from anyone.").  When asked whether there was any way at all that Baraboo could identify where the thousand shares purchased by Rosenberger came from, the witness testified that there was not. (Venezia Decl. Ex. B (McKissick Tr.), at 21:23–22:15 ("Q: Can you tell me where those thousand shares came from?  A: I cannot. . . .  Q: And there's no way you know, based on your experience, that you could identify where those thousand shares came from, correct?  A: There's nothing that I'm aware of.").)

Rosenberger testified that he never read a prospectus for Puda Coal. (Pls.' RSOF ¶ 10.)  He did not speak to anyone at Puda Coal prior to making his December 8, 2010 purchase and he never attended an investor presentation or road show conducted in connection with the December 2010 Offering.  (Id. ¶ 11.)  When Rosenberger purchased 1000 shares of Puda Coal common stock on December 8, 2010, he did not know who the underwriters of the December 2010 Offering were. (Id. ¶ 12.)  The shares that Rosenberger purchased on December 8, 2010, and those that he had previously purchased on nine separate occasions prior to that date, all had the same CUSIP number.  (Id. ¶ 14.)

### B.   Standard on Summary Judgment

Summary judgment may not be granted unless all of the submissions taken together show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In making that determination, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must cite to "particular parts of materials in the record" that establish a "genuine dispute," and cannot rely merely on allegations or denials contained in the pleadings. Fed. R. Civ. P. 56(c)(1)(A); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Self-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment. See BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996).

C.    Section 11 Standing Requirements

Section 11 provides the purchasers of registered securities with strict liability

protection for material misstatements or omissions in registration statements filed

with the Securities and Exchange Commission ('SEC"). See In re Lehman Bros

Mortgage-Backed Sec. Litig., 650 F.3d 167, 175 (2d Cir. 2013).  The "imposition of

strict liability is limited, however, to statutorily enumerated parties: (1) signatories

of the registration statement; (2) directors or partners of the issuer at the time of

filing; (3) persons consenting to be named as about to become a director or partner;

(4) accountants or other experts consenting to be named as preparing or certifying

part of the registration statement; and (5) underwriters of the security at issue."

Id. at 175.  Stated simply, standing for Section 11 claims is limited to those who

have purchased securities that are the direct subject of a specified prospectus or

registration statement.  See Barnes v. Osofsky, 373 F.2d 269, 272 (2d Cir. 1967).

The shares purchased must, in other words, be demonstrably "new"; they

cannot be previously issued shares.  Lorber v. Beebe, 407 F. Supp. 279, 286

(S.D.N.Y. 1975).[5]  Plaintiffs bear the burden of showing that Rosenberger's shares

are traceable to a registration statement.  See In re Global Crossing, Ltd. Secs.

Litig., 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003).  To carry their burden here,

plaintiffs must prove that Rosenberger's shares are directly traceable to the

December 2010 Offering.  Klein v. Computer Devices, Inc., 591 F. Supp. 270, 273

(S.D.N.Y. 2004); see also Abbey v. Computer Memories, Inc., 634 F. Supp. 870, 875–

---

[5] See id. ("Anyone who may have purchased identical securities already traded on the open market
must look elsewhere for relief."); see also In re IPO Secs. Litig., 227 F.R.D. 65, 117 (S.D.N.Y. 2004),
overruled on other grounds, 471 F.2d 24 (2d Cir. 2006).

76 (N.D. Cal. 1986) (granting summary judgment on a Section 11 claim when plaintiff's shares were commingled with other shares in the Depository Trust Company's vault). Showing that identical shares to those issued in an offering may have been acquired is not enough to demonstrate actual traceability to a specific offering. See Klein, 591 F. Supp. at 273 n.7.

Plaintiffs cite Kirkwood v. Taylor, 590 F. Supp. 1375, 1378–83 (D. Minn. 1984), in support of the tracing method they have used. In Kirkwood, the court set forth various methods plaintiffs had attempted or could attempt to trace shares to an offering. Id.

First, the court noted the "direct trace method," by which plaintiffs would show a straight trail back to the underwriter(s). Id. at 1378. This method clearly would work, but plaintiffs in that case conceded their inability to establish such a clear line. In contrast, at oral argument on this motion, plaintiffs' counsel here asserted that they had achieved a direct tracing of the shares. (Hr'g Tr. 13–14, Sept. 27, 2013.)

Next, the court discussed the "fungible mass method," by which plaintiffs would trace their shares to the fungible mass of all pooled shares (old and new) that the DTC held for the benefit of all its member brokerage firms. Kirkwood, 590 F. Supp. at 1379. The court rejected this method as akin to asserting a "proportionate interest" in the fungible shares held by the DTC. Id. at 1380. The Lorber court had previously rejected such an approach because it would show, at best, that shares "might" have been issued pursuant to a defective statement. Id. at 1379. The

Kirkwood court agreed. Id. at 1380 ("The argument plaintiffs are making is merely a variation of one rejected years ago. Essentially, plaintiffs are showing only that their securities 'might' have been issued in the offering and they are asking the court to presume that a pro rata portion of their shares are new shares.").

Next, and most notably for the case before this Court, Kirkwood described the "contrabroker method," which the plaintiffs here also assert they have successfully used. According to that method, a plaintiff demonstrates that he purchased his shares from a broker who purchased from the offering. The Kirkwood court rejected this method in the case before it, because the plaintiffs there had failed to show that the only inventory of shares held by their broker were those from the offering at issue, as opposed to from inventory. Id. at 1381.

Finally, the court reviewed the "heritage method," which it also rejected. That method involved tracing of specific stock certificates in a plaintiff's name back, certificate by certificate, to the original offer. Id. at 1382. The court agreed with defendants that plaintiffs ultimately were unable to show that their certificates related to new rather than old shares. Id. Again, plaintiffs were only showing that they "might" have purchased pursuant to the offering. Id.

The case law is uninterrupted and has long been clear: traceability is strictly construed for a Section 11 claim.

###### D.   Rosenberger Lacks Standing for a Section 11 Claim

Plaintiff Rosenberger has done all that he can do to trace his shares back to the December 2010 Offering, but it is simply not enough. It is of course worth

13

noting that Rosenberger, the plaintiff whom counsel proffered as having standing for a Section 11 claim, had no information regarding the provenance of his shares until well after the Complaint was filed in this action. This begs a threshold question: how could counsel have based a Section 11 claim on his shares in the first instance? It is simply not enough to note that he bought shares on the day of an offering in a marketplace actively trading issued shares, and rely on the similarity of date and share price to demonstrate that the shares were issued pursuant to, or were traceable to, the December 2010 Offering.

Ultimately, after much work, plaintiffs have traced Rosenberger's shares to a series of transactions associated with the Strong Account. That, according to plaintiffs, constitutes a direct tracing of shares (Hr'g Tr. 13–14, Sept. 27, 2013), or is at least akin to the contrabroker method outlined in Kirkwood, 590 F. Supp. at 1381. Plaintiffs have also put forward evidence that the Strong Account had no Puda Coal shares prior to its acquisition of shares in the December 2010 Offering. Plaintiffs ignore crucial steps the shares took on their journey.

First, at oral argument, counsel for plaintiffs conceded that the Underwriters held a preexisting inventory of Puda Coal shares in the form of book entry credits at the DTCC. (Hr'g Tr. 24, Sept. 27, 2013.) When the Underwriters sold shares equivalent to the number of those being purchased by the Strong Account, that trade was effected by a book entry from one DTCC account for the Underwriters to Knight's DTCC account. (Hr'g Tr. 15–19.) All shares in the account were undifferentiated and fungible; only the book entries changed as to who was credited

14

with what.  Next, Baraboo bundled the Strong Account shares, but such bundling did not and could not be clearly and provably of "new shares"; rather, the bundles were of "shares generally" (since shares at the DTCC are held in a non-segregated account).  Some shares could have been old shares, some new, who knows.  Following the Baraboo transaction, the DTCC then credited Fidelity's account with a random group of unsegregated shares, and Fidelity then credited Rosenberger with those unsegregated shares.

The steps necessarily involving the DTCC are fatal to traceability.  See, e.g., In re: Initial Pub. Offering Secs. Litig., 227 F.R.D. 65, 118 (2004), vacated and remanded on other grounds, 471 F.3d 24 (2d Cir. 2006); Abbey, 634 F. Supp. at 875–76; Klein, 591 F. Supp. at 273; Lorber, 407 F. Supp. at 287.  Once a part of the DTCC group of Puda Coal shares, they lose any specific identity.  (Venezia Decl. Ex. B (McKissick Tr.), at 11:15–18 ("[The Puda Shares came in electronically.  Q: And when you're credited with shares electronically, are you credited with specific identifiable share certificates?  A: Absolutely not. They would come in as an electronic reference only.  It does not designate pure identification of what we're getting."); 12:10–14 (Q: "In fact, the Baraboo shares were in book entry form at the DTC and not identified in any specific way or segregated in any way?  A: Correct."), 26:6–11.)

Plaintiffs' theory thus resembles not the contrabroker method of tracing described in Kirkwood, 590 F. Supp. at 1381, but the fungible mass method, id. at

1379.  This fungibility of shares is fatal to Rosenberg's attempt to trace particular

shares to the December 2010 Offering.

At oral argument, plaintiffs argued for the first time that various provisions

of the Uniform Commercial Code ("UCC") supported their view that they had

achieved the level of traceability Section 11 requires.  In particular, counsel pointed

to Sections 8-102, 8-104 and 8-302.  N.Y. U.C.C. § 1-101 et seq. (McKinney 2013).

According to the plaintiffs, the Puda Coal shares were "uncertificated securities" as

defined in Section 8-102.  Section 8-102 comment 18 defines the term

"uncertificated security" to mean "a security that is not represented by a security

certificate.  For uncertificated securities, there is no need to draw any distinction

between the underlying asset and the means by which the holder's interest in that

asset is evidenced . . . ."  Id. § 8-102 Official Comment 18.

Counsel also pointed to Section 8-104(d): "Unless the context shows that a

different meaning is intended, a person who is required by other law, regulation,

rule, or agreement to transfer, deliver, present, surrender, exchange, or otherwise

put in the possession of another person a security or financial asset satisfies that

requirement by causing the other person to acquire an interest in the security or

financial asset pursuant to subsection (a) or (b)."  Id. § 8-104(d).

Finally, counsel pointed to Section 8-302(a): "Except as otherwise provided in

subsections (b) and (c), a purchaser of a certificated or uncertificated security

acquires all rights in the security that the transferor had the power to transfer."  Id.

§ 8-302(a).

16

According to plaintiffs, these UCC provisions demonstrate that when an uncertificated security—such as the Puda Coal shares here at issue in the December 2010 Offering—is transferred, it is transferred with all of its rights intact, and those shares are transferred when another acquires an "interest" in the shares. It is undisputed that the Strong Account acquired an interest in Puda Coal shares residing in an account at the DTCC on December 8, 2008. Thus, they argue, because, pursuant to the UCC, there is no need to draw any distinction between the uncertificated security and the underlying asset, and "a" security may be transferred by transferring the interest in "that" security. Thus, according to plaintiffs, a security "interest" that is once shown to have derived from the December 2010 Offering can never lose its original identity. (Hr'g Tr. 12–14, Sept. 27, 2013.)

These arguments are unavailing. As an initial matter, the UCC does not preempt the specific statutory standing requirements separately set forth in Section 11 of the Securities Act. See Levitin v. PaineWebber, Inc., 159 F.3d 698, 705 (2d Cir. 1998).

In addition, these UCC provisions do not eliminate the statutory and case law requirements for strict adherence to traceability by showing the true identity of shares. If plaintiffs' argument were credited, it would mean that traceability could always be shown without regard to the fungibility of shares at the DTCC, and case law discussions of the problems with fungibility would all be wrongly decided. This Court rejects that argument, not because courts cannot err, but because the case

17

law reflects the plain intent and purpose of Section 11's strict requirements: a lot of

certainty is required regarding the provenance of shares to obtain the strict liability

of Section 11. Finally, plaintiffs' argument misconstrues these provisions of the

UCC: they serve an important purpose of ensuring the efficient movement of shares

through book entries and electronic transfers, but they do not purport to provide a

substitute for Section 11 traceability requirements. Thus, provisions outlining how

a security may be transferred by transferring the interest in that security (akin to

the changing of book entries at the DTCC) is different from a securities law

statutory requirement for standing.

Given the strict requirements, plaintiffs' theory is not enough to show

traceability. Accordingly, Rosenberger lacks standing to assert claims pursuant to

Section 11.[6]

The Court notes that it does not appear that sufficient due diligence was

conducted on Rosenberger's shares prior to filing the Complaint. The discovery

taken in connection with the motion by the Underwriters for summary judgment on

this issue appears to be the only due diligence conducted. As Rosenberger testified,

he did not request information regarding the provenance of his shares until the

Underwriter defendants stated a present intention to file this motion. There are

therefore serious questions as to whether there was ever a sufficient basis to allege

---

[6] The only claims asserted against the Outside Directors are pursuant to Sections 11, 15, and 20. A claim pursuant to Sections 15 and 20 ("control person liability") requires an underlying securities law violation. See In re Global Crossing, Ltd. Secs. Litig., 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004). However, in the absence of a viable Section 11 claim, plaintiffs are unable to maintain either claim against the Outside Directors. The Outside Directors' motion for summary judgment is therefore granted as to Counts I and III.

standing to assert a Section 11 claim, and it is now established that standing is, in fact, lacking. Counsel should have, of course, understood strict traceability requirements at the time of filing.

### E.   Section 12 Standing Requirements

Section 12(2) provides for standing as to statutory "sellers" of securities—that is, people who directly sold securities or solicited their purchase. Pinter v. Dahl, 486 U.S. 622, 641 (1988). "At the very least . . . the language of § 12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity." Id. To survive summary judgment on this claim, if Rosenberger cannot raise a triable issue as to whether he purchased his securities from a defendant, he must demonstrate that he at least purchased them as a result of a defendant's solicitation. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 49–50 (2d Cir. 1991). He cannot.

Rosenberger concedes that he did not purchase any securities directly from any defendant. (Pls.' Mem. of L. in Opp. to Defs.' Mot. for Summ. J. 2, ECF No. 237.) The uncontroverted evidence set forth above shows that he also did not read a prospectus, speak to anyone at Puda Coal, or attend a road show. (Pls.' RSOF ¶ 10–11.) He has not proffered a single fact sufficient to support Section 12 standing (again, raising issues regarding adequate due diligence at the outset).

Accordingly, there is no triable issue as to whether Rosenberger has standing to bring a claim pursuant to Section 12(2). He does not.[7]

---

[7] Plaintiffs' sole claims against the Underwriters arise under Sections 11 and 12. No named plaintiff has standing to assert such claims, and summary judgment is therefore appropriate for the

19

II.   MOTION TO INTERVENE

Plaintiffs assert that even if summary judgment is granted as to the traceability of Rosenberg's shares or his standing under Section 12, those claims should nonetheless survive because Trellus has made a motion to intervene; if that motion to intervene is granted, then Trellus would be able to assert such claims. A number of defendants oppose such intervention.[8] The Court, however, does not agree that Trellus should be allowed to intervene. Its motion is denied and cannot salvage the Section 11 or 12 claims.

A.   Facts Relevant to Intervention Motion

Trellus is a sophisticated institutional investment firm with $93 million in assets. (Decl. of Seth Goodchild in Opp. re: Mot. to Intervene ("Goodchild Decl.") Ex. A (Usdan Dep. Tr.), at 32:6–9.) Trellus is the parent company of a number of investment funds, each of which is a distinct legal entity. (Id. at 156:23–157:7.) While Trellus did not itself purchase any shares in the December 2010 Offering (id. at 156:17–22), five of its investment funds did purchase 179,734 shares (id. at 156:23 –157:7).[9]

In April 2011, the Little Report revealed the transfer of the Shanxi operating company from Puda Coal. Trellus concedes that it learned of the Little Report in April 2011. (Id. at 111:12–18.) In late April or early May 2011, Trellus also became

---

Underwriters with respect to Counts I and II. Count I also asserts a Section 11 claim against Stephen Moore Hong Kong and Stephen Moore P.C. Those claims are similarly dismissed. (Section 10(b) and Rule 10b-5 claims remain as to the Auditor defendants.)

[8] Oppositions to the motion to intervene have been filed by the Underwriters (ECF No. 211), Moore Stephens Hong Kong (ECF No. 210); Moore Stephens PC (ECF No. 213), and the Outside Directors (ECF No. 209).

[9] Trellus received assignments of these entities' claims.

aware that class action lawsuits had been filed against Puda Coal. (Decl. of James Scaplen, May 10, 2013 ("Scaplen Decl.") ¶ 8, ECF No. 179; Goodchild Decl. Ex. A (Usdan Dep. Tr.), at 45:8–17, 127:10–17.) Notably, the Trellus motion to intervene refers to the Goldstein action (ECF No. 1) as the suit of which it became aware. (Mem. of L. in Supp. of Mot. to Intervene by Pls. 1–3, ECF No. 177.) While that complaint did contain claims pursuant to Sections 11 and 12 of the Securities Act, it did not allege that plaintiff Goldstein had purchased shares pursuant and/or traceable to the December 8, 2010 offering. (Goldstein Compl., ¶ 12, ECF No. 1.) On the face of the complaint, Goldstein lacked standing as to Section 11 or 12 claims.

In the fall of 2011, Trellus reached out to Robbins Geller Rudman & Dowd LLP (potential class counsel) regarding the pending lawsuit, and was told that Robbins Geller "was seeking to pursue remedies under the Securities Exchange Act of 1934." (Goodchild Decl. Ex. G, at 375–76.) Nothing in the record suggests that Robbins Geller mentioned possible claims pursuant to Section 11 of the Securities Act of 1933 as part of that communication. On January 6, 2012, James Scaplen, Trellus's then-controller and current chief financial officer, sent an email to Lawrence Rosen of the Rosen Law Firm asking whether there was "anything we should be doing in order to participate in the Class Action." (Scaplen Decl. ¶ 12; Goodchild Decl. Ex. F, at 82.) Scaplen did not follow up; Rosen did not respond until June 2012. (Scaplen Decl. ¶¶ 14–16.) On January 19, 2012, Trellus's outside claims firm informed Trellus that "[t]he lawyers are looking for a large holder to be

21

an additional lead plaintiff. They are looking for someone who purchased on the IPO so they can bring a section 11 claim v. the underwriters." (Goodchild Decl. Ex. G, at 374.)

Plaintiffs filed a [Corrected] Consolidated Amended Complaint on February 9, 2012, which asserted two causes of action against the Underwriters (under Sections 11 and 12); Rosenberger was the sole named plaintiff asserting standing to bring those claims. (ECF No. 47.) Trellus did not read the Complaint at that time. (Goodchild Decl. Ex. A (Usdan Dep. Tr.), at 43:18–44:8.)

By late April or early May 2012, one year had elapsed since the time Trellus first reviewed a complaint asserting securities laws claims against Puda Coal and others. On June 1, 2012, the Underwriter defendants filed a motion to dismiss the Complaint on the grounds that Rosenberger lacked standing to pursue a Section 12(a)(2) claim because he had not purchased directly from either Underwriter. (ECF No. 82.) The next day, Rosen called Trellus to ask whether it had purchased shares in the December 2010 Offering. Trellus stated that it had, and Rosen and a representative of Trellus then discussed the "status of the lawsuit." (Scaplen Decl. ¶¶ 14–16.) Trellus decided not to intervene at that time.[10]

Based on unequivocal statements in the pleadings that Rosenberger had acquired shares from the Underwriters "pursuant and/or traceable to the December

---

[10] According to Trellus, it was informed that only one named plaintiff was required to represent the interests of the Trellus Funds and that Rosenberger had been named; Rosen also informed Trellus that if Rosenberger were found to be inadequate, then it "could" intervene at that stage. (Scaplen Decl. ¶¶ 17–19.) This communication occurred after a motion had been filed challenging Rosenberger's adequacy.

22

Offering" (Compl. ¶ 38), the Court denied the motion to dismiss the Underwriters at that time.

At a conference with the Court in April 2013, the Underwriters restated their intention to move for summary judgment as to Rosenberger's standing to pursue his Section 11 and 12 claims. (Hr'g Tr. 8–9, Apr. 15, 2013, ECF No. 200.)  That same afternoon, Rosen contacted Trellus and recommended that it move to intervene. (Scaplen Decl. ¶¶ 21–22.)

On May 13, 2013, Trellus made its motion to intervene.  The parties conducted limited discovery in connection with that motion, and it was fully briefed as of July 12, 2013. (ECF No. 225.)

      B.     Legal Principles Applicable to Intervention

In order to intervene as a matter of right, a potential intervenor must demonstrate that:  (1) the application is timely; (2) the intervenor claims "an interest relating to the property or transaction that is the subject of the action"; (3) the applicant is situated such that "disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest"; and (4) the applicant's "interest is not adequately represented by the other parties." MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377, 389 (2d Cir. 2006); accord St. John's Univ., New York v. Bolton, 450 F. App'x 81 (2d Cir. 2011) (summary order); Fed. R. Civ. P. 24(a).  Failure to demonstrate one of the above requires denial of the intervention motion.  MasterCard Int'l Inc., 471 F.3d at 389;

Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec. Co., 922 F.2d 92, 96 (2d Cir. 1990).

Courts typically consider the same four factors whether a motion for intervention is "of right" under Fed. R. Civ. P. 24(a) or "permissive" under Fed. R. Civ. P. 24(b). See, e.g., "R" Best Produce, Inc. v. Shulman-Rabin Mktg., Corp., 467 F.3d 238, 240 (2d Cir. 2006); see also Hnot v. Willis Grp. Holdings, Ltd., 234 F. App'x 13, 14 (2d Cir. 2007) (same); Fed. R. Civ. P. Rule 24(b). "A district court has broad discretion under Rule 24(b) to determine whether to permit intervention on the basis that the intervenor's claim or defense and the main action have a question of law or fact in common.'" St. John's Univ., 450 F. App'x at 84 (quoting Fed. R. Civ. P. 24(b)(2)). Here, plaintiffs seek permissive intervention.

Whether or not to grant permissive intervention is within the district court's discretion. See AT&T Corp. v. Sprint Corp., 407 F.3d 560, 561 (2d Cir. 2005). The timeliness of an intervention motion falls within that discretion. In re Bank of N.Y. Deriv. Litig., 320 F.3d 291, 299–300 (2d Cir. 2003). In determining timeliness, the Court considers "(a) the length of time the applicant knew or should have known of [its] interest before making the motion; (b) prejudice to the existing parties resulting from the applicant's delay; (c) prejudice to [the] applicant if the motion is denied; and (d) [the] presence of unusual circumstances militating for or against a finding of timeliness." MasterCard Int'l Inc., 471 F.3d at 390.

First, the possible "prejudice to the existing parties" arising here from Trellus's potential intervention is significant. Id. If Trellus's motion to intervene

24

fails, then the Underwriter and Outside Director defendants would be dismissed from the lawsuit entirely; no current plaintiff has standing to proceed against them. By contrast, if the Court grants Trellus's motion, then at least Trellus—even if not Rosenberger—will have standing to assert such claims. Thus, the very presence of the Underwriter and Outside Director defendants in this lawsuit, and the potential for major prejudice, hinges on the outcome of the intervention motion.

In any event, the intervention motion is not timely, based on "the length of time the applicant knew or should have known of [its] interest." Id. at 390. Timeliness of intervention implicates, inter alia, the statute of limitations and any applicable tolling of such limitations period. As plaintiffs themselves concede, a claim pursuant to Section 11 must be brought within one year of the accrual of the claim. (See Mem. of Law in Supp. of Mot. to Intervene by Pls. and Trellus Mgmt. Co. 11 ("Claims brought pursuant to Sections 11 and 12 of the Securities Act are subject to a one-year statute of limitations running from the date of discovery of the untrue statement or omissions."), ECF No. 177; 15 U.S.C. § 77m.)

Plaintiffs argue that the principles set forth in American Pipe & Constr. v. Utah, 414 U.S. 538 (1974), are applicable to situations such as those before this Court. In American Pipe, the Supreme Court held that the statute of limitations is tolled for putative class members until certification is denied. In such situations, the Court found that it would be fundamentally unfair as well as bad policy to penalize those plaintiffs who assumed that their rights were being protected by the putative named plaintiff. In that case, a lack of numerosity defeated certification.

25

Id. at 553.  The Supreme Court determined that in such circumstances, putative class members should have the opportunity, notwithstanding the running of the statute of limitations prior to denial of certification, to file an individual lawsuit.  Id. There, the named plaintiff had Article III standing at the outset of the case.  The Supreme Court was not asked to address the very separate question of whether American Pipe tolling applies or should apply in instances in which the named plaintiff actually lacks standing to bring a claim in the first instance.

The Second Circuit and other courts in this district have addressed the question of the interplay between American Pipe and Article III standing.  See, e.g., Police & Fire Retirement of City of Detroit et al. v. IndyMac MBS, Inc., et al., 721 F.3d 95 (2d Cir. 2013).  In IndyMac, the Second Circuit addressed whether proposed intervenors may press their otherwise expired claims on a theory of relation back to a timely complaint, when claims have previously been dismissed for want of jurisdiction.  Id. at 110.  There, the district court had dismissed all claims arising from offerings in which the named plaintiffs had not themselves purchased for lack of standing, based on the fact that no named plaintiff had standing to assert such claims.  Id.  The Second Circuit found that "the proposed intervenors' ability to join the suit is foreclosed by the 'long recognized' rule that 'if jurisdiction is lacking at the commencement of a suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim'" (quoting Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc., 675 F.3d 149, 160 (2d Cir. 2012); see also Town of

West Hartford v. Operation Rescue, 915 F.2d 92, 95 (2d Cir. 1990).)[11]  Intervention

is not a cure-all for jurisdictional defects that would have barred the court from

hearing an action in the first instance.  IndyMac, 721 F.3d at 111; see also Walters

v. Edgar, 163 F.3d 430, 432 (7th Cir. 1998); Pressroom Unions-Printers League

Income Sec. Fund, 700 F.2d at 893; In re Direxion Shares ETF Trust, 279 F.R.D.

221, 237 (S.D.N.Y. 2012).

In IndyMac, the Second Circuit ruled that "[t]he District Court lacked

jurisdiction over certain claims of the original lead plaintiff—the very claims now

asserted by the proposed intervenors—and that defect may not be cured by later

intervention."  IndyMac, 721 F.3d at 111.  Thus, "absent circumstances that would

render the newly asserted claims independently timely, neither Rule 24 nor the

Rule 15(c) 'relation back' doctrine permits members of the putative class, who are

not named parties, to intervene in the class action as named parties in order to

revive claims."  Id.  The Court also noted that "[o]ur holding today merely

reemphasizes that 'the [Private Securities Litigation Reform Act] was . . . certainly

not intended to excuse sophisticated parties [such as proposed intervenors] from

being diligent and keeping abreast of developments in the case, especially when the

class is not certified."  Id. at 112 (quoting Employers-Teamsters Local Nos. 175 &

505 Pension Trust Fund v. Anchor Capital Advisors, 498 F.3d 920, 925 (9th Cir.

---

[11] The Second Circuit ruled similarly in the analogous case of Pressroom Unions-Printers League
Income Sec. Fund v. Cont'l Assur. Co., 700 F.2d 889, 893 (2d Cir. 1983).  There, the issue related to
whether plan participants had adequate standing to maintain an ERISA action and, if not, whether
other plan participants could be substituted. The Second Circuit affirmed the lower court's denial of
a motion to amend a complaint to add substitute plan participants as plaintiffs. The Court stated
that "[t]he longstanding and clear rule is that 'if jurisdiction is lacking at the commencement of [a]
suit, it cannot be aided by the intervention of a [plaintiff] with a sufficient claim.'"  Id. (quoting
Pianta v. H.M. Reich Co., 77 F.2d 888, 890 (2d Cir. 1935); additional citations omitted).

2007)); see also New Jersey Carpenters Health Fund v. DLJ Mortg., Inc., No. 08
Civ. 5653 (PAC), 2010 WL 6508190, at *2 n.1 (S.D.N.Y. Dec. 15, 2010).[12]

### C.    Trellus's Motion to Intervene is Untimely

At the latest, Trellus's claim accrued when it learned that lawsuits against
Puda Coal had been filed; according to Trellus's testimony, that was late April or
early May 2011.  Thus, one year later—May 2012—the statute ran.  Trellus waited
until June of 2013 to make the instant motion to intervene; that was twelve months
too late.  Trellus is a sophisticated investor who knew how to follow cases in which
it might have an interest—and, as the facts set forth above, it did, but to an
insufficient extent.  The law does not provide a safe harbor for such a lapse.  Had
Trellus's counsel carefully reviewed the Goldstein complaint in May 2011, it would
have to have understood that the named plaintiff in that action simply could not
represent its interests in connection with claims pursuant to Sections 11 and 12;
Goldstein obviously lacked standing for such claims.

Trellus had further opportunities prior to the running of the statute of
limitations to protect its claims—but it did not.  In January 2012 Trellus "checked
in" on the lawsuit—yet its CFO testified that Trellus did not even read the
Complaint filed in February of that year.  (Goodchild Decl. Ex. A (Usdan Dep. Tr.),

---

[12] In Walters v. Edgar, 163 F.3d 430 (7th Cir. 1999), Judge Posner addressed a situation in which
named class representatives were found to lack standing.  Judge Posner stated, "Certification of a
class action comes after the suit is filed, so if the named plaintiffs lacked standing when they filed
the suit, there was no other party plaintiffs to step into the breach created by the named plaintiffs
lack of standing; and so there was no case when class certification was sought.  The danger that a
class action will have to be dismissed for lack of standing of the named plaintiffs, even though
unnamed members of the class might have standing, is another reason . . . for scrupulous adherence
to the requirement that the determination whether to certify a suit as a class action be made as soon
as practicable after the commencement of the action."  Id. at 433 (citation and internal quotation
marks omitted).

at 43:18–44:8.) Failure to read the Complaint demonstrates that Trellus could not have been relying on the allegations as to Rosenberger in that Complaint.

Finally, not until a year later—long after defense counsel made it clear in open court that they had serious doubts as to the adequacy of Rosenberger's standing and the court invited early motions—did plaintiffs and Trellus bring this motion to intervene. (ECF No. 176.)

The motion is simply too late. American Pipe does not provide refuge. That case dealt with a far different situation—one in which standing existed at the outset. As the Second Circuit recently ruled in affirming IndyMac, if standing does not exist at the outset, it cannot be manufactured through belated intervention. That proposition applies here.[13]

At oral argument, plaintiffs argued that the distinction between constitutional and statutory standing supports applying American Pipe tolling in this case. (See, e.g., Hr'g Tr. 46–51, Sept. 27, 2013.) In fact, the lack of statutory standing reinforces this Court's determination.

Statutory standing is distinct from and often narrower than Article III standing. See Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 43 F.3d 181, 201 (2d Cir. 2005). Here, statutory

---

[13] In a Notice of Supplemental Authority (ECF No. 262), Plaintiffs referred the Court to two further decisions related to IndyMac, but neither supports their proposition that American Pipe tolling applies here. First, plaintiffs' invocation of Saperstein-Stone-Weiss Found. v. Merkin, 2013 WL 2495141 (S.D.N.Y. June 11, 2013), is simply a case of apples and oranges. The court there was dealing with a request to reconsider rather than dismissing fraud claims, and found that IndyMac had no bearing on its decision because a statute of repose was not at issue. The Court respectfully disagrees with the invocation of IndyMac in Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC, 2013 WL 4405538, at *12 n.11 (S.D.N.Y. Aug. 5, 2013). The court there approvingly cited a decision that should have come out the other way under IndyMac. See id.

standing under Sections 11 and 12—established through direct sales of shares or traceability of shares—is narrower than constitutional standing, in order to limit the availability of the Securities Act's strict-liability protection. Plaintiffs argue that if they can show that Rosenberger had Article III standing at the outset of the lawsuit, then Trellus should obtain the benefit of American Pipe tolling; under this theory, Rosenberger's lack of standing becomes irrelevant. This Court disagrees.

First, the argument misconstrues when Article III standing can exist. Article III standing requires that a plaintiff allege an "injury in fact" that (1) is "concrete and particularized" and "actual or imminent"; (2) bears a causal connection to the conduct complained of; and (3) is "likely to be redressed by the requested relief." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). Here, Rosenberger has been injured; but he cannot show a causal connection from his harm to conduct by the defendants in the December 2010 Offering because he cannot trace his shares to the Offering. Even if he could show a concrete injury caused by defendants, he simply does not have a Section 11 (or 12) claim, and the Court could not render a decision in his favor for such a claim. Thus, since Rosenberger lacks statutory standing to assert Sections 11 and 12 claims in this Court, he lacks Article III standing for those claims.

Second, even assuming that Rosenberger did have Article III standing, the absence of subject matter jurisdiction due to lack of statutory standing would ultimately prove fatal to the lawsuit. Statutory standing is "generally treated as jurisdictional in nature." Lifrak v. New York City Council, 389 F. Supp. 2d 500, 503

(S.D.N.Y. 2005) (quoting <u>Lerner v. Fleet Bank, N.A.</u>, 318 F.3d 113, 127 (2d Cir. 2003)).  Thus, Rosenberger's lack of statutory standing means there has been a lack of jurisdiction as to the Section 11 (and 12) claims since the outset of this lawsuit. In the absence of subject matter jurisdiction, this Court has no justiciable controversy to consider, and would need to dismiss the case.

Plaintiffs' argument must also fail based on policy considerations.  If plaintiffs' view of <u>American Pipe</u> were correct, then litigants could effectively hold their place in line by initiating lawsuits in disregard of statutory standing requirements, before then searching for a plaintiff who did have standing to intervene in the action.  <u>American Pipe</u> was not intended to incentivize filing lawsuits on behalf of nominal plaintiffs who in fact lack statutory standing to proceed.

Finally, there are no equitable principles that suggest that the Court should proceed other than with a denial of the motion.  Trellus had plenty of notice of its claims and simply did not do enough to protect them.[14]  To grant intervention would be to condone minimal due diligence regarding the adequacy of a plaintiff in advance of the expiration of the statute of limitations, and to allow defendants to incur significant costs to demonstrate what must have been a clear lack of standing

---

[14] Trellus argues that the reference to an initial public offering or "IPO" did not put it on notice that a plaintiff representative was needed for its Section 11 and 12 claims because it bought in a <u>secondary</u> public offering or "SPO."  (Reply Mem. of L. in Supp. of Mot. to Intervene by Pls. 4 n.12, ECF No. 225.)  This, of course, makes little sense, since the class period in question—November 2009 to October 2011—did not in any event encompass the IPO, which had occurred in early 2008.  <u>See</u> EDGAR Search Results, http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001162747 (last visited Sept. 26, 2013).  At the very least, a sophisticated investor seeking diligently to protect its interest should have probed further.  Even a modest probe—as it turns out—would have revealed the evident problems.

31

from the outset, only to give the proposed intervenor and plaintiffs a "pass" on the clear and longstanding principles of standing. This would not be a just or legally supportable result.

The motion to intervene is denied.

## III.   CLASS CERTIFICATION[15]

The Court's rulings on the various summary judgment and intervention motions have eliminated all claims pursuant to Sections 11 and 12 (and Sections 15 and 20). Thus, the motion to certify the class is a far narrower motion than that originally briefed. Two classes can be maintained, one as to the two Auditor defendants, and one as to the defaulted defendants.[16]

The only remaining claims as to the defendants are those brought pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. 15 U.S.C. § 78(b) (2010); 17 C.F.R. § 240.10b-5 (2013).

Plaintiffs have proposed the following class[17]:

All purchasers of Puda common stock and call options on Puda common stock and sellers of put options on Puda common stock during the period November 13, 2009, through October 3, 2011, both dates inclusive (the "Class Period").[18]

---

[15] Plaintiffs' request to appoint class representatives and class counsel, made as part of their motion to certify a class (ECF No. 216), is granted, except as set forth above with respect to Rosenberger's standing for certain claims. That request was not contested. (See Underwriter Defs.' Opp. to Pls.' Mot. for Class Cert., ECF No. 240.)

[16] The Court notes that certain inside director and officer defendants have not been served. There is no basis to certify a class relating to claims asserted against unserved defendants.

[17] Plaintiffs also propose a subclass relevant to the Section 11 and 12 claims that have now been dismissed.

[18] Excluded from the Class are the defendants, other officers and directors of Puda Coal, members of their immediate families and their heirs, successors or assigns of any of the foregoing. (See Pls.' Mem. in Supp. of Mot. for Class Cert. 3 n.8, ECF No. 217.)

A plaintiff seeking to certify a class must prove by a preponderance of the evidence that its proposed class meets the requirements of Rule 23(a) and, if those requirements are met, that the class is maintainable under at least one of the subdivisions of Rule 23(b).  See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 201–02 (2d Cir. 2008).

Rule 23(a) states that a party may be a class representative only if:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The subdivision of Rule 23 under which plaintiff here seeks to certify a class is (b)(3), which allows certification if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); see also In re Initial Pub. Offering Secs. Litig., 471 F.3d 24, 33 (2d Cir. 2006) (hereinafter "In re IPO Secs. Litig.").

Rule 23 is not a mere pleading standard.  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).  In evaluating a motion for class certification, a district court is required to make a definitive assessment of Rule 23 requirements.  See id.; see also Severin v. Project Ohr, Inc., No. 10 Civ. 9696 (DLC),

2012 WL 2357410, at *4 (S.D.N.Y. June 20, 2012) (citing In re IPO Secs. Litig., 471 F.3d at 27). The district court must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." Teamsters Local 445, 546 F.3d at 204 (quoting In re IPO Secs. Litig., 471 F.3d at 42).

The Auditor defendants raise a threshold issue with respect to the Class Period. They assert that the Class Period as to them—and that is the only Class Period now at issue—must be limited to the timeframe in which they could potentially be implicated in a misstatement or omission. (See Combined Opp. of Moore Stephens Hong Kong and MPSC to Pls.' Mot. for Class Cert. ("Auditor Br.") 3, ECF No. 236.) Plaintiffs concede as much in their memorandum in support of their motion for class certification, noting that "MSHK and MSPC are only being sued with respect to documents containing or incorporating their audited financial statements, not any other of Puda's class period public statements." (Pls.' Mem. in Supp. of Mot. for Class Cert. 3 n.5, ECF No. 217.) The Complaint identifies MSHK's 2009 and 2010 audit reports as the basis for the alleged Auditor liability. Accordingly, the earliest that the Class Period could commence would be March 31, 2010.

###### A.   Numerosity and Common Questions

Class certification is appropriate if, inter alia, "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A class of more than forty members "presumptively satisfies the numerosity requirement." Public

34

Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc., 280 F.R.D. 130, 134 (S.D.N.Y. 2012).  There is no dispute that any class here would be sufficiently numerous. Defendants do not contest that point, and it is clear that the class, if certified, would be greater than forty individual purchasers.  See In re IndyMac Mortgage-Backed Secs. Litig., 296 F.R.D. 226, 233 (S.D.N.Y. 2012).

Commonality is also uncontested on this motion.  Even a single question of law or fact will suffice to satisfy the commonality requirement.  See Marisol A. by Forbes v. Giuliani, 126 F.3d 372, 376–77 (2d Cir. 1997).  Here, the question whether the alleged misstatements and omissions with which the Auditor defendants are associated were legally adequate is itself a sufficient common question to satisfy Rule 23.  That question is common to all members of the proposed class.

      B.    Typicality and Adequacy

In the Second Circuit, typicality is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  See In re Flag Telecom Holdings, Ltd. Secs. Litig., 574 F.3d 29, 35 (2d Cir. 2009).  While there may be variations in fact pattern as between the named plaintiffs and other members of the class, if the same allegedly unlawful conduct was directed at or affected them, the typicality requirement is usually met.  See Robidoux v. Celani, 987 F.2d 931, 936–37 (2d Cir. 1993).

To satisfy the "adequacy" requirement, plaintiffs must prove both that the interests of the named plaintiffs are not antagonistic to other members of the class,

and that plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation. Flag Telecom, 574 F.3d at 35. Courts have generally found that if a named plaintiff's claims satisfy the typicality requirement, he or she is also adequate to represent the class. Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 158 (S.D.N.Y. 2008); see also Hicks v. Morgan Stanley & Co., No. 01 Civ. 10071 (HB), 2003 WL 21672085, at *3 (S.D.N.Y. July 16, 2003) (finding that class representatives were adequate when the complaint alleged a common course of conduct and unitary legal theory for the entire class period).

The Auditor defendants assert that in-and-out purchasers are subject to unique defenses (including negative loss causation) that make them atypical of the class (alternatively, this same argument would apply to a potential lack of predominance under 23(b)(3)). The Auditor defendants do not point to a particular named plaintiff as an in-and-out purchaser. Nevertheless, plaintiffs do not contest that among the purchasers of Puda Coal shares would be in-and-out purchasers. Indeed, they concede as much in their reply memorandum in which they urge the Court to include in-and-out purchasers according to a new "leakage" theory—that news leaked into the market prior to April 8, 2011, and that significant price declines had occurred by that date. (Pls.' Reply Mem. in Supp. of Mot. for Class Cert. 9, ECF No. 251.) Plaintiffs state that they intended to file (and they have filed) a motion to amend the Complaint to add a leakage theory. Plaintiffs' leakage theory—if accepted—would pull into the class some in-and-out purchasers (e.g.,

certain purchasers who sold or "got out" before the Letter Response of April 8, 2011).

Plaintiffs have submitted a report of an expert who performed certain analyses in support of their certification motion, Gregg A. Jarrell (ECF No. 219). The Jarrell Report confirms that there was significant trading activity of Puda Coal shares prior to April 8, 2011. This is not surprising for a stock trading on the New York Stock Exchange. However, it does support the Auditor defendants' argument that in-and-out traders who sold prior to April 8, 2011 could well have had negative loss causation. (Some sellers may also have experienced losses—but there is no showing that such losses predominate over the winners, who theoretically sold at the earliest warning signs.) Defendants, of course, do not bear the burden of proof as to each element of Rule 23—plaintiffs do. In-and-out traders subject themselves to unique inquiries regarding their trading patterns and why they made investment decisions, whether the fraud was in fact irrelevant to their purchasing and sale decisions, and whether they profited on individual trades. These inquiries will also require considerable time and resources, and indeed threaten to become the focus of the litigation.

Accordingly, based on the trading activity, it does appear that there is a significant possibility of negative loss causation for in-and-out traders. On this record, the Court finds that plaintiffs have not carried their burden as to the

typicality of in-and-out traders. Such traders are therefore excluded from the class.[19]

In <u>Flag Telecom</u>, the Second Circuit affirmed a finding that certain class representatives failed the typicality requirement for Rule 23 because they were subject to unique defenses as a result of having been "in-and-out" purchasers (buying and selling into and out of the securities at issue during the class period). <u>Flag Telecom</u>, 574 F.3d at 40–41; <u>see also</u> <u>Bensley v. FalconStor Software, Inc.</u>, 277 F.R.D. 231, 237–41 (E.D.N.Y. 2011) (refusing to appoint a fund, an in-and-out investor, as lead plaintiff because it was subject to unique defenses); <u>In re Bally Total Fitness Sec. Litig.</u>, No. 04C3530, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005) (refusing to appoint an in-and-out trader as lead plaintiff because it would have to establish that losses were actually caused by the alleged fraudulent statements, and would need to expend considerable resources to do so); <u>cf.</u> <u>In re Smart Techs., Inc.</u>, No. 11 Civ. 7673, 2013 WL 139559, at *9 (S.D.N.Y. Jan. 11, 2013) (excluding in-and-out purchasers from the class); <u>Kline v. Wolf</u>, 88 F.R.D. 696, 699 (S.D.N.Y. 1981) (denying class certification in part because a named plaintiff was an in-and-out trader and therefore faced unique defenses), <u>aff'd</u>, 702 F.2d 400 (2d Cir. 1983).

---

[19] The Court also denies the motion for leave to amend. (ECF No. 259.) This action was filed more than two years ago; there has already been significant motion practice on the pleadings; and significant activity in this case has occurred, including discovery, briefing, and decisions on certain summary judgment motions. Amendment would now prejudice defendants. The Court notes that long ago plaintiffs stated—after being asked by the Court—that they were content to rest on their pleadings. In addition, the fact that significant trading occurred prior to April 8, 2011 is not something that required more than a review of daily stock volumes available in any major newspaper, and a leakage theory was therefore available and knowable at the earliest stages of this case. The fact that an expert has now determined that a bigger damage number may come from an earlier class period is insufficient at this late date to change theories of the case.

C.    Predominance

In addition to having to meet each of the requirements of Rule 23(a) by a

preponderance of the evidence, plaintiffs must also meet the requirements of Rule

23(b)(3), referred to as the "predominance" requirement.

Predominance tests whether the proposed class is sufficiently cohesive to

warrant adjudication by representation. Myers v. Hertz Corp., 624 F.3d 537, 547

(2d Cir. 2010); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).

"The requirement's purpose is to ensure that the class will be certified only when it

would achieve economies of time, effort, and expense, and promote uniformity of

decision as to persons similarly situated, without sacrificing procedural fairness or

bringing about other undesirable results." Myers, 624 F.3d at 547 (alteration,

citations, and internal quotation marks omitted). "Economies of time, effort and

expense in fully resolving each plaintiff's claims will only be served, and the

predominance requirement satisfied, if the plaintiffs can show that" the question at

issue can be "answered with respect to the members of the class as a whole through

generalized proof and that those common issues are more substantial than

individualized ones." Id. at 549 (alteration, citations, and internal quotation marks

omitted).

"Class-wide issues predominate if resolution of some of the legal or factual

questions that qualify each class member's case as a genuine controversy can be

achieved through generalized proof, and if these issues are more substantial than

the issues subject only to individualized proof." UFCW Local 1776 v. Eli Lilly &

Co., 620 F.3d 121, 131 (2d Cir. 2010).  The existence of some individualized issues

does not necessarily defeat predominance—it is a question of the balance.  See

Public Emps.' Ret. Sys. of Miss., 277 F.R.D. at 111–19; In re NYSE Specialists Secs.

Litig., 260 F.R.D. 55, 74–77 (S.D.N.Y. 2009).

 Class certification is only warranted if plaintiffs can establish by a

preponderance of the evidence a class-wide presumption of reliance by virtue of the

presence of an efficient market critical to the fraud-on-the-market theory.  See Basic

Inc. v. Levinson, 485 U.S. 224, 241–42 (holding that plaintiffs may be entitled to a

presumption of reliance on material misstatements or omissions to the extent that

securities they have purchased traded in an efficient market that incorporated all

such information into the price of the security).

In the absence of this presumption of reliance on a market that absorbs the

alleged material misstatements and omissions, questions as to whether any

particular investor in fact relied on any particular misstatement or omission come

to the fore and may overwhelm the common questions.  In such a situation,

resolution through representative class action is neither feasible nor a superior

means of adjudication.  See Fed. R. Civ. P. 23(b)(3); see also Basic, 485 U.S. at 241–

42 ("The fraud on the market theory is based on the hypothesis that, in an open and

developed securities market, the price of a company's stock is determined by the

available material information regarding the company and its business.").

The "predominance" issue raised by the Auditor defendants relates to

whether plaintiffs can obtain the benefit of presumed reliance by virtue of trading

40

in an efficient market after April 8, 2011.[20]  According to the Auditor defendants, and confirmed by the Jarrell Report, plaintiffs have only proffered evidence that the market for Puda Coal stock was efficient up to April 8, 2011.  Plaintiffs of course bear the burden of proof on market efficiency—and they have carried that burden up to, but not beyond, April 8, 2011.  Jarrell himself states that he was only tasked with examining market efficiency to that point.  (Jarrell Report at 1.)

### D.   The Auditor Defendants

As a result of the issues relating to the initial time period, in-and-out traders and the lack of a demonstrably efficient market after April 8, 2011, the Court finds that the a class may be certified only as follows:

> All purchasers of Puda common stock and call options on Puda common stock and sellers of put options on Puda common stock during the period March 31, 2010 through April 8, 2011, both dates inclusive (the "Class Period").  In-and-out purchasers are excluded from the class, along with defendants, other officers and directors of Puda Coal, members of their immediate families and their heirs, and successors or assigns of any of the foregoing.

### E.   The Defaulted Defendants

There are two defendants who have been served but are in default.  No judgment of default has yet issued.  The liability phase of this case is still ongoing as a matter of law as to them.  The Court therefore considers certification of a separate class for these defendants.

The Court cannot ignore its findings by a preponderance of the evidence as set forth above, even for defendants in default.  The Court is required to conduct a

---

[20] The Court's prior discussion as to in-and-out traders also applies to the predominance element. For the same reasons that in-and-out traders are not typical, questions as to their trading patterns, losses, etc. would predominate over common questions.

vigorous inquiry under Rule 23 before certifying a claim. See <u>Wal-Mart</u>, 131 S. Ct. at 2551. The lack of demonstrably efficient market after April 8, 2011 thus similarly limits the certifiable class as to the defaulted defendants. However, in-and-out purchasers would similarly have unique defenses defeating typicality/predominance. The Court certifies a class of plaintiffs as to the defaulted defendants as follows:

> All purchasers of Puda common stock and call options on Puda common stock and sellers of put options on Puda common stock during the period November 13, 2009 through April 8, 2011, both dates inclusive (the "Class Period"). In-and-out purchasers are excluded from the class, along with defendants, other officers and directors of Puda Coal, members of their immediate families and their heirs, and successors or assigns of any of the foregoing.

## CONCLUSION

For the reasons set forth above, the Underwriter defendants' motion for summary judgment is GRANTED; the Outside Director defendants' motion for summary judgment is GRANTED; the Auditor defendants' motions for summary judgment are GRANTED; Trellus's motion to intervene is DENIED; plaintiffs' motion for class certification and appointment of class representatives and class counsel is GRANTED as modified; and plaintiffs' motion for leave to amend is DENIED.

The Clerk of the Court is directed to terminate the motions at ECF Nos. 176, 188, 194, 196, 198, 199, 216, and 258.

SO ORDERED.

Dated:     New York, New York
           October ___, 2013

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge