**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR-5733)
Phillip Kim, Esq.  (PK-9384)
Sara Fuks, Esq.  (SF-6034)
Yu Shi, Esq. (YS-2182)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone:  (212) 686-1060
Facsimile: (212) 202-3827

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy (admitted *pro hac vice*)
Joshua L. Crowell (JC-0914)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160

*Co-Lead Counsel for Plaintiffs and the Proposed Class*
*[Additional counsel on signature page]*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE PUDA COAL SECURITIES INC. et al. LITIGATION** | Case No: 1:11-CV-2598(KBF)<br><br>CLASS ACTION<br><br>**SECOND CONSOLIDATED AMENDED AND SUPPLEMENTAL COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................14

III.    PARTIES ............................................................................................................15

        A.      Plaintiffs ..................................................................................................15

        B.      Defendant Puda .......................................................................................16

        C.      Officer and Director Defendants.............................................................16

        D.      Underwriter Defendants..........................................................................18

        E.      Auditor Defendants.................................................................................19

IV.     CLASS ACTION ALLEGATIONS ....................................................................20

V.      BACKGROUND.................................................................................................22

VI.     PUDA'S CONSOLIDATION OF SHANXI COAL INTO THE COMPANY'S
        FINANCIAL STATEMENTS IS A VIOLATION OF GAAP RESULTING IN FALSE
        AND MISLEADING FINANCIAL STATEMENTS ...................................................22

VII.    PUDA'S MATERIALLY FALSE AND MISLEADING STATEMENTS
        REGARDING OWNERSHIP OF SHANXI COAL .....................................................22

VIII.   DEFENDANTS ZHU AND WU'S MATERIALLY FALSE AND MISLEADING
        SARBANES-OXLEY CERTIFICATIONS.................................................................31

IX.     MOORE STEPHENS'S FALSE AND MISLEADING AUDIT REPORTS................33

X.      MATERIALLY FALSE AND MISLEADING STATEMENTS CONTAINED IN THE
        DECEMBER OFFERING DOCUMENTS................................................................43

XI.     LOSS CAUSATION ............................................................................................62

XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-
        MARKET DOCTRINE).........................................................................................76

XIII.    CLAIMS ............................................................................................................77

XIV.   PRAYER FOR RELIEF ........................................................................................... 87

XV.   JURY TRIAL DEMANDED ..................................................................................... 88

Class Representatives Salomón Querub, Howard Pritchard, Hotel Ventures LLC, and Steven Weissmann and intervenor Trellus Management Company LLC (collectively, "Plaintiffs"), allege the following complaint with personal knowledge as to their own acts, and upon information and belief as to all other allegations herein.

## I.   <u>INTRODUCTION</u>

1.      Plaintiffs bring this certified securities class action on behalf of themselves and all other persons or entities which purchased or otherwise acquired Puda Coal, Inc. ("Puda" or the "Company") common stock and call options, or sold Puda put options, between November 13, 2009 and April 8, 2011, inclusive (the certified "Exchange Act Class Period"),[1] and who were injured by a series of revelations which revealed that their investments were worthless. In accordance with this Court's decisions of October 1, 2013, and April 7, 2014, claims under Sections 11 and 15 of the Securities Act are also brought on behalf of persons and entities which purchased Puda shares in or traceable to the public offering on December 8, 2010 (the "December Offering") and did not sell those shares prior to April 8, 2011, and a claim under Section 12(a)(2) of the Securities Act is brought on behalf of those persons or entities which purchased Puda shares in the December Offering from one of the underwriters or were directly solicited to make such purchase by one of the underwriters ("the Securities Act subclass").[2]

---

[1] This is the certified class period for defaulted defendants Puda and Ming Zhao.  A somewhat shorter certified class period for the two auditor defendants is March 31, 2010, through and including April 8, 2011 (the "Exchange Act Auditors Class Period").

[2] Although the Court did not rule on the composition of a Securities Act subclass, the Court excluded in-and-out traders from the Exchange Act classes, requiring class members to have held at least some portion of their class-period-purchased securities until April 8, 2011.  Dkt. No. 263 at 38.  Whereas: (1) all defendants have already filed answers to the Section 11, 12 and 15 claims which are not substantively altered herein (and, as the Court earlier indicated, Trellus would "stand in the shoes, essentially, of Rosenberger" and its claims "would relate back to the beginning of the case"); (2) a finding of market efficiency is not required for a

2.    Until April 2011, investors in Puda's securities had every reason to believe that the Company, through its 90% indirect ownership of its operating subsidiary, Shanxi Puda Coal Group Co., Ltd. ("Shanxi Coal"), was a profitable and growing supplier of "premium high grade metallurgical coking coal used to produce coke for steel manufacturing in China."

3.    In truth, Puda did not own Shanxi Coal.  Puda did not have *any* operations or revenues because its Chairman and major shareholder, Ming Zhao, had improperly transferred Puda's 90% share of Shanxi Coal's common stock to himself and then, ultimately, to an unrelated investment fund controlled by CITIC (defined below), for which Puda received no consideration.

4.    This action arises from a shameless fraudulent scheme in which Puda insiders improperly transferred the Company's sole revenue-producing operating subsidiary to third parties while the Company falsely portrayed to investors that Puda still possessed this operating subsidiary.  And for more than 18 months, during which time there were two public offerings and two independent audits, no one associated therewith revealed the theft.

5.    Puda repeatedly represented to class-period investors that it was a Delaware holding company, with all of its operations conducted through its sole operating subsidiary, Shanxi Coal, which owned all of Puda's mining assets, coal washing plants, cash and receivables.  Shanxi Coal's operations were the sole source of Puda's revenues and profits.

---

Securities Act class; (3) damages are prescribed by statute, as the difference between the offering price and the value of the shares on the date the first action was filed, *see* 15 U.S.C. §77k(e); and (4) as was true for the other proposed class representatives, Trellus's service as a Securities Act subclass representative was not challenged on typicality or adequacy grounds in the papers filed in opposition to class certification, Plaintiffs will seek immediate certification of the Securities Act subclass defined in the text.

6.      While Puda is a corporation organized under Delaware Law and its common stock is publicly traded in the United States, the Company's headquarters and operations (specifically those of Shanxi Coal) are located thousands of miles away in the Shanxi Province of the People's Republic of China ("PRC" or "China").

7.      As such, the information regarding Puda's operations reasonably available to investors during the Class Period was largely limited to the Company's public statements in the U.S., including those in filings with the SEC.  For example, Puda warned investors that "[b]ecause our sole operating company, Shanxi Coal, is based in China, shareholders may have greater difficulty in obtaining information about Shanxi Coal on a timely basis than would shareholders of an entirely U.S.-based company" and "shareholders may have difficulty in obtaining information about Shanxi Coal from sources other than Shanxi Coal itself." Moreover, Puda warned that "[i]nformation available from newspapers, trade journals, or local, regional or national regulatory agencies such as issuance of construction permits and contract awards for development projects will not be readily available to shareholders" and specifically, "shareholders will be dependent upon Shanxi Coal's management for reports of Shanxi Coal's progress, development, activities and expenditure of proceeds."  Indeed, an investigative report prepared for the underwriters of Puda's December Offering noted that "Shanxi Puda Coal Group has a limited media profile."

8.      Before and during the Class Period, Puda represented that it indirectly "own[ed] 90% of the equity interest" in Shanxi Coal.[3]   The remaining 10% was owned by Ming Zhao

_____

[3] Puda's indirect ownership interest in Shanxi Coal was held through Puda's 100% ownership of a subsidiary named Puda Investment Holding Limited ("BVI"), which possessed 100% ownership of a subsidiary named, Shanxi Putai Resources Limited ("Putai"), which purportedly possessed the 90% ownership of Shanxi Coal.   Hence, it was (falsely) publicly

("Zhao") and his brother Yao Zhao ("Y. Zhao").  Zhao, also the Chairman of Puda's Board of Directors and a major Puda shareholder, owned 8% of Shanxi Coal.  Y. Zhao, the legal representative of Putai (the company through which Puda owned Shanxi Coal) under Chinese law and also a significant Puda shareholder, owned the remaining 2%.

9.     Unbeknownst to investors, on or about September 3, 2009, just before the start of the Class Period, Zhao arranged for his brother Y. Zhao to improperly authorize and cause the transfer of Puda's 90% in Shanxi Coal to Zhao, adding to the 8% interest Zhao already held.   Additionally, Y. Zhao divided and transferred his 2% interest of Shanxi Coal to his brother Zhao (1%) and a Shanxi Coal employee named Wei Zhang (1%).  As a result, as of around September 3, 2009, Zhao had increased his ownership of Shanxi Coal to 99%, thereby leaving Puda with zero ownership in Shanxi Coal.  This transfer is reflected in the shareholder minutes of Shanxi Coal, produced to Plaintiffs in discovery by both Puda's former counsel, Goodwin Procter, and Zhao's former counsel, Shearman & Sterling.

10.     Even though Zhao and Y. Zhao's actions effectively rendered Puda a shell company with no assets, no operations and no revenue, the Company nevertheless represented to investors during the Class Period in annual and quarterly filings with the SEC and other statements to the public that Puda continued to own 90% of Shanxi Coal.  Similarly, Puda continued to issue materially false financial statements that were based on its false claim of ownership of 90% of Shanxi Coal – fraudulently consolidating Shanxi Coal's operating results in its financial statements, despite the fact that Puda no longer maintained any ownership interest in Shanxi Coal.

---

reported that Puda owned 100% of BVI, which owned 100% of Putai, which held 90% of Shanxi Coal.

11.    Having obtained a 99% ownership interest in Shanxi Coal on September 3, 2009, on or around July 15, 2010, Zhao transferred 49% of the shares of Shanxi Coal to CITIC Trust Co., Ltd. ("CITIC"), in exchange for 100% of the ordinary shares in the CITIC Juxinhuijin Trust Fund I (the "CITIC Fund I"), which ordinary shares were valued by CITIC at RMB 1.212 billion ($179mm),[4] according to CITIC Fund I's offering documents and management reports.  CITIC is the largest PRC private equity fund and merchant bank, and is owned and controlled by the PRC government.

12.    CITIC had created the CITIC Fund I as an investment vehicle to hold and operate the business of Shanxi Coal.  CITIC raised RMB 3.01 billion ($443mm) from Chinese investors for the CITIC Fund I. According to offering documents and management reports, CITIC expected to and eventually paid its investors an annual return of 9.5% in the first two years and 11% in the third year.

13.    Just days after Zhao transferred 49% of Shanxi Coal to CITIC Fund I, he pledged the other 51% of Shanxi Coal to CITIC as security to obtain a RMB 2.5 billion 3-year loan to Shanxi Coal at a cost of 14.5% (12.5% annual interest plus 2% annual fees). In November 2010, the loan was subsequently increased to RMB 3.5 billion.

14.    Documents produced in this action by Puda's and Zhao's former counsel confirmed the above-described Shanxi Coal equity transfers and the pledge to CITIC.  These documents are on file with the State Administration of Industry and Commerce ("SAIC") office in Shanxi, China, as evidence of the equity transfers[5] and pledge[6] that PRC law requires

---

[4] All RMB amounts are reflected in dollars at an exchange rate of 1 USD = 6.77 RMB Yuan.

[5] According to the China Company Law, a company which transfers its equity shall amend the names of the shareholders and their capital contributions in the bylaws accordingly.  Source:

to be filed. The SAIC is the PRC government agency that regulates corporations in China.  The Shanxi Coal equity transfers and pledge are further confirmed by written statements that CITIC made to investors in CITIC Fund I in offering documents and its annual and quarterly reports.

15.     As the legal representative of Shanxi Coal, on or about September 7, 2009, Zhao signed and authorized the filing with the SAIC documents registering the initial equity transfer of Shanxi Coal to himself.  He later did the same for a series of transfers in 2010, including the sale of 49% of Shanxi Coal to CITIC, as well as the pledge to CITIC, described above.[7]

16.     Puda did not let the fact that the Company no longer possessed any ownership in Shanxi Coal – which had been Puda's sole source of revenues – stand in the way of tapping the American equity markets and raising funds for Puda from unsuspecting public investors.

17.     In its annual reports filed with the SEC and in investment prospectuses soliciting public investment, Puda misrepresented that it earned over $200 million of revenue

---

Company Law of the People's Republic of China (中华人民共和国公司法(2005 修订) issued by the Standing Committee of the National People's Congress on October 27, 2005, effective January 1, 2006.  According to China Administration of Company Registration, in the event of equity transfer or sale of shares of a limited liability company, the company or shareholder shall register the change in such ownership and capitalization with the SAIC by appropriate filing within 30 days immediately after such equity transfer.  Source: Regulations of the People's Republic of China on the Administration of Company Registration (Revised 2005)中华人民共和国公司登记管理条例(2005 修订) enacted by the State Council on June 24, 1994, effective July 1, 1994 (amended December 18, 2005).

[6]  According to China Property Law, every pledge of equity shall be invalid until such pledge is registered with the SAIC.  Source:  Property Law of the People's Republic of China (中华人民共和国物权法) issued by the National People's Congress on March 16, 2007, effective October 1, 2007.

[7] For a one-month period, between March 25, 2010, and April 26, 2010, a company called Shanxi Longxin Coal Company, Ltd. held between 66 2/3% and 80% of Shanxi Coal's shares before withdrawing.

and more than $5 million of profit for 2009 and more than $300 million of revenue and over $23 million of profit for 2010.  In fact, Puda had no revenue and no profit for 2010 and materially less revenue and profit for 2009 because Zhao had transferred ownership of Puda's operation subsidiary, Shanxi Coal, away from Puda on September 3, 2009.

18.     Puda conducted two separate public offerings in 2010 without disclosing these transfers or that it no longer had any operating business at all.  As a result, Puda netted roughly $14.67 million of illicit proceeds from the sale of approximately 2.84 million shares of Puda stock to the public in February 2010, and netted more than $100 million from the sale of another 9 million shares to public investors in December 2010.  Essentially, Puda was able to raise $115 million from public investors by selling shares in what was effectively an empty shell company.

19.     Defendants concealed from investors that Puda no longer had any ownership interest in Shanxi Coal, and hence had no operating business or revenue, until April 2011.  On or around April 8, 2011, Alfred Little published a research report on Puda Coal (the "Little Report") accusing Zhao of improperly transferring ownership of Shanxi Coal to himself in September 2009, selling 49% of Shanxi Coal to CITIC in July 2010, and pledging the remaining 51% interest in Shanxi Coal to CITIC as collateral for a loan.  The source of information for the Little Report was Dan David, an investor whose website, GeoInvesting, is focused upon "providing high quality insights on mid and micro cap equities, both in the China and U.S."

20.     Investors immediately reacted negatively to this news. The Company's stock price promptly declined $3.10 per share, or 34.1%, to close on Friday April 8, 2011, at $6.00 per share, on unusually heavy trading volume.  The following Monday morning, April 11,

2011, before the market opened, NYSE Amex Exchange ("NYSE Amex") halted trading of the Company's shares and it remained halted for more than four months, rendering the stock held by Puda's shareholders immediately illiquid.

21.     In the wake of the Little Report, Puda's Board of Directors commenced an investigation into the allegations of fraud.

22.     On April 11, 2011, Puda stated that "[a]lthough the investigation [was] in its preliminary stages, evidence support[ed] the allegation that there were transfers by [Defendant] Zhao in subsidiary ownership that were inconsistent with disclosure made by the Company in its public securities filings."

23.     On April 29, 2011, Puda issued a press released wherein it "announced that it received a preliminary non-binding proposal from its Chairman, Mr. Ming Zhao to acquire 100% of the outstanding shares of common stock of the Company in a going private transaction at up to $12 per share in cash.  Mr. Zhao proposed to finance the acquisition with a combination of existing cash on hand and external financing sources."  The Company further stated:  "In response to the receipt of the proposal, the Company's Audit Committee composed solely of independent directors will review and evaluate the proposal and, if appropriate, negotiate its terms, and take any other action in connection therewith. The Audit Committee has requested detailed information and documentation from Mr. Zhao relating to the proposal, including information pertaining to matters that are subject to the Audit Committee's previously reported on-going investigation, necessary for the Audit Committee to evaluate the proposal and provide a recommendation to shareholders."

24.     In the months that followed, the Audit Committee's investigation continued and investors waited for the proposed buy-out to take shape.  In mid-July, however, Puda

announced that the Company's long-standing accounting firm resigned and cautioned investors that Puda's financial results for the fiscal years ending 2009 and 2010 should no longer be relied upon. Although it occurred on July 7, 2011, the reasons for the resignation were not made public until after the close of trading on August 18, 2011, namely, that the Audit Committee's early findings, privately provided to the auditors in late June and early July 2011 (after nearly three months of investigation), confirmed that Shanxi Coal had been transferred away from Putai and Puda.

25.     On August 18, 2011, after a halt of more than four months, trading of Puda's stock finally resumed on the OTC Pink Sheets, following its delisting by the NYSE Amex. Over the course of the next two days of trading, investors dumped their holdings *en masse*.

26.     On August 18, 2011, Puda's shares declined $1.90 per share, nearly 32% (from the April 8, 2011, closing price of $6.00 per share), and then declined another $0.87 per share, more than 21%, to close on Friday August 19, 2011, at $3.23 per share. Over these two days, Puda's shares lost 46.17% of their value, on unusually heavy trading volume. The freefall of Puda's stock price was once again stopped when trading was halted again prior to the start of trading on Monday, August 22, 2011.

27.     On September 1, 2011, after exhausting $1 million (the only Company funds the independent directors were able to access), Puda's Audit Committee issued a lengthy report which disclosed, *inter alia*, the "interim" findings of its internal investigation. (Although labeled interim, former Audit Committee Chairman Lawrence S. Wizel ("Wizel") explained that there was no further investigation of the remaining open issues because, in part, the funds available to pay counsel had run out.) The Audit Committee's findings effectively confirmed that the rumors of Zhao's improper and undisclosed transfer of Puda's ownership of Shanxi

Coal to himself and then to CITIC were true, as was the charge that 51% of Shanxi Coal was pledged to CITIC as security for a loan.  Allegations concerning the existence of the loan itself, however, were not resolved because of conflicting evidence, including a letter purportedly issued by CITIC denying that it had funded the loan (the "CITIC Letter").[8]  After a two-week trading halt ordered by the SEC, on September 2, 2011, Puda's shares again resumed trading and plummeted another $1.21 per share, or 37.5%, on the bad news.

28.    On September 26, 2011, Puda Coal issued a press release entitled "Puda Coal Received a Resignation Letter from its CEO," wherein the Company admitted that Liping Zhu had provided a forged letter, purporting to be from CITIC, to Puda's Audit Committee and the SEC in a failed effort to convince the SEC that Puda really did own Shanxi Coal:

> On September 23, 2011, the Board of Directors of Puda Coal, Inc. (the "Company"; Other OTC: PUDA.PK) received a letter from the Company's Chief Executive Officer ("CEO"), Liping Zhu, dated September 22, 2011.  The letter states that Mr. Zhu resigns from his positions as the Company's CEO and as a director on the Board. The letter also states that, on August 29, 2011, Mr. Zhu provided a false letter from CITIC Trust Co. Ltd. ("CITIC") to the U.S. Securities and Exchange Commission ("SEC") and to counsel for Ming Zhao, Chairman of Puda Coal.

> On September 1, 2011, the Company filed a current report on Form 8-K with the SEC disclosing interim findings of the internal investigation by the Audit Committee, including that, on August 31, 2011, Ming Zhao, through his counsel, provided the Audit Committee with a letter purportedly from CITIC (the "CITIC Letter"), and that the Audit Committee was unable to verify the authenticity of, or the information contained in, the "CITIC Letter." The "CITIC Letter" appears to be the same letter that was referred to in the resignation letter from CEO Liping Zhu.

---

[8] The SEC's description of the inconclusive finding based upon the CITIC letter suggested that as of September 1, 2011, investors could still hold out hope that CITIC did not have effective control over all of Shanxi Coal, via the 49% equity transfer and 51% pledge:  "Puda disclosed the letter to the public in an SEC filing, further misleading shareholders about the ownership of Puda's assets."  *See* Litigation Release No. 22264.

10

29.     Finally, on October 3, 2011, any doubts as to the lack of authenticity of the CITIC Letter were laid to rest.  The Company disclosed that it had received a letter from CITIC confirming that the CITIC Letter was, in fact, not issued by CITIC, and that the information CITIC provided its investors with respect to its interests in Shanxi Coal was true. Upon this news, Puda's stock dropped another 16.6%.

30.     Between late September 2011 and March 2012, CFO Qiong "Laby" Wu ("Wu") and Director Defendants Jianfei Ni ("Ni"), Wizel and C. Mark Tang ("Tang") all resigned from the Company in the wake of this scandal.

31.     On February 22, 2012, the SEC brought suit against Zhao and Zhu.  According to an SEC press release announcing the institution of the action, "Zhao and Zhu are charged with violations of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, as well as violating the proxy solicitation rules and various corporate reporting, recordkeeping and internal controls provisions of the Exchange Act. The SEC's complaint seeks a final judgment ordering Zhao and Zhu to disgorge their ill-gotten gains plus prejudgment interest, imposing financial penalties, barring them from acting as officers or directors of a public company, and permanently enjoining them from committing future violations of these provisions."

32.     The day after the SEC filed suit, a business writer for THE NEW YORK TIMES, Floyd Norris, published a scathing article entitled "A Fraud Went Undetected, Although Easy to Spot."  In addition to Zhao and Zhu, the focus of the SEC's action, Norris took aim at the professionals whose stamp of approval gave investors false comfort in Puda's legitimacy:

> But what is most amazing is how easy it turned out to be to discover the fraud. It was basically spelled out in documents that were publicly available in China months before American and Canadian investment banks, advised by major law

11

firms, raised the money from investors. But it appears no one bothered to look — not the underwriters and not the auditors.

"They charge a lot for due diligence," says the man who uncovered the fraud, Dan David, a 43-year-old money manager from Skippack, Pa. "But they don't do it."

At the same time Americans were investing money in the company, Citic Trust, a Chinese state-owned company, was selling investments in the same asset to Chinese investors, saying — evidently correctly — that it controlled the asset.

What the documents showed was laid out this week by the S.E.C. as it filed charges of civil fraud against Ming Zhao, Puda's chairman, and Liping Zhu, the company's former chief executive. Puda's principal asset was a coal mining company, Shanxi Puda Coal. But in 2009, the chairman transferred that interest from Puda to himself. The next year, he sold a controlling interest in it to Citic.

Puda, which had gone public in the United States through a merger with a shell company in 2005, did not disclose those crucial facts when, in February 2010, it raised $12.8 million selling stock to American investors, in an offering underwritten by Brean Murray, Carret & Company of New York and Newbridge Securities of Fort Lauderdale, Fla. In December 2010, a $100 million share sale was underwritten by Macquarie Capital, a Canadian firm, and Brean Murray. Investors in that offering paid $12 a share for stock that now trades for about 25 cents.

All told, the underwriters collected fees of $6.5 million, but they seem not to have acquired the documents that Mr. David said cost him $500. A spokeswoman for Macquarie declined this week to comment, and officials of the other firms did not respond to inquiries.

The fraud blew up last spring. On Friday, April 8, Mr. David posted his analysis on his Web site, GeoInvesting, and a similar analysis was posted on the Web site of Alfred Little, a firm that had a reputation for spotting Chinese frauds. That analysis was unsigned, but it was written by Andrew Wong, the head of the IFRA Group, a Hong Kong research firm.

"In contrast to most of the other Chinese frauds, where the business was not real, this was a profitable company that the chairman just stole," Mr. Wong said in an interview this week. He said he had looked into the company after Mr. David asked him to review his own research.

"Incredibly," Mr. Wong wrote in his report, "Puda's auditor, Moore Stephens, failed to catch this theft of an entire company that is clearly documented in government ownership filings that any lawyer can obtain directly from the source."

12

The stock plunged to $6 by the time the New York Stock Exchange suspended its trading on the following Monday. It would not trade again until it traded over the counter for two days in August, after it was delisted from the N.Y.S.E. The S.E.C. suspended it again.  It trades now on the over-the-counter market.

The company's audit committee investigated the allegations, and eventually concluded they were accurate. But there was excitement along the way. In April, Mr. Zhao produced a letter, ostensibly from Citic, saying that it had not purchased the company, and sought to reassure investors by saying he was considering taking the company private at $12 a share. Eventually, Citic said the letter was false, and the company said Mr. Zhao had admitted forging it.

In July, Moore Stephens quit as the company's auditor and said its previous audits could not be relied on. It did not respond to requests for comment for this column.

In most Chinese fraud cases, the allegations are made by short-sellers, who have bet that the stock will decline. Mr. David, however, is a manager who owned Chinese companies and believed in them. He set out to prove the shorts were wrong.

"We hired our own Chinese team to discredit the short-sellers, because I did not believe what they were saying," Mr. David told me. "What came back to me was that the short-sellers were right." He asked the investigators to look at companies in which he had invested or was considering buying.  Puda was one of the latter.

The readily available documents were filed with China's State Administration for Industry and Commerce, known as S.A.I.C., showing transactions affecting the filing companies. Chinese companies must publish lists of all their subsidiaries, and it is necessary to check filings by all the subsidiaries. The forms are in Chinese, of course, but for the money that investment banks charge, you would think they could afford a few translators.

The two men charged by the S.E.C. are evidently in China and have no intention of coming to the United States to face the allegations. There is probably nothing the commission can do …

33.    Author Norris was correct about certain things.  For example, there appears to

be little that the SEC can do to bring its two Chinese defendants to justice in the United States.

As indicated in a status letter filed with the Court on March 17, 2014, the SEC has yet to effect

service of its complaint on either Zhao or Zhu.  (In contrast, Plaintiffs here successfully served

Puda and Zhao.)  Also, the lead audit partner on the 2010 Puda audit for Moore Stephens Hong

13

Kong ("MSHK") confirmed that MSHK could have obtained Shanxi Coal's ownership information from the local SAIC office through an agent, just as Mr. Norris indicated.

34.      Discovery in this action revealed, however, that Mr. Norris was not correct when he assumed that the underwriters of Puda's 2010 offerings "seem not to have acquired the documents that Mr. David said cost him $500."  On December 2, 2010, six days before the December Offering, an investigative report was delivered by Kroll Inc. ("Kroll"), a word-wide provider of risk solutions, to underwriter Macquarie Capital (USA) Inc. ("Macquarie") as part of the underwriters' due diligence for the $108 million offering.  ("Kroll Report" attached as Exhibit 1 hereto).  Documents produced by Macquarie reveal that Macquarie had engaged Kroll two weeks earlier to vet the key players involved in the December Offering.  Kroll employed public databases, including that of the Shanxi SAIC office, to compile its dossier of background information on these persons and companies.  The executive summary to the 40-page report *clearly indicated that Puda did not own Shanxi Coal*; an appendix to the report listed the various transfers of interests in Shanxi Coal during 2010 – none of which listed Putai as having any ownership interest in Shanxi Coal.

35.      The officers, directors, underwriters and auditors of Puda, a company listed on a U.S. exchange, owed investors integrity, as well as and due diligence and care.  Instead, they propped up an empty shell.  Investors are entitled to recompense for defendants' misconduct.

## II.     JURISDICTION AND VENUE

36.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

14

37.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. §77v) and Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

38.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act (15 U.S.C. §77v) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) and §28 U.S.C. §1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Additionally, Macquarie maintains its principal executive offices within this Judicial District, and, at all relevant times, Puda's stock traded on the NYSE Amex exchange.

39.     In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

III.    **PARTIES**

A.      **Plaintiffs**

40.     Class Representatives Salomón Querub, Howard Pritchard, and Hotel Ventures LLC purchased Puda securities during the Class Period, as set forth in their certifications previously filed with the Court and incorporated by reference herein, and have suffered damages as a result of defendants' federal securities law violations.

41.     Class Representative Steven Weissmann purchased Puda securities, including options, during the Class Period, as set forth in his certification previously filed with the Court and incorporated by reference herein, and suffered damages as a result of defendants' federal securities law violations.

42.     As set forth in the moving papers in support of its motion to intervene, filed May 13, 2013, plaintiff-assignee and proposed Securities Act subclass representative Trellus Management Company LLC ("Trellus") purchased or acquired Puda securities for funds under its management during the Class Period, including 179,734 shares of common stock purchased at $12.00 per share from Brean Murray, Carret & Co. ("Brean Murray") on December 8, 2010, pursuant to the December Offering, and suffered damage as a result of defendants' federal securities law violations.

43.     Class Representatives Salomón Querub, Howard Pritchard, Hotel Ventures LLC, and Steven Weissmann and Trellus are collectively referred to as "Plaintiffs."

**B.     Defendant Puda**

44.     Defendant Puda is a Delaware corporation with its principle executive offices located at 426 Xuefu Street, Taiyuan, Shanxi Province, PRC.  During the Class Period, Puda was a purported supplier of cleaned coking coal used to produce coke for steel manufacturing in China and a government appointee to consolidate mining operations in Shanxi Province. The Company's operations are conducted exclusively through Shanxi Coal, which owns all of Puda's mining assets, coal washing plants, cash and receivables.

**C.     Officer and Director Defendants**

45.     Defendant Zhao was, at all relevant times, the Chairman of the Board of Puda and owned approximately 36% of Puda's outstanding common stock.  Zhao was also, at all relevant times, Chairman of Shanxi Coal's Board.   Zhao was previously Puda's President and CEO from July 2005 to June 2008 and Shanxi Coal's CEO from 1995 to June 2008.  On April 11, 2011, Puda Coal announced that Zhao had agreed to a voluntary leave of absence until the Audit Committee's investigation was complete.  However, with the independent directors long

gone from Puda, and senior management having resigned, Zhao now has sole control of Puda and Shanxi Coal.

46.     Zhao was at all relevant times the legal representative of Shanxi Coal.  As such, he was responsible for signing all regulatory filings made with SAIC on behalf of Shanxi Coal.[9]  In the PRC, official corporate documents are executed by the legal representative by means of a "chop," an official seal used in lieu of an executive's signature.  A company's chop is required for control of a company's bank account and to execute formal documents concerning the business.  Former Directors Tang and Wizel testified that Zhao was able to perpetrate the theft of Shanxi Coal by having control of the company chop.

47.     Though not a defendant, Zhao's brother, Y. Zhao, played a prominent role in the fraud.  Y. Zhao is and was a major shareholder of Puda (9%) and was the legal representative of Putai, the Puda subsidiary that purportedly directly owned 90% of Shanxi Coal.

48.     Defendant Zhu was President, CEO and a director of Puda from June 2008 until September 22, 2011, when he resigned from his positions.

49.     Defendant Wu was Puda's CFO from July 2008 and Puda's secretary from April 2010 until her resignation from both positions on September 27, 2011.

50.     Defendant Ni was, at all relevant times, a director of the Company.  Ni was a member of the Company's Audit, Nominating and Corporate Governance, and Compensation Committees until his resignation from the Board on December 20, 2011. Ni signed the Company's FY 2009 10-K, and its 2010 Registration Statement and FY 2010 10-K, which contained materially false and misleading statements.

---

[9]  Under Chinese law, the legal representative of a corporation is authorized to take actions and enter contracts that are fully binding on the corporation.

51.     Defendant Tang was, at all relevant times, a director of the Company.  Tang was a member of the Company's Audit, Nominating and Corporate Governance, and Compensation Committees until his resignation from the Board on March 1, 2012.  Tang signed the Company's FY 2009 10-K, and its 2010 Registration Statement and FY 2010 10-K, which contained materially false and misleading statements.

52.     Defendant Wizel was, at all relevant times, Chairman of Puda's Audit Committee and a member of the Company's Nominating and Corporate Governance, and Compensation Committees until his resignation from the Board on March 1, 2012.  Prior to joining Puda's Board, Wizel worked at the accounting firm of Deloitte LLP for more than forty years.  Defendant Wizel is also a Certified Public Accountant ("CPA").  Wizel signed the Company's FY 2009 10-K, and its 2010 Registration Statement and FY 2010 10-K, which contained materially false and misleading statements.

53.     Defendants Zhao, Zhu, Wu, Ni, Tang, and Wizel (the "Officer and Director Defendants"), because of their positions with Puda, possessed the power and authority to control the contents of the Company's filings with the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.* the market. Each of these defendants was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

### D.     Underwriter Defendants

54.     Defendant Brean Murray, Carret & Co. was an underwriter of the Company's December Offering and its February 2010 offering.  Brean Murray maintains an address for service of process care of CSC, at 80 State Street, Albany, New York.

55. Defendant Macquarie was an underwriter of the Company's December Offering. Macquarie's principal executive offices are located at 125 West 55th Street, 22nd Floor, New York, New York.

56. Defendants Brean Murray and Macquarie are collectively referred to hereinafter as the "Underwriters."  The Underwriters served as financial advisors, assisted in the preparation and dissemination of the offering materials for the December Offering, and had ultimate authority over the content of the Prospectus; the Underwriters' names were prominently displayed on the first page of the offering prospectus as "Joint Bookrunning Managers."  The Underwriters received more than $6.5 million in underwriting discounts and commissions from their service as underwriters for the December Offering.

57. In connection with the December Offering, Macquarie hired Kroll to perform background checks with respect to Puda and persons associated therewith.  On December 2, 2010, Kroll delivered to Macquarie a 40-page investigative report showing that, based upon SAIC records Puda did not (through its wholly-owned subsidiary Putai) own 90% of Shanxi Coal.  In fact, Kroll informed Macquarie that SAIC records revealed that Putai did not have any ownership interest in Shanxi Coal.  Six days before the December Offering, Kroll reported to Macquarie that Shanxi Coal's owners were:  Ming  Zhao (50%), CITIC (49%),  and Wei Zhang (1%).  Although Brean Murray was a "joint bookrunning manager" – which meant that it shared ultimate control of the offering with Macquarie – to date, Brean Murray has produced no documents in discovery indicating it obtained any third-party backgrounds checks on the key players involved in either of its two Puda underwritings in 2010.

E. **Auditor Defendants**

58. Defendant MSHK is a member firm of Moore Stephens International Limited's

network, located in Hong Kong.

59.     Defendant MSPC, Certified Public Accountants and Advisors, P.C., also known to investors as Moore Stephens, P.C. ("MSPC"), is a member firm of Moore Stephens International Limited's network located in New Jersey and New York.

60.     Defendants MSHK and MSPC are collectively referred to herein as "Moore Stephens" or the "Auditors."

## IV.   CLASS ACTION ALLEGATIONS

61.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of two certified classes.   The certified class against defaulted defendants Puda and Zhao (the "Exchange Act Class") consists of:

> All purchasers of Puda common stock and call options on Puda common stock and sellers of put options on Puda common stock during the period November 13, 2009 through April 8, 2011, both dates inclusive. In-and-out purchasers are excluded from the class, along with defendants, other officers and directors of Puda Coal, members of their immediate families and their heirs, and successors or assigns of any of the foregoing.

A slightly shorter class was certified against the Auditor defendants, consisting of:

> All purchasers of Puda common stock and call options on Puda common stock and sellers of put options on Puda common stock during the period March 31, 2010 through April 8, 2011, both dates inclusive. In-and-out purchasers are excluded from the class, along with defendants, other officers and directors of Puda Coal, members of their immediate families and their heirs, and successors or assigns of any of the foregoing.[10]

62.     Plaintiffs also bring this action as a putative class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Securities Act subclass, under Sections 11, 12 and 15 of the Securities Act, consisting of:

---

[10] Because Plaintiffs' Section 10(b) claims against the Underwriters arise from the December Offering, their liability to the certified Exchange Act Class (defined in the text) would be for the period December 8, 2010, through April 8, 2011, both dates inclusive.

All those persons or entities who (a) purchased Puda shares either directly in the public offering on December 8, 2010, or traceable thereto, or were directly solicited to make purchases by one of the underwriters, *and* (b) did not sell all of those shares prior to April 8, 2011. Excluded from the class are defendants, other officers and directors of Puda Coal, members of their immediate families and their heirs, and entities under any excluded persons control, and successors or assigns of any of the foregoing.

63.     The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Puda securities were actively traded on the NYSE Amex. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Puda Coal shares were traded publicly during the Class Period on the NYSE Amex and as of March 7, 2011, the Company had 30,022,856 shares of common stock outstanding. There were approximately 9 million shares sold in the December Offering. Record owners and other members of the Class may be identified from records maintained by Puda or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

64.     The Class Representatives' and Trellus's claims are typical of the claims of the members of the Exchange Act Classes and the putative Securities Act subclass as all members of these classes are, respectively, similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

65.     Plaintiffs will fairly and adequately protect the interests of the members of the certified Exchange Act Classes, as well as the Securities Act subclass, and have retained counsel competent and experienced in class and securities litigation.

66.     Common questions of law and fact exist as to all members of the respective Classes and subclass and predominate over any questions solely affecting individual members of the respective Classes and subclass.  Among the questions of law and fact common to all Class and subclass members are: (i) whether the federal securities laws were violated by defendants' acts as alleged herein; (ii) whether defendants omitted and/or misrepresented material facts about the Company and its business; and (iii) to what extent the members of the respective Classes and subclass have sustained damages and the proper measure of damages.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual investors may be relatively small, the expense and burden of individual litigation makes it impossible for members of the respective Classes and subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.      BACKGROUND

68.     In the past four years, widespread fraud allegations pertaining to Puda and other Chinese so-called reverse merger or reverse take-over ("RTO") stocks became one of the latest trends in corporate wrongdoing and securities fraud in the United States.

69.     The number of China-based companies, with their principal places of business in the PRC, listed on U.S. exchanges has skyrocketed in the past decade.  The Public Accounting Oversight Board ("PCAOB") identified 159 reverse mergers by companies primarily based in the PRC between January 1, 2007, and March 31, 2010.[11]  Not every PRC

---

[11] Research Note 2011-P1, *Activity Summary and Audit Implications for Reverse Mergers Involving Companies from the China Region: January 1, 2007, through March 31, 2010,*

company that began to trade on a U.S. stock exchange engaged in fraudulent activity, but a substantial number have.  In fact, as disclosed in an April 27, 2011, letter from Mary Schapiro (then-Chairman of the SEC) to Congressman McHenry (Chairman of the Subcommittee on TARP, Financial Services, and Bailouts of Public and Private Programs), the SEC had identified no fewer than 24 PRC-based companies that had filed Forms 8-K disclosing auditor resignations, accounting problems or both – in March and April of 2011 *alone*.

70.     The Chairman of the PCAOB, James R. Doty, stated that there are "significant risks associated with audits of operations of U.S. [listed] companies in China. For example, we are finding through our oversight of U.S. firms that even simple audit maxims, such as maintaining the auditor's control over bank confirmations, may not hold given the business culture in China."[12] Therefore, Doty concluded that "[i]n light of these risks, the PCAOB's inability to inspect the work of registered firms from China is a gaping hole in investor protection."[13]

71.     The reverse merger is the technique *du jour* for fraudulent companies to bypass the typical registration process that allows the SEC to examine a company prior to it selling shares on U.S. stock exchanges.  In a typical registration process for an initial public offering of stock ("IPO"), a Company submits its registration statement to the SEC's Division of Corporate Finance where it undergoes a rigorous examination process, which often includes

---

Public Company Accounting Oversight Board (March 14, 2011).

[12] *Testimony Concerning the Role of the Accounting Profession In Preventing Another Financial Crisis: Hearing Before the Subcommittee on Securities, Insurance, and Investment of the Senate Committee on Banking, Housing and Urban Affairs*, 112th Cong. (2011) (statement of James Doty, Chairman, PCAOB), *available at* http://www.sec.gov/news/testimony/2011/ts040611jlk.htm.

[13] *Id.*

detailed questions from the SEC about the company's disclosures.   In a reverse merger, however, a private operating company based in the PRC is "acquired" by a previously registered U.S.-based publicly traded "shell company," thereby bypassing the rigorous IPO registration process as described by the WALL STREET JOURNAL:

> In reverse mergers, a foreign company is "bought" by a publicly traded U.S. shell company. But the foreign company assumes control and gets the shell's U.S. listing without the level of scrutiny that an initial public offering entails. Though companies from other countries also engage in reverse mergers, such deals are especially common among the Chinese. The PCAOB says nearly three-quarters of the 215 Chinese companies listing in the U.S. from 2007 to early 2010 did so via reverse merger.[14]

72.    This loophole has allowed numerous unscrupulous foreign companies to avoid SEC scrutiny.  A large number of shady stock promoters in recent years have come from the PRC.  In May 2011, there were 19 stocks in which the NASDAQ Stock Market ("NASDAQ") had halted trading; an astonishing 15 of these 19 companies were PRC-based.  Reporters have blamed inadequate auditing procedures by both Chinese and U.S. auditing firms for this disturbing trend.  The WALL STREET JOURNAL revealed in June of 2011, that the SEC had begun examining accounting and disclosure issues regarding Chinese companies that had engaged in reverse mergers.[15]   The investigation specifically targets the work of Chinese auditors:

> People familiar with the matter say the investigation also includes auditors, which hadn't previously been known. As part of its inquiry, the SEC has suspended trading on some Chinese companies, questioning their truthfulness about their finances and operations.

---

[14] Michael Rappaport, *SEC Probes China Auditors*, WALL STREET JOURNAL (June 3, 2011).

[15] *Id.*

The Public Company Accounting Oversight Board, or PCAOB, the government's accounting regulator, said it is investigating some audit firms over whether their audits of Chinese clients are stringent enough.

\*    \*    \*

"Right now, the auditing and regulation of U.S.-listed Chinese companies isn't working very well," said Paul Gillis, a visiting professor of accounting at Peking University's Guanghua School of Management.

\*    \*    \*

Since February, about 40 Chinese companies have either acknowledged accounting problems or seen the SEC or U.S. exchanges halt trading in their stocks because of accounting questions.[16]

73.    Additionally, according to the article, although some auditors say, in response, that they are "intensifying their efforts" and "doing everything they can to perform strong audits," that simply "may raise questions about whether their past efforts were strong enough."[17]

74.    SEC Commissioner Luis A. Aguilar has also spoken out on the subject. In a speech on April 4, 2011, he said that using reverse mergers as a form of "backdoor registration" was a "disturbing trend."  He said, "a growing number of them are proving to have significant accounting deficiencies or being vessels of outright fraud."  The "billions in U.S. savings and investment dollars [that] have been entrusted with these companies" are, therefore, at risk.

75.    A May 26, 2011, article in THE NEW YORK TIMES[18] blamed auditors and inadequate audit procedures for this disturbing trend. This article revealed that another Chinese corporation, Longtop Financial Technologies – not a RTO merger entry into U.S. capital markets – also recently became "worthless" when, after six years, its auditors sought bank

---

[16] *Id.*

[17] *Id.*

[18] Floyd Norris, *The Audacity of Chinese Frauds*, THE NEW YORK TIMES (May 26, 2011).

confirmations from Longtop's bank's headquarters rather than the local branches it had inquired of in years past. Longtop stopped the confirmation process and, ultimately, admitted to having fraudulent cash balances in Chinese banks and on the books.

76. The May 26, 2011, article described how Longtop attempted to deflect criticism by relying upon its clean audit opinions:

> On April 28, the company tried to assure analysts that the fraud claims were bogus. Derek Palaschuk, a Canadian accountant who served as the company's chief financial officer, wrapped himself in Deloitte's prestige, saying that those who questioned Longtop were "criticizing the integrity of one of the top accounting firms in the world."
>
> "For me," he said, "the most important relations I have other than with my family, my C.E.O., and then the next on the list is Deloitte as our auditor, because their trust and support is extremely important."

The article then explained, however, that the major auditing firms in China are not subject to the same type of inspections required of other accounting firms that audit companies whose securities are traded in the U.S.:

> The Chinese audit firms, while they are affiliated with major international audit networks, have never been inspected by the Public Company Accounting Oversight Board in the United States. The Sarbanes-Oxley Act requires those inspections for accounting firms that audit companies whose securities trade in the United States, but China has refused to allow inspections.
>
> In a speech at a Baruch College conference earlier this month, James R. Doty, chairman of the accounting oversight board, called on the major firms to improve preventative global quality controls but said that actual inspections were needed.
>
> Two weeks ago, Chinese and American officials meeting in Washington said they would try to reach agreement on the oversight of accounting firms providing audit services for public companies in the two countries, so as to enhance mutual trust.

## VI. PUDA'S CONSOLIDATION OF SHANXI COAL INTO THE COMPANY'S FINANCIAL STATEMENTS IS A VIOLATION OF GAAP RESULTING IN FALSE AND MISLEADING FINANCIAL STATEMENTS

77. During the Class Period, Puda filed periodic reports with the SEC, including,

Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, containing the Company's reported financial statements.  The following chart identifies the date, signatories, and period covered by each report:

| FORM | PERIOD | DATE FILED | SIGNATORIES | REFERRED TO BELOW AS |
|---|---|---|---|---|
| 10-Q | 2009 Fiscal 3rd Quarter | 11/13/2009 | Defendant Zhu | Q3 2009 10-Q |
| 10-K | 2009 Fiscal Year | 3/31/2010 | Defendants Zhu, Wu, Zhao, Ni, Tang, and Wizel | FY 2009 10-K |
| 10-Q | 2010 Fiscal 1st Quarter | 5/17/2010 | Defendant Zhu | Q1 2010 10-Q |
| 10-Q | 2010 Fiscal 2nd Quarter | 8/16/2010 | Defendant Zhu | Q2 2010 10-Q |
| 10-Q | 2010 Fiscal 3rd Quarter | 11/15/2010 | Defendant Zhu | Q3 2010 10-Q |
| 10-K | 2010 Fiscal Year | 3/16/2011 | Defendants Zhu, Wu, Zhao, Ni, Tang, Wizel | FY 2010 10-K |

**PUDA'S QUARTERLY REPORTS ON FORM 10-Q AND ANNUAL REPORTS ON FORM 10-K FILED WITH THE SEC DURING THE CLASS PERIOD**

78.     As reflected by the below chart, during the Class Period, Puda issued the following press releases announcing its financial and operating results, which were largely, if not completely, based on the operating results of Shanxi Coal:

**PRESS RELEASES ISSUED BY PUDA DURING THE CLASS PERIOD ANNOUNCING THE COMPANY'S FINANCIAL RESULTS**

| PERIOD | DATE | REFERRED TO BELOW AS |
|---|---|---|
| 2009 Fiscal Year | 3/24/2010 | FY 2009 PR |
| 2010 Fiscal 1st Quarter | 5/13/2010 | Q1 2010 PR |
| 2010 Fiscal 3rd Quarter | 11/15/2010 | Q3 2010 PR |
| 2010 Fiscal Year | 3/14/2011 | FY 2010 PR |

79.     All of Puda's financial statements/results issued during the Class Period, including the Company's financial statements contained in Puda's Q3 2009 10-Q, FY 2009 10-

K, Q1 2010 10-Q, Q2 2010 10-Q, Q3 2010 10-Q, and FY 2010 10-K, as well as the financial results that were derived from those financial statements, discussed in those SEC filings, and discussed in the Company's press releases, including the FY 2009 PR, Q1 2010 PR, Q3 2010 PR, and FY 2010 PR, were materially false and/or misleading because, as set forth herein, the financial statements failed to comply with SEC rules and GAAP.

80.     Federal regulations strictly govern what must be included in documents filed with the SEC.  In particular, federal regulations required Puda to comply with GAAP, which are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Specifically, SEC Regulation S-X requires that annual and interim financial statements as filed with the SEC to be prepared in accordance with GAAP.  Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4- 01(a)(1).

81.     Throughout the Class Period, Puda's financial statements (beginning with its 2009 fiscal third quarter through the 2010 full fiscal year) violated GAAP – rendering them materially false and misleading – because the Company continued to consolidate the operating results of Shanxi Coal into Puda's financial statements.

82.     In accordance with Statement of Financial Accounting Standards ("SFAS") 94, the relevant provisions of GAAP require consolidation in certain situations:

> a)      [T]he first sentence of paragraph 2 [of ARB 51] describes its general rule of consolidation policy. The usual condition for a controlling financial interest is ownership of a majority voting interest, and, therefore, as a general rule ownership by one company, directly or indirectly, of over fifty percent of the outstanding voting shares of another company is a condition pointing toward consolidation.
>
> b)      Paragraph 2 precludes consolidation of a majority-owned subsidiary where the control does not rest with the majority owners (as, for instance, where the subsidiary is in legal reorganization or in bankruptcy).

83.     Zhao had transferred Puda's entire ownership of Shanxi Coal to himself in September 2009.   Therefore, starting in September 2009, Puda did not have any interest in Shanxi Coal and was not allowed, under GAAP, to consolidate Shanxi Coal's financial results during the Class Period.  It is axiomatic that Puda's zero percent ownership of Shanxi Coal could neither have been "a controlling financial interest" nor "ownership of a majority voting interest" of Shanxi Coal.

84.     As a result of the transfer of Shanxi Coal away from Puda, all of the assets, liabilities, revenue, expense and net income figures reported by Puda in its financial statements filed From November 13, 2009, forward, as set forth above, were materially false and misleading.

## VII.   PUDA'S MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING OWNERSHIP OF SHANXI COAL

85.     Even though Zhao had come to possess 99% ownership of Shanxi Coal and Puda's ownership had been reduced to zero percent, the Company represented during the Class Period that Shanxi Coal was still 90% owned by Putai, and hence, that Puda indirectly owned 90% of Shanxi Coal.  Specifically, the Company's Q3 2009 10-Q, FY 2009 10-K, and Q1 2010 10-Q, each represented:

> ***The owners of Shanxi Coal were Putai (90%), Mr. Ming Zhao (8%) and Mr. Yao Zhao (2%).***

*     *     *

. . . [T]he organizational structure of the Group is as follows:

29



86.     The Company's Q2 2010 10-Q and Q3 2010 10-Q, similarly represented that "[t]he owners of Shanxi Coal were Putai (90%), Mr. Ming Zhao (8%) and Mr. Yao Zhao (2%)" and that "[i]n May 2010, Mr. Yao Zhao transferred his 2% ownership to Mr. Ming Zhao."  The Company's FY 2010 10-K also similarly represented that "Putai became a 90% owner of Shanxi Coal, and Mr. Ming Zhao and Mr. Yao Zhao owned 8% and 2%, respectively" and that "[i]n May 2010, Mr. Yao Zhao transferred his 2% ownership to Mr. Ming Zhao."

87.     These statements regarding Putai/Puda's ownership interest in Shanxi Coal in Puda's Q3 2009 10-Q, FY 2009 10-K, Q1 2010 10-Q, Q2 2010 10-Q, Q3 2010 10-Q, and FY 2010 10-K filings with the SEC were materially false and misleading when made because, as of September 2009, Puda did not maintain any ownership interesting in Shanxi Coal.  On or around September 3, 2009, Y. Zhao improperly authorized and caused Putai to transfer 90% of Shanxi Coal to Zhao, adding to the 8% Zhao already held.  Y. Zhao also divided the remaining 2% of Shanxi Coal that he owned between Zhao and a Shanxi Coal employee Zhang.  This transfer resulted in Zhao owning 99% of Shanxi Coal and Puda owning zero percent of Shanxi Coal.

88.     After Zhao obtained 99% ownership of Shanxi Coal, according to SAIC records, he engaged in a series of transactions, starting in March 2010, which altered Shanxi Coal's

ownership structure, the most significant of which was the transfer of 49% of Shanxi Coal to

CITIC on July 22, 2010.  At no time after September 2009, however, did Puda own 90% of

Shanxi Coal through its subsidiary, Putai, as was represented to investors in all of Puda's

filings at issue herein.

89.     Additionally, the Company's FY 2009 10-K and FY 2010 10-K represented that

"[t]he operations of Shanxi Coal are [Puda's] sole source of revenues."  While it is true that

Puda had *previously* relied upon Shanxi Coal's operations as its sole source of revenues (as it

had no other sources), these statements were each materially false and misleading *when made*

because Puda did not maintain any ownership interest in Shanxi Coal after it was transferred to

Zhao in September 2009.

## VIII.   DEFENDANTS ZHU AND WU'S MATERIALLY FALSE AND MISLEADING SARBANES-OXLEY CERTIFICATIONS

90.     Each of Puda's Q3 2009 10-Q, FY 2009 10-K, Q1 2010 10-Q, Q2 2010 10-Q,

Q3 2010 10-Q, and FY 2010 10-K, contained Sarbanes-Oxley required certifications, signed by

CEO Zhu and CFO Wu, who certified:

1.     I have reviewed this Quarterly Report on Form 10-Q of Puda Coal, Inc.;

2.     ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.     ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over

financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designated under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external statements for external purposes in accordance with generally accepted accounting principles;*

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):*

a)    *All significant deficiencies and material weaknesses in the design or    operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b)    *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

(Emphasis supplied.)

32

91.     Each of these statements were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that Zhao had transferred ownership/shares of Shanxi Coal to himself through a series of transactions; (2) that Zhao had sold 49% of Shanxi Coal; (3) that Zhao had pledged a 51% interest in Shanxi Coal to CITIC as collateral for a loan; (4) that, as a result, Puda did not possess the ownership interests in Shanxi Coal that the Company claimed to possess; (5) that the Company's internal controls were ineffective and fraught with material weaknesses; and (6) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP.

## IX.   MOORE STEPHENS'S FALSE AND MISLEADING AUDIT REPORTS

92.     During the Class Period, Moore Stephens performed audits of Puda's 2009 and 2010 consolidated financial statements and of Puda's internal control over financial reporting as of December 2009 and 2010.  For each of these years, Moore Stephens issued Independent Auditors' Reports ("Auditors' Reports"), in which it opined that Puda's consolidated financial statements conformed to GAAP and that Puda maintained effective internal control over financial reporting.

93.     The FY 2009 10-K contained a letter from Moore Stephens, which stated:

***We have audited the accompanying consolidated balance sheets of Puda Coal, Inc. and subsidiaries (the "Company") as of December 31, 2009 and 2008, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2009.*** These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes

assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Puda Coal, Inc. and subsidiaries as of December 31, 2009 and 2008 and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2009, in conformity with accounting principles generally accepted in the United States of America.*

*We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2009, based on the criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 31, 2010, expressed an unqualified opinion.*

94.     The Company's FY 2010 10-K, also contained a letter from its independent

auditor, Moore Stephens, which stated:

*We have audited the accompanying consolidated balance sheets of Puda Coal, Inc. and subsidiaries (the "Company") as of December 31, 2010 and 2009, and the related consolidated statements of operations, changes in equity, and cash flows for each of the three years in the period ended December 31, 2010.* These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

*We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).* Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Puda Coal, Inc. and subsidiaries as of December 31, 2010 and 2009 and the results of their operations and their cash flows for each of the three years in the period ended*

34

> *December 31, 2010, in conformity with accounting principles generally accepted in the United States of America.*
>
> *We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2010, based on the criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organization of the Treadway Commission and our report dated March 16, 2011, expressed an unqualified opinion.*

(Emphasis supplied.)

95.     Although the Auditors' Reports were signed by MSHK, the public attributed the reports to MSPC, as well as to MSHK, because MSPC, through its mandated pre-filing review of the work of its foreign affiliate, had the ultimate authority to determine whether the Auditor Reports would be issued.   Indeed, the applicable PCAOB rule, SECPS §1000.45.01(c), provides that in the event of any dispute between the firms, the "disagreement should be resolved in accordance with the applicable policy of the international organization or of the filing or inspection reviewer's firm" -- here, MSPC.   Moreover, in a letter filed with the SEC on May 31, 2006, Puda disclosed to the public that MSPC's role in the audits went beyond the requirements of SECPS §1000.45.01(c), because MSPC was reviewing all of the audit working papers related to Puda and its subsidiaries before signing off on the audit:

> [O]n January 2, 2004, [MSHK] received a letter from the SEC which advised that the Commission staff will accept audit reports signed by [MSHK] on the condition that the audit reports are subject to a "pre-filing" review by [MSPC]. [MSPC] is also a member of Moore Stephens International Limited. . . .
>
> In accordance with the instructions on the SEC letter, [MSPC] has performed pre-filing reviews of all the financial statements which would be filed with the SEC and for which an audit report would be provided by [MSHK] and all the audit working papers in relation to the filing. Such pre-filing reviews were documented by written reports from [MSPC] to [MSHK] which stated that, in the opinion of [MSPC], the audit conducted by [MSHK] was conducted in accordance with the standards of the PCAOB and that the underlying financial statements were prepared in conformity with U.S. GAAP.

96.     The Auditors' Reports included in the FY 2009 10-K and FY 2009 10-K were false and misleading because: (1) Moore Stephens did not conduct its audits in accordance with PCAOB standards; (2)  Puda's consolidated financial statements did not present fairly, in all material respects, either the financial position of Puda and subsidiaries as of December 31, 2009 and December 31, 2010, or the results of their operations and their cash flows for each of the three years in the periods ended December 31, 2009, and December 31, 2010; (3) Puda's financial statements were not presented in accordance with GAAP, rendering the Auditors' Reports not in compliance with PCAOB standards; and (4) the Auditor Reports were also false and misleading because Puda's internal controls were not effective but were instead plagued by significant material weaknesses.

97.     Moore Stephens recklessly issued its Auditor Reports, turning a blind eye to red flags and missing documents such that it had insufficient evidence to support the consolidation of Shanxi Coal's financial results into Puda's results; therefore, Moore Stephens was reckless in stating that its audits were PCAOB-compliant and that Puda's financial statements were presented in conformity with GAAP.

98.     In so doing Moore Stephens failed to comply with the "Objectives" and "Standards" which guide its work as auditors.  For example, CON 1, *Objectives of Financial Reporting by Business Enterprises*, ¶16 states:

> The function of financial reporting is to provide information that is useful to those who make economic decisions about business enterprises and about investments in or loans to business enterprises. Independent auditors commonly examine or review financial statements and perhaps other information, and both those who provide and those who use that information often view an independent auditor's opinion as enhancing the reliability or credibility of the information.

99.     Moore Stephens's Auditors' Reports for the years ending 2009 and 2010, as well as its consent to allowing the 2009 Auditors' Report and the consolidated financial statements and supplementary consolidated financial statements of Puda as of December 31, 2009, and 2008, and for each of the three years in the period ended December 31, 2009, to be set forth in the "expertised" portion of the Registration Statement for the December Offering (by incorporation therein of the Annual Report on Form 10-K of Puda for the year ended December 31, 2009), all of which attest to Moore Stephens's performance of its audits in accordance with the standards of the PCAOB and Puda's financial statements being presented in accordance with GAAP, were materially false and misleading when made, because:

a.      Puda's financial statements did not fairly present, in conformance with GAAP, the financial position of and results of operations for Puda for the fiscal years represented in the Auditors' Reports.  Puda was an empty shell after September 3, 2009, but filed financial statements with the SEC indicating that, *inter alia*, it earned net profits of $5.5 million in 2009 and $23.5 million in 2010, on sales revenues of $214 million in 2009 and $325 million in 2010; and

b.      Puda's internal controls over financial reporting were not effective but rather had serious material weaknesses that enabled Puda's employees to manipulate the Company's financial reporting to a significant extent.[19]   Specifically, Puda's lack of adequate internal controls prevented it from taking the necessary corrective actions

---

[19] A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.  PCAOB Auditing Standard No. 5, Par. A7.

to prevent or uncover the improper consolidation of Shanxi Coal's financials into Puda's financial statements.

100.   By issuing unqualified Auditors' Reports for these years, Defendant Moore Stephens violated the standards of the PCAOB which state:

> The auditor's standard report states that the financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flow in conformity with generally accepted accounting principles. This conclusion may be expressed only when the auditor has formed such an opinion on the basis of an audit performed in accordance with generally accepted auditing standards.   AU §508.07.

101.   This deception happened due to the reckless conduct of Moore Stephens.  AU §311, entitled Planning and Supervision, states that "obtaining an understanding of the entity and its environment, including its internal control, is an essential part of planning and performing an audit in accordance with the generally accepted auditing standards."   AU §311.03.  In both 2007 – the year Putai acquired its 90% ownership interest in Shanxi Coal – and 2008, Puda reported to the SEC that its internal controls over financial reporting were inadequate.  In 2008, Moore Stephens agreed, characterizing Puda's system of internal controls as "seriously deficient" in an Engagement Continuance Form.

102.   At the outset of the 2009 audit, Moore Stephens noted in a Fraud Risk Identification Form that "management is dominated by [a] single individual" and therefore identified the potential fraud risk of "management override of controls" which could lead to fraudulent financial reporting and misappropriation of assets.  Because Shanxi Coal was the sole source of Puda's revenues and profits, the audits conducted in 2009 and 2010 were, in essence, audits of Shanxi Coal's operations, transactions and assets.  Despite acknowledging the risk that Zhao would override controls and misappropriate assets, Moore Stephens did not plan or conduct the audit so as to obtain sufficient, reliable and independent evidence of Puda's

ownership of Shanxi Coal, such that the results of its operations could be incorporated into Puda's. As a result, Moore Stephens audited a company (Shanxi Coal) no longer owned by Puda.

103. The PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, requires an auditor to "design his or her testing of controls to … obtain sufficient evidence to support the auditor's opinion on internal control over financial reporting." AS 5 ¶7. Furthermore, in planning the audit, AS 5 ¶9 requires the auditor to consider his or her knowledge of the company's internal control over financial reporting; matters affecting the industry in which the company operates, such as financial reporting practices, economic conditions, laws and regulations, and technological changes; and matters relating to the company's business, including its organization, operating characteristics, and capital structure. In connection with planning its audit, Moore Stephens recklessly ignored its knowledge of the past deficiencies and weaknesses in Puda's internal controls, particularly those referenced in the 2009 Fraud Risk Identification Form, in determining what would be deemed sufficient evidence to demonstrate both Puda's ownership of its sole operating subsidiary, Shanxi Coal, and the accuracy of Puda's consolidated financial reports.

104. Moore Stephens's recklessness is borne out by the fact that *a series* of improper transactions occurred *throughout* fiscal 2009 and 2010, not one of which Moore Stephens ever uncovered. Moore Stephens was required to ascertain its client's ownership structure and any material loans or pledge agreements Puda, Putai or Shanxi Coal entered into during fiscal 2009 and 2010. It did not do so. Moore Stephens was required to base its Auditors' Reports on evidence obtained during the audit, not upon the conclusions of management. It did not do so.

Instead, Moore Stephens simply accepted various forms of management's representations concerning Puda's ownership of Shanxi Coal.  As an example, Moore Stephens did not obtain or review required shareholders' meeting minutes for Shanxi Coal when told by management that none existed, even though the minutes were required to exist under Shanxi Coal's bylaws. Nor did it obtain independent third-party verification of the ownership of Shanxi Coal yet did so for other less material issues such as bank accounts or ownership issues related to coal mine acquisitions and investments.

105.    Moore Stephens's failure to independently verify ownership is not a one (or two) off mistake. Moore Stephens *never* independently verified Shanxi Coal's ownership since at least 2006.  In 2006, Shanxi Coal increased its registered capital to 100 million RMB, but Puda did not publicly report this increase in its SEC filings, instead reporting that registered capital remained at 22.5 million RMB until May of 2010.   If Moore Stephens had independently verified ownership of Shanxi Coal, or even independently secured a copy of Shanxi Coal's business license, it would have discovered that Puda was under-reporting its registered capital for years.  This also means that Moore Stephens did not independently verify Shanxi Coal's (1) ownership or (2) business license *even in connection with the audit of Puda's 2007 acquisition of Shanxi Coal*.[20]  In addition, Moore Stephens's audit work papers indicate the Auditors never even acquired updated Shanxi Coal bylaws after the 2007 acquisition of Shanxi Coal by Puda and were instead relying on wholly outdated 2001 bylaws up until sometime in 2010.

---

[20] Until the 2007 90% acquisition of Shanxi Coal by Puda, Puda was consolidating Shanxi Coal's operating results based on a contractual arrangement between the companies.

106.   "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements."  AU §326.02.  "To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt or the auditor must express qualified opinion or a disclaimer of opinion."  AU §326.25.

107.   Moore Stephens's failure to obtain Shanxi Coal shareholder meeting minutes despite being aware of certain significant transactions that required shareholder approval, its failure to obtain updated Shanxi Coal bylaws until 2010, and its failure to obtain third-party verification of ownership in the absence of said minutes and bylaws, demonstrates that it did not conduct its audits in compliance with PCAOB standards which required Moore Stephens to obtain sufficient evidence to support Puda's consolidation of Shanxi Coal's financial results or to issue a qualified opinion or a disclaimer of opinion.  Instead, Moore Stephens recklessly issued the Auditor's Reports giving an unqualified opinion attesting to the propriety of Puda's consolidated financial statements.

108.   Moore Stephens's reckless issuance of its Auditors' Reports not only allowed for the issuance of the false and misleading financial statements identified herein during the Class Period, but the fact that Puda's financial statements had Moore Stephens's imprimatur discouraged investors from questioning the accuracy of those statements.

109.   The signature certifying Puda's financial statements on both the 2009 and 2010 Form 10-Ks is simply "Moore Stephens."  Directly underneath Moore Stephens's signature is its description of itself: "Certified Public Accountants."   Directly underneath Moore

41

Stephens's description of its firm is the location of the office in which Moore Stephens made its signature: "Hong Kong."

110.    The way Moore Stephens signed its certification of Puda's financial statements has caused the public to attribute Moore Stephens's certification to MSPC as much as to MSHK. Even if the Auditors' Reports were signed solely by MSHK, investors attributed the Auditors' Report to MSPC as well, because, as was publicly disclosed (and alleged above), the SEC would accept the Auditors' Reports from MSHK on the condition that, before they were filed, MSPC provided a written report stating "that, in the opinion of [MSPC], the audit conducted by [MSHK] was conducted in accordance with the standards of the PCAOB and that the underlying financial statements were prepared in conformity with U.S. GAAP."  In addition, Puda publicly disclosed that all of MSHK's audit work papers were reviewed by MSPC before it signed off on the Auditors' Reports, and MSHK would not have issued the Puda Audit Reports without MSPC's consent.

111.    Just as the public perceived MSHK and MSPC to share responsibility for the contents of the Auditors' Reports, Puda and its officers and directors also considered both MSHK and MSPC to be the Company's auditors, as did the Underwriters.  The MSPC partner responsible for the pre-filing review and audit work papers review once attended a Puda annual shareholders' meeting as a representative of Moore Stephens.

112.    Both MSPC and MSHK were involved in the planning of the audits of Puda's financial statements for fiscal years 2009 and 2010, and the MSPC partner responsible for the pre-filing review even advised that the overall fraud risk be raised to "medium to high" (from "low to medium") for the latter year's audit because Puda "is a public company; moreover, it is a Chinese public company and the scrutiny by the SEC has increased.  Also, the company has

all these new acquisitions."   MSHK followed this direction from MSPC and raised the fraud risk accordingly.

113.    Both MSPC and MSHK jointly prepared and issued the false and misleading Auditors' Reports and certified Puda's false financial statements for fiscal years 2009 and 2010. MSPC was ultimately responsible for Puda's audits, as it reviewed all of MSHK's audit work papers and gave final approval on U.S. compliance, ensuring that all U.S. GAAP requirements were followed.

## X.    MATERIALLY FALSE AND MISLEADING STATEMENTS CONTAINED IN THE DECEMBER OFFERING DOCUMENTS

114.    On December 8, 2010, Puda issued a press release announcing that it intended to sell its common stock in an offering underwritten by Macquarie and Brean Murray as "joint lead managers and bookrunners."  Prior to the December Offering, Puda filed with the SEC a series of Registration Statements and Prospectuses (beginning with an initial registration statement filed on Form S-3 on August 17, 2010, and an initial prospectus dated October 29, 2010) (collectively, the "December Offering Materials").

115.    The December Offering was completed at a per share price of $12.00, 153% above the February 2010 financing price of $4.75 per share.  In fact, the last sale price of the stock prior to the December Offering was $14.60 per share.  The offering price discount was an inducement to potential investors to purchase Puda Coal shares.

116.    The Registration Statement and Prospectus filed with the SEC in connection with the December Offering expressly incorporated Puda's false and misleading FY 2009 10-K, Q1 2010 10-Q, and Q2 2010 10-Q.  As a result, the Registration Statement was materially false and misleading because Puda had, in those periodic filings, improperly incorporated

Shanxi Coal's operating results into its own at a time when it had no ownership or control over Shanxi Coal.

117.    The Registration Statement and Prospectus were also false and/or misleading because they failed to disclose the following material facts: (1) Zhao had transferred ownership/shares of Shanxi Coal to himself and Wei Zhang through a series of transactions; (2) in July 2010, Zhao had sold 49% of Shanxi Coal to CITIC; (3) also in July 2010, Zhao had pledged the other 51% of Shanxi Coal's shares as collateral to CITIC for a loan; (4) Puda did not possess a 90% ownership interest in Shanxi Coal at any time after September 3, 2009; (5) Puda lacked adequate internal controls over its financial reporting; and (6) Puda's financial statements were materially false and misleading and not presented in accordance with GAAP.

### Puda's and the Officers' and Directors' Liability

118.    Puda and its officers and directors who signed the Registration Statement are liable for these material misstatements in and omissions from the Registration Statement and Prospectus.

### The Auditors' Liability

119.    In connection with the December Offering, Moore Stephens expressly consented to the incorporation of its Auditors' Report dated March 31, 2010, into the Registration Statement and Prospectus:

INDEPENDENT AUDITORS' CONSENT

*We consent to the incorporation in this Registration Statement of Puda Coal, Inc. on the Form S-3 submitted to you on or about August 17, 2010 of our Auditors' Report dated March 31, 2010 relating to the consolidated financial statements and supplementary consolidated financial statements of Puda Coal, Inc. and subsidiaries as of December 31, 2009 and 2008 and for each of the three years in the period ended December 31, 2009, which appears in the Annual Report on the Form 10-K for the fiscal year ended December 31, 2009.*

44

> In addition, we consent to the reference to us under the heading "Experts" in the Registration Statement.

(Emphasis supplied.)

120.    The incorporation of Moore Stephens's Auditors' Report from Puda's FY 2009 10-K made the Registration Statement and Prospectus materially false and misleading for the additional reasons that, as alleged above: Moore Stephens did not conduct its audit in accordance with standards of the PCAOB; Puda's financial statements were not presented in accordance with GAAP, rendering Moore Stephens's Auditors' Report not in compliance with PCAOB standards; and the Company's internal controls were not effective and suffered from undisclosed material weaknesses.  Puda's auditing "Experts," MSHK and MSPC, are liable for the materially false and/or misleading statements in and omissions from the Registration Statement and Prospectus.

### The Underwriters' Liability

121.    Macquarie acted as the Underwriters' representative for the December Offering.

122.    Macquarie, as lead underwriter, sold 6,750,000 Puda shares directly to investors in the firm commitment offering (including the over-allotment option).  Brean Murray, its joint bookrunning manager, sold 2,250,000 Puda shares directly to investors in the firm commitment offering.

123.    Prior to filing the Consolidated Complaint in February 2012, plaintiffs engaged the services of an investment banking expert to describe the due diligence and disclosure duties and responsibilities of investment bankers in underwriting public offerings of securities and selling such securities to investors. Mr. William Purcell has been an investment banker for

more than 45 years.[21]   His experience includes performing due diligence investigations for more than 100 financing transactions, including both equity and debt financings. In regard to such underwritten financings, Mr. Purcell has acted as a senior banker in both the capacity of lead underwriting manager and as a co-manager for an underwriting.  In addition, he has been an expert witness in approximately 150 cases, a number of which have involved due diligence issues and disclosure issues. Mr. Purcell has been retained as a consultant and/or expert witness by the SEC, the Department of Justice, and the IRS.

124.    Mr. Purcell reviewed the offering materials from the December Offering and February 2010 offering, publicly-available information concerning Puda, and the initial complaint in this action.  He was also provided information concerning the requirements for corporations under Chinese law to register ownership, transfers and pledges of equity with the SAIC.  Prior to the filing of the Consolidated Complaint in February 2012, he explained Macquarie's and Brean Murray's roles and duties as the underwriters for the December Offering and expressed opinions as to whether, based solely upon public information (without the benefit of discovery), they met their legal duties to investors based on the standards, customs and practices of the investment banking industry.

125.    Prior to filing this current version of the amended complaint, in addition to due diligence and disclosure issues, Mr. Purcell was asked to opine on whether the Underwriters

---

[21] Mr. William Purcell has over 45 years of experience in the investment banking business.  He started his career at Dillon, Read & Co. Inc. ("Dillon Read") after graduation from business school.   He was elected a Managing Director at Dillon Read in 1982.    During his approximately 25 years at Dillon Read, he worked in all areas of corporate finance, including most areas of corporate financing activities and the area of M&A.  He also had various administrative responsibilities.  He is a currently a Senior Director of Seale & Associates, an investment banking firm in the Washington, D.C. area.  Mr. Purcell graduated from Princeton University with a B.A. in economics in 1964, and from New York University Graduate School of Business with an MBA in 1966.

egregiously violated relevant industry standards in going forward with the December Offering and issuing and disseminating a prospectus under their names that was so profoundly false and misleading.   Pertinent facts uncovered during discovery, and his additional conclusions, indicate that the Underwriters were both negligent and reckless in the discharge of their duties to investors.

### The Underwriter's Role

126.   It is well understood within the investment banking and financial communities that an underwriter's role (and duty) is to ensure that all material information is included in the offering documents (in this section of the complaint, the registration statement and prospectus for the December Offering are referred to collectively as the "Prospectus") and that no material information is omitted that is needed to make the information provided therein not misleading.

127.   In the area of selling securities and performing reasonable due diligence, underwriters are often referred to as "gatekeepers."   The underwriter (investment bank) controls what information is in the Prospectus and it controls the dissemination of that information to potential investors. There is much literature that supports the premise of underwriters being "gatekeepers."   Indeed, even the SEC has observed that in enacting Section 11 of the Securities Act: "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998 (emphasis supplied).   In other words, an underwriter such as Macquarie or Brean Murray has ultimate control over the contents and dissemination of the disclosure document,

*i.e.* the Prospectus.  It must either make full disclosure or not underwrite the offering, if full disclosure is not provided.

128.   In fact, on its website, Goldman Sachs, in a document called "Report of the Business Standards Committee" (dated January 2011), referred to itself as a "gatekeeper":  "In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs; as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information that is relevant to the offering."

129.   If an investment bank, based on its due diligence investigation of the issuer, believes that any of the information in the Prospectus is false or misleading, or omits material information, it has the authority and affirmative obligation to change the information, or if others refuse to change the information, then it should not underwrite the offering.[22]  But, if the investment bank allows its name (names) to appear on the cover of the Prospectus, then it is communicating to potential investors that, as the gatekeeper, it is satisfied, based on its reasonable due diligence investigation, that the Prospectus is accurate and not misleading.

### The Underwriters' Duties

130.   It is well understood in the investment banking industry and in the financial community generally, and confirmed by legal precedent, that underwriters of securities have an express duty to perform a reasonable due diligence investigation of the company for which they are selling securities.

---

[22] In *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 684 (S.D.N.Y. 2004), another Court in this District held: "If red flags arise from a reasonable investigation, underwriters will have to make sufficient inquiry to satisfy themselves…, and if unsatisfied, they must demand disclosures, withdraw from the underwriting process, or bear the risk of liability."

131.    Investment banks (such as Macquarie and Brean Murray) that are underwriting securities clearly understand that investors expect the investment banks, whose names appear on the Prospectus, to perform a reasonable due diligence investigation of the issuing entity to ensure, to the best of their ability, that the Prospectus does not include any false or misleading statements of material information, nor omits any material information. The investment banks, by putting their names on the Prospectus, are communicating to investors that they have in fact undertaken a reasonable due diligence investigation and are making full disclosure of all material information in the Prospectus.  Indeed, without having performed a reasonable due diligence investigation of the issuer, it would not be possible to make full disclosure.

132.    It is also well accepted and understood in the investment banking and financial communities that a "reasonable due diligence investigation" refers to an *affirmative duty* to verify the accuracy of disclosure concerning securities offerings; it also refers to the thorough investigation that is expected as part of virtually every issuance of securities.  This view regarding what is expected from a reasonable due diligence investigation is confirmed by many texts, *e.g.*, (i) *Conducting Due Diligence 2002* and *Conducting Due Diligence 2005*, both published by the Practising Law Institute; (ii) *Due Diligence Periodic Reports and Securities Offerings*, annual editions each year 2004 through 2010, by Professor Robert J. Haft and Arthur J. Haft (Thomson/West); and (iii) *Corporate Finance and the Securities Laws*, by Charles J. Johnson, Jr. and Joseph McLaughlin (Aspen Publishers 2004).  The due diligence responsibility is the *primary* responsibility of investment banks.  Also, as stated previously, the SEC has stated that: "Congress recognized that underwriters occupied a *unique* position that enabled them *to discover and compel disclosure* of essential facts about the offering." (Emphasis supplied.)

49

133.   Within the investment banking industry, the "duty to disclose" material information is an absolute requirement.   Indeed, one of the foundations of the investment banking and securities business is the premise of full disclosure -- and "full disclosure" means *both* not making any misleading statements in setting forth material facts and also making sure that there are no omissions of material facts.

134.   The due diligence performed by an investment bank is generally rigorous and thorough, with professional skepticism to be applied.   The due diligence process is *not* just a "ho-hum" exercise of accepting a company's/management's views or its auditor's opinion at face value.   The due diligence process is in fact the opposite.   The investment bank should act as a "devil's advocate" by digging and probing within a company.   The investment bank should cross-examine participants by asking many questions; should obtain and analyze various pieces of information, including any business financial models and projections, and should verify ownership of important assets; and should follow-up with more work as appropriate, depending upon what is learned and what "red flags" surface, if any.   Performing follow-up due diligence in regard to any "red flags" is a fundamental principle for conducting proper due diligence.

135.   As Professor Robert J. Haft[23] stated in his previously-mentioned text: "The underwriter should look upon due diligence primarily as an attempt to find 'red flags' which indicate potential danger. To assist in this search, the underwriter should not hesitate to utilize experts [and attorneys] whenever it feels that neither the corporate finance department nor the firm at large has the expertise necessary to analyze a fundamentally important aspect of a

---

[23] Professor Haft, a Professor of Law at Georgetown University, has been actively engaged in the securities field for over forty years and was on the staff of the SEC as Special Counsel for four years.

company's business.  The underwriter should be prepared to pay whatever is reasonably necessary for expert advice, recognizing that in the final analysis it may well save money." (Page 13 of the 2004-2005 text).

136.    The role and duties of the underwriter, as set forth herein, were assumed by Macquarie and Brean Murray in their underwriting of Puda's common stock in the December Offering.

**Macquarie's and Brean Murray's Utter Failure to Discharge Their Duties Was Both Negligent and Reckless**

137.    Discovery, to date, has borne out that in Puda's December Offering, Macquarie and Brean Murray had control over the contents and dissemination of the Prospectus.  Their names are prominently featured on the cover of the Prospectus.  The two managing underwriters actively participated in creating the Prospectus, drafting it jointly with Puda management.  Investors expected that the Underwriters ensured that the Prospectus provided appropriate disclosure of all material information.

138.    That the Underwriters wielded ultimate authority for the content of the Prospectus is demonstrated in an email exchange among Puda's counsel and the Underwriters and their counsel on the morning of the December Offering.  In an email bearing the subject line "Re: Public Execution Timetable," at 7:04 a.m., Catherine Pan, Puda's counsel at Goodwin Procter, writes to Puda CFO Laby Wu and Controller Irene Cheong, personnel at both Macquarie and Brean Murray and their counsel, Morrison & Foerster, and to personnel at MSHK:  "Again, for the filings/documents scheduled to go out at 7am, I still don't have the underwriters' sign off.  The Company has signed off.  Please let me know ASAP."  One minute later, Underwriters counsel, Ned Welch of Morrison & Foerster, replies:  "We are signed off

on launch documents."  Two minutes after that, William Fang of Macquarie also responds: "Macquarie is signed off."  (BMC000714-15; 000719).

139.    As the Underwriters' representative, Macquarie's was the ultimate sign-off and approval for the Prospectus.  Absent Macquarie's sign-off and approval, the Prospectus would not have been filed with the SEC and disseminated to investors, and the December Offering would not have gone forward.  A review of the SEC's website indicates that within a half hour following the Underwriters' sign-off, Puda filed two Form 8-Ks (a press release announcing the offering and a Regulation FD disclosure), a Free Writing Prospectus, and a Prospectus and Supplement (a final version of which was filed just before 5 p.m., after the market closed).

140.    With regard to Puda's December Offering, both Underwriters failed to faithfully execute their due diligence and disclosure obligations.

141.    Macquarie had actual knowledge that Puda did not own 90% of Shanxi Coal, the primary operating subsidiary of Puda, because several Macquarie investment bankers received and reviewed the Kroll Report on December 2, 2010.  The Kroll Report clearly indicated that Shanxi Coal was owned by Ming Zhao, CITIC and Wei Zhang – not by Putai, Puda, or any Puda subsidiary.

142.    Brean Murray had a duty to independently conduct due diligence on Puda for the December Offering and verify that Puda owned Shanxi Coal.  Brean Murray, as a joint bookrunning manager, had a duty and responsibility to be fully aware of the due diligence being done by Macquarie.  In addition, to the extent that Brean Murray relied on Macquarie to perform due diligence, it had a duty to obtain the Kroll Report (and any other due diligence) from Macquarie and review it as part of its own independent due diligence responsibilities, but failed to do so.

143.     This woefully deficient analysis of Puda is not what investors had been led to expect from the Underwriters.   Both of the Underwriters claimed a special expertise with respect to offerings of this nature and investors reasonably relied upon such expertise to ensure that a thorough due diligence investigation of Puda was conducted and full disclosure of all material information was made in the Prospectus.

144.     The information Macquarie provided to the public emphasizes its purported high standards and generally assures potential investors about the quality of its work.   For example, on its website during 2010-2011, Macquarie stated, among other things, that:

> Macquarie aspires to be a pre-eminent provider of financial services over the long haul. We recognize that, however our achievements to date are judged, the quest for improvement is never ending.   The Macquarie culture is represented by the way in which we act and work together.   The values to which we aspire can be summarized in six principles -- integrity, client commitment, strive for profitability, fulfillment for our people, teamwork, [and] highest standards … When acting for our clients, their interests come first absolutely …. Our people have the ***deepest knowledge in key sectors such as resources [Puda was a coal mining company] and energy*** … Our achievements include over \$A120 billion of M&A and capital markets activity advised on during the 12 months to 30 September 2011 …. With \$A12.4 billion of capital [on our balance sheet] … [we] have the ability to act as a cornerstone for underwritten syndicated financings …. with offices in London, New York, Chicago, Sydney and Singapore …. We combine entrepreneurial drive with deep industry and regional expertise and robust risk management. This gives our clients and investors confidence, and allows us to deliver innovative products and services and strong investment returns …. [we received an] award for the best private equity deal of the year in Southeast Asia ….

(Emphasis supplied.)

145.     Just as Macquarie sought the trust of potential investors by touting its integrity, specialized knowledge and skill, Brean Murray's website during 2009-2011 sought to strike a similar chord.   Brean Murray advertised that it was the "joint lead manager & bookrunner" of Puda's December Offering.   The website also promoted the firm's Beijing office (Brean Murray China) and that the firm was very knowledgeable about China.   For example, Brean

Murray sponsored various conferences featuring "China Growth" companies in May 2009, November 2009, May 2010, November 2010, and June 2011 (in Beijing).  Brean Murray's website also boasted that there "are five sectors in which we have built significant knowledge through various corporate financing activities," one being "China Small/Mid Cap" companies. The website further stated that Brean Murray's analysts "are focused on performing extensive bottoms up due diligence on companies under our coverage…."

146.    A reasonable due diligence investigation into a company's financial statements, including confirming the percentage ownership of important subsidiaries, and especially its sole operating subsidiary from which it receives its only source of income, would be particularly important, and indeed fundamental, because Puda did not have a recent audit, as the December Offering Prospectus had nine months (75% of a year) of unaudited financial statements.  Confirming this view about required investment bankers' due diligence in regard to financial statements, the text *Conducting Due Diligence 2005* states the following:

> (a)    "Though audited financial statements are "expertized" and underwriters receive accountant's comfort letters to cover unaudited financial information, an ***important*** part of underwriters' due diligence involves ***scrutinizing*** an issuer's financial disclosure." (Page 17 of text)

> (b)    "In performing due diligence and considering the adequacy of financial and other issuer disclosure, underwriters should consider the goal of transparency as well as specific initiatives. These initiatives require underwriters to increase their scrutiny of issuers' financial disclosure, and to consider additional procedures to ***verify*** that issuer disclosure is accurate and complies with applicable rules and guidance. These additional procedures may include interviews with members of audit committees, more thorough discussions with issuers' auditors regarding issuer accounts and auditor independence, expanded accountants' comfort letters, ***and other actions***." (Page 19 of text).

> "The bankers and lawyers should interview the company's principal accountants…. Bankers should try to have this discussion ***without*** the company being present….. Principal topics of discussion may include the company's accounting policies generally, the company's revenue recognition and capital expenditures policies, and potential disagreements with the company…., off-

balance sheet liabilities, if any, ….and significant write-offs, if any." (Page 69 of text)  (Emphasis supplied.)

147.   Mr. Purcell identified the following "red flags" that should have caused Macquarie and Brean Murray, as underwriters for the December Offering, to carefully verify the ownership of Shanxi Coal and search for and uncover any undisclosed related party transactions:

(a)   The ownership of Puda involved both a complex structure and related parties.  In terms of corporate structure, Puda Coal is a Delaware corporation, but with its headquarters in Shanxi Province of the People's Republic of China ("China"). Puda Coal's only operating assets (*i.e.*, coal mines and coal washing facilities) are in Shanxi Province, China, and these assets are not even directly owned by Puda Coal.  Prior to the illegal transfers, Puda Coal owned 100% of a British Virgin Islands company named Puda Investment Holding Limited ("BVI"), which in turn owns 100% of a Chinese company, Shanxi Putai Resources ("Putai").  Even Putai, however, did not own the Chinese operating assets.  Instead, Putai owned 90% (but not 100%) of the company which owned the coal mining operating assets, *i.e.,* Shanxi Puda Coal Group Co., Ltd. ("Shanxi Coal").  The other 10% of Shanxi Coal was directly owned by Ming Zhao (8%), Puda Coal's Chairman of the Board and the co-founder, Chairman and CEO of Shanxi Coal since 1995, and Yao Zhao (2%), the brother of Ming Zhao.

(b)   In addition to the above corporate ownership complexities, it was disclosed that Defendant Zhao and his brother (Yao Zhao) owned approximately 47% of Puda Coal's common stock prior to the December 2010 financing (and about 32%-33% of Puda Coal's common stock after the December 2010 financing). They were thus clearly control shareholders. Indeed, as a warning in regard to having control shareholders, the December 2010 Prospectus states as a "risk factor" that "Delaware corporate law provides that certain actions may be taken by consent action of stockholders holding a majority of the outstanding shares …. ***without*** any meeting of stockholders …."

(c)   Also, as described in the December 2010 Prospectus, Putai owed Zhao $35.2 million (240 million Chinese Renminbi, or "RMB", with $1 being about 6.8 RMB) plus interest pursuant to a loan agreement dated May 7, 2010, which loan proceeds were used to increase Putai's registered capital to the level required by the Shanxi provincial government to be allowed to be a "coal mine consolidator" (*i.e.*, allowed to acquire other coal properties in Shanxi province). In addition, Puda Coal financed the $13 million acquisition of two plants in China through Resources Group, an entity owned 80% by Zhao, and 20% by his relatives. Finally, as yet another possible conflict of interest described in the December 2010 Prospectus, all calling for extensive due diligence by the underwriters, on

August 1, 2010 Shanxi Coal entered into an Investment Cooperation Agreement with Zhao and another individual unrelated to Puda Coal, pursuant to which the parties would purchase, consolidate and re-develop six additional coal mines in Shanxi Province. Shanxi Coal would contribute 40% of the total investment needed for the project, with Zhao contributing 30% and the other investor 30%. Shanxi Coal would be entitled to purchase Zhao's equity interest (and the other investor's interest) at its sole discretion at a price determined by an independent professional appraiser.

(d)    It was clearly stated in the December 2010 Prospectus, and known to the underwriters, that all operating assets of Puda Coal were in Shanxi Province, China and that " in September 2009, the Shanxi provincial government approved Shanxi Coal to be an acquirer and consolidator of eight coal mines …" In addition, throughout the Prospectus, it is made very clear that Puda Coal's business in almost all respects will be subject to "central, provincial, local and municipal regulation and licensing in China" and that various and numerous approvals will always be required "from the Shanxi provincial government."

(e)    Given the above and the fact that all of Puda's operating assets were in China, that China's regulatory and political systems generally imposed potential unique risks, that Puda's corporate structure was reasonably complex, that Puda's Chairman had numerous possible conflicts of interest, and that numerous analysts in the U.S. had generally expressed concerns about equity offerings by Chinese companies in the U.S., it was absolutely clear that a very thorough due diligence investigation needed to be performed by the managing underwriters before any Puda securities were sold to the U.S. public.

148.    Given the obvious "red flags" Mr. Purcell identified, the Underwriters should have been "on notice" that a reasonable due diligence investigation, under the circumstances, would have to be very thorough to ensure full and appropriate disclosure before selling the common stock of Puda Coal to the public.  Specifically, according to Mr. Purcell, it would seem obvious that any reasonable due diligence investigation would include, at a minimum, the review of all filings made by Shanxi Coal with its provincial government regulator, *i.e*., the SAIC in Shanxi, [24] and a confirmation/review of all of Zhao's related party transactions.[25]

_____

[24]    It is generally well known within the financial community which deals with China and Chinese companies that China has approximately 30 separate governmental provinces, and that each province has its own branch of the SAIC – to which companies in that province must, by

149.    In addition, Macquarie's decision to go forward with the December Offering six days after the receipt of the Kroll Report is evidence of Macquarie's reckless misconduct. Central to Macquarie's due diligence investigation with respect to Puda's December Offering was its engagement of Kroll, the self-described "leading global provider of risk solutions", to conduct background checks on Puda and its management in China and to prepare an investigative report.  Kroll's work included: "Database and local source inquiries in China into subject entity Puda Coal Inc [sic] and the following principals:  ZHAO Ming, NI Jian Fei, C. Mark Tang, ZHU Li Ping, Laby Wu, LANG Peng Xiang, and Irene Cheong."  *See* Exhibit 1 at MCI 018237.  (Similar checks were conducted in the U.S. for Puda Coal Inc, Lawrence S. Wizel, C. Mark Tang and Irene Cheong.  *Id.*)  In addition, Kroll "conducted inquiries with pertinent database sources, to include regulatory litigation and news media and public record databases, as well as international global compliance databases.  Local source inquiries were also conducted in China and the U.S. to ascertain the reputation of the subjects."  *Id.*  In particular, Kroll performed searches of the local SAIC offices and obtained regulatory filings for Shanxi Coal from the SAIC.  *Id.* at MCI 018271.[26]

---

law, file their annual financial statements and other information, such as any changes in equity ownership and/or capital structure. By law, changes in ownership must be filed within 30 days. Just as underwriters in the U.S. check all of a company's SEC filings as part of a reasonable due diligence investigation, so should an underwriter of a Chinese company check all of the filings made to its provincial governmental regulator.

[25] Although discovery is not yet complete, it appears that Brean Murray made little more than a cursory attempt to inquire of Puda's management whether there were any pertinent related-party transactions.

[26] A copy of the Kroll Report is attached hereto as Exhibit 1.  The Kroll Report was produced by Macquarie on December 16, 2013, pursuant to Plaintiffs' non-party subpoena to Macquarie dated October 22, 2013.  Attached as Exhibit 2 hereto is the email in which Macquarie's "CONFIDENTIAL" designation of the report (pursuant to the Stipulated Protective Order, Dkt.

150.    On December 2, 2010, six days before the December Offering, Macquarie received the Kroll Report, a 40-page report containing the information gleaned from the above-described investigative searches. *See* Exhibit 3 hereto (MCI 014002-014004, an email chain dated from November 17, 2010, through December 2, 2010, between multiple Macquarie employees and Kroll's Director of Research, Chris McCavitt).   Based upon these and other emails among Macquarie investment bankers, as many as seven individuals at Macquarie received the Kroll Report as part of its due diligence in connection with the December Offering.

151.    The Kroll Report's Executive Summary stated that "[a]ccording to the official corporate website of Puda Coal Inc. its PRC operating subsidiary is Shanxi Puda Coal Group Co., Ltd.," and that "AIC records identified the current shareholders of Shanxi Puda Coal Group Co., Ltd." as Ming Zhao, owning 50%, CITIC Trust Co., Ltd., owning 49% and Wei Zhang, owning 1%. *See* Ex. 1 at MCI 018240.   Thus, the ownership of Shanxi Coal was clearly described in the Executive Summary in a manner absolutely contrary to the December Offering Materials.   In addition, a number of ownership transfers of Shanxi Coal which occurred during 2010 were included in the Kroll Report's appendix - not one of which listed Putai as a 90% owner of Shanxi Coal.  MCI 18273.

152.    An email written shortly after Macquarie's receipt of the Kroll Report indicates that it was forwarded to three other Macquarie employees as well as to Underwriters' counsel, Edward ("Ned") Welch at Morrison & Foerster.  MCI 18233.

153.    Macquarie read the Kroll Report and therefore had actual knowledge that Puda did not own 90% of Shanxi Coal, which was represented in the Offering Documents as Puda's

No. 204) was withdrawn.

sole operating subsidiary, *yet it went ahead with the Offering*, despite its ultimate authority over the content and issuance of the Prospectus, and its obligation to include these highly-material facts or not go forward with the deal.

154.    Macquarie had the authority to change the false and misleading information contained in the Prospectus or, failing that, to refuse to underwrite the offering.  Macquarie allowed its name to appear on the cover of the Prospectus, solicited investors for the Offering and distributed Prospectuses to investors, while knowing investors relied on Macquarie's reputation in purchasing Puda shares. Thus, the knowingly false and misleading statements contained in the Prospectus, over which Macquarie had ultimate authority, are attributable to Macquarie.

155.    In Mr. Purcell's opinion, under relevant investment banking industry standards, Macquarie's conduct in going forward with the December Offering given the revelations in the Kroll Report was reckless and indeed so reckless in disregard of the truth to even approach outright fraud.

156.    In addition to the recklessness of Macquarie, Brean Murray was itself reckless.

157.    Consistent with investment banking industry standards, a lead-managing underwriter and a co-managing underwriter should, and generally do, function as a coordinated and efficient team, working together on behalf of the client company and providing full disclosure to prospective investors and to each other.

158.    While the lead-managing underwriter organizes and coordinates the due diligence effort, as co-manager, Brean had duty to perform its own independent due diligence for the December Offering.

159.    Brean is held to the same high standards of due diligence as Macquarie.

160.    To the extent that Brean Murray relied on Macquarie to perform due diligence, Brean Murray was required to thoroughly review Macquarie's due diligence procedures and findings and satisfy itself that full disclosure of all material facts was made in the Prospectus.

161.    With a Beijing office and a public commitment to performing extensive bottoms up due diligence and "provid[ing] clients with excellent investment opportunities," Brean Murray was certainly able, as part of its due diligence investigation, to check Puda's filings with the SAIC, its provincial regulator in Shanxi, China, especially considering that Shanxi Coal was the sole source of Puda's revenues.

162.    Despite having an office in China, Brean Murray did not perform much of an independent investigation of Puda for the December Offering.  In particular, Brean Murray made no attempt to verify Puda's ownership of Shanxi Coal, even though such information was readily available for approximately $500 through third party agents in China.

163.    It does not appear that Brean Murray utilized any independent experts to help in its due diligence investigation. Further, it failed to adequately query Macquarie's due diligence and thus failed to obtain and review the Kroll Report in breach of its due diligence obligations. Having knowledge of (1) the red flags set forth above concerning related-party transactions – and, in fact, becoming aware of several such transactions – and (2) the opacity of business in the PRC, Brean Murray was reckless in not independently verifying the ownership of Shanxi Coal prior to the December Offering or not being fully informed about the due diligence being undertaken by Macquarie.

164.    The Chief Executive of Brean Murray stated in an email that he thought that "a while ago" he had heard reports that Putai no longer owned a 90% interest in Shanxi Coal. The email suggests that Brean Murray may have heard about the improper transfers before the

December Offering.  If so, Brean Murray was required to follow up on this major red flag and not simply dismiss those reports without checking the share ownership of Shanxi Coal with the local Shanxi SAIC office, which is the definitive registry for share ownership of a PRC company.[27]

165.    Moreover, Brean Murray was the lead underwriter for a $16 million public offering of Puda shares in February 2010.[28]   In that offering, Brean Murray knowingly failed to verify ownership of Shanxi Coal.  Indeed, an email among Brean Murray investment bankers appears to acknowledge that the legal opinion they reviewed for the February offering did not verify ownership of Shanxi Coal.  According to emails dated February 3, 2010, Brean Murray may have rushed the February 2010 offering to market without verifying ownership of Shanxi Coal because Chinese New Year was beginning shortly and "we obviously cannot wait until after then." (BMC0001209-1212.)   Brean Murray has thus demonstrated a pattern of recklessness in connection with its due diligence responsibilities.

166.    Even if Brean Murray relied on Macquarie to perform due diligence for the December Offering and verify ownership of Shanxi Coal, and assuming such reliance was permissible under the securities laws (which plaintiffs do not concede), at the barest minimum, Brean Murray was required to conduct an in-depth review of Macquarie's due diligence findings and assure itself that Macquarie had done adequate due diligence and disclosed all material facts in the Prospectus, prior to selling Puda shares in the December Offering.  This

---

[27]   The April 8, 2011, email from William McCluskey to two Macquarie bankers states in pertinent part: "Derek you need to call MacQ on the due dili file and see who gave an opinion on the ownership and what was the basis for that opinion. Wasn't this news talked about and dismissed a while ago?" (BMC001438).

[28] Ming Zhao transferred Shanxi Coal to himself in September 2009, months before the February 2010 offering.

includes obtaining and reviewing the Kroll Report.  Brean Murray either recklessly failed to inquire of Macquarie as to its due diligence findings, or if it did, it (would have) learned of the Kroll Report and had actual knowledge of the fraud.

167.   In Mr. Purcell's opinion, under relevant investment banking industry standards, Brean Murray – in neither independently verifying Shanxi Coal's ownership, nor confirming with Macquarie that it had done adequate due diligence and verified ownership of Shanxi Coal and disclosed all material facts in the Prospectus – was reckless in the preparation and issuance of the Prospectus and the sale of Puda securities in the December Offering.

168.   As a result of Macquarie's and Brean Murray's breaches of duty as Underwriters in connection with the December Offering, the Prospectus for the December 2010 common stock offering (for $94.2 million at $12.00 per share, increased to $108 million upon the exercise of Macquarie's and Brean Murray's over-allotment option) misrepresented material information and omitted material information rendering the Prospectus misleading.

169.   When the true facts about the ownership of Puda Coal's primary subsidiary finally became evident through a series of events concluding on or about October 3, 2011, none of which was disclosed in the December 2010 prospectuses (*i.e.*, that Puda Coal's ownership in its primary operating subsidiary had been secretly transferred to its Chairman and controlling shareholder without any other shareholder's approval or knowledge), Puda Coal's share price dropped in dramatic fashion, and investors who had purchased shares in the December Offering had suffered significant losses.  The true value of Puda Coal common stock at the time this lawsuit was filed was zero.

## XI.   LOSS CAUSATION

170.   Defendants' wrongful conduct, as alleged herein, directly and proximately

caused the economic losses suffered by Plaintiffs and the Class.

171.   After the market closed on April 7, 2011, GeoInvesting published the following investor alert on its website:

> GeoInvesting has taken a **significant** short position in Puda Coal (NYSE AMEX:PUDA) based on rapidly developing details that our research has uncovered that bring into the question the value of the Company to US investors.  We fear that once our findings are validated that PUDA's market value could potentially be cut in half from current levels.  PUDA first piqued our interest at the beginning of March 2011 based on solid analyst estimates and a highly successful and well priced public offering completed on December 8, 2010.  As subscribers are aware, the Geo Team is engaged in an ongoing effort to allocate funds to a very select number of China Hybrid companies that can rise above a challenging environment that has not been kind to Reverse Take Over firms (RTO).  PUDA met our criteria for further investigation.  Much to our surprise, however, during our research we uncovered issues that are potentially of grave concern to US investors.  We are currently developing the details and will issue a full report to subscribers as soon as possible.

172.   On the morning of April 8, 2011, at 9:42 a.m., Alfred Little published a research report on the internet entitled, "Puda Coal Chairman Secretly Sold Half the Company and Pledged the Other Half to Chinese PE Investors."   The report challenged Puda's representations about its 90% ownership of Shanxi Coal.  The report stated, in relevant part:

> Chinese RTO Puda Coal, Inc. (NYSE AMEX: PUDA) Chairman Ming Zhao transferred the ownership of PUDA's sole Chinese operating entity, Shanxi Puda Coal Group Co., Ltd ("Shanxi Coal"), to himself in 2009 without shareholder approval according to official government filings. Then, in 2010 Zhao sold 49% and pledged the other 51% of Shanxi Coal to CITIC Trust Co., Ltd ("CITIC"), a Chinese private equity fund, for RMB245 million ($37.1 million). Zhao then recklessly leveraged Shanxi Coal by borrowing RMB3.5 billion ($530.3 million) from CITIC at an incredibly high 14.5% annual interest rate (including fees) to finance the development of its coal mines. PUDA shareholders are completely unaware of these transactions that decimate the value of its U.S. listed shares.

*      *      *

**PUDA COAL   Chairman Ming Zhao Takes Action, Stealing Shanxi Coal from U.S. Shareholders**

In order to raise money domestically, Zhao needed to sever the direct foreign shareholder ownership of Shanxi Coal, PUDA's sole Chinese operating subsidiary. On 9/3/09, Yao Zhao (Ming Zhao's brother and the legal representative of PUDA's WFOE, Shanxi Putai Resources Limited, "Putai") illegally authorized Putai to transfer 90% of Shanxi Coal to Ming Zhao, adding to the 8% Ming Zhao already held. Additionally, Yao Zhao divided his own 2% of Shanxi Coal between Ming Zhao and Wei Zhang. An official copy of the "Notification of Share Registry Change" can be downloaded here, including a partial translation. **The transfers resulted in Ming Zhao owning 99% of Shanxi Coal, leaving U.S. investors with nothing. Incredibly, PUDA's auditor, Moore Stephens, failed to catch this theft of an entire company that is clearly documented in government ownership filings that any lawyer can obtain direct from the source.**

After stealing Shanxi Coal from U.S. investors, Ming Zhao began looking for domestic investors to fund his aggressive expansion plans. At the same time, Zhao brazenly continued trying to raise money for PUDA in the U.S., despite the fact PUDA (without Shanxi Coal) was just a shell company. As U.S. capital markets recovered, on 2/18/10 PUDA sold 3.284 million shares in a public offering underwritten by Brean Murray and Newbridge Securities raising $14.5 million (8-K here), without disclosing to the investors that PUDA no longer owned Shanxi Coal, its sole operating subsidiary in China. Why did Brean Murray fail to perform any basic legal due diligence on the real ownership of Shanxi Coal?

**Chairman Zhao Sells Half of Shanxi Coal and Borrows $530.3 Million at 14.5%**

In July 2010, Zhao recklessly accepted a highly leveraged RMB2.745 billion ($416 million) equity and debt investment from the $31.3 billion Chinese private equity arm of China International Trust and Investment Company ("CITIC", website here). **On 7/15/10 Zhao sold 49% of Shanxi Coal to CITIC for RMB245 million ($37.1 million) and pocketed the proceeds.** An official copy of the "Notification of Share Registry Change" can be downloaded here, including a partial translation. **On 7/19/10 Zhao and Zhang pledged the other 51% of Shanxi Coal to CITIC as security so that the company could obtain a 3year loan for RMB2.5 billion ($379 million) at a cost of 14.5% (annual interest plus fees) from CITIC.** (Note: Zhao pledged 50% and Wei Zhang pledged his 1% of Shanxi Coal to CITIC so that the entire remaining 51% of the company was thus pledged to CITIC). **The loan was subsequently increased to**

**RMB3.5 billion ($530.3 million), bringing the combined investment to RMB 3.745 billion ($567.4 million). . . .** The official filed copies of the share pledge agreements detailing all these amounts can be downloaded here (.pdf) and here (.pdf).

*     *     *

As of 1/26/11, the outstanding principal, interest and fees payable under the 14.5% 3-year loan agreement amounted to RMB5.0225 billion ($761 million). **Annual interest and fees on the loan are an incredible RMB507.5 million ($76.9 million USD), over twice the $34 million EBIT shown in PUDA's 2010 10-K filing.** Shanxi Coal is now a highly leveraged bet on Ming Zhao's operational ability to dramatically increase coal production and profitability enough to service the company's crushing debt load. Any disruption could lead to default and loss of the pledged shares to CITIC.

On 12/16/10, PUDA again tapped the U.S. capital markets, this time for $101.5 million by selling 7.85 million shares at $12 per share in a public offering underwritten by Macquarie Capital and Brean Murray (8-K here). PUDA again failed to disclose Chairman Zhao's 9/3/09 illegal transfer of 99% of Shanxi Coal to himself, nor Zhao's illegal sale of 49% of Shanxi Coal to CITIC for $37.1 million, nor the $530.3 million 14.5% loan from CITIC secured by the pledge of the remaining 51% of Shanxi Coal shares. Why did Macquarie Capital also fail to perform basic legal due diligence on the real ownership of Shanxi Coal, half of which had been already sold to CITIC?

*     *     *

**Chairman Zhao Secretly Returns a Portion of the Shanxi Coal to the Rightful Owner**

In a partial attempt to cover up his theft of the company, Chairman Zhao and Wei Zhang transferred their pledged 51% interest in Shanxi Coal to Shanxi Puda Mining Industry Ltd ("Puda Mining"), a former 100% owned **subsidiary** of Shanxi Coal that, through suspicious shareholder shuffling, Zhao maneuvered to make it the **51% parent** of Shanxi Coal. Puda Mining's 51% interest in Shanxi Coal continues to be completely pledged to CITIC. **According to the government filing, Puda Mining shares are now 90% owned by Putai (the WFOE), 8% Ming Zhao and 2% Yao Zhao. Following these transfers, PUDA now owns only 45.9% (90% of 51%) of Shanxi Coal, about half of the 90% PUDA owned before Chairman Zhao began his shenanigans.**
**PUDA's 2009 and 2010 Audited Financials can No Longer be Relied Upon**

65

Since Ming Zhao stole 99% of Shanxi Coal in 2009, the operating company's 2009 and 2010 financials should not have been consolidated into PUDA's 2009 and 2010 audited financials. **PUDA 's audited 2009 and 2010 financials can thus no longer be relied upon.** For 2011, even though Zhao recently returned 45.9% of Shanxi Coal to PUDA  through its 90% ownership of Puda  Mining (the 51% owner of Shanxi Coal Puda  Mining's 1% interest in Shanxi Coal is entirely pledged to CITIC.

*      *      *

Note: I would like to thank GeoInvesting LLC for obtaining official copies of all the ownership, loan and share pledge records that I cited and linked in this report.

(Emphasis in original).

173.    Approximately one hour later, at 10:50 a.m., GeoInvesting issued a report containing the same information contained in the Alfred Little report.  (As Floyd Norris of THE NEW YORK TIMES reported in "A Fraud Went Undetected, Although Easy to Spot," GeoInvesting's Dan David had shared his research with Andrew Wong, who authored the April 8, 2011, Alfred Little Report.)

174.    On this adverse news, the Company's shares immediately declined, closing on April 8, 2011, at $6.00 per share, down $3.10, or 34.1%, on unusually heavy trading volume, wiping out more than $161 million in Puda's market capitalization.  Trading of the Company's shares was halted prior to the start of trading on Monday April 11, 2011, by the NYSE Amex at approximately 8:20 a.m.

175.    On April 11, 2011, the Company issued a press release announcing that it was conducting an investigation into the allegations and that "[a]lthough the investigation is in its preliminary stages, evidence supports the allegation that there were transfers by Mr. Zhao in subsidiary ownership that were inconsistent with disclosure made by the Company in its public securities filings." The press release further disclosed that Zhao had agreed to a voluntarily

leave of absence as Chairman of the Board of the Company until the investigation was complete.

176.   In a last minute effort to avoid liability as a result of the fraudulent transfers, Zhao offered to buy the Company for $12 per share, which was disclosed in a press release issued by the Company on April 29, 2011.[29]  The press release further announced that Puda's Audit Committee intended to review and negotiate the terms of the sale and that the Company was "continu[ing] to investigate the allegations raised in a recent article alleging various unauthorized transactions in the shares of a subsidiary company, Shanxi Coal, by Mr. Zhao" and that Puda intended "to provide further information when the investigation [was] complete."

177.   Zhao's promised $12.00/share buyout offer has never materialized and appears to have been nothing but his desperate effort to stave off a collapse of Puda's share price as a result of his fraud.

178.   On June 24, 2011, Puda disclosed that it had received a notice from the NYSE Amex indicating that the Company was not in compliance with its listing standards and that "[i]n order to maintain its listing, the Company must submit a plan of compliance by July 5, 2011 to demonstrate its ability to regain compliance with the applicable continued listing standards by no later than September 20, 2011."

---

[29] On May 3, 2011, Alfred Little published an additional article on the website, Seeking Alpha, lambasting Zhao's ability to obtain funding for a $12 per share offer for the shares of Puda that he did not already own. In particular, the article stated "Shanxi Coal's 2011 cash flow is insufficient [to] cover the $76.9 million interest and fees payable to CITIC in 2011…. Therefore adding $246 million debt [the amount needed to purchase the outstanding shares at $12 per share] to Shanxi Coal in 2011 is impossible and certainly would not be in the best interests of CITIC [which controls Shanxi Coal]."

179.     On July 12, 2011, the Company announced that it had received a resignation letter from Moore Stephens, its long-standing auditing firm, on July 7, 2011.  In its resignation letter, Moore Stephens disclosed that Puda's financial results for the fiscal years ending 2009 and 2010 should no longer be relied upon.  Portions of Moore Stephens's letter were redacted in the public version of the letter filed with the SEC, with confidentiality requested.

180.     On July 25, 2011, the Company issued a press release stating its intent to regain compliance with NYSE Amex's listing standards.

181.     On August 10, 2011, the Company issued a press release announcing its receipt of the delisting notice from the NYSE Amex on August 4, 2011.  Therein, the Company, in relevant part, stated:

> On August 4, 2011, NYSE Amex (the "Exchange") notified Puda Coal, Inc. (NYSE Amex: PUDA) (the "Company") that the Exchange intends to delist the Company's common stock from the Exchange by filing a delisting application with the SEC pursuant to Section 1009(d) of the NYSE Company Guide.  ***The Staff of the Exchange determined that it is necessary and appropriate for the protection of investors to initiate immediate delisting proceedings.***  The Staff based its decision on the reasons that (i) the Company is subject to delisting pursuant to Sections 134 and 1101 of the NYSE Company Guide in that the Company did not timely file its reports with the SEC; (ii) the Company is subject to delisting pursuant to Section 1003(f)(iii) of the NYSE Company Guide in that the Company or its management engaged in operations which, in the opinion of the Staff, are contrary to the public interest; ***(iii) the Company is subject to delisting pursuant to Section 132(e) of the NYSE Company Guide in that the Company's communications contained material misstatements or omitted material information necessary to make such communications to the Exchange not misleading***; and (iv) the Company is subject to delisting pursuant to Section 1002(e) of the NYSE Company Guide in that the an event has occurred or a condition exists which makes further dealings of the Company's securities on the Exchange unwarranted.

182.     Then, on August 18, 2011, just a few weeks after it issued a press release announcing to its shareholders its intent to regain compliance with the NYSE Amex listing standards, Puda issued a press release stating that it did not intend to comply with the listing

standards and that it expected to be delisted from the NYSE Amex immediately.   The

Company also announced its continued review of Zhao's buy-out proposal, stating:

> The Independent Committee of the Board is continuing its discussion with
> representatives of Chairman of the Board, Mr. Ming Zhao, regarding the
> preliminary buy-out proposal made by Mr. Zhao on April 29, 2011.  The
> Company's financial advisors in connection with the buy-out proposal, Cowen
> and Company, LLC and Morgan Joseph TriArtisan LLC, have begun to review
> documentation and financial information of the Company.

> Given the complexity of the issues involved and the requirement for audited
> financial statements, the Independent Committee anticipates the proposed
> transaction, if it proceeds, will take several months to complete.  Neither the
> Company nor the Independent Committee can provide any assurances that a
> definitive agreement will be executed or approved or that a transaction will be
> consummated or the timing of such. In addition, the Company's audit committee
> is in the process of engaging a successor independent accounting firm.

183.    Additionally, on August 18, 2011, after more than four months, the trading halt

of Puda's shares was lifted and trading of the Company's shares resumed.  Puda's shares

declined $1.90 per share, nearly 32%, from the April 8, 2011 closing price of $6.00 per share,

to close on August 18, 2011, at $4.10 per share, on heavy trading volume.

184.    After the close of trading on August 18, 2011, Puda filed with the SEC the

complete text of Moore Stephens's resignation letter from July 7, 2011.  The newly-released

material revealed that Moore Stephens had been informed that the preliminary findings of the

Audit Committee investigation had so far (*i.e.,* after nearly three months, by July 7, 2011)

confirmed both the unlawful transfer of Shanxi Coal's shares from Putai to Zhao in September

2009 and that Zhao caused further transfers of Shanxi Coal's shares to be made in 2010.  The

Company's shares further declined $0.87 per share, more than 21%, to close on Friday August

19, 2011, at $3.23 per share, also on heavy trading volume.  Over the two-day period, Puda's

shares lost 46.17% of their value.   By an order dated August 19, 2011, the SEC halted trading

of the Company's shares (subsequent to the closing of trading on August 19, 2011 and prior to the start of trading on Monday August 22, 2011).  The order remained in effect until 11:59 p.m. on September 1, 2011.

185.    On September 1, 2011, Puda's Audit Committee disclosed its interim findings of its internal investigation, which essentially confirmed the fraudulent transfers, while maintaining that it was unable to confirm or deny Zhao's representation that CITIC's substantial loan to Shanxi Coal was not actually funded by CITIC.  Therein, the Company, in relevant part, stated:

> **Item 8.01 Other Events**
> As disclosed in the current Report on Form 8-K on April 12, 2011, on April 9, 2011 the Audit Committee of Puda Coal, Inc. (the "Company") was authorized by the Company's Board of Directors to investigate the allegations raised in an article published online by a short seller of the Company's stock, Alfred Little, on April 8, 2011.  In the article, Alfred Little alleged that Ming Zhao, the Chairman of the Company's Board of Directors, engaged in a number of undisclosed transactions involving the ownership of Shanxi Puda Coal Group Co., Ltd. ("Shanxi Coal"), and the Company's operating subsidiary in China.  On August 30, 2011, the Audit Committee presented its interim findings to the Company's Board of Directors.
>
> The investigation has been constrained by certain limitations, including, among other things, the lack of cooperation by key individuals, limited access to individuals in China who have knowledge of the allegations, and restrictions on evidence gathering in China.  Subject to these and other limitations, below is a summary of the findings of the Audit Committee to date.  These findings are interim in nature, do not reflect all of the matters examined in the context of the investigation or all of the conflicting evidence obtained with respect to the matters under investigation, and are subject to revision if additional facts are uncovered.
>
> (1)    Allegations Concerning the Transfer of 90% Ownership of Shanxi Coal to Ming Zhao in September 2009.
>
> The Audit Committee has found that Ming Zhao arranged for Shanxi Putai Resources Limited ("Putai"), another subsidiary of the Company and the parent company of Shanxi Coal, to transfer its 90% ownership (and thereby the Company's indirect 90% ownership) of Shanxi Coal to himself in September 2009 (the "90% Transfer") and that Yao Zhao, Ming Zhao's brother and the

70

legal representative of Putai under Chinese law, authorized the transfer*.  **The Audit Committee has also found that Liping Zhu, the Company's CEO, President and director on the Board, was aware of the 90% Transfer but did not disclose it to any other director.  Ming Zhao contends that this transfer was pursuant to a "Trusted Shareholding Agreement" that granted him merely nominal ownership of Putai's 90% equity interest in Shanxi Coal but reserved beneficial ownership for Putai**, and also states that he effectuated this transfer for a legitimate business purpose — to help Shanxi Coal obtain government approval to become a consolidator of coal mines.

(2)     Allegations Concerning the Transfer of 49% of Shanxi Coal to CITIC Trust Co., Ltd. ("CITIC") for RMB245 Million in July 2010.

The Audit Committee has found that Ming Zhao signed various documents to further transfer 49% of the ownership of Shanxi Coal to CITIC in or around July 2010 (the "49% Transfer"), and that he did not disclose the 49% Transfer to the Audit Committee.  Ming Zhao claims that the 49% Transfer was subject to the Trusted Shareholding Agreement discussed above and, as such, beneficial ownership of the 49% equity in Shanxi Coal remained with Putai.  Ming Zhao stated, however, that he did not tell CITIC about the Trusted Shareholding Agreement or his "nominal" ownership of Shanxi Coal, nor is there any evidence that the Trusted Shareholding Agreement was filed in any government registry.  The investigation did not find any evidence that Ming Zhao personally received any funds from CITIC in exchange for the 49% Transfer, but documents in connection with this transaction, among other things, state that he received consideration in the form of trust units in CITIC's trust plan.

(3)     Allegations Concerning the 3-Year "Loan" from CITIC as Being Initially Funded for RMB2.5 Billion, and then Increased to RMB3.5 Billion.

The Audit Committee has found conflicting evidence with respect to these allegations.  The Audit Committee found evidence that would support finding that CITIC loaned money to Shanxi Coal, including but not limited to the following: (a) Ming Zhao signed agreements with CITIC to obtain RMB2.5 billion in financing for Shanxi Coal in July 2010; (b) pursuant to the terms of these agreements, this financing appeared to be a functional equivalent of a "loan" that had to be repaid by Shanxi Coal within three years at a 12.5% annual interest and 2% annual fees; (c) documents reflect that this "loan" increased to RMB3.5 billion in November 2010; (d) CITIC stated in various publications, among other things, that it has funded the "loan" to Shanxi Coal, and Shanxi Coal used such funds to pay for its acquisition of coal mines and for technological upgrades to existing coal mines; and (e) various CITIC representatives orally confirmed the funding of such a "loan."

The Audit Committee, however, has also found evidence that is inconsistent with the CITIC reports stating that the CITIC "loan" had been funded, including

but not limited to: (a) Ming Zhao's repeated denial that CITIC has funded the "loan" to Shanxi Coal; (b) on August 31, 2011, Ming Zhao, through his counsel, provided the Audit Committee with a letter purportedly from CITIC stating (i) that CITIC has not advanced any funds to Shanxi Coal in connection with the credit facility that CITIC established for Shanxi Coal; and (ii) that none of CITIC Trust or any of its subsidiaries or any of its affiliates has ever brought or will bring any claim in respect of any pledge on or ownership interest in any shares in or assets of Shanxi Coal or any of its affiliates;  (c) Ming Zhao's claims, made through his counsel, that numerous inaccuracies exist in reports issued by CITIC rendering the reports wholly unreliable; and (d) the lack of any documentary evidence demonstrating CITIC's lending of funds to Shanxi Coal. Ming Zhao, through his counsel, claims that the lack of funding makes the 49% Transfer and the 51% pledge (discussed below) ineffective, as the transfer and pledge were both part of the overall financing transaction with CITIC.

The investigation into these allegations has been complicated by the general limitations noted above and further by, among other things, claims by Ming Zhao's counsel that Chinese law does not allow Ming Zhao to authorize CITIC to respond to the Audit Committee's requests for interviews and documents, and CITIC's claim that Shanxi Coal will not authorize it to share information based on confidentiality provisions in the agreements between Shanxi Coal and CITIC.  As a result, at this time, the Audit Committee cannot verify the authenticity of, or the information contained in, the above-mentioned letter from CITIC, and might not be able to do so unless Ming Zhao, CITIC and other third parties located in China provide verifiable evidence relating to these allegations.

(4)     Allegations Concerning Ming Zhao and Wei Zhang's Pledge of Shanxi Coal's Remaining 51% to CITIC as Security Interest for a 3-Year "Loan."

The Audit Committee has found that Ming Zhao and Wei Zhang, a Shanxi Coal employee and a 1% shareholder of Shanxi Coal, signed agreements pledging their 51% equity interest in Shanxi Coal to CITIC in July 2010.  Similar to the other transactions with CITIC, the 51% pledge to CITIC was not disclosed to the Audit Committee prior to the Audit Committee's investigation.

(5)     Allegations Concerning the Creation of Shanxi Puda Mining Industry, Ltd. ("Puda Mining") as a New Parent Company of Shanxi Coal, the Transfer of 51% of Shanxi Coal to Puda Mining, and Puda Mining's Re-Pledge of 51% of Shanxi Coal to CITIC.

The Audit Committee has found that, in or around March 2010, Ming Zhao caused Puda Mining, which was initially a subsidiary of Shanxi Coal, to become a new parent company of Shanxi Coal without prior disclosure to or approval from the Audit Committee.  ***Additionally, the Audit Committee has found that Ming Zhao and Wei Zhang transferred their 51% equity interest in Shanxi***

*Coal to Puda Mining in December 2010. The Audit Committee has further found that Puda Mining then re-pledged its 51% equity interest in Shanxi Coal to CITIC.* Ming Zhao contends that the Puda Mining pledge of 51% of Shanxi Coal to CITIC is not effective because no funding of the "loan" has occurred.

     (6)     Additional Matters Identified during the Investigation.

     (a)     The Audit Committee has identified a number of instances throughout 2010 and early 2011 when Ming Zhao made affirmative statements (directly and indirectly) to the Company's financial employees and to the Audit Committee that, among other things, Putai owned 90% of Shanxi Coal, without disclosing the 90% Transfer, the 49% Transfer, the purported Trusted Shareholding Agreement, or the transactions with CITIC.

     (b)     The Audit Committee has identified several additional instances of ownership changes relating to the Company's Chinese subsidiaries that were also not disclosed to the Audit Committee at the time they were executed. For example, government registry documents show that Ming Zhao signed documents that permitted a company called Shanxi Longxin Coke Limited to temporarily become a majority shareholder of Shanxi Coal in March and April 2010. Government registry documents also demonstrate that, on or about April 26, 2011 the ownership of Puda Mining was transferred from Putai (99.55%) and Ming Zhao (0.45%) to Ming Zhao (99%) and Wei Zhang (1%), respectively, but Ming Zhao, through counsel, provided documents to the Audit Committee showing that, as of August 3, 2011, the ownership of Puda Mining had been transferred back to Putai (99.55%) and Ming Zhao (0.45%). Additionally, in June 2011, Ming Zhao signed "restructuring" agreements that purportedly transfer all assets from Shanxi Coal to Putai and Puda Mining. Ming Zhao states that he transferred these assets to alleviate concerns that CITIC has interest in Shanxi Coal's assets. No disclosure of these agreements was made to the Audit Committee prior to their execution, nor has Ming Zhao provided any evidence that these asset transfer agreements have been filed in a government registry.

186. Following this adverse announcement, Puda's shares resumed trading and promptly declined $1.21 per share, or 37.46%, to close on September 2, 2011, at $2.02 per share, on unusually heavy trading volume.

187.    On September 7, 2011, the Company disclosed that the SEC had issued Zhao a Wells Notice indicating that the SEC intended to file an action against him for violations of the federal securities laws.[30]

188.    On September 26, 2011, Puda Coal issued a press release entitled "Puda Coal Received a Resignation Letter from its CEO," admitting that Defendant Zhu issued a fraudulent letter from CITIC to the SEC:

> TAIYUAN, China, Sept. 26, 2011 /PRNewswire-Asia-FirstCall/ -- On September 23, 2011, the Board of Directors of Puda Coal, Inc. (the "Company"; Other OTC: PUDA .PK) received a letter from the Company's Chief Executive Officer ("CEO"), Liping Zhu, dated September 22, 2011.  The letter states that Mr. Zhu resigns from his positions as the Company's CEO and as a director on the Board. The letter also states that, on August 29, 2011, Mr. Zhu provided a false letter from CITIC Trust Co. Ltd. ("CITIC") to the U.S. Securities and Exchange Commission ("SEC") and to counsel for Ming Zhao, Chairman of Puda Coal.
>
> On September 1, 2011, the Company filed a current report on Form 8-K with the SEC disclosing interim findings of the internal investigation by the Audit Committee, including that, on August 31, 2011, Ming Zhao, through his counsel, provided the Audit Committee with a letter purportedly from CITIC (the "CITIC Letter"), and that the Audit Committee was unable to verify the authenticity of, or the information contained in, the "CITIC Letter." The "CITIC Letter" appears to be the same letter that was referred to in the resignation letter from CEO Liping Zhu.

189.    On this news, the Company's shares declined $0.07 per share, more than 9%, to close on September 26, 2011, at $0.68 per share.

190.    On October 3, 2011, the last day of the Class Period, the Company disclosed that it had received from CITIC definitive evidence that CITIC did not issue the "CITIC Letter" as referred to by Zhao and Zhu's resignation letter.  The Company admitted this, stating:

---

[30] The SEC filed suit in February 2012; service of the SEC complaint has not yet been effected.

NEW YORK, Oct. 3, 2011 /PRNewswire-Asia-FirstCall/ --On September 1, 2011, Puda Coal, Inc. (OTC BB: PUDA) (the "Company"; Other OTC: PUDA.PK) filed a current report on Form 8-K with the U.S. Securities and Exchange Commission ("SEC") disclosing interim findings of the internal investigation by the Company's Audit Committee, including that, on August 31, 2011, Chairman Ming Zhao, through his counsel, provided the Audit Committee with a letter purportedly from CITIC Trust Co. Ltd. (the "CITIC Letter"), and that the Audit Committee was unable to verify the authenticity of or the information contained in the "CITIC Letter." As previously announced, on September 26, 2011, the Company's Board of Directors received a resignation letter from its then Chief Executive Officer, Liping Zhu, in which Mr. Zhu stated that he provided a false letter from CITIC to the SEC and to counsel for Ming Zhao. On September 29, 2011, the Audit Committee further received a letter from CITIC confirming that CITIC did not issue the "CITIC Letter." CITIC also stated that all of the information it had publicly disclosed regarding the CITIC Juxinhuijin Coal Industry Investment Fund No.1 Collective Trust Plan (the "Trust Plan"), including the information contained in each of its quarterly management reports and other documents posted on its website (http://www.ecitic.com), was true and valid, but CITIC did not provide any underlying documents related to the Trust Plan or any other purported transaction between CITIC and the Company's operating subsidiary, Shanxi Puda Coal Group Co., Ltd.

On September 26, 2011, Shearman Sterling LLP ("Shearman") resigned as counsel for Ming Zhao in all regards and stated that the Audit Committee should not rely on any of Shearman's prior statements regarding CITIC. The Audit Committee is not aware of whether Ming Zhao has retained successor counsel. Before its resignation, Shearman represented Ming Zhao in connection with the Audit Committee's internal investigation, the SEC's investigation relating to Mr. Zhao, and Mr. Zhao's buy-out proposal. The Independent Committee has not received any recent communication from Mr. Zhao regarding the proposed buy-out transaction, including whether or not he intends to proceed with such transaction.

The Audit Committee received a letter from CITIC on September 29, 2011, confirming that it did not issue the letter in question.

191.    On this news, the Company's shares declined $0.10 per share, almost 17%, to close on October 4, 2011, at $0.50 per share.

192.    In the wake of the Little Report and subsequent disclosures, Puda's market capitalization has lost more than $325 million in value.

193.    On March 1, 2012, Wizel and Tang resigned as directors of Puda.

194.    Zhao never completed his proposed buyout of Puda's deceived investors – either at $12 per share or at any other price.  Puda shares now trade for a few pennies each.

## XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

195.    The trading market for Puda securities was open, well-developed and efficient at all relevant times for the following reasons, among others:

(a)    Puda stock met the requirements for listing, and was listed and actively traded on the NYSE Amex, a highly efficient and automated market;

(b)    During the certified Exchange Act Class Period, the average weekly trading volume as a percentage of shares outstanding was 12.2%, demonstrating a very strong presumption of an efficient market;

(c )    As a regulated issuer, Puda filed periodic public reports with the SEC and the NYSE Amex and was eligible (and did file) S-3 registration statements with the SEC during the Class Period;

(d)    Puda  regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    Puda was followed by several securities analysts employed by major brokerage firms including Brean Murray and Liberty Analytics (among others), which wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

(f)      There was a Designated Market Maker for PUDA stock at all times during the Class Period; and

(g)      Unexpected material news about PUDA was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

196.    As a result of the foregoing, the market for Puda securities promptly digested current information regarding Puda from all publicly available sources and reflected such information in Puda's stock price.  Finding the market for Puda shares to have been efficient from November 13, 2009, through April 8, 2011, during which time material misstatements and omissions entered the market, the Court certified the Exchange Act Class and the Exchange Act Auditor Class.  Plaintiffs and the Class are permitted a presumption of reliance on the integrity of the market price for Puda securities.

## XIII.   CLAIMS

### COUNT I
### VIOLATION OF SECTION 11 OF THE 1933 ACT
### Against All Defendants

197.    Plaintiffs repeat and incorporate each allegation contained above as if fully set forth herein.

198.    This Count does not sound in fraud. Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of this claim.

199.    This Count is brought by Trellus against all Defendants, pursuant to Section 11 of the 1933 Act on behalf of a subclass of persons who acquired shares of the Company's

common stock in or traceable to the December Offering pursuant to the false offering materials issued in connection with the December Offering.

200.   The offering materials for this offering contained untrue statements of material facts, omitted to state other facts necessary to make the statement made not misleading, and/or omitted to state material facts required to be stated therein.

201.   The defendants named herein were responsible for the content of the December Offering Materials.

202.   None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

203.   By reasons of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the 1933 Act.

204.   Trellus and the Securities Act subclass sustained damages in that the value of Puda shares declined substantially subsequent to and because of defendants' wrongful conduct and violations of the law.

205.   At the time of their purchases of the Puda's common stock, Trellus and other members of the Securities Act subclass were without knowledge of the facts concerning the untrue statements or omissions herein and could not have reasonably discovered those facts until just prior to the date of the filing of the initial complaint herein.

206.   By virtue of the foregoing, Trellus and the other members of the Securities Act subclass are entitled to damages from these defendants and each of them, jointly and severally.

207.   This claim is timely, as Class Plaintiffs' Consolidated Complaint For Violations Of The Federal Securities Laws [Corrected] (Dkt. #47) ("Consolidated Complaint") was filed

within one year after Trellus discovered or reasonably could have discovered the untrue statements and omissions in the December Offering Materials, thereby tolling and complying with the statute of limitations under Section 13.

208.    Trellus' claims are timely because both the plaintiff who filed the initial complaint and Thomas Rosenberger, the named plaintiff representing the Securities Act subclass in the Consolidated Complaint, had Article III standing to file Securities Act claims; their injuries were fairly traceable to the December Offering -- particularly Mr. Rosenberger's, because he purchased Puda shares on the day of the December Offering having viewed the offering as a positive sign for Puda's business prospects.  At a hearing on September 27, 2013, the Court acknowledged that Mr. Rosenberger had sufficiently alleged standing.   In addition, Mr. Rosenberger had standing to bring the Section 10(b) claims alleged in the Consolidated Complaint.

209.    Even though the Court ultimately found, based upon the evidence presented by the parties on summary judgment, that Mr. Rosenberger lacked statutory standing to assert claims under the Securities Act, pursuant to *American Pipe & Construction v. Utah*, 414 U.S. 538, 553 (1974), and its progeny ("*American Pipe*"), the Court has always had subject matter jurisdiction over all the claims alleged herein, as they arise under the federal securities laws. Therefore, the statute of limitations has been tolled as to Trellus's claims since the outset of the litigation and, in any event, no later than the date of the filing of the Consolidated Complaint.

210.    Under the Federal Rules of Civil Procedure and the lead plaintiff provisions of the Private Securities Litigation Reform Act of 1995, the Court has broad discretion to appoint Trellus to prosecute the Securities Act claims to prevent these meritorious claims from being forfeited.  At the time Trellus moved to intervene in the action, defendants had full notice of and

had been defending the Securities Act claims from the outset of the litigation.  Thus, any balancing of the relative equities favors the prosecution of the Securities Act claims on their merits because defendants are not prejudiced thereby.

### COUNT II
### VIOLATIONS OF SECTION 12(a)(2) OF THE 1933 ACT
### Against Puda and the Underwriter Defendants

211.   Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

212.   This Count does not sound in fraud. Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of this claim.

213.    This count is brought by Trellus, pursuant to Section 12 of the 1933 Act on behalf of the subclass of persons and entities which purchased Puda stock directly from one of the Underwriters in the December Offering or were directly solicited to make their purchases by one of the Underwriters.

214.   Puda and the Underwriters offered, sold and/or solicited a security, namely shares of Puda's common stock, by means of the December Offering Materials identified above, and sold, or solicited the sale, of Puda's shares for their own financial benefit. The December Offering Materials contained untrue and/or misleading statements of material fact that Puda and the Underwriters in the exercise of reasonable care should have known were false.

215.   Puda and the Underwriters actively solicited the sale of Puda's shares to serve their own financial interests.

216.     At the time of purchase of Puda's shares, Trellus and other members of the Securities Act subclass did not know that the representations made to them by Puda and the Underwriters were materially untrue and did not know the above-described omitted material facts that were not disclosed.

217.     As a result, Trellus and the Securities Act subclass members are entitled to tender Puda shares they purchased and receive from Puda and the Underwriters the consideration paid for those shares with interest thereon, less the amount of any income received thereon, or to collect damages resulting from their misconduct.

218.     Puda and the Underwriters are liable to Trellus and the Securities Act subclass members pursuant to Section 12 (a)(2) of the Securities Act, as sellers of Puda shares in the December Offering.

219.     The Consolidated Complaint in this action was filed within three years from the time that the securities upon this Count is brought were sold to the public, and within one year from the time when Trellus discovered or reasonably could have discovered the facts upon which this Count is based, and is also timely for the reasons set forth in ¶¶ 207-210 above.

### COUNT III
### VIOLATIONS OF SECTION 15 OF THE 1933 ACT
### Against the Officer and Director Defendants

220.     Plaintiffs repeat and incorporate each allegation contained above as if fully set forth herein.

221.     This Count does not sound in fraud. Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do not allege for this Count that Defendants had scienter or fraudulent intent, which are not elements of this claim.

222.   This Count is brought pursuant to Section 15 of the 1933 Act against the Officer and Director Defendants.

223.   Each of the Officer and Director Defendants was a control person of Puda, by virtue of his or her position as a senior officer and/or membership on various of Puda's Board of Directors committees, including Puda's Audit Committee.

224.   Each of the Officer and Director Defendants signed the Registration Statement for the December Offering.

225.   Each of the Officer and Director Defendants was a participant in the violations of Section 11 and 12 of the 1933 Act alleged above because they signed or authorized the signing of the registration statements issued pursuant to the December Offering, otherwise participated in the process which allowed Puda's December Offering to be successfully completed, or participated in the offer or sale of the shares of Puda.

226.   The Officer and Director Defendants named herein were responsible both for the content of the registration statements issued pursuant to the December Offering and for ensuring that the registration statements were not false and misleading.

227.   Plaintiffs and the Class have sustained damages as a result of these violations in that the value of Puda stock declined as a result of the Officer and Director Defendants' conduct, as alleged herein.

228.   The Consolidated Complaint in this action was filed within three years from the time that the securities upon this Count is brought were sold to the public, and within one year from the time when Trellus discovered or reasonably could have discovered the facts upon which this Count is based, and is also timely for the reasons set forth in ¶¶ 207-210 above.

<u>COUNT IV</u>
**Violation of Section 10(b) of The Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against Puda, Defendants Wu, Zhu and Zhao, the Auditor Defendants, Macquarie and
<u>Brean Murray</u>**

229.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

230.    Puda, Wu, Zhu, Zhao, Moore Stephens Macquarie and Brean Murray: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Puda's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

231.    Puda, Wu, Zhu, Zhao, Moore Stephens, Macquarie and Brean Murray, either individually or in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a course of conduct to misrepresent material facts and conceal adverse material information about Puda's financial well-being and prospects, as specified herein.

232.    Wu, Zhu and Zhao's primary liability, and controlling person liability, arises from the following facts: (i) Wu, Zhu and Zhao were high-level executives, major shareholders, and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal

reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

233. Wu, Zhu and Zhao had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

234. Because of their positions and access to material, non-public information available to them, Wu, Zhu and Zhao knew, or recklessly disregarded, that the Company's internal controls were inadequate, which was not disclosed to, and was being concealed from, the public, and that the interim reports filed on Form 10-Q on November 13, 2009, May 17, 2010, August 16, 2010, and November 15, 2010 as well as the Company's prospectuses and registration statements issued pursuant to the December Offering, and the Company's 2009 and 2010 annual reports, which were all filed with the SEC, were materially false and misleading. Wu, Zhu and Zhao are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of their collective actions as officers and directors.

235. Macquarie and Brean Murray jointly with Puda's officers drafted the fraudulent Prospectus. Macquarie and Brean Murray delivered the Prospectus to investors. Macquarie (as representatives of the Underwriters) had ultimate authority and provided final approval for

the contents of the Prospectus before it was filed with the SEC and issued to the public. Macquarie fraudulently and/or recklessly underwrote the December Offering knowing that the Company's Registration Statement and Prospectus issued pursuant to the December Offering were materially false and misleading. Brean Murray recklessly underwrote the December Offering and distributed the Prospectus to investors publicly without conducting adequate due diligence of its own or reviewing the due diligence materials gathered by Macquarie, despite the existence of red flags and its failure to ascertain Puda's ownership of Shanxi Coal in connection with the February 2010 stock offering.

236.    Moore Stephens fraudulently certified the financial statements contained in each of the annual reports identified herein, and, in connection with the December Offering, expressly consented to the incorporation of its Auditors' Report dated March 31, 2010, into the Registration Statement and Prospectus, each time without qualification, despite having either actual knowledge of or at least recklessly disregarding, the fact that the financial statements were materially false and misleading because Puda did not own Shanxi Coal and therefore could not consolidate Shanxi Coal's results of operations into Puda's.

237.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Company's improper claim of 90% ownership of Shanxi Coal, which was not disclosed by these defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Puda securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially-inflated prices which they paid.

238.    By virtue of the foregoing, these defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

239.    As a direct and proximate result of Puda's, the Officer and Director Defendants', Macquarie's, Brean Murray's and Moore Stephens's wrongful and reckless conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### COUNT V
### Violation of Section 20(a) of The Exchange Act
### Against the Officer Defendants

240.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

241.    The Officer Defendants were controlling persons of Puda within the meaning of Section 20(a) of the Exchange Act as alleged herein.

242.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements and other misstatements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86

243.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

244.     As set forth above, Puda violated Section 10(b) and Rule 10b-5, through their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class  members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  April 21, 2014                    **GLANCY BINKOW & GOLDBERG LLP**

By:  *s/ Lionel Z. Glancy*
Lionel Z. Glancy
Joshua L. Crowell (JC-0914)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

– and –

Robin Bronzaft Howald (RH-9974)
122 East 42nd Street, Suite 2920
New York, New York  10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
rhowald@glancylaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR-5733)
Phillip Kim, Esq.  (PK-9384)
Sara Fuks, Esq. (SF-6034)
Yu Shi, Esq. (YS-2182)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone:  (212) 686-1060
Facsimile: (212) 202-3827
info@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the Class*

**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

– and –

Patrick V. Dahlstrom
Louis C. Ludwig
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Jeffrey P. Campisi
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

**KIRBY MCINERNEY LLP**
Daniel Hume
David E. Kovel
825 Third Avenue
New York, NY  10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Additional Counsel for Plaintiffs*

**PROOF OF SERVICE BY ELECTRONIC POSTING
PURSUANT TO SOUTHERN DISTRICT OF NEW YORK
ECF AND LOCAL RULES AND BY MAIL
ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court.  I am over the age of 18 and not a party to the within action.  My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On April 21, 2014, I caused to be served the following document:

**SECOND CONSOLIDATED AMENDED AND SUPPLEMENTAL COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

By posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the attached Court's Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 21, 2014, at Los Angeles, California.

_s/ Lionel Z. Glancy_
Lionel Z. Glancy

## Mailing Information for a Case 1:11-cv-02598-KBF

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joseph Alexander Baratta**
  jabaratta@barattalaw.com

- **Jeffrey Philip Campisi**
  jcampisi@kaplanfox.com

- **Jason Canales**
  jcanales@mosessinger.com

- **Albert Yong Chang**
  achang@cfsblaw.com,lcox@cfsblaw.com,kcochran@cfsblaw.com,aringer@cfsblaw.com,sammirati@cfsblaw.com,albert.chang.law@gmail.com

- **Michael Vincent Cibella**
  mvc@cibellalaw.com

- **Joshua Lon Crowell**
  jcrowell@glancylaw.com

- **Greg A. Danilow**
  greg.danilow@weil.com,ariel.rothstein@weil.com,david.byeff@weil.com,stefania.venezia@weil.com,MCO.ECF@weil.com,Christopher.Gismondi@weil.com

- **Dana S. Douglas**
  dsdouglas@mayerbrown.com

- **Mary Kathryn Dulka**
  mdulka@goodwinprocter.com,cbrown@goodwinprocter.com

- **William Bernard Federman**
  wbf@federmanlaw.com,ngb@federmanlaw.com,law@federmanlaw.com

- **Frederic Scott Fox , Sr**
  ffox@kaplanfox.com

- **Sara Esther Fuks**
  sfuks@rosenlegal.com

- **Lionel Z. Glancy**
  lglancy@glancylaw.com,mmgoldberg@glancylaw.com,csadler@glancylaw.com,pbinkow@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Seth Goodchild**
  seth.goodchild@weil.com,Dan.Martin@weil.com

- **Mark Holland**
  mholland@goodwinprocter.com

- **Robin Bronzaft Howald**
  hobbit99@aol.com,info@glancylaw.com

- **D. Seamus Kaskela**
  skaskela@ktmc.com

- **David E Kovel**
  dkovel@kmllp.com,ecf@kmllp.com

- **Louis Carey Ludwig**
  lcludwig@pomlaw.com

- **Matthew M. Madden**
  mmadden@robbinsrussell.com,ggordon@robbinsrussell.com

- **Ottavio Vincenzo Mannarino**
  mannarino@barattalaw.com

- **Brian James Massengill**
  bmassengill@mayerbrown.com,courtnotification@mayerbrown.com

- **Justin Adam McCarty**
  jmccarty@mayerbrown.com

- **Jonathan Craig Medow**
  jmedow@mayerbrown.com

- **Joshua N. Mitchell**
  jmitchell@robbinsrussell.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,echang@glancylaw.com

- **Andrei V. Rado**
  arado@milberg.com,maoffice@milberg.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kevin F. Ruf**
  kevinruf@gmail.com

- **Yu Shi**
  yshi@rosenlegal.com

- **Richard Mark Strassberg**
  rstrassberg@goodwinprocter.com,nymanagingclerk@goodwinprocter.com

- **Jennifer Elizabeth Traystman**
  jtraystman@trinko.com

- **Curtis Victor Trinko**
  ctrinko@gmail.com

- **John Brandon Walker**
  bwalker@kmllp.com

- **Michael Jonathan Wernke**
  mjwernke@pomlaw.com

- **Robert S. Wolf**
  rwolf@mosessinger.com

- **Kathryn Schaefer Zecca**
  kzecca@robbinsrussell.com

- **Maryana Zubok**
  mzubok@goodwinprocter.com,mdulka@goodwinprocter.com,rshah@goodwinprocter.com,rstrassberg@goodwinprocter.com,ndaughtrey@goodwinproxcter.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Adriene O. Bell**
Kessler Topaz Meltzer & Check, LLP (PA)
280 King of Prussia Road
Radnor, PA 19087

**Samuel Blankenship**
,

**Michael Goldberg**
Glancy Binkow & Goldberg, LLP (CA)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

**Michael Marc Goldberg**
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars   Suite 311
Los Angeles, CA 90067

**Myron Harris**
South 106-Park Tower Place
22nd & Benjamin Franklin Pkwy
Philadelphia, PA 19130

**David M. Promisloff**
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087