UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PUDA COAL INC.
et al. SECURITIES LITIGATION

CASE NO: 1:11-CV-2598 (KBF)

**BREAN MURRAY'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS COUNT IV
(SECURITIES FRAUD) OF THE SECOND CONSOLIDATED
<u>AMENDED AND SUPPLEMENTAL COMPLAINT</u>**

MOSES & SINGER LLP
Robert S. Wolf
Jason Canales
405 Lexington Avenue
New York, New York 10075
*Attorneys for Defendant Brean Murray Carret & Co. Inc.*

## **Table of Contents**

**Page**

Preliminary Statement …………………………………………….………… 1

Statement of Facts ……………………………………………………….…… 2

       Brief Summary of Pertinent Procedural Background …………………….………… 3

       The Allegations of the Second Amended Complaint
       as Against Brean Murray ……………………………………………… 5

Argument …………………………………………………………........ 12

    I.    As a Threshold Matter, Brean Murray is Not Sufficiently
         Alleged to Have Been the "Maker" of the False Statements
         at Issue So As To Be Liable Under Rule 10b-5 Pursuant to
         the Supreme Court's Holding in *Janus* ……………………………… 12

    II.   Plaintiff's Allegations Do Not Amount to Actionable Scienter
         Under the Applicable Authorities …………………………………… 14

         The Legal Framework …………………………………….………… 14

         By Far the Most Compelling Inference with Regard to
         Brean Murray From the Allegations of the Complaint is
         Negligence For its Failure to Discount the Puda Fraud ……..... 16

            Underwriter Cases in Particular ……………………… 20

Conclusion ……………………………………………………………… 23

## Table of Authorities

**Cases**                                                                                         **Page**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ……………………………………..………14

*Bd. of Trustees of AFTRA Retirement Fund v JPMorgan Chase Bank*,
      2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) ………………………………….. 11

*Chambers v. Time Warner*, 282 F.3d 147 (2d Cir. 2002) ……………………………. 10

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan
      Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ………………………………..……… 14

*Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278 (5th Cir. 2006) ……………. 11

*Highland Capital Mgmt. v. Schneider,* 379 F.Supp.2d 461 (S.D.N.Y.2005) …..………11

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*,
      643 F. Supp.2d 482 (S.D.N.Y. 2009) …………………………………….………11

*In re Crazy Eddie Securities Litigation*, 817 F. Supp. 306 (E.D.N.Y. 1993) ………… 22

*In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp.2d 458 (S.D.N.Y. 2012) …………….13

*In re Keryx Biopharmaceuticals, Inc. Securities Litigation*,
      2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ………………………………..…… 14

*In re Lululemon Securities Litigation*,
      2014 WL 1569500 (S.D.N.Y. Apr. 18, 2014) …………………………………… 17

*In re Suprema Specialties, Inc. Securities Litigation*,
      438 F.3d 256 (3d Cir. 2006) …………………………………………………… 22

*In re WRT Energy Securities Litigation*,
      1999 WL 178749 (S.D.N.Y. Mar. 31, 1999) ………………………………..…… 21

*Iowa Public Employee's Retirement System v. Deloittte & Touche LLP*,
      919 F. Supp.2d 321 (S.D.N.Y. 2013) …………………………………………... 17

*Janus Capital Group v. First Derivative Traders*, 131 S. Ct. 2296 (2011) …………… 13

*Manufacturers Life Ins. Co. v. Donaldson, Lufkin & Jenrette*,
      2000 WL 709006 (S.D.N.Y. June 1, 2000) ……………………………………... 20

**Cases**                                                                                                    **Page**

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ………………………………..… 15

*South Cherry Street v. Hennessee Group*, 573 F.3d 98 (2d Cir. 2009) …… 14, 15, 16, 18

*Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308 (2007) …………..… 15, 16, 20, 21

**Statutes**

Securities Exchange Act of 1934, Section 10b, 15 U.S.C………………………..1, 3, 4

Securities Exchange Act of 1934, Rule 10b-5 ……………..1, 2, 4, 12, 13, 14, 16, 17, 20

Securities Act of 1933, Section 11 ……………………………………..…… 1, 3, 4 ,5

Securities Act of 1933, Section 12 ……………………………………..… 1, 3, 5

15 U.S.C. § 78u-4 …………………………………………...………………… 14

15 U.S.C. § 78u-4(b)(2) ……………………………………………………….. 14

Defendant Brean Murray, Carret & Co. respectfully submits this memorandum of law in support of its motion to dismiss Count IV of the Second Consolidated Amended and Supplemental Complaint ("SAC"), alleging securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, for lack of sufficient allegations of scienter under applicable Supreme Court and Second Circuit precedent, and because Brean Murray was not the "maker" of the relevant false statements under the Supreme Court's *Janus* ruling.

## Preliminary Statement

Buoyed by the emergence of the "Kroll Report" and the reinstatement of their Section 11 and 12 claims against several previously-dismissed parties, plaintiffs now overreach and charge Brean Murray, in addition to Macquarie, with securities fraud under Rule 10b-5.  Unable to satisfy the "scienter" element by alleging any actual knowledge on Brean Murray's part – of either the underlying fraudulent transfer which rendered Puda essentially worthless, or of the Kroll Report itself – plaintiffs repeat over and over again the conclusory opinion of its hired expert that Brean Murray's due diligence was "reckless" in failing to uncover the fraud.  But after taking their best shot in the Second Amended Complaint, plaintiffs' allegations fall far short of the scienter standard established by the Supreme Court and the Second Circuit.

Those courts have made clear that the required "recklessness" must be "a state of mind approximating actual intent, and not merely a heightened form of negligence."  The inference of scienter must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  If there are "a number of permissible competing inferences," and a non-fraudulent inference is "at least as compelling as the conscious-recklessness inference," a securities fraud claim must be dismissed.

Those standards utterly doom plaintiffs' 10b-5 case against Brean Murray.  Given that the underlying fraud so fundamentally destroyed Puda's value, it is hardly sensible that Brean Murray would have known or suspected that the company no longer owned its sole revenue-producing asset.  (This is not a situation where an underwriter is alleged to have deliberately shut its eyes to some weakness or vulnerability in an issuer with the hope that the problem would not end up mattering.)  But whatever the conceivable plausibility of the fraudulent inference, it is dwarfed by the non-fraudulent inference that screams out from page after page of the pleading: Brean Murray (like many others) missed the transfer, and plaintiffs claim that it should have done more due diligence, and better due diligence, in a host of itemized ways, and that had it performed up to the level their expert says was required, it "would have" discovered the fraud. That's negligence.

Because there is no way that anyone could rationally conclude, from the circumstances described in the Second Amended Complaint, that the negligence inference is not "at least as compelling" (and actually much more compelling) than the inference that Brean Murray had "a state of mind approximating actual intent," this cause of action should be dismissed.  In addition, and in fact as a threshold matter, because plaintiffs' own pleading indicates that Brean Murray was not the "maker" of the false statements of ownership, this claim should be dismissed as against Brean Murray even without regard to the lack of scienter.

### Statement of Facts

The fraud committed by Puda's principal is undisputed:  "'[T]his was a profitable company that the chairman just stole'" (SAC, ECF 352, also annexed to the accompanying transmittal declaration of Jason Canales, Esq., at ¶ 32.)  Also undisputed are the facts that Brean Murray did not participate in the fraud; did not know of the fraud; and (unfortunately) did not uncover the fraud in the course of its due diligence.

2

**Brief Summary**
**of Pertinent**
**Procedural Background**

On April 19, 2011, an action was commenced in this district by a plaintiff named Thomas

Rosenberger relating to the Puda fraud.  In that suit, 11-cv-02660, Rosenberger alleged violations

of Sections 11 and 12 of the Securities Act of 1933.  Neither Macquarie Capital (USA), Inc., the

lead underwriter on the December 2010 public offering at issue in the case, nor Brean Murray,

the non-managing underwriter on that offering, were named as defendants in that complaint.

On February 9, 2012, an amended complaint was filed adding (among other things)

Macquarie and Brean Murray as party defendants on the Section 11 and 12 claims.  (ECF 47)

No claim was asserted in that pleading against Macquarie or Brean Murray pursuant to Section

10(b) of the Securities Exchange Act of 1934.   In fact, that pleading expressly stated that fraud

was not being alleged as to the underwriters.  (ECF 47 at ¶¶ 164, 175)

On May 13, 2013, realizing that Rosenberger did not have standing to assert the

Securities Act claims, lead plaintiffs' counsel filed a motion to intervene on behalf of Trellus

Management Company LLC.  (ECF 176-179)  Trellus's motion to intervene was accompanied

by a proposed complaint (ECF 178, Ex. 7), which also did not assert a Rule 10b-5 claim against

Macquarie or Brean Murray.

On May 29, 2013, the underwriter defendants filed a motion for summary judgment

against Rosenberger on standing grounds.  (ECF 188-193)  The Court stayed merits discovery as

to the underwriters during the pendency of the summary judgment motion.  (ECF 233)  On

October 1, 2013, the Court granted the underwriters' motion for summary judgment, dismissing

all claims against them.  The Court also denied Trellus's intervention motion at the same time

(ECF 263), in large part because the "prejudice [to the underwriter defendants] would actually be

extraordinary here.  It is the difference between them getting out and staying in.  So it is not a

matter of . . . they are going to be here no matter what." (ECF 264 at 38-39)  As a result of that ruling, the underwriters were no longer parties to the action.

The underwriters were thereafter served with non-party subpoenas and duly produced responsive documents.  Contained in Macquarie's – but not Brean Murray's – document production was a document known as the "Kroll Report," which plaintiffs characterize as a "smoking gun."  Following this production, plaintiffs filed a motion to amend its most recent complaint to assert a 10b-5 claim against Macquarie.  (ECF 282-284)  Plaintiffs did not at that time state an intention of asserting a fraud claim against Brean Murray.

On February 4, 2014, Trellus moved for an "indicative ruling" and asked the Court to reverse its denial of the intervention motion due to the discovery of the Kroll Report.  (ECF 288-290)  Trellus argued that "[h]ad the [Kroll Report] been timely produced . . . and a § 10(b) claim been alleged against Macquarie . . ., this Court's weighing of the relative prejudice . . . with respect to Trellus's intervention motion could have been quite different.  At least in regard to Macquarie, the Court could have determined that it would continue as a § 10(b) defendant, regardless of the fate of the Plaintiffs' § 11 claims, and [that it would] therefore not be prejudiced by Trellus's intervention."  (ECF 289 at 3)

The Court initially denied Trellus's motion (ECF 292), but on February 21, 2014, granted the motion and gave plaintiffs leave to file another amended complaint so as to assert a 10b-5 claim against Macquarie.  (ECF 305)  After briefing and argument as to whether Trellus would be permitted to intervene just as against Macquarie, or against all defendants, the Court ruled on March 18, 2014, that "Trellus [may] assert claims against all parties, although whether some or all of those claims will survive a pleadings motion is a question for another day, after full briefing." (ECF 331)

4

\*                    \*                    \*

That day has arrived.  There is no question that the SAC's allegations, taken as true and absent any rebuttal at this juncture, paint a persuasive picture of negligence for Brean Murray having missed (as did others) what was later discovered.  There is also no question that if Trellus's intervention stands (Brean Murray joins in all of Macquarie's arguments and reservations of rights in that regard), plaintiffs can state a claim under Sections 11 and 12 against Brean Murray, which will defend itself vigorously at the appropriate time.  But the SAC, read as a whole, does not remotely portray conduct by Brean Murray that "approximates an actual intent to aid in the fraud being perpetrated by the company," as required by the caselaw discussed in the Argument section below.

### The Allegations of the Second Amended Complaint as Against Brean Murray

Together with the "lead underwriter" Macquarie, Brean Murray "was an underwriter of the Company's December [2010] Offering," the offering at issue in this suit.  Brean Murray was also an underwriter of Puda's "[prior] February 2010 offering."  (SAC ¶¶ 122, 54)  Macquarie and Brean Murray "served as financial advisors [and] assisted in the preparation and dissemination of the offering materials for the December Offering" (id. ¶ 56).  Macquarie "acted as the Underwriters' representative," but Brean Murray is alleged to have "jointly," with Macquarie and Puda's officers, "drafted the fraudulent Prospectus" and, with Macquarie, to have "delivered the Prospectus to investors" (id. ¶¶ 121, 235).

Following a lengthy disquisition on the "role" and "duties" of underwriters in connection with public offerings (id. ¶¶ 126-136), plaintiffs allege that "both Underwriters failed to faithfully execute their due diligence and disclosure obligations" (id. ¶ 140).  "This woefully deficient analysis of Puda is not what investors had been led to expect from the Underwriters,"

both of which "claimed a special expertise with respect to offerings of this nature."  "[I]nvestors reasonably relied upon such expertise to ensure that a thorough due diligence investigation of Puda was conducted and full disclosure of all material information was made in the Prospectus" (id. ¶ 143).

With regard to Brean Murray in particular, the SAC states that the firm's website "promoted [its] Beijing office . . . and [claimed] that the firm was very knowledgeable about China.  For example, Brean Murray sponsored various conferences featuring 'China Growth' companies in May 2009, November 2009, May 2010, November 2010, and June 2011 (in Beijing).  Brean Murray's website also boasted that there 'are five sectors in which we have built significant knowledge through various corporate financing activities,' one being 'China Small/Mid Cap' companies.  The website further stated that Brean Murray's analysts 'are focused on performing extensive bottoms up due diligence on companies under our coverage. . . .'"

The SAC then goes into great detail as to what plaintiffs' expert contends constitutes "[a] reasonable due diligence investigation into a company's financial statements" (id. ¶ 146).  It was "particularly important, and indeed fundamental," to "confirm[] the percentage ownership of important subsidiaries, and especially its sole operating subsidiary from which it receives its only source of income," because "Puda did not have a recent audit" (id.).  Several subparagraphs are devoted to quoting a treatise "about required investment bankers' due diligence in regard to financial statements" (id.).  The pleading then recites a series of "red flags," identified by their expert witness, "that <u>should have caused</u> . . . [the] underwriters . . . to carefully verify the ownership of Shanxi Coal and search for and uncover any undislosed related party transactions" (id. ¶ 147(a), (b), (c), (d), and (e); emphasis added):

(a) The ownership of Puda involved both a complex structure and related parties.  In terms of corporate structure, Puda Coal is a Delaware corporation, but with its headquarters in Shanxi Province of the People's Republic of China. . . .  Puda Coal's only operating assets (*i.e.*, coal mines and coal washing facilities) are in Shanxi Province, China, and these assets are not even directly owned by Puda Coal. Prior to the illegal transfers, Puda Coal owned 100% of a British Virgin Islands company named Puda Investment Holding Limited ("BVI"), which in turn owns 100% of a Chinese company, Shanxi Putai Resources ('Putai').  Even Putai, however, did not own the Chinese operating assets. Instead, Putai owned 90% (but not 100%) of the company which owned the coal mining operating assets, *i.e.*, Shanxi Puda Coal Group Co., Ltd. ("Shanxi Coal"). The other 10% of Shanxi Coal was directly owned by Ming Zhao (8%), Puda Coal's Chairman of the Board and the co-founder, Chairman and CEO of Shanxi Coal since 1995, and Yao Zhao (2%), the brother of Ming Zhao.

(b) In addition to the above corporate ownership complexities, it was disclosed that Defendant Zhao and his brother (Yao Zhao) owned approximately 47% of Puda Coal's common stock prior to the December 2010 financing. . . .  They were thus clearly control shareholders. Indeed, as a warning in regard to having control shareholders, the December 2010 Prospectus states as a 'risk factor' that 'Delaware corporate law provides that certain actions may be taken by consent action of stockholders holding a majority of the outstanding shares ... [without] any meeting of stockholders. . . .'

(c) Also, as described in the December 2010 Prospectus, Putai owed Zhao $35.2 million . . ., which loan proceeds were used to increase Putai's registered capital to the level required by the Shanxi provincial government to be allowed to be a 'coal mine consolidator' . . . . In addition, Puda Coal financed the $13 million acquisition of two plants in China through Resources Group, an entity owned 80% by Zhao, and 20% by his relatives.  Finally, as yet another possible conflict of interest described in the December 2010 Prospectus, all calling for extensive due diligence by the underwriters, on August 1, 2010 Shanxi Coal entered into an Investment Cooperation Agreement with Zhao and another individual unrelated to Puda Coal, pursuant to which the parties would purchase, consolidate and re-develop six additional coal mines in Shanxi Province. . . .

(d) It was clearly stated in the December 2010 Prospectus, and known to the underwriters, that all operating assets of Puda Coal were in Shanxi Province, China and that 'in September 2009, the

Shanxi provincial government approved Shanxi Coal to be an acquirer and consolidator of eight coal mines. . . .'  In addition, throughout the Prospectus, it is made very clear that Puda Coal's business in almost all respects will be subject to 'central, provincial, local and municipal regulation and licensing in China' and that various and numerous approvals will always be required 'from the Shanxi provincial government.'

(e) Given the above and the fact that all of Puda's operating assets were in China, that China's regulatory and political systems generally imposed potential unique risks, that Puda's corporate structure was reasonably complex, that Puda's Chairman had numerous possible conflicts of interest, and that numerous analysts in the U.S. had generally expressed concerns about equity offerings by Chinese companies in the U.S., it was absolutely clear that a very thorough due diligence investigation needed to be performed by the managing underwriters before any Puda securities were sold to the U.S. public.

Therefore, according to the SAC, "[g]iven the obvious 'red flags' [plaintiffs' expert] identified, the Underwriters should have been 'on notice' that a reasonable due diligence investigation, under the circumstances, would have to be very thorough to ensure full and appropriate disclosure before selling the common stock of Puda Coal to the public. Specifically, according to [the expert], it would seem obvious that any reasonable due diligence investigation would include, at a minimum, the review of all filings made by Shanxi Coal with its provincial government regulator, *i.e.*, the SAIC in Shanxi, and a confirmation/review of all of Zhao's related party transactions."  (id. ¶ 148 (footnotes omitted))

Beyond the alleged failure to follow up on the claimed "red flags," plaintiffs allege that Macquarie – but <u>not</u> Brean Murray – received, reviewed, and circulated among several of its investment bankers, six days before the December Offering, a report Macquarie had commissioned from Kroll Inc. that revealed Puda's non-ownership of its claimed principal asset (id. ¶¶ 34, 141, 149-152):

Macquarie . . . therefore had actual knowledge that Puda did not own 90% of Shanxi Coal, which was represented in the Offering

8

Documents as Puda's sole operating subsidiary, *yet it went ahead with the Offering*, despite its ultimate authority over the content and issuance of the Prospectus, and its obligation to include these highly-material facts or not go forward with the deal. (id. ¶ 153; emphasis by plaintiffs)

None of the foregoing allegations "approximate an actual intent" by Brean Murray to "aid in the fraud being perpetrated by the company." Quite the contrary. Nonetheless, plaintiffs ask this Court to somehow infer Brean Murray's actionable scienter. Their wholly unpersuasive reasoning is as follows (SAC ¶¶ 157-167):

157.   Consistent with investment banking industry standards, a lead-managing underwriter [Macquarie] and a co-managing underwriter [Brean Murray] should . . . function as a coordinated and efficient team. . . .

158.   While the lead-managing underwriter [Macquarie] organizes and coordinates the due diligence effort, as co-manager, Brean [Murray] had [the] duty to perform its own independent due diligence for the December Offering.

159.   Brean [Murray] is held to the same high standards of due diligence as Macquarie.

160.   To the extent that Brean Murray relied on Macquarie to perform due diligence, Brean Murray was required to thoroughly review Macquarie's due diligence procedures and findings. . . .

161.   With a Beijing office and a public commitment to performing extensive bottoms up due diligence . . ., Brean Murray was certainly able, as part of its due diligence investigation, to check Puda's filings with . . . its provincial regulator in Shanxi, China. . . .

162.   Despite having an office in China, Brean Murray did not perform much of an independent investigation of Puda for the December Offering. In particular, Brean Murray made no attempt to verify Puda's ownership of Shanxi Coal. . . .

163.   It does not appear that Brean Murray utilized any independent experts to help in its due diligence investigation. Further, it failed to adequately query Macquarie's due diligence and thus failed to obtain and review the Kroll Report in breach of

9

its due diligence obligations.  Having knowledge of . . . the red flags . . . [and] the opacity of business in the PRC, Brean Murray was reckless in not independently verifying the ownership of Shanxi Coal prior to the December Offering or not being fully informed about the due diligence being undertaken by Macquarie.

164.    The Chief Executive of Brean Murray stated in an e-mail [to one of his subordinates, after the fraud was publicly disclosed] . . . 'you need to call MacQ on the due dili file and see who gave an opinion on the ownership and what was the basis for that opinion.  Wasn't this news talked about and dismissed a while ago?' . . .

165.    Moreover, Brean Murray was the lead underwriter for a $16 million public offering of Puda shares in February 2010 . . . [and] knowingly failed to verify ownership of Shanxi Coal [at that time].  Indeed, an email among Brean Murray investment bankers appears to acknowledge that the legal opinion they reviewed for the February offering did not verify ownership of Shanxi Coal . . . [and that] Brean Murray may have rushed the February 2010 offering to market without verifying ownership of Shanxi Coal because Chinese New Year was beginning shortly[1] . . . .

166.  Even if Brean Murray relied on Macquarie to perform due diligence for the December Offering and verify ownership of Shanxi Coal, . . . at the barest minimum, Brean Murray was required to conduct an in-depth review of Macquarie's due diligence findings and assure itself that Macquarie had done adequate due diligence. . . . This includes obtaining and reviewing the Kroll Report.  Brean Murray either recklessly failed to inquire of Macquarie as to its due diligence findings, or if it did, it (would have) learned of the Kroll Report and had actual knowledge of the fraud.

---

[1] Plaintiffs' language ("knowingly fails") implies that the cited e-mail chain reveals a deliberate decision by Brean Murray, in connection with its due diligence for the prior February offering when it was the lead underwriter, not "to verify ownership of Shanxi Coal" (SAC ¶ 165).  But the cited e-mail chain does not address "ownership of Shanxi Coal," much less 'knowingly fail[] to verify" it; to the contrary, the opinion of Chinese counsel attached to the e-mail chain stated affirmatively that Shanxi Coal was in fact owned indirectly by Puda ("Shanxi Coal is a 90% subsidiary of Putai").  The problem, as the Court knows, is that those statements were false, and that neither Brean Murray nor anyone else picked that up at the time.  But there is no evidence in the e-mails (or anywhere else) of any "knowing[] fail[ure]" as misleadingly alleged by the plaintiffs.  (The e-mail chain and attachment quoted and cited by plaintiffs is attached for the Court's reference as Exhibit B to the Canales transmittal declaration, as authorized by applicable authorities given plaintiffs' reliance on those documents in their complaint.  See, e.g., *Chambers v. Time Warner*, 282 F.3d 147, 152-154 (2d Cir. 2002).)

It is undisputed that plaintiffs cannot allege, and have not alleged, that Brean Murray actually "learned of the Kroll Report" or "had actual knowledge of the fraud."  The allegation can only be that Brean Murray "should have" learned of the Kroll Report during the six days between its delivery to Macquarie and the public offering.  Evidently recognizing that that allegation amounts (at best) to negligence, plaintiffs engage in convoluted syntax to imply in paragraph 166 of the complaint, quoted immediately above, something more than they can allege in good faith under the strictures of Rule 11.  They then go on to conclude as follows:

> 167.  In Mr. Purcell's opinion [Mr. Purcell being plaintiff's due-diligence expert], . . . Brean Murray – in neither independently verifying Shanxi Coal's ownership, nor confirming with Macquarie that it had done adequate due diligence and verified ownership of Shanxi Coal and disclosed all material facts in the Prospectus – was reckless in the preparation and issuance of the Prospectus.

As set forth in the Argument section below, none of the allegations in paragraphs 157-167 (or elsewhere) – taken individually or collectively – rises to the level of "recklessness" constituting the required "strong" inference of scienter, notwithstanding Mr. Purcell's paid opinion.[2]  None of it shows, or tends to show, that "the danger" that Puda did not own its purported asset was "known" to Brean Murray "or so obvious that [Brean Murray] must have been aware of it."  And even if that inference were plausible – which it is not – plaintiffs have another hurdle and it is insurmountable on these allegations:  Under binding Supreme Court and

---

[2] While the factual allegations in the complaint must be taken as true for purposes of a motion to dismiss, that does not extend to plaintiffs' improper reliance on the legal conclusion assertedly reached by their expert (SAC ¶ 167 above), because "[t]here is no dispute that opinions concerning state of mind are an inappropriate topic for expert opinion." *Bd. of Trustees of AFTRA Retirement Fund v JPMorgan Chase Bank,* 2011 WL 6288415 at *8 (S.D.N.Y. Dec. 15, 2011), citing *Highland Capital Mgmt. v. Schneider,* 379 F. Supp.2d 461, 469 (S.D.N.Y.2005).  "Rule 704 restricts how an expert may frame her opinions. . . . She may opine that a defendant acted outside of established guidelines, but she may not opine that the defendant acted *negligently* or *recklessly.*"  *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.,* 643 F. Supp.2d 482, 504-05 (S.D.N.Y. 2009) (emphasis in original); see also *Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 285-86 (5th Cir. 2006) ("[A]llowing plaintiffs to rely on an expert's opinion in order to state securities claims requires a court to 'confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage'") (citation omitted).

Second Circuit precedent, the court must also consider "opposing inference[s] of nonfraudulent intent" and engage in a "comparative evaluation."  Only if a reasonable person would deem the inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged" can a 10b-5 pleading survive a motion to dismiss.

Under the facts described above and in the SAC as a whole, the overwhelming inference a reasonable person would draw is that Brean Murray did not conduct sufficient due diligence and (like many others) negligently "missed" the fraudulent transfer committed by Puda's principal.  That does not "approximate intent" and it does not come close to securities fraud.

## Argument

### I.  As a Threshold Matter,<br>Brean Murray is Not Sufficiently Alleged<br>to Have Been the "Maker" of the False Statements at Issue<br>So As To Be Liable Under Rule 10b-5<br>Pursuant to the Supreme Court's Holding in *Janus*

Before even addressing the absence of sufficient scienter allegations against it, Brean Murray joins in Macquarie's motion to dismiss Count IV of the SAC, as it applies to Brean Murray, on the ground that Plaintiffs have failed to sufficiently allege that either of the underwriters were "makers" of the material misstatements at issue.  As to Brean Murray itself, however, it must be added that nowhere in the SAC is it alleged with any particularity that Brean Murray had the "ultimate authority" over the subject misstatements contained in the registration statement and prospectus.  To the contrary, the SAC alleges only that Macquarie was the entity with the ultimate authority over those documents.[3]

---

[3] Whether plaintiffs sufficiently plead what is necessary against Macquarie in this context is briefed by Macquarie in its motion papers, and is not addressed by Brean Murray herein.  Brean Murray's point, as set forth in the text above, is simply that plaintiffs have failed to make any non-conclusory allegations that Brean Murray was the "ultimate authority" and therefore the "maker" of the misstatements at issue.

Specifically, in ¶ 139 of the SAC plaintiffs allege that "[a]s the Underwriters' representative, Macquarie's was the ultimate sign-off and approval for the prospectus.  Absent Macquarie's sign off and approval, the Prospectus would not have been filed with the SEC and disseminated to investors, and the December Offering would not have gone forward."  Similarly in ¶ 235, plaintiffs allege that "Macquarie (as representative[] of the Underwriters) had ultimate authority and provided final approval for the contents of the Prospectus before it was filed with the SEC and issued to the public.  Macquarie fraudulently and/or recklessly underwrote the December Offering knowing that the Company's Registration Statement and Prospectus issued pursuant to the December Offering were materially false and misleading."  And in ¶ 154, Plaintiffs allege, "Thus, the knowingly false and misleading statements contained in the Prospectus, over which Macquarie had ultimate authority, are attributable to Macquarie."

Accordingly, for the reasons set forth in Macquarie's brief and additionally for the reasons set forth above, Count IV of the SAC should be dismissed as to Brean Murray under the principles enunciated by the Supreme Court in *Janus Capital Group v. First Derivative Traders*, 131 S. Ct. 2296 (2011).  See also, e.g., in addition to the authorities cited in Macquarie's memorandum of law, *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp.2d 458, 484 (S.D.N.Y. 2012) (applying *Janus,* the Court dismissed plaintiff's 10b-5 claims against an underwriter where the plaintiff "[had] not plausibly alleged facts to show that [the underwriter] was the 'entity with the ultimate authority over the statement[s], including its content and whether and how to communicate it'").

## II.  Plaintiff's Allegations Do Not Amount to
## Actionable Scienter Under the Applicable Authorities

### The Legal Framework

Brean Murray is moving to dismiss plaintiffs' fourth cause of action (SAC ¶¶ 229 et seq.) for violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.  "To state a claim under Section 10(b) and Rule 10b-5, plaintiffs must adequately allege [that] the defendant made a misstatement or omission of a material fact [and] did so with the requisite scienter" (among other things).  *In re Keryx Biopharmaceuticals, Inc. Securities Litigation*, 2014 WL 585658 at *6 (S.D.N.Y. Feb. 14, 2014) (Forrest, J.).

On a motion to dismiss, the Court accepts as true all well-pleaded factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009).  As a private securities fraud action, this suit is governed by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"), which imposes the "heightened" pleading requirement discussed in detail below.  *South Cherry Street v. Hennessee Group*, 573 F.3d 98, 110 (2d Cir. 2009).  "Therefore," according to the Second Circuit, "'[w]hile we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter.'"  *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009), quoting 15 U.S.C. § 78u-4(b)(2) (emphasis added):

> [T]he complaint shall . . . state with particularity facts giving rise to a <u>strong</u> inference that the defendant acted with the required state of mind.

The Second Circuit has "long held that the scienter element can be satisfied by a strong showing of reckless disregard for the truth," and plaintiffs appear to base their fraud claim against Brean Murray on allegations of recklessness alone (see, e.g., SAC p. 51 and ¶¶ 156, 167,

235).  But "[b]y reckless disregard for the truth, we mean 'conscious recklessness – i.e., a state of mind <u>approximating actual intent</u>, and <u>not merely a heightened form of negligence</u>.'"  *South Cherry*, supra at 109, quoting *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) (emphasis by the Second Circuit in *South Cherry*).  This Court has held, summarizing by now well-established law, that to sufficiently plead actionable recklessness in this context,

> requires allegations that a defendant's conduct was highly unreasonable and constituted an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.

*Keryx*, supra at *8.

The United States Supreme Court has pronounced, and the Second Circuit has reiterated, that "[t]o meet the 'strong inference' standard [of the PSLRA], it is not sufficient to set out 'facts from which, if true, a reasonable person <u>could</u> infer that the defendant acted with the required intent," for that gauge 'does not capture the stricter demand that Congress sought to convey.'"  *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 314 (2007), quoted in *South Cherry*, 573 F.3d at 110-111 (emphasis by the Second Circuit).  "Rather, '[t]o qualify as 'strong' within the intendment of [the PSLRA], . . . <u>an inference of scienter</u> must be more than merely plausible or reasonable – it <u>must be cogent and at least as compelling as any opposing inference of nonfraudulent intent</u>.'  *Tellabs*, supra, quoted in *South Cherry*, 573 F.3d at 111 (emphasis by the Second Circuit).

> To determine whether a complaint's scienter allegations can survive threshold inspection, . . . a court . . . <u>must consider, not only inferences urged by the plaintiff</u>, . . . but also <u>competing inferences rationally drawn from the facts alleged</u>.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.

*Tellabs*, supra at 314, quoted in *South Cherry*, supra at 111 (emphasis by the Second Circuit).

"The inquiry is inherently comparative:  How likely is it that one conclusion, as compared to others, follows from the underlying facts? . . . A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, supra at 323-324.  Thus, according to the Second Circuit, if there are "a number of permissible competing inferences," and a non-fraudulent inference is "'at least as compelling' as the conscious-recklessness inference," the PSLRA requires dismissal of the fraud claim (*South Cherry*, supra at 111).  That is almost the situation here, except that in the case of Brean Murray and the Puda fraud, the inference of negligence is actually far more compelling than any inference "approximating actual intent."

**By Far the Most Compelling Inference**
**with Regard to Brean Murray**
**From the Allegations of the Complaint**
**is Negligence**
**<u>For its Failure to Discover the Puda Fraud</u>**

In plaintiffs' <u>own</u> description of the underwriters' claimed liability for securities fraud under Rule 10b-5, they use the word "recklessly" in conclusory (and insufficient) fashion, but their actual allegations make clear that as to Brean Murray, at best negligent due diligence is what they describe.  See Count IV of the SAC ("Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder"), at ¶ 235:

> Macquarie and Brean Murray jointly with Puda's officers drafted the fraudulent Prospectus.  Macquarie and Brean Murray delivered the Prospectus to investors. Macquarie (as representative of the Underwriters) had ultimate authority and provided final approval for the contents of the Prospectus before it was filed with the SEC and issued to the public.  Macquarie fraudulently and/or recklessly underwrote the December Offering knowing that the Company's Registration Statement and Prospectus issued pursuant to the December Offering were materially false and misleading.  Brean Murray recklessly underwrote the December Offering and distributed the Prospectus to investors publicly without conducting

16

> adequate due diligence of its own or reviewing the due diligence
> materials gathered by Macquarie, despite the existence of red flags
> and its failure to ascertain Puda's ownership of Shanxi Coal in
> connection with the February 2010 stock offering.

That is simply not sufficient.  "[F]or substantially the reasons stated by the district court," the

Second Circuit recently affirmed dismissal of a 10b-5 claim and "agree[d]" that "[plaintiff's]

allegations of red flags, though perhaps sufficient to give rise to a negligence claim . . ., do not

support a recklessness indicative of conscious indifference," although plaintiff claimed – just like

the plaintiffs here – that had defendant "investigated [various] irregularities, it would have

uncovered the fraud."  But "a purported failure to investigate [does] not rise above the level of

negligence."  *Iowa Public Employee's Retirement System v. Deloittte & Touche LLP*, 919 F.

Supp.2d 321, 336 (S.D.N.Y. 2013), aff'd, 2014 WL 998311 (2d Cir. Mar. 17, 2014).

Quite recently, this Court stated similarly that "'[a]n allegation that a defendant merely

ought to have known is not sufficient to allege recklessness.'"  *In re Lululemon Securities*

*Litigation*, 2014 WL 1569500 at *13 (S.D.N.Y. Apr. 18, 2014) (Forrest, J.).  In that decision, this

Court expressly applied the Supreme Court's "cogent" and "compelling" mandate in weighing

competing inferences:

> It is more reasonable and likely that a publicly traded company,
> which touts quality as a centerpiece, will want to rectify any
> quality issues as quickly as possible since [such] issues would be
> (and were) immediately apparent and directly affected sales.  It is
> far less likely (and certainly not cogent and compelling) that the
> need for quality in order to maintain its brand would lead a
> company to make intentionally false statements regarding its
> remediation of quality problems, since doing so could only result
> in inevitable discovery with defective products on the shelves.

*Id.* at *21.  Bearing in mind that the PSLRA requires a "strong inference" that the defendant

"acted with the required state of mind," and that the Supreme Court has defined "strong" in this

context as "powerful or cogent"; "'persuasive, effective, and cogent'"; and "'powerful to

demonstrate or convince,'" in the case of the Puda fraud, it is far "more reasonable and likely" –
at worst, taking plaintiff's allegations as true for purposes of this motion – that Brean Murray
(like many others) simply missed the ownership transfer through faulty due diligence, than that it
deliberately closed its eyes to that issue and consciously failed to investigate whether Puda's
subsidiary actually still owned the company's sole revenue-producing asset. The latter would
simply make no sense, because (as in fact happened) eventually the fraud would emerge to the
severe detriment of Brean Murray and everyone else involved in the offering.

It simply strains credulity, and is surely not as "cogent and compelling" as the negligence
inference, that Brean Murray would seek to sweep the ownership issue under the rug for
purposes of a public offering. Unlike (say) unduly positive projections, or puffed-up test results,
or manipulation of financial numbers – in all of which situations, among many others, there is a
rational hope that things will turn around and all will end up well – here, if Puda did not own a
revenue-producing asset, there was literally no way the situation could be salvaged. For that
reason, the inference of negligence is far more "compelling and cogent" than anything
"approximat[ing] an actual intent to aid in the fraud."

The Second Circuit too has applied the Supreme Court's standard in a way that makes
clear the appropriate result here. In the *South Cherry* case, supra, the court dealt with plaintiff's
investment in Bayou Accredited Fund on the recommendation of defendant Hennessey Group
("HG"). The Bayou Fund turned out to be fraudulent; "the figures Hennessee Group provided to
South Cherry were all false, showing profits where there were instead large losses"; and "all of
the . . . representations by Hennessee Group as to [the] background [of Bayou Fund's principal]
and the performance of Bayou Fund were false" (573 F.3d at 102). Noting that "'there are limits
to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of

18

others,'" the Second Circuit found that "nowhere in the Complaint" – and the same is true here as to Brean Murray – "is there any allegation that Hennessee Group had [actual] knowledge that any representation it made . . . was untrue.  Instead" – as is precisely the case here with regard to Brean Murray – "the Complaint is replete with allegations that HG 'would' have learned the truth . . . if HG had performed the 'due diligence' it promised" (id. at 112):

> Nor, to the extent that [plaintiff] sought to allege recklessness, does the Complaint contain an allegation of any fact . . . that . . . created a strong inference that HG had a state of mind approximating an actual intent either to relay false or misleading information . . . or to aid in the fraud being perpetrated by [others].  Although the Complaint alleged that . . . Hennessee Group 'failed to take obvious investigative steps and ignored clear red flags' [an almost verbatim description of plaintiffs' allegations here against Brean Murray], it did not allege that Hennessee Group did not believe that the various Bayou funds' representations . . . were accurate.

Similarly there is, and can be, no allegation that Brean Murray "did not believe" that Puda owned the rights to the coal mines upon which its profitability, and the public offering, were based.

Continuing in the same vein, the Second Circuit also held that "there were [no] obvious signs of fraud, or that the danger of fraud was so obvious that HG must have been aware of it" (id.).  Rather, the complaint alleged that if HG had "taken [various] 'steps,' . . . [it] would have <u>discovered the existence</u> of [the fact critical to the fraud'" (id. at 113; emphasis in original):

> [Those] factual allegations . . . do not give rise to a strong inference that the alleged failure to conduct due diligence was indicative of an intent to defraud [and plaintiff cited no realistic motive for such an intent]. . . . Given the [eventual] disclosures . . . as to the Bayou Family Funds principals' fraudulent conduct, it would be plausible to infer that Hennessee Group had been negligent in failing to discover the truth.  It is far less plausible to infer that an industry leader that prides itself on having expertise . . . [and] that emphasizes its due diligence process . . . would <u>deliberately</u> jeopardize its standing and reliability, and the viability of its business. . . . (id.; emphasis added)

So too here.  Plaintiffs admit that Brean Murray "was the lead underwriter for a . . . public

offering of Puda shares in February 2010," at which time its due diligence failed to uncover the

underlying fraud, and that in the follow-on offering at issue in this suit, at worst, it "relied on

Macquarie to perform due diligence and verify ownership of Shanxi Coal" (SAC ¶¶ 165-166).

In other words, according to plaintiffs, Brean Murray performed its own due diligence

defectively in connection with the February 2010 offering, when it was the lead underwriter but

failed to detect the fraudulent ownership transfer, and then "failed to adequately query

Macquarie's due diligence" in connection with the December offering (SAC ¶ 163), when

Macquarie also failed to detect the fraud and did not act upon the Kroll Report.  It is certainly

plausible from those allegations to infer negligence on the part of Brean Murray – an issue that

Brean Murray will contest at the appropriate time – but "far less plausible," and surely not "at

least as compelling," to infer anything remotely like "an actual intent to aid in the fraud."

**Underwriter Cases in Particular**

Post-*Tellabs* claims of underwriter liability under Rule 10b-5 have been few and far

between, which itself indicates the very high bar applied to imputing "fraud by hindsight" to

third parties who failed to discover the fraud of others.  The pre-*Tellabs* caselaw, however, was

broadly consistent that allegations of defectively-performed due diligence, even if deemed

"inexcusable," cannot be transformed into securities fraud merely by slapping on the label

"reckless."

For example, much like this case, in *Manufacturers Life Ins. Co. v. Donaldson, Lufkin &*

*Jenrette*, 2000 WL 709006 (S.D.N.Y. June 1, 2000), plaintiff "ask[ed] [the court] to infer that

DLJ was reckless in failing to discover and disclose [certain key information]," because it

consisted of "publicly known facts" – in the U.S., not in China – "that could have been readily

discovered [by the defendant] as the . . . news media did [discover] subsequently." The court

rejected the invitation:

> We can draw no such inference however. . . . [P]laintiff has simply
> alleged a claim of arguable negligence and pointed to no facts from
> which to draw a strong inference of recklessness.

Id. at *4, holding that "we find nothing in plaintiff's preferred 'red flags' from which we can

infer that defendant acted with fraudulent intent. At most, plaintiff asserts a claim for

negligence," but "even inexcusable negligence" does not rise to "[t]he level of recklessness

required in a securities fraud case" (id. at *3).

Similarly, in *In re WRT Energy Securities Litigation*, 1999 WL 178749 (S.D.N.Y. Mar.

31, 1999), the court noted that

> In bringing claims against . . . [u]nderwriter [d]efendants, Plaintiffs
> are charging third-party advisers with fraud. . . . Plaintiffs must
> allege facts approaching a knowledgeable participation in the fraud
> or a deliberate and conscious disregard of facts. Where third-party
> advisers are concerned, to meet such a standard the allegations
> must 'approximate an actual intent to aid in the fraud being
> perpetrated . . .' (id. at *9).

In that case, plaintiffs "allege[d] over and over again" – much like plaintiffs' allegations in this

case – that "under ordinary underwriting procedures, [the underwriter defendants] should have

been able to . . . learn during the course of their due diligence" a series of facts demonstrating

that all of the statements made by the underwriters about the issuer "were false and misleading

[and had] no reasonable basis" (id. at *10, *2). But

> at base, these allegations claim that if Oppenheimer and Schroder
> had properly done their jobs as underwriters and performed due
> diligence adequately, they would have uncovered the truth. . . .
> These allegations constitute negligence at best, and these types of
> allegations against an underwriter have always been insufficient to
> establish scienter under the federal securities laws.

That remains true today, as *Tellabs* and the post-*Tellabs* cases cited above made clear.

21

In *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256, 282 (3d Cir. 2006), plaintiffs alleged that "the Underwriters collectively failed to adequately review Suprema's internal financial forecasts, contracts, and other documents, make a physical inspection of Suprema's major facilities, employ analysts having expertise in the . . . business, conduct interviews with Suprema's senior and middle management, or interview Suprema's major customers, outside quality consultants, auditors, and legal counsel. . . ." Those allegations were, in effect, of a near-total absence of due diligence, which is not alleged here: plaintiffs acknowledge that Brean Murray served as lead underwriter in the prior February offering and conducted due diligence in that regard, and with respect to the December offering, allege only that Brean Murray "failed to adequately query Macquarie's due diligence," was "not . . . fully informed about the due diligence undertaken by Macquarie," and "did not perform much of an independent investigation for the December Offering" (SAC ¶¶ 162-163). The Third Circuit nonetheless held that "even inexcusable negligence is not enough. . . . Our review of the . . . Plaintiffs' allegations confirms the District Court's conclusion that they failed adequately to allege scienter. The breaches alleged are, at best, negligent breaches of the duty to investigate." Furthermore, notwithstanding plaintiff's allegations that "the Underwriters earned significant fees for services rendered in connection with the public offerings," the court held that "the fact that the Underwriters earned fees for their services does not establish that they acted with any culpable intent."

Finally, in *In re Crazy Eddie Securities Litigation*, 817 F. Supp. 306 (E.D.N.Y. 1993), where the court observed that while "'actions performed with deliberately cultivated ignorance are a form of intentional conduct' meeting the scienter requirement," "even if plaintiffs could explain how the Underwriters might have discovered the fraud, plaintiffs fail to raise a genuine

issue as to whether the Underwriters deliberately shut their eyes to the fraud.  At most plaintiffs' argument suggests that the Underwriters were negligent" (id. at 312, 316).  Here there can be no allegation that Brean Murray acted with "deliberately cultivated ignorance" of whether Puda actually owned its sole underlying asset, nor would that make any sense.  Brean Murray did not know of the fraud (plaintiffs do not and cannot allege otherwise), did not receive the Kroll Report (plaintiffs do not and cannot allege otherwise), and it cannot plausibly be inferred that Brean Murray "deliberately shut [its] eyes" to something that would have rendered the entire company utterly worthless.  And even if that could somehow be plausibly inferred, it would surely not be as "cogent and compelling" as the "opposing nonfraudulent inference" of negligence.

## Conclusion

For the reasons set forth above, the Court should dismiss plaintiffs' fourth cause of action against Brean Murray for insufficient allegations of scienter under applicable Supreme Court and Second Circuit precedent, as well as for failure to satisfy *Janus* requirements.  Because plaintiffs have amended their pleading several times, and because their basis to charge Brean Murray with fraud was so tenuous (if not frivolous), the dismissal should be with prejudice and without leave to further amend.

Dated:  May 21, 2014                         MOSES & SINGER LLP

                                             Attorneys for Brean Murray,
                                             Carret & Co.

                                             By:_____
                                                   Robert S. Wolf
                                                   Steven R. Popofsky
                                                   Jason Canales
                                             The Chrysler Building
                                             405 Lexington Avenue, 12th Floor
                                             New York, New York 10174
                                             (212) 554-7800

24