UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PUDA COAL SECURITIES INC.
et al. LITIGATION

CASE NO:  1:11-CV-2598 (KBF)

**MEMORANDUM OF LAW IN SUPPORT OF
MACQUARIE CAPITAL (USA) INC.'S MOTION TO DISMISS
THE SECOND CONSOLIDATED AMENDED AND SUPPLEMENTAL COMPLAINT**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

*ATTORNEYS FOR MACQUARIE CAPITAL (USA)
INC.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 3

ARGUMENT ..................................................................................................................... 5

I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b)
      AND RULE 10b-5................................................................................................... 5

      A.    The Prospectus, And The Statements Therein, Are The Company's .................... 7

      B.    Macquarie Did Not "Make" Any Statements In The Prospectus ......................... 10

II.   TRELLUS'S SECURITIES ACT CLAIMS ARE TIME-BARRED ............................... 20

III.  TRELLUS LACKS STANDING TO ASSERT A
      SECTION 12 CLAIM AGAINST MACQUARIE ....................................................... 21

CONCLUSION ................................................................................................................. 23

US_ACTIVE:\44484275\6\60851.0107

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

In re Allstate Life Ins. Co. Litig.,
 2012 WL 176497 (D. Ariz. Jan. 23, 2012) ................................................................... 17, 18

Ashcroft v. Iqbal,
 556 U.S. 662 (2009) .................................................................................................. 5

In re Barclays Bank PLC Sec. Litig.,
 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ..................................................................... 21

Bell Atl. Corp. v. Twombly,
 550 U.S. 544 (2007) .................................................................................................. 5

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
 511 U.S. 164 (1994) .................................................................................................. 6

Chambers v. Time Warner, Inc.,
 282 F.3d 147 (2d Cir. 2002) ....................................................................................... 1

In re CitiGroup Inc. Bond Litig.,
 723 F. Supp. 2d 568 (S.D.N.Y. 2010) .......................................................................... 21

Cortec Indus., Inc. v. Sum Holding L.P.,
 949 F.2d 42 (2d Cir. 1991) ......................................................................................... 21

Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,
 2012 WL 231567 (S.D.N.Y. Jan. 24, 2012),
 rev'd on other grounds, 722 F.3d 81 (2d Cir. 2013) ....................................................... 21

In re Fannie Mae 2008 Sec. Litig.,
 891 F. Supp. 2d 458 (S.D.N.Y. 2012),
 aff'd, 525 F. App'x 16 (2d Cir. 2013) ......................................................... 8, 11, 15, 18

In re Global Crossing, Ltd. Sec. Litig.,
 471 F. Supp. 2d 338 (S.D.N.Y. 2006) ........................................................................... 1

Griffin v. PaineWebber, Inc.,
 2001 WL 740764 (S.D.N.Y. June 29, 2001) ................................................................. 22

Highland Capital Mgmt., L.P. v. Schneider,
 2004 WL 2029406 (S.D.N.Y. Sept. 9, 2004) ................................................................. 19

US_ACTIVE:\44484275\6\60851.0107

**TABLE OF AUTHORITIES**
(continued)

Page(s)

In re Initial Pub. Offering Sec. Litig.,
    214 F.R.D. 117 (S.D.N.Y. 2002) ..................................................................21

Janus Capital Grp., Inc. v. First Derivative Traders,
    131 S. Ct. 2296 (2011) ...................................................................... passim

Kramer v. Time Warner, Inc.,
    937 F.2d 767 (2d Cir. 1991) .........................................................................1

Krasner v. Rahfco Funds LP,
    2012 WL 4053809 (S.D.N.Y. Aug. 9, 2012)......................................................12

Liberty Media Corp. v. Vivendi Universal, S.A.,
    861 F. Supp. 262 (S.D.N.Y. 2012) ..................................................................18

Meeks v. Murphy Auto Grp., Inc.,
    2009 WL 3669639 (M.D. Fla. Oct. 30, 2009) ...................................................19

In re Miller Energy Res. Sec. Litig.,
    2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) ....................................................15

In re Nat'l Century Fin. Enters., Inc.,
    846 F. Supp. 828 (S.D. Ohio 2012)..............................................................17, 18

In re Optimal U.S. Litig.,
    2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011)................................12, 13, 14 16, 19

Pac. Inv. Mgmt. Co. v. Mayer Brown LLP,
    603 F.3d 144 (2d Cir. 2010) ......................................... 2, 11, 12, 17

Pinter v. Dahl,
    486 U.S. 622 (1988) ...............................................................................21, 22

Scott v. ZST Digital Networks, Inc.,
    896 F. Supp. 2d 877 (C.D. Cal. 2012)..............................................................17

SEC v. Tambone,
    597 F.3d 436 (1st Cir. 2010)...................................................................12, 13

SEC v. Tourre,
    2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) .......................................................11

Shapiro v. Cantor,
    123 F.3d 717 (2d Cir. 1997) ........................................................................12

iii

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

Shuler v. Regency House of Wallingford, Inc.,
2006 WL 118383 (D. Conn. Jan. 13, 2006).................................................21

Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,
2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001).............................................22

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,
552 U.S. 148 (2008) ...............................................................................6, 13

Yung v. Lee,
432 F.3d 142 (2d Cir. 2005) ........................................................................1

**Statutes & Rules:**

15 U.S.C. § 77e ............................................................................................9

15 U.S.C. § 77f .............................................................................................9

15 U.S.C. § 77k ..........................................................................................13

15 U.S.C. § 77l ...........................................................................................21

Fed. R. Civ. P. 10b-5 ..........................................................................passim

Fed. R. Civ. P. 12(b)(1) ...............................................................................1

Fed. R. Civ. P. 12(b)(6) ...........................................................................1, 5

Fed. R. Civ. P. 15 ........................................................................................3

Fed. R. Civ. P. 17 ........................................................................................3

Fed. R. Civ. P. 19 ........................................................................................3

Fed. R. Civ. P. 21 ........................................................................................3

Fed. R. Civ. P. 24 ........................................................................................3

Fed. R. Civ. P. 82 ........................................................................................3

US_ACTIVE:\44484275\6\60851.0107

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Other Authorities:**

Chair Mary Jo White, <u>Three Key Pressure Points in the Current Enforcement Environment</u>, NYC Bar Association's Third Annual White Collar Crime Institute, <u>available at</u> http://www.sec.gov/News/Speech/Detail/Speech/1370541858285#.U3tBTSiOR8E (May 19, 2014)...................................................................................................................13

<u>Glossary Item: 10b-5 Letter</u>, Practical Law, <u>available at</u> http://us.practicallaw.com/cs/Satellite/us/resource/1-382-3202 (2014)..................................17

<u>Negative Assurances in Securities Offerings (2008 Revision)</u>, 64 Bus. Law. 395, <u>available at</u> http://apps.americanbar.org/buslaw/tribar/materials/20090519000000.pdf...........................17

Sinalko, Stephen M. & Matan Koch, '<u>Janus Capital' & Underwriter Liability Under Section 10 & Rule 10b-5</u>, 246 N.Y.L.J. No.7 (2011)..........................................................................18

US_ACTIVE:\44484275\6\60851.0107

Defendant Macquarie Capital (USA) Inc. ("Macquarie") respectfully submits this memorandum of law in support of its motion to dismiss Counts I, II and IV of the Second Consolidated Amended and Supplemental Complaint For Violations of the Federal Securities Laws, dated April 21, 2014 (the "Amended Complaint" or "SAC"), pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

This action arises from an alleged fraudulent scheme orchestrated by Defendant Ming Zhao ("Zhao") to mislead investors as to the true ownership of Defendant Puda Coal, Inc.'s ("Puda" or the "Company") primary operating subsidiary, the Shanxi Puda Coal Group Co., Ltd. ("Shanxi Coal"). Although Puda represented in public filings throughout the putative class period that it owned 90% of Shanxi Coal, Zhao (Puda's former Chairman and its controlling shareholder) had secretly transferred Puda's interest in the subsidiary first to himself and then to an unrelated private equity fund with no consideration to the Company, effectively leaving Puda a shell company without any assets, operations or revenues.

Plaintiffs have asserted a Section 10(b) claim against Macquarie, and have also re-asserted previously dismissed (and time-barred) Section 11 and 12 claims against Macquarie, which claims are now brought by Trellus Management Company LLC ("Trellus"). For the reasons set forth below, each of Plaintiffs' claims should be dismissed.

---

[1] Copies of any documents referred to in this memorandum of law are attached to the accompanying declaration of Stefania D. Venezia ("Venezia Decl."). When reviewing a motion to dismiss under Rule 12(b)(6), a Court may consider "'any written instrument attached to [the complaint] as an exhibit,' 'any statements or documents incorporated in it by reference,' and any document not incorporated but that is, nevertheless, 'integral' to the complaint because the complaint 'relies heavily upon its terms and effect.'" Yung v. Lee, 432 F.3d 142, 146 (2d Cir. 2005) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)). The court "may also take judicial notice of matters of public record, including the contents of documents required to be filed with the SEC." In re Global Crossing, Ltd. Sec. Litig., 471 F. Supp. 2d 338, 343 (S.D.N.Y. 2006) (citing Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

First, Plaintiffs have not established that Macquarie (as opposed to Puda) made any of the false statements at issue as required by Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011).   As the Amended Complaint itself makes clear, the Prospectus was Puda's – and the statements made therein – were made by Puda (as evidenced by, among other things, the references to "we" and "our" (which, as defined in the Prospectus, refer to Puda and its subsidiaries)).   Macquarie is identified as an underwriter in the Prospectus; it is never identified as the author.   Plaintiffs have failed to point to a single statement, let alone a misstatement about ownership, that was actually attributed to Macquarie.   Rather, flying in the face of Janus, Plaintiffs allege only that Macquarie participated in the drafting of the Prospectus, signed-off on the Prospectus and distributed the same to investors.   Under Janus, these allegations are insufficient to establish that Macquarie, as opposed to Puda, made the statements in the Prospectus and had "ultimate authority" over them.   Indeed, holding Macquarie liable as a primary actor under Section 10(b) would subject each and every underwriter – as well as similarly situated financial and legal advisors – to primary liability for their secondary roles in securities offerings, a result neither intended by Congress nor consistent with the Supreme Court's decision in Janus or the Second Circuit's holding in Pacific Investment Management Company LLC v. Mayer Brown, LLP, 603 F.3d 144 (2nd Cir. 2010).

Second, as set forth in multiple briefs and letters submitted to the Court, Trellus's Section 11 and 12 claims are time-barred given the Court's prior rulings (none of which have been reversed or vacated) that:  (i) Mr. Rosenberger, the sole named plaintiff who previously asserted Section 11 and 12 claims against Macquarie, had no Article III standing to bring such claims in the first instance; (ii) Macquarie's previous dismissal from the action at summary judgment was for "lack of subject matter jurisdiction"; (iii) Trellus's motion to intervene was

filed after the expiry of the applicable statute of limitations; and (iv) the doctrine of <u>American Pipe</u> tolling was inapplicable under the circumstances.  Where, as here, there was no subject matter jurisdiction over the initial Section 11 and 12 claims, no federal rule of civil procedure can create jurisdiction as a matter of law.  <u>See</u> Fed. R. Civ. P. 82.  Thus, respectfully, none of Rules 15, 17, 19, 21 or 24 can serve to revive indisputably time-barred Section 11 and 12 claims as to which there was never any subject matter jurisdiction.  Macquarie includes these arguments here solely for the purpose of preserving the issue for appeal.

Finally, Trellus's Section 12 claim as against Macquarie should be dismissed for the independent reason that Trellus has not pled, as it must, that it either (i) purchased Puda shares in the December Offering directly from Macquarie or (ii) was solicited to make such purchase directly by Macquarie.

In short, each of Counts I, II and IV of the Amended Complaint should be dismissed as against Macquarie.

## STATEMENT OF FACTS

Puda, a Delaware corporation headquartered in Shanxi Province, China, was, at all relevant times, a supplier of cleaned coking coal used to produce coke in steel manufacturing. SAC ¶ 44.  Before the transfers described below, Puda indirectly owned 90% of Shanxi Coal with the remainder owned by Zhao (8%), its controlling shareholder and Chairman of the Board, and his brother, Yao Zhao (2%); the Company accordingly consolidated Shanxi Coal's results in the financial statements it provided investors.  <u>Id.</u> ¶¶ 8, 81, 87.   Plaintiffs allege that just prior to the putative class period, Zhao arranged for his brother to transfer to him all of Puda's holdings in Shanxi Coal (as well as 1% of Y. Zhao's interest), thereby increasing his personal stake in the subsidiary to 99%.  <u>Id.</u> ¶ 9.  Puda received no consideration for these transfers even though they left the company with "zero ownership in Shanxi Coal."  <u>Id.</u>   Zhao thereafter: (i) transferred

US_ACTIVE:\44484275\6\60851.0107

49% of Shanxi Coal to CITIC Trust Co. (China's largest private equity fund and merchant bank, owned and controlled by the Chinese government) in return for shares in a mutual fund worth $179 million; and (ii) pledged the remainder to CITIC as security for a $369 million loan (which loan was subsequently increased to $738.55 million).  Id. ¶¶ 11, 13.  Nowhere is Macquarie alleged to have participated in, benefitted from, or known about, these transfers at the time they were perpetrated.

During the putative class period, "Puda conducted two separate public offerings . . . without disclosing [the fraudulent] transfers or that it no longer had any operating business at all."  Id. ¶ 18.  The first occurred in February 2010 (the "February Offering") and was underwritten by Brean Murray, Carret & Co., LLC ("Brean Murray").  Id. ¶¶ 54-56.  There is no allegation that Macquarie had any involvement in the February Offering (indeed, it did not).  Id. The second offering closed in December 2010 (the "December Offering").  Id. ¶¶ 18, 42. Macquarie and Brean Murray served as co-underwriters for the December Offering.  Id. ¶¶ 54-56.

In connection with the December Offering, the Amended Complaint alleges that "Macquarie hired Kroll" to assist with Macquarie's due diligence efforts.  Id. ¶ 57.  Specifically, Macquarie is alleged to have hired Kroll to "perform background checks with respect to Puda and persons associated therewith."  Id.  Plaintiffs allege that the investigative report prepared by Kroll (the "Kroll Report") and delivered to Macquarie showed that, "based upon SAIC records Puda did not (through its wholly-owned subsidiary Putai) own 90% of Shanxi Coal."  Id.  As alleged by Plaintiffs, the Kroll Report "'identified the current shareholders of Shanxi Puda Coal Group Co., Ltd.' as Ming Zhao, owning 50%, CITIC Trust Co., Ltd., owning 49% and Wei Zhang, owning 1%."  Id. ¶ 151; see also id. ¶ 57.

Also in connection with the December Offering, "Puda filed with the SEC a series of Registration Statements and Prospectuses." Id. ¶ 114 (emphasis added). Plaintiffs allege that the Registration Statement and Prospectus filed by Puda were false and misleading because they: (i) incorporated the materially false and misleading financial statements contained in Puda's SEC filings; and (ii) represented that Puda owned 90% of Shanxi Coal and nowhere disclosed the transfers by Zhao and his brother which left the Company without any ownership interest in the subsidiary. Id. ¶¶ 116-17.

Plaintiffs now assert claims against Macquarie under both the Securities Exchange Act of 1934 (specifically, Section 10(b)) (id. ¶¶ 229-39) and the Securities Act of 1933 (Sections 11 and 12). Id. ¶¶ 197-219.

## ARGUMENT

In deciding a motion to dismiss under Rule 12(b)(6), the Court must assume that well-pled factual allegations in the complaint are true. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). But the Court need not accept legal conclusions, naked assertions, mere conclusory statements or implausible inferences. See Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (citing Twombly, 550 U.S. at 555). A claim must raise more than the "mere possibility of misconduct" – a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678-79.

## I.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) AND RULE 10b-5

Under Rule 10b-5, it is unlawful for any person to "make any untrue statement of a material fact" in connection with the purchase or sale or securities. Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2301 (2011) (emphasis added). But only those who actually make the untrue statements can have 10b-5 liability. Id. Thus, in order to be held liable,

US_ACTIVE:\44484275\6\60851.0107

Macquarie must have "made" the material misstatements about the ownership of Shanxi Coal contained in the Registration Statement and Prospectus.  Id.  According to the Supreme Court:

> One "makes" a statement by stating it . . . .  For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed.

Janus, 131 S. Ct. at 2302.[2]

In Janus, Plaintiffs brought Section 10(b) claims against an entity, JCM, for false and misleading statements in several mutual fund prospectuses issued by Janus Investment Fund, a related entity for which JCM acted as investment adviser and administrator.  Id. at 2299-2301. Despite the "'uniquely close relationship between [the] mutual fund and its investment adviser,'" the fact that the two had overlapping offices, and despite the fact that JCM was "significantly involved" in preparing the prospectuses at issue, the Court noted that Janus Investment Fund filed the prospectuses – not JCM – and that the statements were attributed to Janus Investment Fund, not to JCM.  Id. at 2304-05.  As the Court explained, JCM's "assistance, subject to the ultimate control of Janus Investment Fund, does not mean that JCM 'made' any statements in the prospectuses."  Id. at 2305.  Janus Investment Fund, not JCM, "made" the statements at issue.

---

[2] "A broader reading of 'make,' including persons or entities without ultimate control over the content of a statement, would substantially undermine," Janus, 131 S. Ct. at 2302, the Court's prior holdings that the implied private right of action in §10 and Rule 10b-5 does not include suits against aiders and abettors.  See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 180 (1994); see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 166 (2008) (explaining that, even without §10 liability, "secondary actors . . . are not necessarily immune from private suit"; the securities statutes "provide an express private right of action against accountants and underwriters in certain circumstances, and the implied right of action in §10 continues to cover secondary actors who commit primary violations") (citations omitted & emphasis added).

US_ACTIVE:\44484275\6\60851.0107

<u>Id.</u>  <u>Janus</u> is dispositive here.  If JCM, which was (i) related to Janus Investment Fund, (ii) served as its investment advisor and administrator, (iii) shared office space with it, and (iv) was "significantly involved" in preparing the prospectus, was <u>not</u> as a matter of law the maker of the statements in the prospectus, then Macquarie, which (i) was completely unrelated to Puda, (ii) had no involvement with Puda prior to the Secondary Offering, (iii) did not share offices or personnel with Puda, and (iv) had no role in the business or management of Puda, could not possibly have primary Section 10(b) liability.  Add to that the irrefutable fact that all statements about the ownership of Shanxi Coal in the Prospectus were actually attributed to Puda itself and it necessarily follows that the motion should be granted.

   <u>Janus</u> raises three critical questions:  (i) whose statements are at issue; (ii) who are the statements attributed to; and (iii) who has "ultimate authority" over the statements at issue.  Here, as set forth in detail below, the answer to each of these questions is Puda (not Macquarie).  Thus, Plaintiffs' Section 10(b) claim against Macquarie should be dismissed.

  **A.**  **<u>The Prospectus, And The Statements Therein, Are The Company's</u>**

   As Plaintiffs themselves have acknowledged, the Prospectus is "[t]he Company's" document.  <u>See</u> SAC ¶ 234 ("the Company's prospectuses and registration statements issued pursuant to the December Offering, and the Company's 2009 and 2010 annual reports, which were all filed with the SEC, were materially false and misleading"); <u>see also id.</u> ¶ 116 ("The Registration Statement and Prospectus filed with the SEC in connection with the December Offering expressly incorporated <u>Puda's</u> false and misleading FY 2009 10-K, Q1 2010 10-Q, and Q2 2010 10-Q.") (emphasis added).[3]  The Amended Complaint is replete with allegations that

---

[3] These same annual and quarterly filings were incorporated by reference in the Prospectus.  <u>See</u> Ex. A (Prospectus) at S-25 ("The SEC allows **us** to 'incorporate by reference' the information contained in documents that **we** file with them, which means that **we** can disclose important information to you by referring you to those documents. **We** incorporate by reference into this

7

the misrepresentations at issue are the Company's.  For example, according to Plaintiffs, "the Company nevertheless represented to investors during the Class Period in annual and quarterly filings with the SEC and other statements to the public that Puda continued to own 90% of Shanxi Coal."   See SAC ¶ 10 (emphasis added).   And, "the Company" (not Macquarie) "represented during the Class Period that Shanxi Coal was still 90% owned by Putai, and hence, that Puda indirectly owned 90% of Shanxi Coal."  Id. ¶ 85 (emphasis added); see also, e.g., id. ¶¶ 17, 77, 86-89, 114-16 and heading VII on page 29 (similarly referring to the Company's/Puda's filings and representations therein).

As a review of the Prospectus makes clear, the misstatements about the ownership of Shanxi Coal were made by the Company; none were made by Macquarie.  Indeed, on their face, the alleged misstatements in the Prospectus were made by Puda, not Macquarie.[4]  For example:

- "**Our** operations are conducted exclusively in China through **our** 90% owned subsidiary, Shanxi Puda Coal Group Co., Ltd., or Shanxi Coal."  Ex. A at S-5 (emphasis added).

---

prospectus supplement the following documents, which contain important information about **us** and **our** business and financial results: (•) our Annual Report on Form 10-K for the fiscal year ended December 31, 2009; (•) our Definitive Proxy Statement for our 2010 Annual Meeting of Stockholders, filed with the SEC on April 29, 2010; (•) our Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2010, June 30, 2010, and September 30, 2010; (•) our Current Reports on Form 8-K, filed with the SEC on May 12, May 13, May 17, May 25, July 1, August 5, August 16, October 25 and November 3; and (•) the description of our common stock set forth in our Registration Statement on Form 8-A filed with the SEC on September 16, 2009.") (emphasis added).

[4] As explained in the Prospectus, "[a]ll references in this prospectus supplement to 'Puda,' 'the Company,' 'we,' 'us' or 'our' mean Puda Coal, Inc. and its subsidiaries, unless we state otherwise or the context otherwise requires."   See Ex. A (Prospectus) at S-2; see also In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 484 (S.D.N.Y. 2012), aff'd on other grounds, 525 F. App'x 16 (2d Cir. 2013) ("All of the purported misrepresentations in the offering documents are couched in terms of 'we' and 'our,' which clearly refer to FNMA, not Goldman").

US_ACTIVE:\44484275\6\60851.0107

- "**Our** company has an offshore holding structure commonly used by foreign investors with operations in China. **We** are a corporation which owns BVI, and BVI owns Putai. **Our** operations are conducted exclusively through Shanxi Coal, in which **we** own 90% of the equity interest." <u>Id</u>. at S-10 (emphasis added).

- "**We** conduct substantially all of **our** operations through **our** control of Shanxi Coal." <u>Id</u>. at S-16 (emphasis added).

Moreover, the Prospectus clearly states that "[p]ursuant to this prospectus supplement and the accompanying prospectus, **we** are offering and selling 7,850,000 shares of **our** common stock at a price of $12.00 per share." <u>Id</u>. at Cover (emphasis added).    In contrast, the Prospectus' references to "Macquarie" are in the third-person and merely identify Macquarie as a joint bookrunning manager and describe its role as an underwriter.[5]  Finally, Puda, not Macquarie, had the statutory obligation[6] to file the Registration Statement and Prospectus with the Securities and Exchange Commission and did so file.    See <u>Janus</u>, 131 S. Ct. at 2304-05 ("Only Janus Investment Fund – not JCM – bears the statutory obligation to file the prospectuses with the SEC. . . .   The SEC has recorded that Janus Investment Fund filed the prospectuses. . . . [Nothing] on the face of the prospectuses indicate that any statements therein came from JCM rather than Janus Investment Fund – a legally independent entity with its own board of trustees.").

---

[5] <u>See</u> Ex. A (Prospectus) at Cover; <u>see also</u> <u>id</u>. at S-22 ("Macquarie Capital (USA) Inc. is the representative of the underwriters. **We** have entered into an underwriting agreement dated December 8, 2010 with the underwriters. Subject to the terms and conditions of the underwriting agreement, each of the underwriters have severally agreed to purchase, and **we** have agreed to sell to them, the number of shares of common stock listed next to its name in the table below at the public offering price listed on the cover page of this prospectus supplement, less the underwriting discounts and commissions, payable in cash to us against delivery of shares.") (emphasis added).

[6] <u>See</u> 15 U.S.C. § 77e; <u>see also</u> 15 U.S.C. § 77f.

US_ACTIVE:\44484275\6\60851.0107

**B.**   **Macquarie Did Not "Make" Any Statements In The Prospectus**

*Not A Single Statement Is Attributed To Macquarie*

A review of the Amended Complaint makes the following abundantly clear: Plaintiffs have not pointed to a single statement – let alone a misstatement – in the Prospectus that is attributed to Macquarie.[7]   Nevertheless, according to Plaintiffs, the false and misleading statements in the Prospectus are "attributable to Macquarie" (SAC ¶ 154) because Macquarie: (i) actively participated in creating the Prospectus, drafting it jointly with Puda management (id. ¶ 137) and (ii) "allowed its name to appear on the cover of the Prospectus, solicited investors for the Offering and distributed Prospectuses to investors."  Id. ¶ 154.  But each of those arguments is foreclosed by Janus.  Participating in the drafting and dissemination of a document, and being named in it, does not as a matter of law equate to making the statements in the document.

As set forth in Janus, "[a]ttribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed."  Janus, 131 S. Ct. at 2302.  Here, none of the misleading

---

[7] In contrast, Plaintiffs have pointed to statements that they allege were expressly attributed to – and, thus, "made" by – Puda's auditors.  Specifically, Plaintiffs have pointed to the certification of Puda's 2009 and 2010 financial statements, which were allegedly signed "Moore Stephens" and incorporated into the Prospectus.  SAC ¶¶ 99, 109-10; Ex. A (Prospectus) at S-24, 36.  Put simply, there is no question that at least one Moore Stephens entity, unlike Macquarie, "made" a statement within the meaning of that word under Janus.  We understand that there is a dispute as to whether Moore Stephens P.C., as opposed to Moore Stephens Hong Kong, "made" any statements in the Prospectus.  For purposes of this motion, which Moore Stephens entity "made" the statement is irrelevant.  No such issue arises with Macquarie because there is no doubt that Macquarie did not "make" any statement here.  Thus, concluding that Macquarie cannot, under Janus, be held primarily liable for purposes of Section 10(b) is entirely consistent with this Court's prior determination that Plaintiffs' Section 10(b) claim against Moore Stephens P.C. could proceed past the pleading stage.  See Dkt. No. 155 (Mar. 13, 2013 Oral Arg. Tr.).  In fact, the difference between a signed, incorporated audit opinion – clearly a statement made by the auditor – and simply being named in the Company's Prospectus as an underwriter makes clear why this motion should be granted.

statements relating to the ownership of Shanxi Coal are actually attributed to Macquarie, nor have Plaintiffs tied Macquarie to having played any role with respect to any specific misstatement. Here, the strong evidence, based on attribution, is that the false statements in the Prospectus were made by – and only by – Puda, the party to whom they are attributed.

As <u>Janus</u> and the cases following it make clear, "[a]ny role [Macquarie] served in the drafting process, or in preparing and publishing the offering materials is insufficient to impose primary liability under <u>Janus</u>." <u>Fannie Mae</u>, 891 F. Supp. 2d at 484. <u>Janus</u> could not be clearer: "significant[]" involvement in preparing the Prospectus does not equate to making the statements in the Prospectus. <u>Janus</u>, 131 S. Ct. at 2299. Macquarie's "assistance, subject to the ultimate control of" Puda "does not mean that" Macquarie "'made' any statements in the [Prospectus]." <u>Id.</u> at 2305. "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it." <u>Id.</u> at 2302; <u>see</u> <u>also</u> <u>SEC</u> v. <u>Tourre</u>, 2014 WL 61864, at *6 (S.D.N.Y. Jan. 7, 2014) (KBF) (reciting jury instructions in which the Court explained that, in light of <u>Janus</u>, "it is not sufficient for the SEC to prove that Mr. Tourre may have been involved, even significantly involved, in the preparation of a document that may have contained a materially false statement").

As explained by the Court in <u>Janus</u>, suits against entities "that contribute 'substantial assistance' to the making of a statement but do not actually make it – may be brought by the SEC" but "not private parties." <u>Janus</u>, 131 S. Ct. at 2302. This point was made clear by the Second Circuit in <u>Pacific Investment Management Company LLC</u> v. <u>Mayer Brown LLP</u>, 603 F.3d 144 (2d Cir. 2010). As the Court held, "[s]econdary actors can be liable in a private action under Rule 10b-5 for only those statements that are explicitly attributed to them. The mere identification of a secondary actor as being involved in a transaction, or the public's

understanding that a secondary actor 'is at work behind the scenes,' are alone insufficient." Pac. Inv. Mgmt., 603 F.3d at 155; see also Shapiro v. Cantor, 123 F.3d 717, 720 (2d Cir. 1997) ("[a]llegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms . . . all fall within the prohibitive bar of Central Bank"). In short, without attributing any specific statements to Macquarie, "the mere mention of the firm's representation of [Puda] [cannot] be considered an 'articulated statement' by [Macquarie] adopting [Puda]'s statements as its own." Pac. Inv. Mgmt., 603 F.3d at 158. This conclusion follows inevitably from Janus. See also, e.g., In re Optimal U.S. Litig., 2011 WL 4908745, at *6 (S.D.N.Y. Oct. 14, 2011) (the offering materials "designation of OIS on the cover page is also insufficient to establish liability under Janus"); Krasner v. Rahfco Funds LP, 2012 WL 4053809, at *4 (S.D.N.Y. Aug. 9, 2012) (explaining that, post-Janus, "defendants must have made the statement. It is not sufficient that defendants be referenced in a client's prospectus").

Plaintiffs next allege that "by putting [its] name on the Prospectus, [Macquarie is] communicating to investors that [it has] in fact undertaken a reasonable due diligence investigation and [is] making full disclosure of all material information in the Prospectus." SAC ¶ 131. But, even if true, this does not make Macquarie the "maker" of any particular misstatement and surely does not support a Section 10(b) claim. See, e.g., SEC v. Tambone, 597 F.3d 436, 447-48 (1st Cir. 2010) (stating that "securities professionals working for underwriters have a duty to investigate the nature and circumstances of an offering" but rejecting the SEC's theory that "such securities professionals impliedly 'make' a representation to investors that the statements in a prospectus are truthful and complete."). Rather, those arguments underpin Congress' decision to enact Section 11 of the 1933 Act – which, unlike Section 10(b), does not require Plaintiffs to link Macquarie's conduct to any particular misstatement – but have no

relevance under Section 10(b) of the 1934 Act.  See Stoneridge, 552 U.S. at 166 (explaining that there is no reason to expand the breadth of liability under §10 to include secondary actors because "[t]he securities statutes provide an express private right of action against accountants and underwriters in certain circumstances, see 15 U.S.C. § 77k, and the implied right of action in §10 continues to cover secondary actors who commit primary violations") (emphasis added); see also In re Optimal U.S. Litig., 2011 WL 4908745, at *5 ("Plaintiffs' argument that OIS should be liable based on its one-hundred percent ownership of Multiadvisors also fails because Janus refused to extend Rule 10b-5 liability where Congress had created a separate statutory remedy").[8]  Thus, whatever a third-party investor may (or may not have) understood with respect to Macquarie's due diligence investigation is irrelevant to Plaintiffs' Section 10(b) claim; the fact remains that the Amended Complaint fails to plead – as it must in order to maintain a Section 10(b) claim – that the misleading statements were actually made by or attributed to Macquarie. See supra, pp. 6-13.

---

[8] See also Tambone, 597 F.3d at 449 ("We agree that underwriters have a special niche in the marketing of securities and, thus, have a special set of responsibilities.  But the duty that the dissent seeks to impose is unprecedented – and far exceeds the scope of Rule 10b-5(b).  While that rule could have been drafted to cut a wider swath, it was not.  The SEC has other, more appropriate tools that it may use to police the parade of horribilis that the dissent envisions, and it is neither necessary nor wise to attempt to expand the rule by judicial fiat. Most importantly, doing so would, as a matter of law, be wrong.").

Indeed, the focus of Janus and the concomitant inapplicability of Rule 10b-5 to reach those participating in disseminating information through offering materials was recently addressed by SEC Chair Mary Jo White.  See Chair Mary Jo White, Three Key Pressure Points in the Current Enforcement Environment, NYC Bar Association's Third Annual White Collar Crime Institute, available at ___http://www.sec.gov/News/Speech/Detail/Speech/1370541858285#.U3tBTSiOR8E (May 19, 2014) ("One new approach to charging individuals is to use Section 20(b) of the Exchange Act. . . . It is potentially a very powerful tool that can reach those who have participated in disseminating false or misleading information to investors through offering materials, stock promotional materials, or earnings call transcripts, but who might not be liable under Rule 10b-5(b) following the Supreme Court's decision in Janus because they may not be the 'maker' of the statement.").

The fact that, as Plaintiffs allege, Macquarie was "prominently featured on the cover of the Prospectus" (SAC ¶ 137) does not establish that Macquarie had "ultimate authority" over the contents of the Prospectus. In fact, the Cover expressly identifies Puda as the issuer and Macquarie as the underwriter/joint bookrunning manager. See Ex. A (Prospectus) at Cover. And, as the Court said in In re Optimal U.S. Litig., "[b]ecause the cover page indicates that OIS is only the investment manager and Multiadvisors is the issuer, the cover page provides no stronger a basis for Rule 10b-5 liability in this case than in Janus." 2011 WL 4908745, at *6.

### *Plaintiffs' Conclusory Allegations Fail To Establish That Macquarie Had "Ultimate Authority" Over The Contents Of The Prospectus*

Faced with the reality that the Prospectus is the Company's document, and having failed to point to any false and misleading statement that was attributed to Macquarie, Plaintiffs conclusorily allege that Macquarie "wielded ultimate authority for the content of the Prospectus" because in an e-mail exchange among Puda's counsel, the underwriters and underwriters' counsel on the morning of the December Offering, the underwriters' "sign off" on the Prospectus was requested. SAC ¶ 138; see also id. ¶ 139 ("As the Underwriters' representative, Macquarie's was the ultimate sign-off and approval for the Prospectus. Absent Macquarie's sign-off and approval, the Prospectus would not have been filed with the SEC and disseminated to investors, and the December Offering would not have gone forward."); id. ¶ 235 (similar). Plaintiffs further allege that Macquarie had "control over the contents and dissemination of the Prospectus" because it "actively participated in creating the Prospectus, drafting it jointly with Puda management." Id. ¶ 137; see also id. ¶ 154 ("Macquarie had the authority to change the false and misleading information contained in the Prospectus or, failing that, to refuse to underwrite the offering.").

14

Critically, none of the above allegations establish that Macquarie had "ultimate authority" over the contents of the Prospectus, let alone over any particular statement therein. As an initial matter, Plaintiffs do nothing more than make conclusory statements that Macquarie had "control" and/or "ultimate authority" over the Prospectus. The absence of particularized facts in this regard prove fatal to Plaintiffs' theory. See Fannie Mae, 891 F. Supp. 2d at 484 (applying Janus and dismissing plaintiff's Section 10(b) and Rule 10b-5 claims asserted against an underwriter where plaintiff "has not plausibly alleged facts to show that Goldman is the 'entity with the ultimate authority over the statement[s], including its content and whether and how to communicate it'") (citation omitted); see also In re Miller Energy Res. Sec. Litig., 2014 WL 415730, at *9 (E.D. Tenn. Feb. 4, 2014) (finding that plaintiff had failed to allege "with sufficient particularity facts supporting the conclusion that Graham was a 'maker' of the allegedly false statements" because "there are no allegations tying any actions by Graham to any of the statements"); id. ("Simply asserting that he was a 'maker' of the statements with 'the authority to control' them, without more, is not enough; these are conclusions, not allegations of facts stated with particularity.").[9]

Nor do Plaintiffs' allegations that Macquarie had "ultimate authority" over the "false and misleading statements contained in the Prospectus" because (i) its "sign-off and approval" (SAC ¶ 139; see also id. at ¶¶ 138, 235) was necessary to file the Prospectus and (ii) it could "refuse to underwrite the offering" advance Plaintiffs' theory of control. Id. ¶ 154. The fact that an unrelated third party is asked to "sign-off" on a document does not make that party

---

[9] Plaintiffs' wholly conclusory allegation that Macquarie engaged in a "scheme[] . . . to defraud" (SAC ¶ 230) investors similarly fails. Plaintiffs fail to allege any facts (let alone particularized facts) explaining how Macquarie engaged in a scheme to defraud investors along with Defendants Wu, Zhu, Zhao, Moore Stephens and Brean Murray. See, e.g., Fannie Mae, 891 F. Supp. 2d at 469.

the maker of the statement.  Rather, as is customary in securities offerings – and as is clear from the face of the e-mail cited by Plaintiffs – Macquarie's "sign-off" was sought in its capacity as underwriter.  Id. ¶¶ 138-39.  Plaintiffs here conflate "sign-off" with the authority to "make" a statement under Janus.  See In re Optimal U.S. Litig., 2011 WL 4908745, at *5 ("Plaintiffs' attempt to avoid Janus by conflating shareholder control with "ultimate authority" is unavailing.  Janus emphasizes the narrow scope of the private right of action under Rule 10b-5 and a formalistic approach to Rule 10b-5 liability.  Under this precedent, Multiadvisors had 'ultimate authority' over the contents of the Ems and the decision to issue the Ems.  Accordingly, Multiadvisors, not OIS, 'made' the statements in the Ems for purposes of Rule 10b-5.").  Janus could not be clearer:  "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker."  131 S. Ct. at 2302 (emphasis added).

Here, the document and statements at issue, as discussed above, were unquestionably Puda's.  See supra, pp. 7-10.  In its capacity as underwriter, Macquarie could "suggest what to say" and did assist in the preparation of the Prospectus.  But Macquarie could not force Puda to make any particular statement in its own Prospectus, nor could it force Puda to delete or modify any statement therein.  Again, Plaintiffs are required to plead that Macquarie had "ultimate authority" over a specific misstatement.  But nothing in the Amended Complaint ties Macquarie to any statement, let alone a specific misstatement.  And, importantly, the Amended Complaint makes no allegation that Macquarie had any role with respect to the specific misstatements in the Prospectus relating to Puda's ownership of Shanxi Coal.

16

Moreover, Macquarie's "sign-off" was not the only one sought.  Indeed, in the same set of e-mails cited by Plaintiffs, underwriters' counsel similarly "signed-off" on the Prospectus.  SAC ¶ 138.  In fact, no underwriting may proceed without a 10b-5 opinion from both company counsel and underwriter's counsel.[10]  Without these opinions there can be no offering.  Does that turn that law firm into the party with ultimate authority and thus the statement maker for purposes of Rule 10b-5? Of course not.  The notion that each party whose "sign-off" is sought is a speaker who has "made" a statement sufficient to establish primary liability under <u>Janus</u> is simply absurd and would render all professionals who worked on an offering document primarily liable under Section 10(b) because they "signed-off."  This simply cannot be (and is not) the law.  <u>See, e.g., Pac. Inv. Mgmt.</u>, 603 F.3d at 155.[11]

---

[10] <u>See Negative Assurances in Securities Offerings (2008 Revision)</u>, 64 Bus. Law. 395, 396, <u>available at</u> http://apps.americanbar.org/buslaw/tribar/materials/200905 19000000.pdf ("To help them establish the statutory 'due diligence' defense in registered offerings, underwriters have long followed the practice of <u>requiring</u>, as a condition to the closing, that counsel participating in the preparation of the registration statement provide negative assurance regarding the disclosures in the registration statement and prospectus.") (emphasis added); <u>see also</u> <u>Glossary Item: 10b-5 Letter</u>, Practical Law, <u>available at</u> http://us.practicallaw.com/cs/Satellite/us/resource/1-382-3202 (2014) ("A 10b-5 letter is not a legal opinion and is delivered as a condition to the closing of a securities offering. The 10b-5 letter helps the underwriters or initial purchasers (as applicable) evidence their due diligence investigation.").

[11] Plaintiffs will undoubtedly point to <u>Scott</u> v. <u>ZST Digital Networks, Inc.</u>, 896 F. Supp. 2d 877 (C.D. Cal. 2012), to suggest that Section 10(b) claims may still proceed against underwriters post-<u>Janus</u>. Plaintiffs are wrong.  Not only is <u>Scott</u> factually distinguishable – <u>e.g.</u>, the underwriter in <u>Scott</u> was specifically argued to have been the "architect" of the fraud (<u>id.</u> at 889) – but, more importantly, its logic cannot be squared with <u>Janus</u>.  Although the underwriter in <u>Scott</u> may have been "instrumental . . . in preparing or assisting with the relevant statements," <u>id.</u> at 890, this fact is clearly insufficient under <u>Janus</u> to establish "ultimate control" over the relevant statements.  And, although other cases post-<u>Janus</u> have also held that underwriters may be primarily liable under Section 10(b) – namely, <u>In re Allstate Life Ins. Co. Litig.</u>, 2012 WL 176497 (D. Ariz. Jan. 23, 2012) and <u>In re Nat'l Century Fin. Enters., Inc.</u>, 846 F. Supp. 2d 828 (S.D. Ohio 2012) – these two cases are factually distinguishable and, with all due respect, for the reasons discussed above, incompatible with <u>Janus</u> or <u>Pacific Investment</u>.

In <u>Allstate</u>, and unlike this case, plaintiffs specifically alleged that the underwriter "'<u>made</u> all of the false and misleading statements of fact . . . in the Official Statements.'"  2012 WL 176497, at

Here, Puda, not Macquarie, made the ultimate decision to file its Prospectus and issue additional Puda common stock.  Even after Macquarie's "sign-off," Puda and only Puda had the authority to pull the offering.  Thus, for example, if Puda was unhappy with the indications of pricing Puda – not Macquarie – had the authority to withdraw the offering, either temporarily or permanently.[12]  Similarly, Puda (not Macquarie) was the only entity with the "authority to change the false and misleading information contained in the Prospectus," as the filing (and the information contained therein) was unquestionably Puda's.  SAC ¶ 154; see also supra, pp. 7-10.  In other words, Puda, as the issuer, had "ultimate authority" over the contents of its Prospectus.  See Fannie Mae, 891 F. Supp. 2d at 484 ("[I]t is absolutely clear that FNMA, not Goldman, had ultimate authority over statements made in its SEC filings incorporated by reference in the offering materials"; "[T]he alleged misstatements in the [offering materials] . . . and the alleged misstatements in FNMA's quarterly and annual SEC filings, which were incorporated by reference, were not attributed to Goldman").[13]  Macquarie's ability to "refuse"

---

*5 (emphasis in original).  And, although the fact that the underwriter's name was "prominently" displayed on the Official Statements was a factor taken into account by the court in its analysis (id.), this fact is clearly insufficient under Janus.  In Nat'l Century Financial, also unlike this case, the "PPMs displayed the Credit Suisse name prominently on the front pages and told potential investors that Credit Suisse was 'specifically designated' to make representations about the notes."  846 F. Supp. 2d at 861 (emphasis added).  And, plaintiffs pointed to specific evidence, wholly absent here, that Credit Suisse itself "considered the PPMs to be 'shared product[s]' over which it exercised some degree of control over the content."  Id.  Although the court ultimately found that a "factfinder could reasonably find from the available evidence that the PPMs should be attributed to the issuers and Credit Suisse" because Credit Suisse "play[ed] a role in drafting and preparing the PPMs," this logic flies in the face of Janus.  Id. (emphasis added).

[12] See Sinalko, Stephen M. & Matan Koch, Janus Capital & Underwriter Liability Under Section 10 & Rule 10b-5, 246 N.Y.L.J. No. 7 (2011) ("The ultimate decisions as to whether an offering will proceed, whether to disseminate an offering document, and what the offering document will say rest with the issuer, not the underwriter.").

[13] See also Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262, 271 (S.D.N.Y. 2012) ("[T]here is no dispute as to whether Vivendi had 'ultimate authority' under Janus.

(SAC ¶ 154) to underwrite the offering does <u>not</u>, as Plaintiffs suggest, mean that Puda could not still have moved forward with the issuance of additional common stock. As the Amended Complaint itself acknowledges, Puda had previously issued common stock in a February 2010 offering which was <u>not</u> underwritten by Macquarie. <u>Id.</u> ¶ 54. Thus, even without Macquarie, Puda could have (as it had done in the recent past) continued with its plans to issue additional common stock in a secondary offering.

Plaintiffs attempt to bolster their claim that Macquarie had "ultimate authority" over the contents of the Prospectus through the unavailing tactic of purporting to include an expert's opinion in their Amended Complaint. <u>See</u> SAC ¶ 127 ("In other words, an underwriter such as Macquarie or Brean Murray has ultimate control over the contents and dissemination of the disclosure document."); <u>see also id.</u> ¶¶ 123-29, 130-36, 146-49, 155, 168. These opinion allegations, however, do not save the Amended Complaint from dismissal. <u>See Highland Capital Mgmt., L.P.</u> v. <u>Schneider</u>, 2004 WL 2029406, at *4 (S.D.N.Y. Sept. 9, 2004) (finding that the inclusion of an expert's findings in a proposed amended complaint "merely constitutes an attempt to plead additional evidence, the inclusion of which thwarts the purpose of concise, answerable, notice pleading").[14] None of the allegations attributed to Mr. Purcell contain

---

Vivendi cannot seriously claim that it did not have ultimate authority over documents it filed with the SEC or French securities regulators, regardless of who signed such documents"); <u>In re Optimal U.S. Litig.</u>, 2011 WL 4908745, at *4 (applying <u>Janus</u> and concluding that a 100% shareholder of an issuer did not have "ultimate authority" over the contents of the offering materials – nor did it have "ultimate authority" over the decision to issue the offering materials – and therefore was not subject to Rule 10b-5 liability).

[14] <u>See also, e.g., Meeks</u> v. <u>Murphy Auto Grp., Inc.</u>, 2009 WL 3669638, at *1 (M.D. Fla. Oct. 30, 2009) (striking expert affidavit attached as an exhibit to Plaintiff's amended complaint and holding that "[t]he inclusion of such expert opinions as part of the Plaintiff's Amended Complaint is contradictory to the pleading requirements set forth in Fed. R. Civ. P. 8 which requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief'").

particularized <u>factual</u> allegations supporting Plaintiffs' theory of control.  <u>See</u> SAC ¶¶ 123-29, 130-36, 146-49, 155, 168.  Moreover, even if each of the opinion allegations attributed to Mr. Purcell are accepted, they do no more than explain Mr. Purcell's view regarding the underwriters' role as "gatekeepers" and in due diligence generally.  <u>Id.</u> ¶ 127.  Such allegations are no substitute for particularized <u>factual</u> allegations establishing that an underwriter has "ultimate authority" with respect to a specific misstatement in a particular document.

## II.    <u>TRELLUS'S SECURITIES ACT CLAIMS ARE TIME-BARRED</u>

In light of this Court's prior holding (which remains the law of the case) that Thomas Rosenberger, the sole named plaintiff who previously asserted Securities Act claims against Macquarie, lacked both Article III and statutory standing to assert such claims (<u>see</u> Dkt. Nos. 263-64), Trellus now seeks to assert Section 11 and 12 claims against Macquarie.  <u>See</u> SAC ¶¶ 199, 213.[15]  But Trellus's claims, for the reasons set forth in Macquarie's prior memoranda of law and letters to the Court, which are incorporated herein by reference, are unquestionably time-barred and cannot stand.[16]

---

[15] Plaintiffs contend in the SAC that they "will seek immediate certification of the Securities Act subclass defined in the text" because "Trellus's service as a Securities Act subclass representative was not challenged on typicality or adequacy grounds in the papers filed in opposition to class certification."  SAC ¶ 1 n.2.  To the extent Plaintiffs are suggesting that a Securities Act subclass as to Macquarie be certified without full briefing, this position is untenable.  The Court has already indicated that the parties should confer on a schedule, including additional motions for class certification.  <u>See</u> Dkt. No. 331 ("The parties should confer on a proposed schedule from here to resolution of this matter, and include, within such schedule, any provisions for additional motions for class certification.").  Moreover, Macquarie has not waived any right to challenge Trellus's ability to represent a Securities Act subclass because, until now, Trellus has not been a plaintiff in this action (a point raised by Macquarie in connection with the prior class certification briefing).  <u>See</u> Dkt. No. 241 at 4 ("Because Trellus is not yet a plaintiff in this case – nor should it be – this Court cannot certify a Section 11 class with Trellus as the class representative.").

[16] Given the procedural posture of this action, and the Court's familiarity with the arguments, Macquarie will not repeat herein the arguments made on this issue but, rather, solely for purposes of appeal, incorporates by reference each of the previously submitted memoranda of

## III.   TRELLUS LACKS STANDING TO ASSERT A
## SECTION 12 CLAIM AGAINST MACQUARIE

   In addition to being time-barred, Trellus's Section 12 claim should be dismissed as against Macquarie because Trellus lacks standing to assert such a claim.[17]   Section 12(a)(2) provides that: "[a]ny person who . . . (2) offers or sells a security . . . by means of a prospectus . . . which includes an untrue statement of material fact or omits to state a material fact . . . shall be liable" only "to the person purchasing such security from him." 15 U.S.C. § 77l (emphasis added).  This provision thus very much limits both the class of persons who can sue and be sued, "contemplate[ing] a buyer-seller relationship not unlike traditional contractual privity."  Pinter v. Dahl, 486 U.S. 622, 642 (1988).  As a result, a purchaser in a public offering can sue only his statutory seller, i.e., the person who either sold the securities directly to him[18] or "solicited"[19] his

---

law and letters to the Court on this issue and expressly preserves the arguments set forth therein.  See Dkt. Nos. 83, 110, 189, 211, 254, 263, 317, 326; see also Dkt. Nos. 155, 264, 332; Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 2012 WL 231567, at *3 n.3 (S.D.N.Y. Jan. 24, 2012), rev'd on other grounds, 722 F.3d 81 (2d Cir. 2013) ("[U]pon Dorchester's submission of an amended complaint, BRJ was entitled to file a new motion to dismiss and new briefs in support of that motion.  BRJ is entitled to rely on the earlier briefing and to supplement that briefing with additional arguments."); Shuler v. Regency House of Wallingford, Inc., 2006 WL 118383, at *1 n.1 (D. Conn. Jan. 13, 2006) ("The second motion to dismiss incorporates by reference the memorandum filed in support of the first motion, as permitted by Fed. R. Civ. P. 10(c), which is sufficient").

[17] See In re Initial Pub. Offering Sec. Litig., 214 F.R.D. 117, 122 (S.D.N.Y. 2002) ("in order for a claim to be asserted on behalf of a putative class, . . . . [p]laintiffs must first establish that they have a valid claim with respect to the shares that they purchased.  If the named plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim") (emphasis in original) (citation omitted).

[18] See e.g., Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 49 (2d Cir. 1991) ("[O]nly a defendant from whom the plaintiff purchased the securities may be liable"); In re CitiGroup Inc. Bond Litig., 723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010) ("[f]or a complaint to plausibly plead standing to raise a claim pursuant to Section 12, it must identify a particular purchase from a particular defendant"); In re Barclays Bank PLC Sec. Litig., 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011) (to state a Section 12(a)(2) claim against a defendant, "plaintiff must adequately allege that he or she purchased the relevant shares directly from the defendant").

US_ACTIVE:\44484275\6\60851.0107

purchase "motivated at least in part by a desire to serve [its] own financial interests or those of the securities owner." Id. at 623, 642-47.

    Here, the Amended Complaint makes clear that Trellus did not purchase any December Offering shares directly from Macquarie.  Plaintiffs allege only that Trellus "purchased or acquired Puda securities for funds under its management during the Class Period, including 179,734 shares of common stock purchased at $12.00 per share from Brean Murray, Carret & Co. [] on December 8, 2010, pursuant to the December Offering." SAC ¶ 42.  Nor do Plaintiffs plead even a single specific fact suggesting that Macquarie said or did anything to solicit Trellus's purchase of Puda stock in the December Offering.  Rather, Plaintiffs merely allege – in wholly conclusory fashion – that "the Underwriters actively solicited the sale of Puda's shares to serve their own financial interests." SAC ¶ 215; see also id. ¶ 214.  But the fact that Macquarie may have, in connection with the December Offering, engaged in solicitation activities does not state a claim by Trellus against Macquarie.  See Griffin v. PaineWebber, Inc., 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) (plaintiff lacks standing where he has not alleged that the particular defendant "was directly involved in the actual solicitation of his purchase" even though he has pled facts describing solicitation activities "as they affected other putative plaintiffs"); see also Steed Fin. LDC, 2011 WL 1111508, at *7 (dismissing claim where plaintiff did not allege "any specific acts by [the defendant] to directly solicit it to purchase the [securities] and has failed to allege that plaintiff in fact purchased the [securities] as a result of [the defendant's] solicitation").  As a result, Trellus's Section 12 claim should be dismissed.

---

[19] "Successful solicitation" requires an allegation that the particular defendants "not only . . . actively solicited investors" with respect to this transaction but also that Plaintiffs purchased the "securities as a result of [that defendant's] solicitation." Steed Fin. LDC v. Nomura Sec. Int'l, Inc., 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).

US_ACTIVE:\44484275\6\60851.0107

## CONCLUSION

For the foregoing reasons, Macquarie respectfully requests that the Court dismiss with prejudice Counts I, II and IV as against Macquarie.

Dated: New York, New York
       May 21, 2014

Respectfully submitted,

By: */s Greg Danilow*
Greg A. Danilow
Seth Goodchild
Stefania D. Venezia
Christopher Gismondi
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Defendant Macquarie Capital (USA) Inc.*

23