UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PUDA COAL SECURITIES INC. et al. LITIGATION | Case No.: 1:11-cv-2598 (KBF) |
| | CLASS ACTION |
| | Hon. Katherine B. Forrest |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT MACQUARIE CAPITAL (USA) INC.'S MOTION TO DISMISS
THE SECOND CONSOLIDATED AMENDED AND SUPPLEMENTAL COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ..........................................................................................3

ARGUMENT ..............................................................................................................4

I.     Plaintiffs State a Claim Against the Underwriter Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 .................................................5

        A.     The Underwriter Defendants Made Actionable Statements for Purposes of Section 10(b) and Rule 10b-5 ...............................................................5

        B.     The Underwriter Defendants Had a Duty to Disclose the Nonpublic Information Revealed in the Kroll Report Before Selling Puda Shares ...............19

II.    Trellus Asserts Timely Claims for Violations of Section 11 and Section 12 of the Securities Act and Has Standing to Assert Them ............................................................20

        A.     Trellus's Section 11 and Section 12 Claims Are Not Time-Barred......................20

        B.     Macquarie Is a Statutory Seller for Purposes of Section 12 and Trellus Has Standing to Assert a Section 12 Claim Against Macquarie ...................................22

CONCLUSION.........................................................................................................25

# TABLE OF AUTHORITIES

Cases

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
106 F.3d 11 (2d Cir. 1997)...................................................................................... 21

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974)..........................................................................................20-21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................. 4

*Biotech. Fund, L.P. v. Celera Corp.*, No. C,
13-3248 WHA, 2014 WL 988913 (N.D. Cal. Mar. 10, 2014).......................... 9

*Blue Tree Hotel Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
369 F.3d 212 (2d Cir. 2004)................................................................................... 24

*Capri v. Murphy*,
856 F.2d 473 (2d Cir. 1988)................................................................................... 23

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)................................................................................................ 19

*Chiarella v. U. S.*,
445 U.S. 222 (1980)................................................................................................ 20

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................... 8, 12, 13

*Dirks v. S.E.C.*,
463 U.S. 646 (1983)................................................................................................ 20

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..................................................................................... 4

*Gabriel Capital, L.P. v. NatWest Fin., Inc.*,
94 F. Supp. 2d 491 (S.D.N.Y. 2000).............................................................. 13, 14

*Griffin v. PaineWebber, Inc.*,
No. 99-Civ-2292 (VM), 2001 WL 740764 (S.D.N.Y. June 29, 2001) ............. 25

*Ho v. Duoyuan Global Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012)................................................................. 15

*In re Allstate Life Ins. Co. Litig.*,
No. CV-09-8162-PCT-GMS, 2012 WL 176497 (D. Ariz. Jan. 23, 2012)..................... 6, 7

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    93 F. Supp. 2d 424 (S.D.N.Y. 2000)..................................................................... 23, 24, 25

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    MDl 12-2389, 2013 WL 6621024 (S.D.N.Y. Dec. 12, 2013) .......................................... 25

*In re Fannie Mae 2008 Sec. Litig.*,
    891 F. Supp. 2d 458(S.D.N.Y. 2012),............................................................... 6, 9, 13, 18

*In re IndyMac Mortg.-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010).............................................................................. 24

*In re Miller Energy Res. Sec. Litig.*,
    No. 3:11-CV-386-TAV-CCS, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) .................. 12

*In re Nat'l Century Fin. Enters., Inc.*,
    846 F. Supp. 2d 828 (S.D. Ohio 2012) ................................................................... passim

*In re Optimal U.S. Litig.*,
    No. 10 Civ. 4095 SAS, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ...................... 14, 17

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    199 F.R.D. 119 (S.D.N.Y. 2001) .................................................................................... 22

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007).............................................................................. 23

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003).............................................................................. 23

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003).............................................................................. 24

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
    131 S. Ct. 2296 (2011) ............................................................................................. passim

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)........................................................................................ 1, 24

*Krasner v. Rahfco Funds LP*,
    No. 11 CV 4092 (VB), 2012 WL 4053809 (S.D.N.Y. Aug. 9, 2012) ............................. 14

*Kremens v. Bartley*,
    431 U.S. 119 (1977)......................................................................................................... 22

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
    861 F. Supp. 2d 262 (S.D.N.Y. 2012).............................................................................. 15

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).................................................................................... 21

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*,
    471 F.3d 377 (2d Cir. 2006)....................................................................... 22

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013)......................................................... 15

*Morrison v. Australia Bank Ltd.*,
    561 U.S. 247 (2010).................................................................................... 22

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010)................................................................ 10, 11

*Pinter v. Dahl*,
    486 U.S. 622 (1988).............................................................................. 23, 24

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013).......................................................................... 21

*S.E.C. v. Tambone*,
    597 F.3d 436 (1st Cir. 2010)........................................................ 10, 11, 12, 18

*S.E.C. v. Tourre*,
    No. 10 Civ. 3229 KBF, 2014 WL 61864 (S.D.N.Y. Jan. 7, 2014).................... 12

*Scott v. ZST Digital Networks, Inc.*,
    896 F. Supp. 2d 877 (C.D. Cal. 2012) ..................................................... 6, 7

*Shapiro v. Cantor*,
    123 F.3d 717 (2d Cir. 1997)....................................................................... 19

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
    No. 00-Civ-8058 (NRB), 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) .......... 25

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)................................................................................ 21, 22

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008)...................................................................................... 5

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998)....................................................................... 13

Statutes

15 U.S.C. § 77b(3) ................................................................................................................. 24

Plaintiffs respectfully submit this memorandum of law in opposition to Macquarie Capital (USA) Inc.'s ("Macquarie") motion to dismiss Counts I, II, and IV of the Second Consolidated Amended and Supplemental Complaint for Violations of the Federal Securities Laws (Dkt. No. 352) ("SAC") pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[1] This memorandum also opposes the motion to dismiss filed by Brean Murray, Carret & Co. ("Brean Murray") (together with Macquarie, the "Underwriter Defendants") to the extent it adopts arguments made by Macquarie. The arguments in Plaintiffs' opposition to Brean Murray's motion to dismiss are hereby incorporated by reference.

## PRELIMINARY STATEMENT

Plaintiffs assert claims against the Underwriter Defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 and 17 C.F.R. § 240.10b-5(b) (SAC ¶¶ 229-39), and Plaintiff Trellus Management Company LLC ("Trellus") asserts claims for violations of Sections 11 and 12 of the Securities Act of 1933 (SAC ¶¶ 197-219). These claims arise from a public stock offering by Puda Coal Inc. ("Puda") on December 8, 2010 (the "December Offering"), underwritten by Macquarie and Brean Murray pursuant to a Prospectus and Underwriting Agreement.[2] Six days before the Offering, Macquarie received a report (the "Kroll Report") revealing that Puda no longer owned its sole operating subsidiary, Shanxi Puda Coal Group Co., Ltd. ("Shanxi Coal"). Macquarie does not dispute that it was informed that Puda was a holding company that held essentially nothing.

---

[1] Herein, citations to Macquarie's memorandum of law in support of its motion to dismiss the SAC (Dkt. No. 374) are in the form "MQ Br. at __."

[2] "Prospectus" refers to Puda's Form 424B5 filed with the Securities and Exchange Commission ("SEC") on December 8, 2010. "Underwriting Agreement" refers to the agreement executed by Puda and Macquarie (for itself and Brean Murray) and attached as Exhibit 1.1 to Puda's Form 8-K filed with the SEC on December 14, 2010. The Prospectus and Underwriting Agreement are attached as Exhibit 1 ("EX. 1") and Exhibit 2 ("EX. 2"), respectively, to the Declaration of Joshua L. Crowell ("Crowell Declaration") accompanying this memorandum of law. Courts may take judicial notice of and consider SEC filings on a motion to dismiss. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

Yet Macquarie approved and disseminated the Prospectus anyway.

Under *Janus Capital Grp., Inc. v. First Deriv. Traders*, 131 S. Ct. 2296, 2302 (2011), only a defendant that had "ultimate authority" over a statement can be deemed to have "made" that statement for purposes of liability under Rule 10b-5. Here, the Prospectus, Underwriting Agreement, and internal documents indicate that the Underwriter Defendants had formal approval authority over the Prospectus not subject to Puda's control and that they exercised their authority to approve the filing of the Prospectus. Macquarie's and Brean Murray's names were prominently placed on the front cover of the Prospectus, along with Puda's, indicating to investors' their joint approval of the statements contained therein. Moreover, the Prospectus indicated that the Underwriter Defendants were authorized to make representations about Puda shares, which was reinforced by the fact that they were obligated to buy all of the offered shares and then sell them to investors.

Based on these facts, Plaintiffs adequately plead that attribution of the Prospectus to the Underwriter Defendants as well as to Puda is "implicit from surrounding circumstances." *Janus*, 131 S. Ct. at 2302. The Underwriter Defendants' contrary arguments largely boil down to the premise that if Puda made the statements in the Prospectus, then the Underwriter Defendants cannot also be deemed makers of those statements. But *Janus* and its progeny do not support this either-or premise, and, as shown below, several cases reject it. Moreover, the Underwriter Defendants' self-serving concern about subjecting all underwriters to Rule 10b-5 liability, MQ Br. at 2, is exaggerated given the need to plead a strong inference of scienter (which is why underwriter claims were rare even before *Janus*). The discovery of the Kroll Report makes this one of those rare cases.

Finally, Trellus adequately pleads its Securities Act claims. For reasons previously stated in this case, its Section 11 and Section 12 claims are timely. And Trellus is not required to have purchased shares directly from Macquarie to assert a Section 12 claim against it, particularly in view

of Macquarie's active solicitation of investors, including Trellus itself.

**STATEMENT OF FACTS**

During the course of performing due diligence for Puda's December Offering, Macquarie engaged Kroll Inc. to "perform background checks with respect to Puda and persons associated therewith." SAC ¶57. The resulting Kroll Report, provided to Macquarie six days before the Offering on December 2, 2010, informed Macquarie that Puda's Chairman and controlling shareholder, Ming Zhao, had surreptitiously transferred away Puda's *entire* interest in Shanxi Coal. Specifically, the Report stated that, "based upon SAIC records Puda did not (through its wholly-owned subsidiary Putai) own 90% of Shanxi Coal." *Id.* The Report instead "'identified the current shareholders of Shanxi Puda Coal Group Co., Ltd.' as Ming Zhao, owning 50%, CITIC Trust Co., Ltd., owning 49% and Wei Zhang, owning 1%." SAC ¶¶57, 151. Upon its receipt, the Report was reviewed by at least half a dozen people as it circulated among Macquarie personnel and legal counsel for *both* Underwriter Defendants. SAC at ¶¶150-53.

In connection with the December Offering, Puda filed a series of registration statements and prospectuses with the SEC. SAC ¶114. These filings represented that Puda, through multiple subsidiaries, indirectly owned 90% of Shanxi Coal, providing the basis for consolidating the financial results of Puda's sole operating subsidiary into its own. The Kroll Report directly contradicted this ownership information. Nonetheless, on the morning of the December Offering, Macquarie gave its approval of the offering documents, including the Prospectus. SAC ¶138. These documents contained material misrepresentations and omissions because they failed to disclose that Puda no longer had any ownership interest Shanxi Coal while incorporating financial statements that fraudulently consolidated Shanxi Coal's financial results. SAC ¶¶116-17.

The Prospectus disclosed to investors the Underwriter Defendants' responsibilities and authority in the December Offering. First, on the front cover, both Macquarie's and Brean Murray's

names were prominently placed in bold; besides Puda's, no other names were listed. EX. 1. Second, the first page of text included the following bolded language: "You should rely only on the information contained in, or incorporated by reference in, [the Prospectus].We have not, and the **underwriters** have not, authorized anyone to provide you with different information." EX. 1 at S-2 (emphasis added). Third, the Prospectus stated that the "underwriters are obligated to take and pay for all of the common stock offered by this prospectus supplement if any such shares are purchased under the underwriting agreement."[3] EX. 1 at S-22. Fourth, the Prospectus also stated that, under the Underwriting Agreement, "the obligations of the several underwriters to pay for an accept delivery of the common stock offered by [the Prospectus] are subject to the approval of certain legal matters by their counsel and to certain other conditions." EX. 1 at S-22. Consistent with the Prospectus, the Underwriting Agreement filed with the SEC provided that Puda would "prepare the Prospectus in a form *approved by the Representative [i.e., Macquarie]*." EX. 2 at ¶ 5(a)(i) (emphasis added).

The Underwriter Defendants solicited investors to buy in the December Offering. SAC ¶¶214-15. Ultimately, nine million shares were sold for proceeds of $108 million. SAC ¶¶18, 32.

## **ARGUMENT**

On a Rule 12(b)(6) motion, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). "The plausibility standard is not akin to a 'probability requirement.'" *Id.*

---

[3] This language means that the December Offering was a "firm commitment underwriting," in which an underwriter buys all the offered shares and then sells them to investors for profit.

I.      **Plaintiffs State a Claim Against the Underwriter Defendants for Violations of
        Section 10(b) of the Exchange Act and SEC Rule 10b-5**

        To state a claim in a private action under Section 10(b) and Rule 10b-5, a plaintiff must

allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv.*

*Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Macquarie contests only the first

element: While acknowledging the falsity of statements in the Puda Prospectus, Macquarie argues

that it cannot be charged with making those statements. At this stage, it does not dispute that it

publicly disseminated a prospectus that it knew to be materially false, marketed Puda shares that it

knew to be worthless, and then sold these worthless securities to hapless investors for profit.

        A.      **The Underwriter Defendants Made Actionable Statements for Purposes of
                Section 10(b) and Rule 10b-5**

        In *Janus*, the Supreme Court announced the following standards in determining who can be

deemed to have "made" a false or misleading statement for purposes of Rule 10b-5:

> [T]he maker of a statement is the person or entity with ultimate authority over the
> statement, including its content and whether and how to communicate it. Without
> control, a person or entity can merely suggest what to say, not 'make' a statement in
> its own right. One who prepares or publishes a statement on behalf of another is not
> its maker. And in the ordinary case, attribution within a statement or implicit from
> surrounding circumstances is strong evidence that a statement was made by – and
> only by—the party to whom it is attributed.

131 S. Ct. at 2302. The Court held that an investment fund advisor could not have made statements

in an investment fund's prospectuses merely due to the advisor's assistance in preparing the

prospectuses and its close relationship with the fund. *Id.* at 2301. Rejecting the argument that the

advisor's assistance meant that both the fund and the advisor made the statements, the Court

reasoned that such assistance was still "subject to the ultimate control" of the fund. *Id.* at 2305.

        Because the *Janus* plaintiffs relied solely on the defendant's participation in creating the

relevant statements and its relationship with the issuer, the Court had no occasion to specify what constitutes "ultimate authority over the statement," how attribution can be "implicit from surrounding circumstances," and the extent to which authority and attribution can lie with multiple defendants—all of which concern underwriter liability. Providing some guidance that is relevant here, the *Janus* Court stated that Rule 10b-5 liability cannot result from "an undisclosed act preceding the decision of an independent entity to make a public statement," *id.* at 2304, and observed that nothing "on the face of the prospectuses indicate that any statements therein came from [the fund advisor] rather than [the fund itself]," *id.* at 2305.

On this guidance, statements may be implicitly attributed to an underwriter where it has formal authority to approve a prospectus that is not subject to the control of the issuer, its authority to approve the prospectus and make representations about the offered securities are indicated on the face of the prospectus and surrounding circumstances, it prominently exercises its authority to approve public dissemination of the prospectus, and actively disseminates the prospectus to investors. As shown below, several courts have agreed with this interpretation of *Janus*.

### 1.  Following *Janus*, Courts Have Sustained Rule 10b-5 Claims Against Underwriters for Making False Statements in Offering Documents

The parties have identified four cases where the court applied *Janus* in the context of underwriter liability. In three of these cases, where the plaintiffs alleged the underwriter's ultimate authority, the court sustained the claim. *Scott v. ZST Digital Networks, Inc.*, 896 F. Supp. 2d 877, 890 (C.D. Cal. 2012); *In re Nat'l Century Fin. Enters., Inc.*, 846 F. Supp. 2d 828, 861 (S.D. Ohio 2012); *In re Allstate Life Ins. Co. Litig.*, No. CV-09-8162-PCT-GMS, 2012 WL 176497, at *5 (D. Ariz. Jan. 23, 2012). In the fourth case, where the plaintiffs failed to allege *any* facts supporting the underwriter's ultimate authority, the court dismissed the claim. *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 484 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013). Together, these

decisions strongly confirm the post-*Janus* viability of underwriter Rule 10b-5 liability.

As an initial matter, two of these courts expressly rejected the argument that an underwriter cannot make statements in a prospectus because the ultimate authority over them is held only by the issuer. *National Century*, 846 F. Supp. 2d at 861; *Allstate*, 2012 WL 176497, at *5. As the *National Century* court reasoned: "[Underwriter] Credit Suisse attempts to cast the issue of attribution as an either-or situation: the [offering documents] either belonged to the issuers or Credit Suisse, but not to both. However, a factfinder could reasonably find from the available evidence that the [offering documents] should be attributed to the issuers and to Credit Suisse." 846 F. Supp. 2d at 861.

In *Scott*, the court ruled that the plaintiff established that an underwriter made statements for purposes of Rule 10b-5 based in part on allegations that the underwriter "was instrumental . . . in preparing or assisting with the relevant statements" and that its "name was featured prominently on the offering documents." 896 F. Supp. 2d at 890-91. The Underwriter Defendants try to cast *Scott* as an unusual case because the underwriter was allegedly the "architect" of the fraud. MQ Br. at 17 n.11. Whatever this allegation means, it is not a consequential distinction, as the fund advisor in *Janus* was also alleged to have been the primary wrongdoer. 131 S. Ct. at 2300.

Similarly, in *Allstate*, the court sustained the plaintiffs' Rule 10b-5 claim in part based on the allegation that that the underwriters' names "were placed 'prominently and in bold type on the first page of the [offering documents],'" which the plaintiffs argued "could only mean that the [offering documents] were attributed, at least in part, to the underwriters." 2012 WL 176497, at *5. That the *Allstate* plaintiffs alleged that the underwriter made "all" of the false statements, *id.*, does not distinguish the case, MQ Br. at 17 n.11, as Plaintiffs here also allege that the Underwriter Defendants, along with Puda itself, made all of the actionable statements in the Prospectus.

And in *National Century*, the court ruled that investors could attribute statements to

underwriter Credit Suisse based in part on allegations that: "[Its] own witnesses testified of playing a role in drafting and preparing the [offering documents] and of exercising control over their content. The [offering documents] displayed the Credit Suisse name prominently on the front pages and told potential investors that Credit Suisse was 'specifically designated' to make representations about the notes." 846 F. Supp. 2d at 861. The Underwriter Defendants try to distinguish *National Century* on two grounds: (i) the offering documents were a "shared product" of the issuer and underwriter, and (ii) the underwriter was "specifically designated" to make representations about the securities. *Id.*; MQ Br. at 17 n.11. The first ground relates to participation, which is not a meaningful distinction under *Janus*. The second ground is factually incorrect because the Prospectus indicates that the Underwriter Defendants were authorized to make representations about Puda shares.

Contrary to the Underwriter Defendants' contention, MQ Br. at 17 n.11, the foregoing cases are consistent with *Janus* and provide sufficient support for Plaintiffs' claim. First, *Janus* does not foreclose the possibility that multiple legal entities, such as issuer and underwriter, can make the same statement. As one court in this District explained: "[*Janus*] does not imply that there can be only one 'maker' of a statement in the case of express or implicit attribution. The Supreme Court's statement was couched in terms of the 'ordinary case,' and arose in the context of one speaker who actually made the alleged misrepresentation and another possible defendant who did not have authority over the content of the statement." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 n.9 (S.D.N.Y. 2011).

Second, it is wrong to assert that statements in a prospectus are made exclusively by the entity that is obligated to file the prospectus with the SEC. MQ Br. at 9 & n.6. Although the *Janus* Court noted that the investment fund had the obligation to and did file the prospectuses, this fact was not presented as a determinative test for establishing the one and only maker of the relevant

statements. *See* 131 S. Ct. at 2304-05. One court has expressly rejected such an argument. *See Biotech. Fund, L.P. v. Celera Corp.*, No. C 13-3248 WHA, 2014 WL 988913, at *4 (N.D. Cal. Mar. 10, 2014) (rejecting argument that "one's statutory obligation to file always precluded another's liability for alleged misrepresentations"). Puda's statutory obligation to file the Prospectus does not preclude the Underwriter Defendants from also having authority over it.

And third, even if this Court were to find fault with the reasoning in the *Scott*, *National Century*, and *Allstate* decisions, that is not fatal to Plaintiffs' claim here. To the extent this Court agreed that these decisions placed too much weight on what is indicated on the prospectus cover or on the defendant's participation in preparing the prospectus, MQ Br. at 17 n.11, Plaintiffs allege additional facts establishing the Underwriter Defendants' ultimate authority over the Prospectus and that attribution was implicit from surrounding circumstances.

The Underwriter Defendants cite only one post-*Janus* case, *Fannie Mae*, that dismisses a Rule 10b-5 claim against an underwriter. MQ Br. at 11, 18. There, the plaintiffs failed to allege any facts showing ultimate authority or attribution; instead, the plaintiffs relied solely on participation in preparing the prospectus. 891 F. Supp. 2d at 484. Crucially, the relevant misrepresentations in *Fannie Mae* were not contained in the prospectus itself but were found in previous SEC filings that the prospectus incorporated by reference. *Id.* The underwriters could not possibly have had ultimate authority over such statements, nor could such statements possibly have been attributed to them. Here, in contrast, the Prospectus itself falsely stated: "Our operations are conducted exclusively in China through our 90% owned subsidiary, . . . Shanxi Coal." EX. 1 at S-5. *Fannie Mae* is therefore distinguishable and can be easily harmonized with the other underwriter cases.

### 2. *PIMCO* and *Tambone* Are Inapplicable Because They Are Pre-*Janus* Decisions Addressing Factually Distinguishable Claims

In their motion to dismiss, the Underwriter Defendants rely heavily on two pre-*Janus* Circuit

Court decisions, *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010) (hereinafter "*PIMCO*"), and *S.E.C. v. Tambone*, 597 F.3d 436 (1st Cir. 2010). MQ Br. at 11-12. However, because the plaintiffs in these cases alleged that the defendants made actionable statements merely due to their role in preparing offering documents, the courts could not and did not address the key factors set forth in *Janus*—ultimate authority and attribution. *PIMCO* and *Tambone* therefore do not undermine the sufficiency of Plaintiffs' specific allegations here.

The primary import of the Second Circuit's *PIMCO* decision was the rejection of the so-called "creator" theory, which would have permitted Rule 10b-5 liability merely for helping to create an offering document, even if the document "made no mention of the defendant." 603 F.3d at 155-56. The court also rejected the notion that a law firm could be deemed to have made a statement for purposes of Rule 10b-5 solely because it was mentioned in an offering document as being the issuer's legal counsel. *Id.* *PIMCO* did not address the attribution of statements to underwriters.

The Underwriter Defendants rely on *PIMCO*'s statement that: "[S]econdary actors can be liable in a private action under Rule 10b-5 for only those statements that are explicitly attributed to them. The mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient." *Id.* at 155. This holding does not foreclose Rule 10b-5 liability for the Underwriter Defendants. First, Plaintiffs are not merely relying on the public's knowledge that the Underwriter Defendants were "involved" in the December Offering and "at work behind the scenes." Far more than that, the face of the Prospectus and surrounding circumstances establish their ultimate authority.

Second, *PIMCO*'s requirement of explicit attribution for "secondary actors" must be read in the context of liability for an issuer's legal counsel, not an underwriter. As the court noted:

> Mayer Brown, among other counsel, represented Refco in connection with those transactions but neither document attributes any particular statements to Mayer

> Brown. Mayer Brown is not identified as the author of any portion of the documents. Nor can the mere mention of the firm's representation of Refco be considered an "articulated statement" by Mayer Brown adopting Refco's statements as its own.

*Id.* at 158. There was nothing in the offering document to suggest that a law firm mentioned as representing the issuer made a statement, and no reasonable juror could conclude that from the text.

Here, Plaintiffs' underwriter liability claim presents an entirely different context. As shown below, the Puda Prospectus: (i) indicated that the Underwriter Defendants had an independent gatekeeping role in the December Offering with formal authority under the Underwriting Agreement to approve the Prospectus; (ii) included the Underwriter Defendants' names prominently placed on its front cover, indicating to investors' their formal approval of the statements contained therein; and (iii) indicated that the Underwriter Defendants were authorized to make representations about Puda shares. This is substantially more than a "mere identification of [the Underwriter Defendants] as being involved." *Id.* at 155. One could reasonably conclude from the text and surrounding circumstances that such a prospectus was attributable to both issuer and underwriters.

Further, it is unclear whether and how an explicit attribution requirement would be applied to an underwriter, and it is far from obvious that an underwriter was the type of secondary actor the Second Circuit had in mind when deciding *PIMCO*. Indeed, in defining the term "secondary actor," the court mentioned lawyers and accountants, but nowhere did it mention underwriters. *Id.* at 148 n.1. And to the extent that *PIMCO* could be fairly read as precluding implicit attribution of a prospectus to an underwriter, such a holding would be in conflict with *Janus* and its progeny.

The First Circuit's *Tambone* decision does not help the Underwriter Defendants either. Although that case involved underwriter liability, it addressed a legal question that is not presented here: whether a defendant makes a statement by "directing the offering and sale of securities on behalf of an underwriter, thus making an ***implied statement*** that he has a reasonable basis to believe that the key representations in the relevant prospectus are truthful and complete." 597 F.3d at 442

(emphasis added). In answering in the negative, the court noted that the SEC did not even argue that the defendant had any role in preparing the prospectus, let alone have ultimate authority over it. *Id.* at 447. Given that Plaintiffs do not rely on the "implied statement" theory and allege facts showing ultimate authority and attribution, *Tambone* is inapplicable here.[4]

### 3.   Attribution of the Prospectus to Puda and the Underwriter Defendants Is Implicit from Surrounding Circumstances

The Underwriter Defendants erroneously argue that the "voice" of the offering document is dispositive—*i.e.*, the Prospectus is presented in Puda's "voice," so only Puda made statements in the Prospectus. MQ Br. at 7-9 & nn.3-5. This argument was expressly rejected in *Roseville*: "Although the Registration Statements did speak in the voice of ES and were signed by the Individual Defendants in their capacities as directors or officers of ES, these explicit attributions do not preclude attribution to ENV as well. Indeed, *Janus* recognized that attribution could be 'implicit from surrounding circumstances.'" 814 F. Supp. 2d at 418. Moreover, "the lack of an explicit statement that ENV was speaking through the Registration Statements does not control the answer to the question of whether it made those statements," so long as a reasonable jury could conclude that the statements were attributable to ENV and that it had ultimate authority over them. *Id.* Accordingly, where, as here, an underwriter's own authority is indicated on the face of the document, the fact that the prospectus is couched in the issuer's voice is not dispositive.

---

[4] Other cases cited by the Underwriter Defendants are similarly inapt. In *S.E.C. v. Tourre*, No. 10 Civ. 3229 KBF, 2014 WL 61864, at *6 (S.D.N.Y. Jan. 7, 2014) (MQ Br. at 11), this Court noted that its jury instructions included: "[I]t is not sufficient for the SEC to prove that Mr. Tourre may have been involved, even significantly involved, in the preparation of a document that may have contained a materially false statement." This instruction is correct and irrelevant, given that Plaintiffs allege not just involvement in preparation but also ultimate authority and attribution. In *In re Miller Energy Res. Sec. Litig.*, No. 3:11-CV-386-TAV-CCS, 2014 WL 415730, at *10 (E.D. Tenn. Feb. 4, 2014) (MQ Br. at 15), the court dismissed a Rule 10b-5 claim against an officer due to "the absence of any specific factual allegations that [he] took any action, failed to take any action, or played any role whatsoever in preparing or issuing the alleged false or misleading statements[.]" Unlike here, the *Miller* plaintiffs alleged no facts connecting the relevant statements to the officer defendant.

As the Underwriter Defendants point out, MQ Br. at 8 n.4, the *Fannie Mae* court dismissed a Rule 10b-5 claim against underwriters, noting that all of the alleged misrepresentations in the prospectus were couched in terms of "we" and "our," referring to the issuer, not the underwriters. 891 F. Supp. 2d at 484. But given that the plaintiffs failed to make any allegations supporting attribution or ultimate authority, and instead relied entirely on the underwriters' participation in preparing the prospectus, there is no indication that "voice" was dispositive. *See id.* Such a holding would be in tension with *Janus*, which endorses implicit attribution and does not foreclose the existence of multiple makers of the same statement. *See Roseville*, 814 F. Supp. 2d at 418.

In *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 502 (S.D.N.Y. 2000), a court in this District ruled that there was a sufficient basis for attributing the relevant statements to the defendants, who were initial purchasers of the offered securities similar to underwriters, because the cover of the offering memorandum prominently listed their names and they disseminated the memorandum as part of their marketing efforts. Although *Gabriel Capital* was decided well before *Janus*, the court applied the standard adopted in *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998), which held that "the misrepresentation must be attributed to that specific actor at the time of public dissemination." Thus, on the issue of what allegations are sufficient to establish attribution, *Gabriel* is still good law, and Plaintiffs' allegations fit well within its holding.

Under the foregoing case law, Plaintiffs sufficiently allege that attribution of the Puda Prospectus to the Underwriter Defendants is implicit from the face of the document and surrounding circumstances. First, their names along with Puda's were prominently placed in bold on the cover of the Prospectus; no other names were listed. EX. 1. Second, the following bolded language on the first page of text in the Prospectus indicated to investors that they and Puda were jointly responsible for the representations made therein: "You should rely only on the information contained in, or

incorporated by reference in, [the Prospectus].We have not, and ***the underwriters have not, authorized anyone to provide you with different information***." EX. 1 at S-2 (emphasis added). This language indicated that the Underwriter Defendants *were* authorized to make representations about Puda shares.[5] Third, the Prospectus disclosed that the December Offering was a firm commitment underwriting, meaning that the Underwriter Defendants would initially own all the shares offered to investors. EX. 1 at S-22. And fourth, they disseminated the Prospectus as part of their marketing efforts. SAC ¶154. On these facts, it is more than plausible that investors attributed statements in the Prospectus to both Puda and the Underwriter Defendants. *See Gabriel*, 94 F. Supp. 2d at 502.

Citing *In re Optimal U.S. Litig.*, No. 10 Civ. 4095 SAS, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011), the Underwriter Defendants counter that being mentioned on the cover of a prospectus is insufficient.[6] But that case is distinguishable and illustrates why attribution is proper here. In *Optimal*, the defendant was an investment advisor that had shareholder control over a related investment fund, the issuer. In rejecting attribution to the advisor, the court stated: "The [offering documents'] designation of [the advisor] on the cover page is also insufficient to establish liability under *Janus*. The formatting of the [offering documents'] cover pages indicate that [the fund] is the issuer. In contrast, [the advisor] is listed alongside several other support professionals—including auditors, lawyers and custodians—specifically in its capacity as investment advisor." 2011 WL 4908745 at *6. Essentially, the plaintiffs were pressing the advisor as the *de facto issuer*, but the

---

[5] Moreover, the Prospectus contained no disclaimer that may have vitiated any implicit attribution to the Underwriter Defendants. *See Gabriel*, 94 F. Supp. 2d at 501-02.

[6] The Underwriter Defendants also cite *Krasner v. Rahfco Funds LP*, No. 11 CV 4092 (VB), 2012 WL 4053809, at *4 (S.D.N.Y. Aug. 9, 2012) (stating that "[i]t is not sufficient that defendants be referenced in a client's prospectus"). MQ Br. at 12. But this statement was made without discussion and totally irrelevant to the case—pure dicta. The defendant was not an underwriter, his name was not placed prominently on the front page of the prospectus, and he was not even alleged to have made a misrepresentation in the prospectus. His only false statement was made orally.

court found that this was not reflected on the cover or in the text of the offering documents.

As shown below, unlike the *informal* authority over the offering documents that the *Optimal* advisor was alleged to have behind the scenes, the Underwriter Defendants here prominently exercised *formal* authority over the Prospectus. This formal authority was reflected in the text of the Prospectus and on the cover, which listed only the Underwriter Defendants along with the issuer— much different from being listed among auditors, lawyers, and custodians. Plaintiffs' claim is therefore much closer to *Gabriel*, *Scott*, *National Century*, and *Allstate* than it is to *Optimal*.

### 4. The Underwriter Defendants, Along with Puda, Jointly Held Ultimate Authority over the Prospectus

While the *Janus* Court did not define the contours of "ultimate authority," it did state that "[w]ithout such authority, it is not 'necessary or inevitable' that any falsehood will be contained in the statement." 131 S. Ct. at 2303. This implies that ultimate authority over a statement lies with the persons and entities that approved the statement and can prevent its public issuance. *See Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 576 (S.D.N.Y. 2012) (holding that plaintiffs failed to establish defendant's ultimate authority over audit opinion because there was no allegation that defendant approved opinion before it was publicly issued); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 137 (S.D.N.Y. 2013) (same).[7]

Here, the Underwriter Defendants' ultimate authority over the Prospectus was not premised on their informal or indirect control over Puda but on their formal, legal authority as disclosed in the Prospectus and Underwriting Agreement. The text of the Prospectus indicated to investors that the Underwriter Defendants and Puda were jointly responsible for the representations made therein and

---

[7] The Underwriter Defendants misconstrue the import of *Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 271 (S.D.N.Y. 2012) (stating that "there is no dispute as to whether Vivendi had 'ultimate authority' under *Janus*"). MQ Br. at 18 n.13. In *Liberty Media*, the court rejected Vivendi's attempt to avoid responsibility for the statements of its own agents, but in so doing, the court did not hold that *only* Vivendi had ultimate authority.

that the Underwriter Defendants were authorized to make representations about the Puda shares. *See supra* at 13-14. The Prospectus also stated that, under the Underwriting Agreement, "the obligations of the [Underwriter Defendants] to pay for an accept delivery of the common stock offered by [the Prospectus] are subject to the approval of certain legal matters by their counsel and to certain other conditions." EX. 1 at S-22. The Underwriting Agreement filed with the SEC provided that Puda would "prepare the Prospectus in a form *approved by [Macquarie]*." EX. 2 at ¶ 5(a)(i) (emphasis added). Moreover, the Underwriter Defendants' emails show that the they actually exercised this formal approval authority on the day that the Prospectus was filed with the SEC. SAC ¶138. These facts show that the Underwriter Defendants' ability to shape the contents of the Prospectus was not "subject to the ultimate control" of the fund. *See Janus*, 131 S. Ct. at 2305.

Incorrectly asserting that Plaintiffs confuse ultimate authority with a mere sign-off, the Underwriter Defendants point out that an underwriter's counsel's sign-off is also typically required before filing a prospectus. MQ Br. at 17. Setting aside the failure to define the boundary between "approval" and "sign-off" or cite any case law recognizing this nebulous distinction, the Underwriter Defendants help make Plaintiffs' point. As their cited source states, it is the *underwriter* that requires a legal sign-off, not the issuer. *Id.* at n10. Before approving the prospectus and putting its name on the cover, the underwriter requires assurance from legal experts. The legal counsel's sign-off is ultimately subject to the control of the underwriter. In contrast, the underwriter's approval of the prospectus is not subject to the control of the issuer; if the underwriter does not approve, the issuer will have to postpone the offering, find another underwriter, and restart the due diligence process.[8]

---

[8] The Underwriter Defendants cite a *New York Law Journal* article stating that "[t]he ultimate decisions as to whether an offering will proceed, whether to disseminate an offering document, and what the offering document will say rest with the issuer, not the underwriter." MQ Br. at 18 n.12. The article's authors, attorneys who represent underwriters in securities litigation, make this assertion without any elaboration or support.

The Underwriter Defendants also rely on the statement in *Optimal* that: "Plaintiffs' attempt to avoid *Janus* by conflating shareholder control with 'ultimate authority' is unavailing. *Janus* emphasizes the narrow scope of the private right of action under Rule 10b-5 and a formalistic approach to Rule 10b-5 liability. Under this precedent, [the fund] had 'ultimate authority' over the contents of the [offering documents] and the decision to issue [them]." 2011 WL 4908745, at *5. There, the plaintiffs argued that the advisor's informal authority over the relevant statements essentially displaced the issuer's formal authority. That ran afoul of *Janus* because it "disregard[ed] the corporate form." 131 S. Ct. at 2304. *Optimal* is inapplicable here because Plaintiffs allege that the Underwriter Defendants had formal authority over the Prospectus that was independent from, rather than displaced, Puda's authority. These allegations are consistent with the Supreme Court's "formalistic approach," *Optimal*, 2011 WL 4908745, at *5, because they respect the corporate form.

### 5.   The Underwriter Defendants Made Actionable Statements by Knowingly or Recklessly Disseminating a False Prospectus to Investors

In *National Century*, the court held that an underwriter can be deemed to have made a statement by disseminating allegedly false offering documents to investors:

> Credit Suisse's focus on the [offering documents] "belonging" to the issuers ignores the fact that it was Credit Suisse who took these statements and put them into investors' hands. Even if Credit Suisse did not author every word in the [offering documents], it did communicate them to investors. *See Janus Capital*, 131 S.Ct. at 2303 (rejecting the argument that § 10(b) liability requires that the defendant "create" the statement). It is fraud to knowingly provide false information to another person, regardless of who originally drafted the words. As the Seventh Circuit held, "One doesn't have to be the inventor of a lie to be responsible for knowingly repeating it to a dupe." *S.E.C. v. Lyttle*, 538 F.3d 601, 604 (7th Cir. 2008).

846 F. Supp. 2d at 862. While *Janus* is silent on the question of whether disseminating a false prospectus is actionable, it does state that "[m]erely hosting a document on a Web site does not indicate that the hosting entity adopts the document as its own statement or exercises control over its content." 131 S. Ct. at 2305 n.12.

Here, Plaintiffs allege that the Underwriter Defendants, by receiving the Kroll Report before the December Offering, knowingly or recklessly disseminated a prospectus that contained material misrepresentations and omissions and solicited the purchase of worthless Puda securities. Their marketing efforts went far beyond passively hosting the Prospectus on their respective websites. The Underwriter Defendants solicited investors for the Offering and distributed the Prospectus to investors. SAC ¶154. Under *National Century*, their active dissemination of misstatements in the Prospectus constituted actionable communications that are attributable to them for purposes of Rule 10b-5. *See* 846 F. Supp. 2d at 862.

*Tambone* rejected dissemination as a basis for liability, but unlike *Tambone*, *National Century* was decided after *Janus* and is more faithful to its holding. The *Tambone* court reasoned that the dissemination theory could implicate a defendant that had no role in creating a statement. 597 F.3d at 447; *id.* at 443 (stating that "the SEC's asseveration that one can 'make' a statement when he merely uses a statement created entirely by others cannot follow"); *id.* at 446 ("Allowing courts to imply that 'X' has made a false statement with only a factual allegation that he passed along what someone else wrote would flout a core principle that underpins" *Central Bank*).[9]

Under *Janus*, however, the focus is properly on who has the ultimate authority over a statement, not on who prepared it. *See Fannie Mae*, 891 F. Supp. 2d at 484 ("Any role [that the underwriter] served in the drafting process, or in preparing and publishing the offering materials is insufficient to impose primary liability under *Janus*."). That a statement was created entirely by others is not a crucial fact under *Janus*. The underwriter has ultimate authority over whether it will disseminate a prospectus that it knows or recklessly disregards is false. Moreover, subjecting an underwriter to liability for disseminating a prospectus with its name on the front cover satisfies the

---

[9] This holding was cited with approval in *Fannie Mae*, but because the plaintiffs do not appear to have relied on dissemination, the court did not analyze the issue. 891 F. Supp. 2d at 483.

Supreme Court's requirement of public reliance and attribution. *See Janus*, 131 S. Ct. at 2303.[10]

### 6.     Rule 10b-5 Liability for the Underwriter Defendants Is Consistent with *Janus* and *Central Bank*

The *Janus* Court sought to maintain the bar on aiding and abetting liability established by *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), and draw a "clean line" between those who are primarily liable and those who are secondarily liable. 131 S. Ct. at 2302 & n.6. Contrary to the Underwriter Defendants' assertion, MQ Br. at 2, 6 n.2, sustaining Plaintiffs' claim would preserve that clean line. Unlike in *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997) (cited at MQ Br. at 12), Plaintiffs allege a primary violation that is not premised on "[a]llegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms . . . [that] fall within the prohibitive bar of *Central Bank*." Plaintiffs contend that, under *Janus* and cases applying it, a non-issuer makes statements in a prospectus for purposes of Rule 10b-5 where the text of the prospectus and surrounding circumstances establish that the defendant prominently and publicly exercised formal approval authority over it. This interpretation of *Janus* virtually applies only to underwriters and just in the rare case that a strong inference of scienter can be pleaded. For example, *Puda* became one of those rare cases only after Plaintiffs discovered the Kroll Report.

### B.     The Underwriter Defendants Had a Duty to Disclose the Nonpublic Information Revealed in the Kroll Report Before Selling Puda Shares

Before the December Offering, the Underwriter Defendants received material nonpublic information from the Kroll Report confirming that Puda was an empty shell. The December Offering

---

[10] The Underwriter Defendants cite a speech by SEC Chair Mary Jo White: "[Section 20(b)] is potentially a very powerful tool that can reach those who have participated in disseminating false or misleading information to investors through offering materials . . ., but who might not be liable under Rule 10b-5(b) following the Supreme Court's decision in *Janus* because they may not be the 'maker' of the statement." This quote is misleading. Ms. White was addressing enforcement against "individuals [who] have engaged in unlawful activity but attempted to insulate themselves from liability by avoiding direct communication with the defrauded investors." Thus, she could not possibly have been talking about underwriters, who regularly communicate directly with investors.

was a firm commitment underwriting, meaning that the Underwriter Defendants acquired the entire

issuance of Puda shares and then traded them on their own accounts for profit. When trading on such

insider information, a duty to disclose typically arises only when there is a fiduciary relationship

between the defendant and investors. *Chiarella v. U. S.*, 445 U.S. 222, 228 (1980). As the Supreme

Court held in *Dirks v. S.E.C.*, 463 U.S. 646, 655 n.14 (1983):

> Under certain circumstances, such as **where corporate information is revealed
> legitimately to an underwriter**, accountant, lawyer, or consultant working for the
> corporation, **these outsiders may become fiduciaries of the shareholders**. The basis
> for recognizing this fiduciary duty is not simply that such persons acquired nonpublic
> corporate information, but rather that they have entered into a special confidential
> relationship in the conduct of the business of the enterprise and are given access to
> information solely for corporate purposes.

(Emphases added.) Here, critical, nonpublic information about Puda was revealed legitimately to the

Underwriter Defendants during the course of their due diligence, rendering them "temporary

insiders" owing a fiduciary duty to Puda investors. Therefore, even if this Court concluded that the

Underwriter Defendants did not make statements for purposes of Rule 10b-5, in the alternative, they

had a duty to publicly disclose the information revealed in the Kroll Report or refrain from selling

Puda shares to unknowing investors for profit.

II.     **Trellus Asserts Timely Claims for Violations of Section 11 and Section 12 of the
        Securities Act and Has Standing to Assert Them**

        A.      **Trellus's Section 11 and Section 12 Claims Are Not Time-Barred**

        As this Court stated, it has retained federal subject matter jurisdiction over Plaintiffs'

Securities Act claims *throughout this litigation*: "I don't think there's any debate that I have the

power to hear federal securities cases and that I have the power to hear a Section 11 or Section 10

case." Mar. 10, 2014 Hearing Tr. at 20:25-21:2. Thus, the assertion of Section 11 and 12 claims in

the initial complaint in this action tolled the applicable statutes of limitations for Trellus. *See Am.*

*Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552-53 (1974).[11]

On its instant motion, while rehashing its argument that *American Pipe* tolling does not apply to Trellus's claims and that those claims are time-barred, Macquarie continues to conflate *statutory standing* with the Court's *subject matter jurisdiction* over the federal claims at issue. MQ Br. at 20. Macquarie's argument fails because it ignores: (i) the Court's acknowledgement that it has had subject matter jurisdiction over this case from the outset, such that *American Pipe* tolling commenced in April 2011; (ii) the difference between dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction and dismissal under Rule 12(b)(6) for failure to state a claim, including a failure of *statutory standing*;[12] and (iii) the Court's recognition that it must also take into account

---

[11] During the hearing on March 10, 2014, the Court also cited *Advanced Magnetics, Inc. v. Bayfront Partners, Inc*., 106 F.3d 11, 20 (2d Cir. 1997), for the proposition that where an initial plaintiff is found to lack standing, "[t]here plainly should be no dismissal where a substitution of the real party in interest is necessary to avoid injustice." Mar. 10, 2014 Hearing Tr. at 7:14-8:1. In such cases, the substituted plaintiff's claims relate back to the original complaint. *Advanced Magnetics*, 106 F.3d at 20. Moreover, implicit in the Court's ruling that Trellus's claims could be asserted under various Federal Rules of Civil Procedure is that such claims are timely. Macquarie's argument that these claims are time-barred is in direct conflict with this Court's order allowing Trellus to intervene.

In addition to the Court's jurisdiction to hear claims "arising under" federal securities laws, as Trellus has previously argued and briefed, Article III standing was sufficiently alleged by Thomas Rosenberger under *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), such that *American Pipe* tolling is properly applied to Trellus's claims. *See* Dkt. No. 327 at 6-7. Unlike the plaintiff in *Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013), who bought only five of approximately 100 offerings at issue, and Article III standing *could not* exist as to the remaining offerings, here, there is only one security at issue: Puda stock, which was purchased by both Rosenberger and Trellus. Rosenberger's pleading that he bought on the day of the add-on offering at the offering price from an underwriter, alleged Article III standing (even though he *ultimately* was found to lack statutory standing). Trellus believed claims were being asserted on its behalf and relied on the class action mechanism. When Trellus found out that Rosenberger's assertion of Securities Act claims would come under attack, it promptly moved to intervene.

Plaintiffs incorporate by reference their previous arguments and submissions on jurisdiction, timeliness, and tolling. *See, e.g.,* Mar. 13, 2013 Hearing Tr. at 35-38; Sept. 27, 2013 Hearing Tr. at 38-64, Mar. 10, 2014 Hearing Tr. at 3-9, 19-32, 55-60; Dkt. Nos. 289, 309, 327, and 334.

[12] The Supreme Court holds that lack of statutory standing is an issue of claim viability, addressed by Rule 12(b)(6), which does not implicate subject matter jurisdiction. "Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action. . . ." *Steel*

equitable considerations when considering the timeliness of Trellus's claims.[13]

Finally, Macquarie challenges Trellus's representation of a Securities Act subclass. *Id.* at 20 n.15. Macquarie must concede that Plaintiffs moved to have Trellus appointed as a class representative (Dkt. No. 177); the CEO and CFO of Trellus each sat for full-day depositions, during which defendants were asked to address all certification issues; and Trellus produced hundreds of pages of documents. Yet no defendant substantively challenged Trellus's suitability as a subclass representative. The Court should reject any attempt to revisit the issue.[14] *See Kremens v. Bartley*, 431 U.S. 119, 137 (1977) (stating that "failure to object to a class certification waives any defects not related to" the Article III "cases or controversies" requirement) (Brennan, J., dissenting).

**B.      Macquarie Is a Statutory Seller for Purposes of Section 12 and Trellus Has Standing to Assert a Section 12 Claim Against Macquarie**

Macquarie wages one final attack on Trellus, arguing that so-called "direct" privity is required to plead standing necessary to support a Section 12 claim and that because Trellus did not

---

*Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). Rulings that conflate claim viability with the court's power to hear the case "have no precedential effect." *Id*. at 91. In *Morrison v. Nat'l. Australia Bank Ltd*., 561 U.S. 247 (2010), Justice Scalia explained: "[W]e must correct a threshold error in the Second Circuit's analysis. It considered the extraterritorial reach of § 10(b) to raise a question of subject-matter jurisdiction, wherefore it affirmed the District Court's dismissal under Rule 12(b)(1). . . . But to ask what conduct §10(b) reaches is to ask what conduct 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case. . . . The District Court here had jurisdiction under 15 U.S.C. §78aa to adjudicate the question whether §10(b) applies. . . ." *Id.* at 254 (citations and quotation marks omitted).

[13] *See* Order dated Apr. 7, 2014 (Dkt. No. 347) at 2 (granting Plaintiff's motion to vacate its previous Order denying Trellus's motion to intervene, noting that "this case presents 'unusual circumstances militating for ... a finding of timeliness' of Trellus's initial motion to intervene") (citing *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir. 2006)).

[14] Asserting that a non-plaintiff cannot become class representative (MQ Br. at 20 n.15 (citing Dkt. No. 241 at 4)) is an incorrect statement of the law. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 199 F.R.D. 119, 125 (S.D.N.Y. 2001). Nor is that bald assertion a placeholder to allow a second bite at the apple. Macquarie did not know at the time it opposed class certification that its summary judgment motion would be granted and that Trellus's intervention motion would be denied. Macquarie had the opportunity to object to Trellus as a representative and now it is waived.

purchase Puda shares "directly" from Macquarie it cannot be liable to Trellus under Section 12. MQ

Br. at 21-22. Macquarie misstates the law to support an overly restrictive application of the privity

requirement for a "statutory seller" under Section 12. In *Pinter v. Dahl*, 486 U.S. 622, 644 (1988),

the Supreme Court expressly held that the definition of "seller" is not to be read "so restrictively" as

to require "transferring title for value." Rather, a "statutory seller" includes any person who

"solicits" a securities purchase for his or her own financial gain. *Id.* at 644-46. Specifically:

> Section 2(3) defines "sale" or "sell" to include "every contract of sale or disposition
> of a security or interest in a security, for value," and the terms "offer to sell," "offer
> for sale," or "offer" to include "every attempt or offer to dispose of, or solicitation of
> an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(3).

> Under these definitions, the range of persons potentially liable under § 12(1) is not
> limited to persons who pass title. The inclusion of the phrase "solicitation of an offer
> to buy" within the definition of "offer" brings an individual who engages in
> solicitation, an activity not inherently confined to the actual owner, within the scope
> of § 12.

*Id.* at 642-43 (citation omitted).

Although *Pinter* interpreted Section 12(a)(1), the Second Circuit has applied the ruling to

identical language in Section 12(a)(2). *See Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988)

(holding that Section 12 liability could be alleged against general partners who "contemplated and

authorized" the solicitation). Thereafter, courts in the Second Circuit "have consistently held that a

plaintiff [asserting a claim under Section 12(a)(2)] must plead or prove (1) that a defendant directly

sold stock to the plaintiff or (2) directly solicited the plaintiff's purchase of stock." *In re Am. Bank

Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 438 (S.D.N.Y. 2000).[15]

---

[15] *See also In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 399 (S.D.N.Y. 2007)
(stating that for purposes of Section 12 "[seller] applies not only to the seller who is in privity with
the investor-plaintiff, but also with other persons, not in privity, who 'solicited the sales in question
for financial gain'"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y.
2003) ("Since *Capri*, it has become well settled in this Circuit that [a statutory] seller need not have
'personal' contact with the purchaser . . . to be held liable under § 12(a)(2)").

Here, although Macquarie did not "directly" transfer title of any Puda shares to Trellus, Macquarie directly solicited Trellus's purchase for its own financial gain. Plaintiffs allege that Macquarie was an underwriter, assisted in the preparation and dissemination of the offering materials for the December Offering, including the Prospectus, prominently displayed its name on the Prospectus, and received substantial financial benefits in the form of discounts and commissions in connection with the December Offering. SAC ¶56. Plaintiffs further allege that lead underwriter Macquarie served as a representative for itself and Brean Murray in the December Offering and sold 6,750,000 Puda shares directly to investors in a firm commitment underwriting. SAC ¶¶121-122. Moreover, Macquarie solicited investors for the Offering and distributed the Prospectus to investors. SAC ¶154. These solicitation efforts included sending a Macquarie representative to accompany Ming Zhao to meet personally with Trellus to discuss investing in Puda.[16]

Macquarie's direct participation in preparing the December Offering materials and soliciting the purchase of Puda shares by Trellus and others makes it a statutory seller for purposes of Section 12 liability. *See* 15 U.S.C. §77b(3); *Pinter*, 486 U.S. at 646 (citing cases); *Holographics*, 93 F. Supp. 2d at 438 (stating that "firm commitment" underwriters are statutory sellers, and "solicitation" includes "participating in the preparation of the false and misleading Registration Statement and Prospectus and participating in 'road shows' to promote the sale of [the subject] common stock"); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003) (same).[17] *Holographics*

---

[16] *See* Trellus Rule 30(b)(6) Depo. Tr. at 84:10-85:10, attached as Crowell Declaration EX. 3. This deposition transcript was attached to Plaintiffs' opposition to the Underwriter Defendants' partial motions for summary judgment. Dkt. No. 238. Documents previously filed with the court are subject to judicial notice. *See Blue Tree Hotel Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Kramer*, 937 F.2d at 774.

[17] *See also In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 502 (S.D.N.Y. 2010) (stating that allegations that underwriters were associated with offerings and "'promoted and sold' the Certificates for their own personal gain" were sufficient to allege Section 12 standing); *Perry v. Duoyuan Printing, Inc.*, Slip Copy, (Aug. 22, 2013) ("[C]ourts within the Second Circuit do

also explicitly rejects Macquarie's contention, MQ Br. at 22, that solicitation to "unspecified investors" fails to state a Section 12(a)(2) claim. 93 F. Supp. 2d at 438.

Finally, the cases cited by Macquarie to assert a lack of Section 12 standing, *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00-Civ-8058 (NRB), 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001), and *Griffin v. PaineWebber, Inc.*, No. 99-Civ-2292 (VM), 2001 WL 740764 (S.D.N.Y. June 29, 2001) (MQ Br. at 22), are distinguishable. In *Steed*, the court ruled that an allegation that the defendant was "part of the chain of title" was insufficient to establish Section 12 standing where, unlike here, there was no indication that the defendant actually participated in the solicitation. 2001 WL 1111508, at *7. Similarly, in *Griffin*, the court ruled that Section 12 liability was not adequately alleged where the defendant was not "directly involved in the actual solicitation" in the purchase of the subject offering. 2001 WL 740764, at *2. Here, by contrast, Macquarie *was directly involved* in the solicitation of Trellus's purchase, and Macquarie and Ming Zhao together visited Trellus's offices specifically to secure Trellus's investment in Puda. In sum, Trellus alleges sufficient facts to establish its standing to bring its Section 12 claim against Macquarie.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Underwriter Defendants' motions to dismiss in their entirety. In the alternative, if the Court granted any part of the motions, Plaintiffs respectfully request leave to amend. *See In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, MDL 12-2389, 2013 WL 6621024, at *33 (S.D.N.Y. Dec. 12, 2013).

---

not require that the [plaintiff] identify the specific underwriter from which it purchased shares," and ruling that standing was adequately alleged where underwriter "assisted in the preparation and dissemination of the IPO materials" and "negotiated the IPO price, controlled the contents and dissemination of the Registration Statement and Prospectus, and offered to engage in transactions to stabilize, maintain or otherwise affect the price of the common shares during and after the offering").

DATED:    June 19, 2014                 **GLANCY BINKOW & GOLDBERG LLP**


By: *s/ Joshua L. Crowell*
Lionel Z. Glancy
Joshua L. Crowell (JC-0914)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
info@glancylaw.com

Robin Bronzaft Howald (RH-9974)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone:  (212) 682-5340
Facsimile:  (212) 884-0988


**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR-5733)
Phillip Kim, Esq. (PK-9384)
Sara Fuks, Esq. (SF-6034)
Yu Shi, Esq. (YS-2182)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
info@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the Class*

**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

Patrick V. Dahlstrom
Louis C. Ludwig
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Jeffrey P. Campisi
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

**KIRBY MCINERNEY LLP**
Daniel Hume
David E. Kovel
825 Third Avenue
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Additional Counsel for Plaintiffs*

**PROOF OF SERVICE BY ELECTRONIC POSTING
PURSUANT TO SOUTHERN DISTRICT OF NEW YORK
ECF AND LOCAL RULES AND BY MAIL
ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.

On June 19, 2014, I served true and correct copies of **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MACQUARIE CAPITAL (USA) INC.'S MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED AND SUPPLEMENTAL COMPLAINT**, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 19th day of June, 2014, at Los Angeles, California.

*s/ Joshua L. Crowell*
Signature


Joshua L. Crowell
Print Name

## Mailing Information for a Case 1:11-cv-02598-KBF

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joseph Alexander Baratta**
  jabaratta@barattalaw.com

- **Jeffrey Philip Campisi**
  jcampisi@kaplanfox.com

- **Jason Canales**
  jcanales@mosessinger.com

- **Albert Yong Chang**
  achang@cfsblaw.com,lcox@cfsblaw.com,kcochran@cfsblaw.com,aringer@cfsblaw.com,sammirati@cfsblaw.com,albert.chang.law@gmail.com

- **Michael Vincent Cibella**
  mvc@cibellalaw.com

- **Joshua Lon Crowell**
  jcrowell@glancylaw.com

- **Greg A. Danilow**
  greg.danilow@weil.com,ariel.rothstein@weil.com,david.byeff@weil.com,stefania.venezia@weil.com,MCO.ECF@weil.com,Christopher.Gismondi@weil.com

- **Dana S. Douglas**
  dsdouglas@mayerbrown.com

- **Mary Kathryn Dulka**
  mdulka@goodwinprocter.com,cbrown@goodwinprocter.com

- **William Bernard Federman**
  wbf@federmanlaw.com,ngb@federmanlaw.com,law@federmanlaw.com

- **Frederic Scott Fox , Sr**
  ffox@kaplanfox.com

- **Sara Esther Fuks**
  sfuks@rosenlegal.com

- **Lionel Z. Glancy**
  lglancy@glancylaw.com,mmgoldberg@glancylaw.com,csadler@glancylaw.com,pbinkow@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Seth Goodchild**
  seth.goodchild@weil.com,Dan.Martin@weil.com

- **Mark Holland**
  mholland@goodwinprocter.com

- **Robin Bronzaft Howald**
  hobbit99@aol.com,info@glancylaw.com

- **D. Seamus Kaskela**
  skaskela@ktmc.com

- **David E Kovel**
  dkovel@kmllp.com,ecf@kmllp.com

- **Louis Carey Ludwig**
  lcludwig@pomlaw.com

- **Matthew M. Madden**
  mmadden@robbinsrussell.com,ggordon@robbinsrussell.com

- **Ottavio Vincenzo Mannarino**
  mannarino@barattalaw.com

- **Brian James Massengill**
  bmassengill@mayerbrown.com,courtnotification@mayerbrown.com

- **Justin Adam McCarty**
  jmccarty@mayerbrown.com

- **Jonathan Craig Medow**
  jmedow@mayerbrown.com

- **Joshua N. Mitchell**
  jmitchell@robbinsrussell.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,echang@glancylaw.com

- **Andrei V. Rado**
  arado@milberg.com,maoffice@milberg.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kevin F. Ruf**
  kevinruf@gmail.com

- **Yu Shi**
  yshi@rosenlegal.com

- **Richard Mark Strassberg**
  rstrassberg@goodwinprocter.com,nymanagingclerk@goodwinprocter.com

- **Jennifer Elizabeth Traystman**
  jtraystman@trinko.com

- **Curtis Victor Trinko**
  ctrinko@gmail.com

- **John Brandon Walker**
  bwalker@kmllp.com

- **Michael Jonathan Wernke**
  mjwernke@pomlaw.com

- **Robert S. Wolf**
  rwolf@mosessinger.com,ografakos@mosessinger.com

- **Kathryn Schaefer Zecca**
  kzecca@robbinsrussell.com

- **Maryana Zubok**
  mzubok@goodwinprocter.com,mdulka@goodwinprocter.com,rshah@goodwinprocter.com,rstrassberg@goodwinprocter.com,ndaughtrey@goodwinproxcter.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Adriene          O. Bell
Kessler Topaz Meltzer & Check, LLP (PA)
280 King of Prussia Road
Radnor, PA 19087

Samuel Blankenship
,

Michael          Goldberg
Glancy Binkow & Goldberg, LLP (CA)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

Michael          Marc Goldberg
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars   Suite 311
Los Angeles, CA 90067

Myron            Harris
South 106-Park Tower Place
22nd & Benjamin Franklin Pkwy
Philadelphia, PA 19130

David            M. Promisloff
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087
```