UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE PUDA COAL SECURITIES INC. ET AL. LITIGATION** | Case No: 1:11-CV-2598 (KBF)<br><br>CLASS ACTION<br><br>ECF Case |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ENTER DEFAULT JUDGMENT AGAINST DEFENDANTS PUDA COAL, INC. AND MING ZHAO**

Pursuant to Rule 55(b) of the Federal Rules of Civil Procedure and Rule 55.2 of the Local Civil Rules for the United States District Courts for the Southern and Eastern District of New York ("Local Rules") Lead Plaintiffs and the Class apply for entry of default against defendants Puda Coal, Inc. ("Puda") and Ming Zhao ("Zhao") upon the Clerk of the Court's certificates of default entered on March 14, 2013 (Dkt. Nos. 150 and 151).

This application is based on the following Case Summary, the supporting Report and Declaration of Peter W. Lert Ph.D., CFA ("Lert Report") as to the damages proximately caused by Puda's and Zhao's securities fraud as alleged in the Consolidated Amended Complaint, all relevant portions of the files and records in the action, and on such other matters as may properly come before the court at the presentation and hearing of this application.

As set forth below and as supported in the Lert Report, Lead Plaintiffs and the Class seek judgment against Puda and Ming Zhao for monetary damages in the amount of $236.7 million.

I.  **CASE SUMMARY**

A.  **Party Identification**

The Plaintiffs are Class Representatives Salomon Querub, Howard Pritchard, Hotel Ventures LLC, and Steven Weissmann and Trellus Management Company LLC (collectively, "Plaintiffs") who bring claims on behalf of a certified class on behalf of themselves and all other

persons or entities which purchased or otherwise acquired Puda common stock and call options, or sold Puda put options, between November 13, 2009 and April 8, 2011, inclusive (the certified "Exchange Act Class Period")[1] and who were injured by a series of disclosures revealing that their investments in Puda were worthless.

Defendants are: (1) Puda; (2) Puda's officers Liping Zhu and Qiong Wu; (3) Chairman of the Board Ming Zhao, and directors C. Mark Tang and Lawrence Wizel ("Directors") and Jianfei Ni; (4) Puda's auditors Moore Stephens Hong Kong ("MSHK") and Moore Stephens Certified Public Accountants, P.C. ("MSPC") (collectively, "Auditors"); and (5) Puda's underwriters, Brean Murray & Carret ("Brean") and Macquarie Capital (USA) Inc. ("Macquarie") (collectively, "Underwriters").

**B. Procedural History**

The first complaint in this securities class action was filed on April 15, 2011 (Dkt. No. 1). On December 6, 2011 the Court appointed Salomon Querub, Howard Pritchard and Hotel Ventures LLC as lead plaintiffs and the Rosen Law Firm, P.A. and Glancy Binkow & Goldberg LLP as co-lead counsel. (Dkt. No. 38). On February 9, 2012 Plaintiffs filed the Consolidated Complaint ("CAC"). (Dkt. No. 47).

On March 9, 2012 Puda's counsel moved to withdraw. (Dkt. Nos. 50-53). That motion was granted on March 16, 2012. (Dkt. No. 56). Following briefing on the non-defaulting

---

[1] This is the certified class period for the defaulted defendants Zhao and Puda. Plaintiffs also bring the Second Amended Consolidated and Supplemental Class Action Complaint ("SAC") on behalf of April 7, 2014 claims under Section 11 and 15 of the Securities Act on behalf of persons and entities who purchased Puda shares in or traceable to the public offering on December 8, 2010 and did not sell those shares prior to April 8, 2011 and a claim under Section 12(a)(2) of the Securities Act on behalf of persons or entities which purchased Puda shares in the December Offering from one of the underwriters and were directly solicited to make such purchase by one of the underwriters ("Securities Act subclass."). A shorter class period for the Auditors is March 31, 2010 through and including April 8, 2011 (the "Exchange Act Auditors Class Period.").

defendants' motions to dismiss, the Court sustained Plaintiffs' Complaint, and defendants filed their answers on April 12, 2013.  (Dkt. Nos. 165-169).  The PSLRA stay was thereby lifted and the case proceeded to discovery.

On October 18, 2012 Ming Zhao was properly served with a copy of the summons and CAC in both English and translated into Chinese via the convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at the Hague ("Hague Convention").  *See* Declaration of Laurence Rosen in Support of Motion to Enter Default Judgment Against Defendants Puda Coal, Inc. and Ming Zhao ("Rosen Decl.") filed herewith, at ¶ 5.  A copy of the executed returned summons was filed with the Court on February 20, 2013 (Dkt. No. 138) and is attached to the Rosen Declaration as Exhibit A.  On March 15, 2012 Puda was properly served with a copy of the summons and CAC by service on its registered agent for service of process in the State of Delaware.  *See* Dkt No. 59, Affidavit of Service confirming that on March 15, 2012 at 10:35 a.m. summons and CAC service was effected on Puda through its registered agent the Corporation Trust Company); Rosen Decl. ¶4.  An affidavit of service was filed with the Court on April 5, 2012.  (Dkt. 59).

On March 15, 2013, the Clerk entered certificates of default as to Puda and Zhao.  (Dkt. No. 149-151); Rosen Decl. ¶ 5.

On May 13, 2013 Trellus Management Company, LLC ("Trellus") filed a motion to intervene. (Dkt. No. 176).  On May 29, 2013 the Auditors, Underwriters and Tang & Wizel moved for summary judgment as to Plaintiffs' Section 11 and 12 claims.  (Dkt. Nos. 188-199).  On July 1, 2013 Plaintiffs filed their motion for class certification. (Dkt. No. 216).

On October 1, 2013 the Court granted the summary judgment claims, denied Trellus' motion to intervene and granted Plaintiffs' motion for class certification as to two classes (one as

3

to the Auditors and one as to the defaulted defendants), but narrowed Plaintiffs' proposed class definition.

Plaintiffs appealed the Court's denial of Trellus' motion to intervene with the Second Circuit. (Dkt. No. 272). On January 6, 2014 Plaintiffs filed a motion for leave to amend to file a (second) consolidated amended complaint (Dkt. No. 282). The Court granted Plaintiffs' motion to amend on February 21, 2014. (Dkt. No. 305).

On February 4, 2014 Trellus filed a motion for an indicative ruling pursuant to Fed. R. Civ. P. 62.1(a)(3) asking the Court to consider or grant a Fed. R. Civ. P. 60(b) motion to permit investors to again pursue Securities Act claims (which the Court had dismissed based upon its finding that Plaintiffs lacked standing to assert them).

In February 2014 the Auditors filed summary judgment motions as to Plaintiffs' Section 10 claims. All of the summary judgment briefing as to the Auditors' motions has been filed under seal. The Court granted the Auditors' summary judgment motions on June 18, 2014.

On March 18, 2014, the Court issued an order holding that it would allow Trellus to assert "all claims against all parties." (Dkt. No. 331). Following briefing on the matter, on April 7, 2014 the Court vacated its prior decision and granted Trellus' motion to intervene due to newly discovered evidence. (Dkt. No. 247).

On April 21, 2014 Plaintiffs filed a Second Consolidated Amended and Supplemental Complaint ("SAC") which asserted additional claims against the Underwriters. (Dkt. No. 352). The SAC also renewed the Securities Act claims that had been asserted in the CAC, pursuant to the Court's March 18 Order. The SAC does not contain any additional claims as to Puda or Zhao and does not provide grounds for any additional defenses as to Puda or Zhao that did not exist at the time of the filing of the CAC.

The Underwriters filed motions to dismiss the SAC on May 21, 2014 (Dkt. Nos. 370-375). The Auditors and Tang and Wizel answered the Complaint on June 2, 2014.  (Dkt. Nos. 377-379).  The motions currently pending before the Court do not implicate the claims against Puda or Zhao.

### C. Nature of the Claims Against Puda and Zhao

The Complaint alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, 20(a).  Puda is charged with violations of all of the above, with the exception of Section 15 of the Securities Act.  Zhao is charged with violations of all of the above with the exception of Section 12(a)(2) of the Securities Act.

Investors in Puda's securities believed that Puda, through its 90% ownership of its primary operating subsidiary, Shanxi Coal, was a profitable and growing supplier of "premium high grade metallurgical coking coal used to produce coke for steel manufacturing in China." CAC ¶ 2.  In truth, however, Puda did not own Shanxi Coal or have *any* operations or revenues during the entire Class Period because Ming Zhao (its Chairman and major shareholder), had improperly transferred Puda's 90% share of Shanxi Coal to himself and then to an unrelated investment fund controlled by CITIC,[2] for which Puda received no consideration.  *Id.* ¶¶ 2-3.

Before and during the Class Period, Puda represented that it indirectly "own[ed] 90% of the equity interest" in Shanxi Coal.[3]  *Id*. ¶ 8.  The remaining 10% was owned by Defendant Zhao and

---

[2] CITIC is the largest Chinese private equity fund and merchant bank, and is owned and controlled by the Chinese government.  Defendant Zhao later sold 49% of Shanxi Coal to CITIC in July 2010, and pledged the remaining 51% interest in Shanxi Coal to CITIC as collateral for a loan, all of which was revealed in  Alfred Little's April 8, 2011 Report. *Id.*  ¶ 19.

[3] Puda's indirect ownership interest in Shanxi Coal was held through Puda's 100% ownership of a subsidiary named, Puda Investment Holding Limited ("BVI"), which possessed 100% ownership of a subsidiary named, Shanxi Putai Resources Limited ("Putai"), which possessed

5

his brother Yao Zhao ("Y. Zhao"). *Id.* Defendant Zhao, also the Chairman of Puda's Board of Directors and a major Puda shareholder, owned 8% of Shanxi Coal. Y. Zhao, the legal representative of Putai (the company through which Puda owned Shanxi Coal) under Chinese law and also a significant Puda shareholder, owned the remaining 2%. *Id.*

On or about September 3, 2009, Zhao arranged for his brother to improperly authorize and cause the transfer of Puda's 90% interest in Shanxi Coal to him, adding to the 8% interest Defendant Zhao already held. ¶ 9. As a result, as of around September 3, 2009, Defendant Zhao had increased his ownership of Shanxi Coal to 99%, thereby leaving Puda with zero ownership in Shanxi Coal. *Id.*

Even though the outright theft of Shanxi Coal left Puda a shell company with no assets, no operations, and no revenue, Puda nevertheless represented to investors during the Class Period in annual and quarterly filings with the SEC and other statements to the public that Puda continued to own 90% of Shanxi Coal. *Id.* ¶ 10. Similarly, Puda reported fraudulent financial results and continued to issue financial statements that incorporated its false claim of ownership of 90% of Shanxi Coal – fraudulently consolidating Shanxi Coal's operating results in its financial statements, despite the fact that Puda no longer maintained any ownership interest in Shanxi Coal. *Id.*

Puda conducted two separate public offerings in 2010 without disclosing these transfers of Shanxi Coal or that it no longer had any operating business at all, raising more than $100 million from public investors by selling shares in what was effectively an empty shell company. *Id.* ¶ 18.

---

the 90% ownership of Shanxi Coal. Hence, Puda owned 100% of BVI, which owned 100% of Putai, which held 90% of Shanxi Coal. *Id.* ¶ 8 and n.2 thereto.

On April 8, 2011, Alfred Little published a research report on Puda Coal (the "Little Report") accusing Defendant Zhao of improperly transferring ownership of Shanxi Coal to himself in September 2009. *Id.* ¶ 19.

Investors immediately reacted negatively to the revelations in the Little Report. Puda's stock price plummeted 34.1%, to close on Friday April 8, 2011, at $6.00 per share, on unusually heavy trading volume. *Id.* ¶ 20. The following Monday morning, before the market opened, NYSE Amex halted trading of the Company's shares, and it remained halted for more than four months, rendering the stock held by Puda's shareholders illiquid and effectively worthless. *Id.* ¶ 20. When Puda's stock finally resumed trading on August 18, 2011, investors dumped their holdings en masse. Over the next two days, Puda's shares lost 46.17% of their value, again on unusually heavy trading volume. *Id.* ¶ 25. The freefall of Puda's stock price was once again stopped when trading was halted prior to the start of trading on Monday August 22, 2011. *Id.* Days later, on September 2, 2011, Puda's shares again resumed trading and plummeted another 37.5%, after Puda's audit committee disclosed, among other things, that the interim findings of its internal investigation effectively confirmed that the rumors of Defendant Zhao's transfer of Puda's ownership of Shanxi Coal to himself, and eventually to CITIC were true. *Id.* ¶ 26.

Finally, on October 3, 2011, Puda disclosed that Defendant Zhao had provided Puda's directors with a false letter purportedly from CITIC claiming that CITIC did not actually fund the loan or have an ownership interest in Shanxi Coal. Further, Puda disclosed that Defendant Zhao admitted that he had provided this fraudulent letter to the SEC. Upon this news, Puda's stock dropped another 16.6%. *Id.* ¶ 28.

## II. ARGUMENT

7

### A. LEAD PLAINTIFFS AND THE CLASS ARE ENTITLED TO A DEFAULT JUDGMENT AGAINST PUDA AND ZHAO

Rule 55 creates a two-step process for the entry of a default judgment. *New York v. Green,* 420 F.3d 99, 104 (2d Cir.2005). The first step of this process "requires first that the clerk of the court 'enter the party's default' indicating that a party has 'failed to plead or otherwise defend.'" *Lyons Partnership, L.P. v. D & L Amusement & Entertainment, Inc.,* 702 F.Supp.2d 104, 111 (E.D.N.Y.2010) (quoting Fed.R.Civ.P. 55(a)). After a party obtains a default under Fed. R. Civ. P. 55(a), the party may then seek a default under Fed. R. Civ. P. 55(b). *Getty Images (US) Inc. v. Advernet, Inc.,* 2010 WL 4536995, at *3 (S.D.N.Y. Nov. 2, 2010). The party must apply to the Court, rather than the clerk, for a default judgment if the party's claim is not for a sum certain. Under Local Civil Rule 55.2(b), the party seeking default judgment must attach the clerk's certificate of default and a proposed default judgment form to their motion. S.D.N.Y. Civ. R. 55.2(b).

Here, the clerk has entered defaults under Fed. R. Civ. P. 55(a) as to Ming Zhao and Puda. (Dkt. Nos. 150 and 151). The clerk's entries of default are attached to the Rosen Declaration as Exhibits C and D. Plaintiffs now are seeking a default judgment from the Court under Fed. R. Civ. P. 55(b). Pursuant to the requirement of S.D.N.Y. Civ. R. 55.2 a proposed default judgment is attached to the Rosen Declaration as Exhibit E.[4]

Upon default, the factual allegations of the complaint, except those related to damages, will be taken as true. *Chen v. Jenna Lane, Inc.*, 30 F. Supp. 2d 622, 623 (S.D.N.Y. 1998) (citing 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2688 at 58–59 (3d ed.1998).

---

[4] Local Rule 55.2(c) requires that all papers submitted to the Court in connection with a motion for default judgment be mailed to the party against whom default judgment is sought. In accordance with this Rule, Plaintiffs will send, via U.S. Mail, a copy of all papers submitted to the Court pursuant to Local Rule 55(b) to Defendant Puda and Zhao at their last known business addresses.

The default itself establishes the defendant's liability. "Upon default, the well-pleaded allegations of the complaint relating to liability are taken as true." *Dundee Cement Co. vs. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983).[5]

Liability determination includes admission of proximate cause properly alleged in the complaint. The fact of injury is thus established and the plaintiff is required only to prove that the "compensation sought relates to the damages that naturally flow from the injuries pleaded." *Greyhound Exhibitgroup, Inc. vs. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2nd Cir. 1992). Moreover, since default establishes liability, it also precludes affirmative defenses. *Id.*

In determining whether to grant a motion for default judgment under Rule 55 the court may consider several factors, including: 1) whether plaintiff has been substantially prejudiced by the delay involved and 2) whether the grounds for default are clearly established or in doubt. *Lemus v. Manhattan Car Wash, Inc.*, 2010 WL 4968182, at *7 (S.D.N.Y. Nov. 24, 2010). The Court also considers the same factors that apply in assessing a motion to set aside entry of a default, i.e., 1) whether the default was willful, (2) whether plaintiffs would be prejudiced by the denial of the motion for default judgment and 3) whether there are any meritorious defenses to plaintiff's claims. *Id.* citing *Pecarsky v. Galaxiworld.com, Ltd.,* 249 F.3d 167, 170–71 (2d Cir.2001)). The Court may also consider "whether any 'material issues of fact remain,' the amount of money at issue, and 'how harsh an effect a default judgment might have on the defendant.' *Id.* quoting *Group Merchandising Services, Inc. v. Ninna, Inc.,* 655 F.Supp.2d 177, 186 (E.D.N.Y. Aug.27, 2009)(citing *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d

---

[5] It is improper for the court to consider liability issues involving a defaulted defendant if it does not first give plaintiff notice that the merits of the case will be addressed. *Black vs. Lane*, 22 F.3d 1395, 1398 (7th Cir. 1994); *Ramos-Falcon vs. Autoridad de Energia Electrica*, 301 F.3d 1, 3 (1st Cir. 2002).

Cir.1981)); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, §§ 2685, 2688 (3d ed.1988).

Assuming the plaintiff demonstrates proper service, the decision to grant a motion for a default judgment lies in the sound discretion of the trial court. *See Shah v. New York State Dep't of Civil Serv.,* 168 F.3d 610, 615 (2d Cir.1999).

Here, all of the relevant factors favor entry of default.

### 1. Plaintiffs and the Class Are Substantially Prejudiced by the Delay Involved

There is no possibility that Puda or Ming Zhao will join the issues and permit Plaintiffs to litigate this case against them.  Puda and Zhao have simply disappeared from this litigation. As for Zhao, he never appeared in this case.  As for Puda, the law firm representing it withdrew from the case in March 2012, over two years ago (*See* Dkt. No. 50, Motion for Sidley Austin LLP to Withdraw as Attorney) and it has not surfaced since. This case was filed over three years ago and Plaintiffs and the Class have received no recompense for their losses incurred when Puda's share price was decimated by Ming Zhao's outright theft of Puda's sole source of revenue.

Absent default judgment, "there are no additional steps available to secure relief in this Court" against Zhao and Puda.  *House of Diamonds, Inc. v. Borgioni LLC*, 2009 WL 2633144, at *6 (S.D.N.Y. Aug. 26, 2009); *HICA Educ. Loan Corp. v. Bolte*, 2012 WL 423361, at *2 (S.D.N.Y. Feb. 10, 2012) ("[D]enying the motion would be unfairly prejudicial to Plaintiff because Defendant has failed to respond or appear").

### 2. The Grounds for Default Are Clearly Established

Procedurally, the grounds for default are clearly established and it is indisputable that Puda and Zhao have been properly served.  Here, the clerk has entered defaults under Fed. R.

10

Civ. P. 55(a) as to Ming Zhao and Puda.  Plaintiffs now are seeking a default judgment from the Court under Fed. R. Civ. P. 55(b).  Pursuant to the requirement of S.D.N.Y. Civ. R. 55.2 a proposed default judgment is attached to the Rosen Declaration as Exhibit E.  On October 18, 2012 Ming Zhao was properly served with a copy of the summons and complaint in both English and translated into Chinese via the Hague Convention of Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (opened for signature November 15, 1965 20 U.S.T. 361, 658 U.N.T.S. 163)  ("Hague Convention").  *See* Rosen Decl. at ¶5.  A copy of executed returned summons was filed with the Court on February 20, 2013 (Dkt. No. 138) and is attached to the Rosen Declaration as Exhibit A.  On March 15, 2012 Puda, was properly served with a copy of the summons and complaint by service its registered agent for service of process.  (Dkt. No. 59). An affidavit of service was filed with the Court on April 5, 2012.  (Dkt. No. 59), Rosen Decl. ¶ 9.

### 3. The Default is Willful

In addition, there is no question that both Zhao's and Puda's defaults were willful.  Ming Zhao is a wealthy Chinese national who scammed U.S. investors out of over one hundred million dollars and who knows that he cannot be forced to defend the lawsuit in the U.S.  Zhao is well aware of the lawsuit against him as he has retained counsel who, though not formally responding to the suit, have contacted Counsel for Plaintiffs and informed them that Zhao is aware of this class action.   Zhao has thus made a conscious decision not to appear and defend this litigation.  Rosen Decl. ¶ 11.  Puda has simply disappeared from the case.  On March 9, 2012 the law firm representing Puda, Sidley Austin LLP ("Sidley"), moved to withdraw as counsel for Puda.  (Dkt. No. 50), Rosen Decl. ¶ 6.  In support of its motion, Sidley noted the resignation of Puda's board members and that the only "remaining member of the Puda Coal Board is Ming Zhao."(Dkt. No.

51 at 2). In support of its motion to withdraw, Sidley cited Puda's non-payment of its legal fees, and the fact that Puda's Board of Directors had ceased to operate. *Id.* at 3-4.

The defaulting defendants were both properly served with notice of the Action, yet each has failed to appear to answer the Complaint. Such a failure to appear and defend is indicative of willful conduct. *See HICA*, 2012 WL 423361, at *2 ("Defendant's non-appearance in the action and failure to respond to the Complaint and the instant motion practice indicated willful conduct.").

### 4. There Are No Meritorious Defenses to Plaintiffs' Claims

Plaintiffs' Complaint survived motions to dismiss under the exacting pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). There is no question that Plaintiffs' case has merit. As the Court noted in its October 1, 2013 decision certifying a class "[n]o party disputes…that a fraud occurred in connection with Puda Coal's transfer through Zhao of its interest in Shanxi." (Dkt No. 263 at 4). The remaining Defendants in this lawsuit, Puda's auditors and underwriters as well as Puda's outside directors acknowledge Puda/Zhao's shameless, outright and indefensible fraud, which has been widely publicized. *See e.g.* Plaintiffs' Second Amended Complaint ("SAC") ¶32, quoting "A Fraud Went Undetected, Although Easy to Spot, NEW YORK TIMES, "Puda's principal asset was a coal mining company, Shanxi Puda Coal. But in 2009, the chairman transferred that interest from Puda to himself…'In contrast to most of the other Chinese frauds, where the business was not real, this was a profitable company that the chairman just stole'…"

Furthermore, Defendants' failure to answer the Complaint also precludes them from raising any "meritorious defense" to the claims asserted against them. *See HICA*, 2012 WL 423361, at *2 ("[The Court is unable to determine whether Defendant has a meritorious defense to Plaintiff's

12

allegations because he has presented no such defense to the Court."). Accordingly, Plaintiffs' allegations are deemed to be admitted. *See F.T.C. v. 1263523 Ontario, Inc.*, 205 F. Supp. 2d 218, 221 (S.D.N.Y. 2002) ("Entry of a default constitutes an admission of all well-pleaded allegations by the defaulted third party.").

### 5. The Amount at Stake Does Not Support Denial of Relief

The amount at stake is substantial. But the amount at stake in any securities fraud class action will be substantial. In such cases, where the amount involved is substantial, the courts are more cautious in granting default relief. But this factor bears little significance where the defaulting defendants Puda and Zhao have failed to respond to the complaint, and have shown no desire to defend this lawsuit. In addition, because all of the other factors involved weigh heavily in favor of granting default, the large amount at stake here should not deter the court from entering judgment. *See, e.g. Trustees of Local 7 Tile Indus. Welfare Fund v. Caesar Max Tile Corp.,* 2014 WL 991723, at * (E.D.N.Y. Mar. 13, 2014) certainly a great deal of money [is] at stake…However, nearly every other relevant [ ]factor weighs on the other side of the balance. Defendants' default is not 'largely technical' or a product of 'good-faith mistake or excusable neglect,' and this is 'clearly established.'" Similarly, the effects on Defendants do not support denial of relief: given the brazen fraud that occurred it is hard to imagine that there could be any circumstances under which the effect on defendants would warrant denial of relief.

### B. THE CLASS IS ENTITLED TO $236.7 MILLION IN COMPENSATORY DAMAGES

Expert opinion evidence is the proper method for establishing damages in cases involving securities fraud. *See generally,* Rule 702, *Federal Rules of Evidence*, which permits a witness to testify as an expert where the court determines that "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." In addition, a district court is

13

empowered under Rule 55(b)(2), in the exercise of its discretion, to "conduct hearings or make referrals" as may be necessary, *inter alia,* to determine the amount of damages or establish the truth of the plaintiff's allegations. Fed.R.Civ.P. 55(b)(2)(B)-(C). *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*, 888 F. Supp. 2d 385, 392-94 (S.D.N.Y. 2012). However, in this case, a hearing on damages is not necessary because the amount claimed is "liquidated or capable of ascertainment from definite figures." *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.,* 722 F.2d 1319, 1323-24 (7th Cir. 1983). Furthermore, "the determination of damages upon default does not require mathematical precision." *In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1171 (E.D.N.Y. 1996).

The Lert Report sets forth aggregate class-wide damages attributable to the misconduct of the defaulting defendants Puda and Zhao only[6]. The Lert Report's aggregate damages analysis is based directly upon the per share damage estimates and per contract estimates provided in the Expert Report of Gregg A. Jarrell dated January 7, 2014 ("Jarrell Report"). The Jarrell Report was submitted to Counsel for Defendants in connection with Plaintiffs' Fed. R. Civ. P. 26 expert disclosures and is attached to the Rosen Declaration as Exhibit F, Rosen Decl. ¶13. In addition, in connection with Plaintiffs' motion for class certification, Jarrell provided an expert report establishing that the market for Puda's shares was efficient. (Dkt. No. 219). The Court accepted Jarrell as an expert in its class certification decision. (*See, e.g.* Dkt. No. 263 at 27, "[t]wo classes can be maintained, one as to the Auditor defendants and one as to the defaulted defendants…[p]laintiffs have submitted a report of an expert who performed certain analyses in support of their certification motion, Gregg. A. Jarrell…"

---

[6] A copy of the Lert Report is attached to the Rosen Declaration as Exhibit G, Rosen Decl. ¶14.

Jarrell performed his per share damages analysis by assuming liability of Zhao and Puda, and determining that the artificial inflation of Puda stock during the Class Period was consistent with a value of zero.  *See* Jarrell Report , ¶¶69, 80, Exhibit F to Rosen Decl..  With respect to the trading halts that occurred (from April 8, 2011 through August 18, 2011 and then from August 19, 2011 to September 2, 2011) Jarrell suggested two alternatives for the PSLRA look-back prices.  *Id*.  The Lert Report utilized Jarrell's two alternative prices suggested.  Lert Report ¶3.  Lert then analyzed the price and volume behavior of Puda stock, reviewed market data, SEC filings and other pertinent data and documents which are listed in an exhibit to the Lert Report.  *Id*. at 4.  Lert concluded that aggregate class-wide damages to investors who purchased Puda common stock, estimated conservatively using the PSLRA look-back price of $0.59 amount to $197.1 million.  *Id*. ¶21.  When using the price of $4.10- the price of Puda stock on August 18, 2011, the first trading day after the 90 day look-back period, aggregate damages amounted to $144.2 million.  *Id*.  As to aggregate damages to holders of call options and writers of put options, Lert concluded that damages, using the PSLRA look-back price of $0.59 per share are $39.6 million.  When using the August 18, 2011 price of $4.10 per share, they are $27.8 million.  *Id*. at ¶22.  Total damages are therefore $236.7 million (using the look-back price of $0.59 per share) or $172 million (using the look-back price of $4.10 per share).

The Lert Report applies the measure of damages generally applied in Section 10(b) cases: that is the reduction in dollar inflation over an investor's holding period.  *Id*. at 25.  Pursuant to the Court's class certification order, Lert did not include in-and-out traders.  *Id*.  Lert adopted Jarrell's damages per share analysis, which is in turn based on the Supreme Court's decision in *Dura Pharmaceuticals*.  *Id.* at ¶28, citing Jarrell Report at ¶67.  Lert then aggregated damages using the two-trader proportional trading model.  ¶¶35-41.

The damages analyses set forth in the Lert Report and the conclusions Lert reached should be accepted by this Court in entering a default judgment in the amount of $236.7 million. First, Lert has significant relevant experience and is highly credentialed. Lert holds both a Ph.D. and a Chartered Financial Analyst ("CFA") designation. Lert Report ¶13. He has over 24 years of experience in the financial services industry, 10 years of experience as a Portfolio Manager, and has developed and applied quantitative investment strategies and analytics for over 23 years. *Id*. at ¶¶8,9. Lert led research and analysis at Fidelity for over 10 years. *Id*. at ¶10. Additionally, Lert is an active member of the CFA Institute and the Boston Security Analysts Society and taught for over five years at its CFA Review Program. *Id.* at ¶15. Lert has also authored several publications and articles in the field of finance. *Id*. at ¶¶17-19.

Second, the aggregate damages analysis and the two-trader model presented in the Lert Report has been widely accepted by Courts and in finance and economics literature, and is used by both plaintiff and defense experts. Lert Report at ¶ 44. The model is a "representative-agent" model, which is a generally accepted model in finance and economic research. *Id.* at ¶42.

The two-trader proportional trading model for estimating aggregate damages utilized by Lert's has been accepted by this court and courts in other jurisdictions in calculating aggregate damages under Section 10(b). *See, e.g. In re Worldcom, Inc.*, 2005 WL 517331, at * 4 (S.D.N.Y. March 4, 2005) (denying motion by defendants to preclude plaintiff expert from testifying as to aggregate damages, noting that "the benefits of an aggregate damages award are many"); *In re Oxford Health Plans, Inc.*, 244 F. Supp. 2d 247, 249-52 (S.D.N.Y. 2003) (noting that aggregate damages in securities fraud cases were utilized both before and after the enactment of the PSLRA; *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 171 (D.N.J. 2000) ("The use of trading models is accepted to create an estimate of aggregate damages.").

While Lert utilized both look-back prices, the more accurate look-back price, and the one that should be utilized in entering a default judgment here, is $0.59 per share.  This is consistent with the purpose of the PSLRA's look-back provision as well as Second Circuit precedent elaborating on the look-back provision.

The PSLRA caps damages on an investment loss based on the price paid for the stock and the market price for the stock subsequent to the disclosure:  "[T]he award of damages to the plaintiff shall not exceed the difference between the purchase..[price]… and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. 78u-4(e)(2); Lert Report ¶26.  Therefore, damages are not calculated based upon a single day decline in price, but are given a 90-day opportunity to recover.  *See Acticon AG v. China North East Petroleum Holdings, Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012).

The legislative history of the PSLRA indicates that the purpose of this 90 day look-back is to prevent an overestimation of plaintiffs' damages by looking only at the price only on the day following the corrective disclosure.  *Acticon*, 692 F.3d at 40.  The Second Circuit in *Acticon* reiterated this purpose as well as the proper measure of damages in securities fraud cases, stating that "[s]ubject to the bounce-back limitation imposed by the PSLRA, a securities fraud action attempts to make a plaintiff whole by allowing him to recover his out-of-pocket damages, that is, the difference between what he paid for a security and the uninflated price." *Id*. at 41.

Because Puda only traded on *one day* following the NASDAQ trading halt- August 18, 2011- its closing price of $4.10 on that day is not truly representative of the 90-day mean trading price prior to that date because trading had been halted throughout those previous 90 days.  Utilizing the price of $4.10 per share would therefore underestimate Plaintiffs' damages, insofar

as the single one day of trading following the halt does not represent the full effect of the disclosure of the fraud on Puda's stock price. Instead, the full effect of the disclosure of the fraud on Puda's share price is more accurately reflected utilizing the look-back price is $0.59 per share which represents Puda's average closing price in the 90 days after Puda *actually* began trading daily again (on September 2, 2011). Lert Report at ¶27.  Plaintiffs therefore request that the Court enter judgment in the amount of $236.7 million, the total estimated damages amount utilizing the look-back price of $0.59 per share. However, if the Court finds that the look-back price of $4.10 per share represents a more appropriate look-back price, Plaintiffs respectfully request that the Court enter judgment in the amount of $172 million, the total estimated damages amount utilizing the look-back price of $4.10 per share.

### III.    CONCLUSION

For the foregoing reasons Plaintiffs respectfully request and order (a) entering a default judgment for the Class against Defendants Puda and Zhao; (b) holding Defendants Puda and Zhao jointly and severally liable for damages in the amount of $236.7 million, plus interest on such amount on the rate allowed by law; and (c) for such other relief as this Court may deem just and proper.

Dated: July 7, 2014
New York, New York

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen
Sara Fuks
Yu Shi
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
E-mail: info@rosenlegal.com

**GLANCY BINKOW & GOLDBERG LLP**
Robin B. Howald (RH-9974)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
E-mail: rhowald@glancylaw.com

-and-

Lionel Z. Glancy
Joshua L. Crowell (JC-0914)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Co-Lead Counsel for Plaintiffs and the Class*

**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
Emma Gilmore
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

-and-

Patrick V. Dahlstrom
Leigh Handelman Smollar
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

**KAPLAN FOX & KILSHEIMER LLP**
Federic S. Fox
Jeffrey P. Campisi
Pamela A. Mayer
850 Third Avenue
New York, New York 10022
Telephone: (212) 687-1980
Facsimile (212) 687-7714

**KIRBY MCINERNEY LLP**
Daniel Hume
David E. Kovel
J. Brandon Walker
825 Third Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Additional Attorneys for Plaintiffs*