```
                                           ┌─────────────────────────────┐
                                           │ USDC SDNY                   │
UNITED STATES DISTRICT COURT               │ DOCUMENT                    │
SOUTHERN DISTRICT OF NEW YORK              │ ELECTRONICALLY FILED        │
                                           │ DOC #: _____    │
------------------------------------------ X│ DATE FILED: JUL 1 4 2014  │
                                           └─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

IN RE PUDA COAL SECURITIES INC.,  :
et al. LITIGATION                 :

                                  :
                                  :
                                  :
This document relates to: ALL ACTIONS  :

                                  :
------------------------------------------------------------- X

11-cv-2598 (KBF)
and all member and related
cases

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

The second consolidated amended complaint in this matter ("Compl.," ECF

No. 352) asserts claims, <u>inter alia</u>, against Brean Murray, Carret & Co. ("Brean

Murray") and Macquarie Capital (USA) Inc. ("Macquarie") (collectively, the

"underwriters"), the underwriters of a public stock offering by Puda Coal Inc.

("Puda"), under Sections 11 and 12 of the Securities Act of 1933 and Section 10(b) of

the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

Now before the Court are the underwriters' motions to dismiss the complaint

on the grounds that (1) plaintiffs fail to allege that the underwriters "made" the

false statements within the meaning of Section 10(b) and Rule 10b-5, (2) plaintiffs

fail to allege facts sufficient for scienter, (3) plaintiff Trellus's claims are time-

barred, and (4) Trellus lacks standing.  (ECF Nos. 370, 373.)

For the reasons set forth below, both motions are DENIED.

I.     BACKGROUND

The Court assumes familiarity with the factual background underlying this

action.  This action arises from an alleged fraudulent scheme orchestrated by

defendant Ming Zhao ("Zhao") to mislead investors as to the true ownership of Puda's primary operating subsidiary, the Shanxi Puda Coal Group Co., Ltd. ("Shanxi"). Although Puda represented in public filings throughout the putative class period that it owned 90% of Shanxi Coal, Zhao (Puda's former chairman and its controlling shareholder) had secretly transferred Puda's interest in the subsidiary first to himself and then to an unrelated private equity fund, effectively leaving Puda a shell company without any assets, operations, or revenues. (Compl. ¶¶ 8, 9, 11, 13, 81, 87.)

During the putative class period, Puda conducted two separate public offerings without disclosing the transfers. (Id. ¶ 18.) In February 2010, Puda conducted the first public offering, for which Brean Murray was the underwriter. (Id. ¶¶ 54–56.) In December 2010, Puda conducted the second public offering, for which Macquarie and Brean Murray were co-underwriters. (Id. ¶¶ 18, 42, 54–56.) In this capacity, the underwriters "served as financial advisors, assisted in the preparation and dissemination of the offering materials for the December Offering, and had ultimate authority over the content of the Prospectus; the Underwriters' names were prominently displayed on the first page of the offering prospectus as 'Joint Bookrunning Managers.'" (Id. ¶ 56.) "Macquarie and Brean Murray jointly with Puda's officers drafted" the prospectus in question and delivered it to investors. (Id. ¶ 235.)

Before the December 2010 offering, Macquarie hired Kroll Inc. to assist with Macquarie's due diligence efforts, specifically to "perform background checks with

respect to Puda and persons associated therewith." (Id. ¶ 57.) On December 2, 2010, Kroll delivered to Macquarie an investigative report showing that, based upon public State Administration of Industry and Commerce ("SAIC") records, Puda did not in fact own 90% of Shanxi Coal. (Id.) Six days before the December offering, Kroll identified the true owners of Shanxi to Macquarie. (Id.) The Kroll report was reviewed and disseminated among several Macquarie employees as well as legal counsel for both underwriters. (Id. ¶ 152.)

The instant motions relate primarily to registration statements and a prospectus that Puda filed with the SEC in connection with the December 2010 offering. (Id. ¶ 114.) Plaintiffs allege that these statements and prospectus were false and misleading because they represented that Puda owned 90% of Shanxi without disclosing the transfers. (Id. ¶¶ 116, 117.)

## II.    APPLICABLE LEGAL PRINCIPLES

### A. Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal 556 U.S. 662, 678 (2009). In applying that standard, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in plaintiff's favor, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id.

B. Section 10(b) and Rule 10b-5 of the Securities Exchange Act

To state a cause of action under Section 10(b) or Rule 10b-5, plaintiffs must set forth sufficient plausible allegations that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." In re IBM Corp. Sec. Litig., 163 F.3d 102, 106 (1998). "For purposes of Rule 10b-5, the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it." Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2303 (2011).

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Of particular relevance here, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—that is, scienter. 15 U.S.C. § 78u-4(b)(2)(A).

Scienter is the "mental state embracing intent to deceive, manipulate, or defraud" by the maker of a statement. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007). When deciding a motion pursuant to Rule 12(b)(6), the inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Id. at 322–23 (emphasis in original). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent

4

and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

The Second Circuit has "long held that the scienter element can be satisfied by a strong showing of reckless disregard for the truth. By reckless disregard for the truth, we mean conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." S. Cherry Street, LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009) (emphasis in original) (citations and internal quotation marks omitted); see also Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (explaining that recklessness is "highly unreasonable" conduct that represents "an extreme departure from the standards of ordinary care").

### C. Sections 11 and 12 of the Securities Act

"Sections 11 and 12(a)(2) of the Securities Act impose liability on certain participants in a registered securities offering when the registration statement or prospectus contains material misstatements or omissions." Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 119 (2d Cir. 2012). Section 11 imposes liability for misstatements or omissions in registration statements, whereas Section 12 imposes liability for misstatements or omissions in prospectuses. Id.

### III. DISCUSSION

#### A. The Underwriters as "Makers" of the Statements

Defendants argue that plaintiffs have failed to allege that they were "makers" of the material misstatements at issue within the meaning of Section 10(b) of the Securities Exchange Act and Rule 10b-5. Under Janus, the "maker of a

5

statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. . . . [I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." Janus, 131 S. Ct. at 2302. Relying on Janus, several district courts have sustained Section 10(b) claims brought against underwriters. See Scott v. ZST Digital Networks, Inc., 896 F. Supp. 2d 877, 890 (C.D. Cal. 2012) (sustaining a Section 10(b) claim against an underwriter whose name appeared on the statement in question); In re Nat'l Century Fin. Enters., Inc., 846 F. Supp. 2d 828, 861 (S.D. Ohio 2012) (same); In re Allstate Life Ins. Co. Litig., No. cv-09-8162 (GMS), 2012 WL 176497, at *5 (D. Ariz. Jan. 23, 2012) (same).

Macquarie, with whom Brean Murray joins for purposes of this argument, asserts that it was not the "maker" of the misstatements in Puda's prospectus and registration statements. Rather, Macquarie argues that the prospectus was Puda's document, and that Puda—not Macquarie—made any statements contained in that prospectus. (See, e.g., Compl. ¶¶ 10 (alleging that "the Company" represented to investors that Puda owned 90% of Shanxi), 234 (alleging that "the Company's" prospectuses and registration statements were false and misleading) (emphasis added).)

This Court disagrees. Under Janus, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." 131 S. Ct. at 2302.

6

With facts construed and inferences drawn in plaintiffs' favor, the complaint alleges that Macquarie had authority over the information contained in the prospectus sufficient to make its statements attributable to Macquarie. The complaint alleges that the underwriters "actively participated in creating the Prospectus, drafting it jointly with Puda management." (Compl. ¶ 137.) Pursuant to its formal agreement with the underwriters, Puda agreed to "prepare the Prospectus in a form approved by" Macquarie. (Rosen Decl. Ex. 2, at ¶ 5(a)(i), ECF No. 386.) Indeed, on the morning of the December offering, Puda's counsel sent an email stating that, while the "Company has signed off," Puda's counsel still did not have "the underwriters' sign off." (Compl. ¶ 138.) Thus, the complaint alleges that, "[a]bsent Macquarie's sign-off and approval, the Prospectus would not have been filed with the SEC and disseminated to investors." (Id. ¶ 139.)

Furthermore, the complaint alleges that the underwriters communicated their involvement with the prospectus to the investing public in several ways. The front cover of the prospectus prominently displayed both underwriters' names, thus endorsing the statements within the prospectus to investors. (Id. ¶ 56.) Macquarie also solicited investors for the offering and distributed the prospectus to investors. (Id. ¶¶ 56, 137.) Finally, the prospectus provided that the underwriters were authorized to make representations about Puda shares. (See Rosen Decl. Ex. 1, at S-2.) Construed in plaintiffs' favor, these facts are sufficient to show "attribution within a statement or implicit from surrounding circumstances" such that the

7

statements within the prospectus are attributable to the underwriters. Janus, 131 S. Ct. at 2302.

The underwriters cite several cases for the proposition that the underwriters' actions here—participating in drafting and disseminating the December 2010 prospectus—are insufficient for them to have "made" the statements. However, the cases on which the underwriters rely are distinguishable.[1]

First, Macquarie cites Pacific Investment Mgmt. Co. LLC v. Mayer Brown LLP for the proposition that "secondary actors can be liable in a private action under Rule 10b-5 for only those statements that are explicitly attributed to them. The mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient." 603 F.3d 144 (2d Cir. 2010). However, that case dealt with a law firm that was merely "mention[ed]" on offering documents as having represented the issuing party as legal counsel. Id. at 158. The complaint in this case, with reasonable inferences drawn in favor of the plaintiffs, alleges facts supporting asserting far more intricate involvement by the underwriters. (See Compl. ¶¶ 56, 137–139; Rosen Decl. Ex. 1, at S–2, Ex–2, at ¶ 5(a)(i).) The

---

[1] Macquarie also cites the Supreme Court's recent decision in Halliburton Co. v. Eric P. John Fund, Inc.. for the principle that Section 10(b) and Rule 10b-5 liability should not be extended "to entirely new categories of defendants who themselves had not made any material, public misrepresentation." No. 13-317, 2014 WL 2807181, at *2 (U.S. June 23, 2014). Halliburton did not, however, disturb the Supreme Court's prior statements in Janus that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it," and that "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." 131 S. Ct. at 2302. Based on the well-pleaded allegations of the complaint, the underwriters fall within the definition of "maker" set forth in Janus.

underwriters' involvement in creating, approving, and disseminating the prospectus constitute "attribution within a statement or implicit from surrounding circumstances" sufficient for them to be "makers" of the statements. Janus, 131 S. Ct. at 230.

Second, Macquarie cites SEC v. Tambone for the proposition that securities professionals do not "impliedly 'make' a representation to investors that the statements in a prospectus are truthful and complete." 597 F.3d 436, 447 (1st Cir. 2010). However, in that case, the SEC did not allege that the defendant played a role in preparing the prospectus, but only in disseminating a prospectus. See id. at 439. Here, by contrast, plaintiff alleges not only that the underwriters distributed the prospectus, but that they were involved in preparing and signing off on the prospectus. (Compl. ¶¶ 56, 137; Rosen Decl. Ex. 2, at ¶ 5(a)(i).) That combination of facts, construed in plaintiffs' favor, is sufficient at the pleading stage to show the necessary "authority over the content of the statement and whether and how to communicate it." Janus, 131 S. Ct. at 2303.

Finally, both underwriters cite In re Fannie Mae 2008 Sec. Litig. for the proposition that generalized, conclusory statements that an underwriter "made" the alleged misstatements are insufficient. 891 F. Supp. 2d 458, 484 (S.D.N.Y. 2012), aff'd, 525 F. App'x 16 (2d Cir. 2013). However, the plaintiffs in that case did not allege facts supporting an attribution theory, as here; rather, plaintiffs' claims were based only on the underwriter's participation in preparing the prospectus. See Fannie Mae, 891 F. Supp. 2d at 484. Additionally, the prospectus there only

9

incorporated the misrepresentations of previous SEC filings, over which Fannie Mae, not the underwriter, had authority; the prospectus itself did not contain the misstatements in question. See id. By contrast, the prospectus in this case itself contained the false statements that Puda conducted its operations through its subsidiary Shanxi. (See, e.g., Rosen Decl. Ex. 1, at S-5.) The specific facts set forth in the complaint in this action are sufficient to survive a motion to dismiss.

Brean Murray separately argues that the complaint alleges only that Macquarie, not Brean Murray, was the entity with ultimate authority over the documents. (See Compl. ¶¶ 139, 154, 235.) This Court again disagrees. The complaint does allege that Macquarie ultimately signed off on and approved the prospectus, but the complaint also alleges that it did so as the representative of both underwriters. (Id. ¶ 139; Rosen Decl. Ex. 1, at S-22.) Additionally, both underwriters' names are displayed on the front cover of the December offering prospectus, and the prospectus provided that the "underwriters," not just Macquarie, were authorized to make representations about Puda. (See Compl. ¶ 56; Rosen Decl. Ex. 1, at S-2.)

With all well-pleaded factual allegations assumed to be true and all reasonable inferences drawn in plaintiffs' favor, plaintiffs' allegations are sufficient at this stage to meet the "heightened pleading requirements" of a securities fraud claim, ATSI Commc'ns, 493 F.3d at 99, and to plead that both underwriters were "makers" of the alleged misstatements within the meaning of Section 10(b) under Janus.

10

### B. The Underwriters' Scienter

Brean Murray argues that plaintiffs' factual allegations fail to allege the necessary scienter to survive a motion to dismiss under the "heightened pleading requirements" of a securities fraud claim. ATSI Commc'ns, 493 F.3d at 99. Brean Murray claims that the Kroll report was found only in Macquarie's files, and that it neither had the Kroll report nor was aware of the facts contained in the Kroll report. (Hr'g Tr. 41, Mar. 10, 2014, ECF No. 332.) Rather than recklessly or deliberately closing its eyes to the issue of whether Puda actually owned Shanxi Coal, Brean Murray claims that it simply missed the ownership transfer through faulty due diligence. Thus, Brean Murray argues, an inference of negligence is far more "compelling" than an inference of scienter, Tellabs, 551 U.S. at 324, which requires "conscious recklessness—i.e., a state of mind approximating actual intent." S. Cherry Street, 573 F.3d at 110 (emphasis in original).

This Court disagrees. The Court is mindful, of course, that simply alleging that a party should have known of a fact is insufficient to survive a motion to dismiss. See, e.g., Novak, 215 F.3d at 312. However, when construed in plaintiffs' favor, the allegations in the complaint indeed allege that the transfer was "so obvious" that Brean Murray "must have been aware of it," S. Cherry Street, 573 F.3d at 112, and "consciously disregarded it," Dolphin & Bradbury, Inc. v. SEC, 512 F.3d 634, 639 (D.C. Cir. 2008)—that is, that Brean Murray was reckless.

On April 8, 2011, after Alfred Little revealed Zhao's transfer of Shanxi, the chief executive officer ("CEO") of Brean Murray, William McCluskey, stated in an email, "Wasn't this news talked about and dismissed a while ago?" (Compl. ¶ 164 &

11

n.27.) Construed in plaintiffs' favor, that statement is enough to show that Brean Murray was aware of the transfer and consciously disregarded it. Moreover, Zhao's transfer of Shanxi to himself was not hidden and was in fact recorded in public files. An American money manager named Dan David, Kroll, and Puda's board of directors all were able to obtain documentation of the transfer through inquiring with the SAIC, where Zhao filed the relevant paperwork. (See Compl. ¶¶ 32, 150, 175.) The fact that Brean Murray lacked the Kroll report itself is not dispositive. In light of underwriters' "unique position" and the requirement that underwriters "exercise a high degree of care in investigation and independent verification of the company's representation," plaintiffs adequately allege that Brean Murray's failure to uncover the transfer was fraudulent. See In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004).

For these reasons, the factual assertions in the complaint—assumed to be true and with all reasonable inferences drawn in plaintiffs' favor—allege enough "circumstantial evidence of . . . recklessness" to raise a strong inference of scienter. ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). The complaint therefore satisfies the "heightened pleading requirements" of a securities fraud claim, ATSI Commc'ns, 493 F.3d at 99, and "the inference of scienter [is] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324; see also Ganino v. Citizens Utils Co., 228 F.3d 154, 169 (2d Cir. 2000) (stating that "great specificity" is not required for allegations of scienter).

12

### C. Trellus's Claims and the Statute of Limitations

Macquarie also repeats its argument previously set forth in this litigation

that Section 11 and 12 claims by Trellus Management Company LLC ("Trellus") are

time-barred. (See, e.g., ECF Nos. 211, 317, 326; Hr'g Tr. Mar. 10, 2014.) For the

reasons set forth below, this Court disagrees.

#### 1. Procedural history

The Court assumes familiarity with the unusual procedural history of this

litigation. On May 13, 2013, Trellus moved to intervene in this action. (ECF No.

176.) On October 1, 2013, the Court granted the underwriters' motion for summary

judgment; it ruled, inter alia, that named plaintiff Thomas Rosenberger lacked

standing due to his inability to trace the shares he purchased to the December 2010

offering. (ECF No. 263 at 13–19.) Accordingly, the Court dismissed the claims

against the underwriter defendants "for lack of subject matter jurisdiction." (ECF

No. 305.) In the October 2013 opinion, the Court also denied Trellus's motion to

intervene as time-barred under the statute of limitations, and ruled that Trellus

could not benefit from tolling under American Pipe & Construction Co. v. Utah, 414

U.S. 538 (1974), due to a lack of subject matter jurisdiction over Rosenberger's

claims at the outset of the action. (ECF No. 263 at 23–32.) The Court also ruled

that Trellus's motion was untimely based on a four-factor test weighing the equities

in favor and against intervention. Trellus appealed that ruling. (ECF No. 272.)

On February 4, 2014, after Macquarie produced the Kroll report in discovery,

Trellus moved pursuant to Rule 62.1(a)(3) for an indicative ruling that this Court

would grant a Rule 60(b) motion to vacate its earlier denial of Trellus's intervention

motion and would permit Trellus to intervene. (ECF Nos. 288, 289.) On February 21, 2014, the Court granted the Rule 62.1(a)(3) motion. (ECF No. 305.) On March 18, 2014, after further briefing on the issue, the Court reaffirmed that it was prepared to allow Trellus to assert claims as a party plaintiff under several Federal Rules of Civil Procedure. (ECF No. 331.) On April 2, 2014, the Second Circuit remanded the appeal to this Court. (ECF No. 343.) On April 7, 2014, the Court granted Trellus's Rule 60(b) motion and allowed it to enter as a party plaintiff. (ECF No. 347.)

Macquarie argues that the Court should not have allowed Trellus to intervene in this action. It maintains that Trellus's claims remain time-barred notwithstanding the production of the Kroll report because, when Trellus moved to intervene in May 2013, the applicable statute of limitations had already expired, and American Pipe tolling was unavailable. The Court agrees with Macquarie that the equitable factors involved in determining timeliness do not relate to the question of whether a complaint is time-barred due to the statute of limitations. See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377, 390 (2d Cir. 2006). The Court also does not revisit its earlier determination that American Pipe tolling is unavailable under these circumstances. Furthermore, the Court is mindful of the Second Circuit's recent holding that "the Rule 15(c) 'relation back' doctrine does not permit members of a putative class, who are not named parties, to intervene in the class action as named parties in order to revive claims that were

14

dismissed from the class complaint for want of jurisdiction." <u>Police & Fire Ret. Sys.</u> <u>of City of Detroit v. IndyMac MBS, Inc.</u>, 721 F.3d 95, 110 (2d Cir. 2013).[2]

Nonetheless, the doctrine of equitable tolling provides a basis for tolling the statute of limitations and either granting Trellus's motion to intervene under Rule 24 or substituting Trellus for Rosenberger as plaintiff under Rules 15 and 21.

### 2. Equitable tolling

"Equitable tolling is a doctrine that permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity." <u>Warren v. Gavin</u>, 219 F.3d 111, 113 (2d Cir. 2000); <u>see also</u> <u>Irwin v. Dep't of Veterans Affairs</u>, 498 U.S. 89, 95 (1990); <u>IndyMac</u>, 721 F.3d at 108 ("Judicial power to toll statutes of limitations arises from an exercise of a court's equity powers, traditionally used to relieve hardships which, from time to time, arise from a hard and fast adherence to more absolute legal rules.") (internal quotation marks omitted). "Equitable tolling requires a party to pass with reasonable diligence through the period it seeks to have tolled." <u>Johnson v. Nyack Hosp.</u>, 86 F.3d 8, 12 (2d Cir. 1996).

For the reasons set forth in the Court's prior orders, this case presents unusual circumstances that warrant equitable tolling. On April 15, 2011—one week after the Shanxi transfer was revealed—Harriet Goldstein filed the first complaint in this action on behalf of herself and other purchasers of Puda securities

---

[2] The Second Circuit in <u>IndyMac</u> faced the question whether the Rule 15(c) "relation back" doctrine applied to make claims timely notwithstanding the three-year statute of repose, rather than the one-year statute of limitations. 721 F.3d at 110. The Second Circuit noted that, in contrast to the statute of limitations, application of equitable tolling to the "three-year repose period is barred by <u>Lampf</u>, which states that equitable 'tolling principles do not apply to that period.'" <u>Id.</u> at 109 (quoting <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 363 (1991)). <u>IndyMac</u> thus does not bar the application of equitable tolling to the one-year statute of limitations.

pursuant to or traceable to Puda's December 2010 offering; on the face of the complaint, it appeared that she could trace her shares to the December 2010 offering. (ECF No. 1 ¶¶ 39, 52.) Trellus became aware of the lawsuit within a month of its filing, and contacted plaintiffs' lead counsel on January 6, 2012. (ECF No. 263 at 21.) On February 9, 2012, Thomas Rosenberger filed the operative complaint, which alleged that he purchased shares pursuant to or traceable to the offering and thus had standing. (Id. at 22.) In June 2012, Trellus and plaintiffs' counsel again discussed the status of the lawsuit. (Id.) On May 13, 2013, Trellus then moved to intervene, before the underwriters filed motions for summary judgment and before the Court dismissed Rosenberger's claims for lack of standing. (ECF Nos. 176, 188, 263.)

Based on the complaints of which Trellus was aware, it was reasonable to believe that the plaintiffs had standing to represent a class including Trellus and other investors. Trellus also acted diligently in following up with plaintiffs' counsel to discuss the lawsuit. Furthermore, although Trellus moved to intervene after the statute of limitations on its claims in fact expired, Trellus could reasonably believe that plaintiffs had standing and that Trellus could benefit from American Pipe tolling. Trellus thus acted with "reasonable diligence through the period it seeks to have tolled," and can benefit from equitable tolling. Johnson, 86 F.3d at 12.

Because equitable tolling applies to the statute of limitations in this matter, Trellus may intervene in this action pursuant to Rule 24. As the Court previously explained in its orders of February 21 and April 7, 2014 (ECF Nos. 305, 347), the

16

production of the Kroll report increases the "prejudice to [the] applicant if the motion [for intervention were] denied," and presents "unusual circumstances militating for . . . a finding of timeliness." <u>MasterCard</u>, 471 F.3d at 390.

The Court may alternatively substitute Trellus as plaintiff pursuant to Rules 15 and 21. Under Rule 21, "on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Under Rule 15, the "court should freely give leave [to amend the complaint] when justice so requires." Fed. R. Civ. P. 15. The Court's discretion in this regard "encompasses both whether to permit substantive amendments of plaintiffs' claims and allegations, as well as whether to permit the joinder of additional plaintiffs." <u>In re Initial Public Offering Sec. Litig.</u>, 224 F.R.D. 550, 551 (S.D.N.Y. 2004). Even where the statute of limitations has run on a putative plaintiff's claims, equitable tolling may nonetheless permit the Court to substitute a plaintiff. <u>See</u> <u>In re Initial Public Offering Sec. Litig.</u>, Nos. 21-mc-92, 01-cv-9741, 01-cv-10899 (SAS), 2004 WL 3015304, at *4 (S.D.N.Y. Dec. 27, 2004).

For these reasons, Trellus's claims are not time-barred under the doctrine of equitable tolling.

### D. <u>Trellus's Standing With Respect to Macquarie Under Section 12</u>

Finally, Macquarie argues that Trellus lacks standing to assert a Section 12 claim against it. Section 12(a)(2) provides that any "person who . . . offers or sells a security . . . by means of a prospectus . . . which includes an untrue statement of a material fact or omits to state a material fact . . . shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77*l*. Thus, Macquarie argues that a purchaser in a public offering can sue only his statutory seller—the person who

17

either sold the securities directly to him or solicited his purchase and was "motivated at least in part by a desire to serve [its] own financial interests or those of the securities owner." Pinter v. Dahl, 486 U.S. 622, 642 (1988). The complaint alleges that Trellus purchased December offering shares not from Macquarie, but rather from Brean Murray. (See Compl. ¶ 42.)

Nonetheless, Trellus has standing under Section 12 to assert claims against Macquarie. Trellus alleges that Macquarie prepared and disseminated the December 2010 offering materials, prominently displayed its name on the prospectus, received financial benefits in connection with the offering, and served as a representative for Brean Murray. (Id. ¶¶ 56, 121, 154.)[3] Macquarie's direct participation in preparing the offering materials and soliciting the purchase of Puda shares by Trellus makes it a statutory seller under Section 12. See Pinter, 486 U.S. at 642; Capri v. Murphy, 856 F.2d 473, 478 (2d Cir. 1988) (finding that plaintiffs could state a Section 12 claim against partners who "contemplated and authorized" a transaction). Trellus therefore has standing against Macquarie under Section 12.

---

[3] Plaintiff also cites deposition testimony indicating that Macquarie sent a representative with Zhao to meet with Trellus. (Crowell Decl. Ex. 3, at 84:10–85:10 ("I think there was a banker from Macquarie . . . present."), ECF No. 388.) Plaintiffs provided this deposition testimony as an exhibit to their opposition to Macquarie's motion to dismiss. (See id.) The testimony is therefore outside the four corners of the complaint and does not appear to be the type of public filing of which the Court may take judicial notice. The cases that plaintiffs cite are not to the contrary. See Blue Tree Hotels Inv. (Can.) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212 (2d Cir. 2004) ("[W]e may also look to public records, including complaints filed in state court, in deciding a motion to dismiss."); Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (relying on "public documents" filed with the SEC in deciding a motion to dismiss). But see Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) (explaining that "the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the [party] that they may be so considered," and affirming a district court's decision to consider non-public documents in deciding a motion to dismiss). In any event, the deposition testimony is not necessary to this Court's finding that Macquarie was a statutory seller within the meaning of Section 12.

18

IV.   CONCLUSION

For the reasons set forth above, the underwriters' motions to dismiss the complaint are DENIED.  The Clerk of Court shall terminate the motions at ECF Nos. 370 and 373.  The parties shall confer and submit a proposed schedule for the resolution of this matter within 10 days, or no later than **Thursday, July 24, 2014**.

SO ORDERED.

Dated:      New York, New York
            July 1⁴, 2014

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge