UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE PUDA COAL SECURITIES INC. et al. LITIGATION | CASE NO:  1:11-CV-2598 (DLC) |

## MACQUARIE CAPITAL (USA) INC.'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

*ATTORNEYS FOR MACQUARIE CAPITAL (USA) INC.*

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ...................................................................................................3

ARGUMENT ........................................................................................................4

I.      JANUS NARROWLY DEFINES WHAT IT MEANS TO "MAKE" A STATEMENT ...5

II.     MACQUARIE DID NOT "MAKE" ANY OF THE MISLEADING
        STATEMENTS AT ISSUE UNDER JANUS ................................................8

        A.      Based On The Evidence, Macquarie Is Not The "Maker".........................8

        B.      Under Janus, Macquarie Is Not The "Maker"........................................16

                1.      Macquarie Was Not The Entity With Ultimate Authority............................16

                2.      Not A Single Statement Is Attributed To Macquarie....................................20

        C.      Plaintiffs' Definition Of "Make" Impermissibly Expands Section 10(b) ................22

CONCLUSION....................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases:</u>**                                                                              **<u>Page(s):</u>**

<u>In re Allstate Life Ins. Co. Litig.</u>,
    2012 WL 176497 (D. Ariz. Jan. 23, 2012) ...........................................................................18

<u>Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>,
    511 U.S. 164 (1994)........................................................................................7, 8, 22, 23

<u>In re Eugenia VI Venture Holdings, Ltd. Litig.</u>,
    649 F. Supp. 2d 105 (S.D.N.Y. 2008),
    <u>aff'd</u>, 370 Fed. App'x 197 (2d Cir. 2010).............................................................5, 8

<u>In re Fannie Mae 2008 Sec. Litig.</u>,
    891 F. Supp. 2d 458 (S.D.N.Y. 2012),
    <u>aff'd on other grounds</u>, 525 F. App'x 16 (2d Cir. 2013) ....................................9, 19

<u>In re Gas Reclamation, Inc. Sec. Litig.</u>,
    659 F. Supp. 493 (S.D.N.Y. 1987)........................................................................23

<u>Glickenhaus & Co. v. Household Int'l, Inc.</u>,
    787 F.3d 408 (7th Cir. 2015) ...........................................................................3, 16

<u>Holowecki v. Fed. Express Corp.</u>,
    644 F. Supp. 2d 338 (S.D.N.Y. 2009),
    <u>aff'd</u>, 382 Fed. App'x 42 (2d Cir. 2010).....................................................................5

<u>IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC</u>,
    2015 WL 1005961 (S.D.N.Y. Mar. 3, 2015) .........................................................20

<u>Janus Capital Grp., Inc. v. First Derivative Traders</u>,
    131 S. Ct. 2296 (2011)........................................................................... <u>passim</u>

<u>In re Nat'l Century Fin. Enters., Inc.</u>,
    846 F. Supp. 2d 828 (S.D. Ohio 2012) .................................................................18

<u>In re Optimal U.S. Litig.</u>,
    2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ........................................................21

<u>Pacific Inv. Mgmt. Co. v. Mayer Brown, LLP</u>,
    603 F.3d 144 (2d Cir. 2010)................................................................... <u>passim</u>

<u>Powell v. H.E.F. P'ship</u>,
    793 F. Supp. 91 (D. Vt. 1992)..............................................................................23

<u>In re Puda Coal Sec. Inc., Litig.</u>,
    30 F. Supp. 3d 261 (S.D.N.Y. 2014)..................................................................1, 15

Scott v. ZST Digital Networks, Inc.,
    896 F. Supp. 2d 877 (C.D. Cal. 2012) .................................................................18

SEC v. Apuzzo,
    689 F.3d 204 (2d Cir. 2012)......................................................................22, 23

SEC v. Tambone,
    597 F.3d 436 (1st Cir. 2010).....................................................................21, 24

SEC v. Tourre,
    2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) ...........................................................19

Shapiro v. Cantor,
    123 F.3d 717 (2d Cir. 1997).........................................................................24

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,
    552 U.S. 148 (2008)............................................................................. passim

**Statutes &Rules:**

15 U.S.C. § 77e ............................................................................................10

15 U.S.C. § 77f ............................................................................................10

15 U.S.C. § 77k .......................................................................................18, 24

Fed. R. Civ. P. 56 ...........................................................................................4

**Other Authorities:**

Chair Mary Jo White, Three Key Pressure Points in the Current Enforcement
    Environment(2014), NYC Bar Association's Third Annual White Collar Crime Institute,
    http://www.sec.gov/News/Speech/Detail/Speech/1370541858285#.U3tBTSiOR8E ............24

Negative Assurances in Securities Offerings (2008 Revision), 64 Bus. Law. 395 (2009),
    http://apps.americanbar.org/buslaw/tribar/materials/20090519000000.pdf..........................18

Stephen M. Sinaiko & Matan Koch, 'Janus Capital' & Underwriter Liability Under Section 10 &
    Rule 10b-5, 246 N.Y.L.J. No. 7 (2011) .................................................................17

Defendant Macquarie Capital (USA) Inc. ("Macquarie") respectfully submits this memorandum of law in support of its Motion for Partial Summary Judgment to dismiss Count IV of the Second Consolidated Amended and Supplemental Complaint For Violations of the Federal Securities Laws, dated April 21, 2014 (the "Amended Complaint" or "SAC").[1]

## PRELIMINARY STATEMENT

This action arises from an alleged fraudulent scheme orchestrated by Defendant Ming Zhao ("Zhao") to mislead investors as to the true ownership of Defendant Puda Coal, Inc.'s ("Puda" or the "Company") primary operating subsidiary, the Shanxi Puda Coal Group Co., Ltd. ("Shanxi Coal"). Although Puda represented in public filings throughout the putative class period that it owned 90% of Shanxi Coal, Zhao (Puda's former Chairman and its controlling shareholder) had secretly transferred Puda's interest in the subsidiary first to himself and then to an unrelated private equity fund with no consideration to the Company. It is undisputed that Macquarie was not aware of Zhao's wrongful conduct at the time it was perpetrated, nor did Macquarie play any role in Zhao's scheme.

In May 2014, Macquarie moved to dismiss the Section 10(b) claim against it on grounds that, under Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), it could not possibly be deemed the "maker" of the misleading statements at issue. Judge Forrest denied Macquarie's motion to dismiss but, in doing so, made clear that she had to accept Plaintiffs' allegations as true and construe all facts and inferences in Plaintiffs' favor. See In re Puda Coal Sec. Inc., Litig., 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014). This Court is not so bound

---

[1] The undisputed facts material to this motion are set forth in the accompanying S.D.N.Y. Local Civil Court Rule 56.1 Statement, along with the Declaration of Stefania D. Venezia ("Venezia Decl.") and the exhibits attached thereto.

and, in fact, has the benefit of a fully developed factual record which indisputably supports Macquarie's position.

Here, the evidence makes clear that Puda was the "maker" of the statements at issue because: (i) Puda, not Macquarie, had "ultimate authority" over the Prospectus and its contents; and (ii) the statements relating to Puda's ownership of Shanxi Coal were attributed to Puda.  Plaintiffs have not elicited <u>any</u> evidence from which a jury could conclude that Macquarie "made" any of the statements at issue here.  Rather, the evidence shows that Macquarie, as underwriters typically do, lent its assistance to Puda in connection with the December Offering by helping Puda draft the Prospectus and providing it with comments and suggestions.  The evidence further shows that Puda <u>rejected</u> certain of Macquarie's comments and suggestions, a fact that is completely inconsistent with Plaintiffs' theory that Macquarie had "ultimate authority" over the Prospectus.  In short, <u>none</u> of the evidence elicited establishes that Macquarie could or did compel Puda to move forward with the December Offering, nor is there any evidence from which a jury could conclude that Macquarie had the authority to prevent Puda from going forward with the December Offering should it so choose.  All Macquarie could do, which is typical in any underwriting, is determine whether it will participate in the underlying transaction (a far cry from having "ultimate authority" over the Prospectus and its contents).

In short, holding Macquarie liable as a primary actor under Section 10(b) would subject each and every underwriter – as well as similarly situated financial and legal advisors – to primary liability for their secondary roles in securities offerings, a result neither intended by Congress nor consistent with the Supreme Court's decision in <u>Janus</u> or the holdings in <u>Pacific</u>

Investment Management Company LLC v. Mayer Brown, LLP, 603 F.3d 144 (2d Cir. 2010)[2]

and Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 425 (7th Cir. 2015).  Based on the

evidence elicited in discovery, no finder of fact could reasonably conclude that Macquarie was

the "maker" of any of the false statements at issue here.

## BACKGROUND

Puda, a Delaware corporation headquartered in Shanxi Province, China, was, at

all relevant times, in the business of processing and selling high-grade metallurgical coking coal

to industrial sectors in China.  Venezia Decl. Ex. A at S-5, S-8; see also 56.1 ¶ 1.  Puda publicly

represented that it indirectly owned 90% of Shanxi Coal.  See, e.g., Venezia Decl. Ex. A at S-5,

S-10, S-18.  As set forth in the Amended Complaint, just prior to the putative class period, Zhao

secretly transferred Puda's interest in the subsidiary first to himself and then to an unrelated

private equity fund.  See SAC ¶¶ 9, 11, 13.  There is no evidence that Macquarie participated in

or knew about these transfers at the time they occurred.

During the putative class period, Puda conducted two separate public offerings.

The first occurred in February 2010 (the "February Offering") and was underwritten by Brean

Murray, Carret & Co., LLC ("Brean Murray") and Newbridge Securities Corp.  Venezia Decl.

Ex. B; see also 56.1 ¶¶ 2-4.  Macquarie did not have any involvement in the February Offering.

Id.  The second offering closed in December 2010 (the "December Offering").  Venezia Decl.

Ex. A; see also 56.1 ¶ 2.  Macquarie and Brean Murray served as co-underwriters for the

December Offering.  Venezia Decl. Ex. A; see also 56.1 ¶ 5.

---

[2] "If Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)."  Pac. Inv. Mgmt., 603 F.3d at 153 (internal quotations and citations omitted) (emphasis added).

In connection with the December Offering, Macquarie hired Kroll to assist with Macquarie's due diligence efforts.  Venezia Decl. Ex. C.  The investigative report prepared by Kroll (the "Kroll Report") and delivered to Macquarie included information indicating that, based upon SAIC records, Puda did not (through its wholly-owned subsidiary Putai) own 90% of Shanxi Coal.  Venezia Decl. Ex. D.

Also in connection with the December Offering, Puda filed with the SEC a series of Registration Statements and Prospectuses.  Venezia Decl. Exs. A, E and P; <u>see</u> <u>also</u> 56.1 ¶ 9.  According to Plaintiffs, the Registration Statement and Prospectus filed by Puda were false and misleading because they: (i) incorporated the materially false and misleading financial statements contained in Puda's SEC filings; and (ii) falsely represented that Puda owned 90% of Shanxi Coal and nowhere disclosed the transfers by Zhao and his brother which left the Company without any ownership interest in the subsidiary.  SAC ¶¶ 116-17.  Plaintiffs assert claims against Macquarie under both the Securities Exchange Act of 1934 (specifically, Section 10(b)) (<u>id.</u> ¶¶ 229-39) and the Securities Act of 1933 (Sections 11 and 12).  <u>Id.</u> ¶¶ 197-219.  With respect to the Section 10(b) claim, Plaintiffs assert that Macquarie "recklessly" underwrote the December Offering while in possession of information illustrating that certain statements in the offering documents – <u>i.e.</u>, the statements regarding Puda's 90% ownership of Shanxi Coal – were false and misleading and, further, that Macquarie itself "made" the statements in the Prospectus.  <u>Id.</u> ¶¶ 229-39.  Although Macquarie does not believe that Plaintiffs, at trial, can meet their heavy burden of proving scienter, this motion deals only with the question of whether Macquarie can properly be deemed the "maker" of statements in Puda's Prospectus.

## <u>ARGUMENT</u>

A movant is entitled to summary judgment when there are no genuine issues of material fact in dispute and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  Although the trial court must resolve all ambiguities, draw all reasonable inferences, and construe the evidence in the light most favorable to the non-moving party, a plaintiff cannot rely upon "'mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment' . . . .  [He] must 'set forth specific facts showing that there is a genuine issue for trial.'"  In re Eugenia VI Venture Holdings, Ltd. Litig., 649 F. Supp. 2d 105, 116-17 (S.D.N.Y. 2008), aff'd, 370 Fed. App'x 197 (2d Cir. 2010).  Establishing such facts "requires going beyond the allegations of the pleadings, as the moment has arrived to put up or shut up."  Id. at 117 (internal quotations and citations omitted); see also Holowecki v. Fed. Express Corp., 644 F. Supp. 2d 338, 362 (S.D.N.Y. 2009) ("to the extent that any plaintiff seeks to support his or her claims with unsupported allegations that lack any evidentiary basis… the Court need not consider [] the validity of such claims"), aff'd, 382 Fed. App'x 42 (2d Cir. 2010).

## I.      JANUS NARROWLY DEFINES WHAT IT MEANS TO "MAKE" A STATEMENT

Under Rule 10b-5, it is unlawful for any person to "<u>make</u> any untrue statement of a material fact" in connection with the purchase or sale or securities.  Janus, 131 S. Ct. at 2301 (emphasis added).  But only those who actually <u>make</u> the untrue statements may be liable under Rule 10b-5.  Id.  Thus, in order to be held liable, Macquarie must have "made" the material misstatements about the ownership of Shanxi Coal contained in the Registration Statement and Prospectus.  Id.  According to the Supreme Court:

> One "makes" a statement by stating it . . . .  For purposes of Rule 10b-5, the maker of a statement is <u>the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it</u>. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is

5

> strong evidence that a statement was made by – and only by – the
> party to whom it is attributed.

Janus, 131 S. Ct. at 2302 (emphasis added).  In other words, there are three critical takeaways from Janus:  (i) only a person or entity with "ultimate authority" over a statement can actually be a "maker"; (ii) preparing and/or publishing a statement on behalf of someone else does not make you a "maker"; and (iii) attribution within a statement or from surrounding circumstances is strong evidence of who the "maker" really is.

Here, there is no evidence from which a jury could conclude that Macquarie had "ultimate authority" over the Prospectus in general or with respect to statements about Puda's ownership of Shanxi Coal in particular.  Rather, the evidence shows that Macquarie provided comments and suggestions to Puda and its counsel but, ultimately, Puda had final say over which comments to accept and which to reject.  See 56.1 ¶¶ 13-15.  The very fact that Puda rejected certain of Macquarie's comments is dispositive evidence that Puda, not Macquarie, had "ultimate authority" over the contents of its Prospectus.  Moreover, even if Plaintiffs had evidence establishing that it was Macquarie who prepared the Prospectus -- in fact, they do not, as the record reflects that Puda's counsel actually drafted the Prospectus (see 56.1 ¶ 12) -- that would be insufficient under Janus to conclude that Macquarie was the "maker."  And, finally, the Prospectus itself could not be clearer.  The statements at issue are expressly attributed to Puda. See 56.1 ¶ 21.  There is no contradictory evidence from which a finder of fact could conclude that Macquarie was the maker of any statement in the Prospectus, let alone evidence from which it could conclude that Macquarie made any statements regarding Puda's ownership of Shanxi Coal.

In Janus, Plaintiffs brought Section 10(b) claims against an entity, JCM, for false and misleading statements in several mutual fund prospectuses issued by Janus Investment Fund,

a related entity for which Janus Management acted as investment adviser and administrator.  Id. at 2299-2301. Despite the "'uniquely close relationship between [the] mutual fund and its investment adviser,'" the fact that the two had overlapping offices, and despite the fact that Janus Management was "significantly involved" in preparing the prospectuses at issue, the Court noted that Janus Investment Fund filed the prospectuses – not Janus Management – and that the statements were attributed to Janus Investment Fund, not to Janus Management.  Id. at 2304-05. As the Court explained, JCM's "assistance, subject to the ultimate control of Janus Investment Fund, does not mean that JCM 'made' any statements in the prospectuses."  Id. at 2305.  Janus Investment Fund, not JCM, "made" the statements at issue.  Id.

Thus, under Janus, even significant involvement in the preparation and drafting of a Prospectus is insufficient to hold that someone is a "maker" for purposes of Section 10(b) liability, particularly where, as here, the Prospectus was filed by a different entity and the statements at issue were attributed to someone else.  The evidence here illustrates that while Macquarie, as is customary, lent assistance to Puda in connection with the preparation of the Prospectus, it did so subject at all times to Puda's "ultimate authority" over the document. Plaintiffs can point to no evidence from which a jury could conclude otherwise.  And, as in Janus, Puda (not Macquarie) had the statutory obligation to file the Prospectus and the misleading statements therein were expressly attributed to Puda (not Macquarie).

The rule set forth in Janus follows from the Court's earlier rulings in Central Bank and Stoneridge, two cases in which the Court narrowly construed §10 and Rule 10b-5 liability and limited the exposure of secondary actors thereunder.  See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994); Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008).  As explained by the Janus Court, 131 S. Ct. at

2302, "[a] broader reading of 'make,' including persons or entities without ultimate control over the content of a statement, would substantially undermine" the Court's holding in <u>Central Bank</u> – namely, that the implied private right of action in §10 and Rule 10b-5 does <u>not</u> include suits against aiders and abettors.  <u>Cent. Bank</u>, 511 U.S. at 191.  In other words, "[i]f persons or entities without control over the content of a statement could be considered primary violators who 'made' the statement, then aiders and abettors would be almost nonexistent." <u>Janus</u>, 131 S. Ct. at 2302.  Moreover, by not "expand[ing] liability beyond the person or entity that ultimately has authority over a false statement," the Court's ruling "accords with the narrow scope that we must give the implied private right of action" found in both §10 and Rule 10b-5. <u>Janus</u>, 131 S. Ct. at 2303.

In this case, the evidence elicited through discovery – both documentary and testimonial – fails to support Plaintiffs' theory that Macquarie was the "maker" of the statements in the Prospectus within the meaning of <u>Janus</u>.  To the contrary, the evidence makes abundantly clear that Macquarie was <u>not</u> the "maker."  Indeed, the only conclusion that a jury could reach after a review of the evidence here is that Puda was the "maker" of the statements at issue.

## II.     MACQUARIE DID NOT "MAKE" ANY OF THE MISLEADING STATEMENTS AT ISSUE UNDER JANUS

### A.      Based On The Evidence, Macquarie Is Not The "Maker"

As noted above, Plaintiffs must now "'set forth specific facts showing that there is a genuine issue for trial.'" <u>Eugenia</u>, 649 F. Supp. 2d at 116-17.  This "requires <u>going beyond</u> the allegations of the pleadings." <u>Id</u>. (emphasis added).  The critical question for the Court at this stage is whether Plaintiffs have in fact elicited <u>any</u> <u>evidence</u> – for example, through testimony or documents – creating a genuine issue of material fact on the question of whether Macquarie was the "maker" of the misleading statements contained in the Prospectus for the December Offering.

Because the answer to this question is a resounding "NO," summary judgment is appropriate. Put simply, finding Macquarie to be a "maker" on the facts adduced here would eviscerate both Janus and Central Bank as all underwriters, lawyers, corporate executives and accountants would be considered "makers."

As set forth below, the record evidence makes clear that Puda was the maker of the statements at issue and, relatedly, that Puda (not Macquarie) had "ultimate authority" over both the Prospectus and its contents. The evidence elicited by Plaintiffs does not create a genuine issue of material fact with respect to whether Macquarie acted as the "maker" of any statement, let alone a misstatement, as contemplated by Janus.

The documentary evidence makes clear that the Prospectus is in fact "[t]he Company's" document, not Macquarie's. See, e.g., SAC ¶ 234 ("the Company's prospectuses and registration statements issued pursuant to the December Offering, and the Company's 2009 and 2010 annual reports, which were all filed with the SEC, were materially false and misleading") (emphasis added). As an initial matter, the language of the Prospectus itself reflects that the misstatements about the ownership of Shanxi Coal were made by the Company; none were identified as having been made by Macquarie. Indeed, on their face, the alleged misstatements in the Prospectus were made by Puda, not Macquarie.[3] See 56.1 ¶¶ 20-21, 23. For example:

---

[3] As explained in the Prospectus, "[a]ll references in this prospectus supplement to 'Puda,' 'the Company,' 'we,' 'us' or 'our' mean Puda Coal, Inc. and its subsidiaries, unless we state otherwise or the context otherwise requires." See Venezia Decl. Ex. A at S-2; see also In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 484 (S.D.N.Y. 2012), aff'd on other grounds, 525 F. App'x 16 (2d Cir. 2013) ("All of the purported misrepresentations in the offering documents are couched in terms of 'we' and 'our,' which clearly refer to FNMA, not Goldman.").

- "**Our** operations are conducted exclusively in China through **our** 90% owned subsidiary, Shanxi Puda Coal Group Co., Ltd., or Shanxi Coal." Venezia Decl. Ex. A at S-5 (emphasis added).

- "**Our** company has an offshore holding structure commonly used by foreign investors with operations in China. **We** are a corporation which owns BVI, and BVI owns Putai. **Our** operations are conducted exclusively through Shanxi Coal, in which **we** own 90% of the equity interest." Id. at S-10 (emphasis added).

- "**We** conduct substantially all of **our** operations through **our** control of Shanxi Coal." Id. at S-16 (emphasis added).

Moreover, the Prospectus clearly states that "[p]ursuant to this prospectus supplement and the accompanying prospectus, **we**" i.e., Puda, "are offering and selling 7,850,000 shares of **our** common stock at a price of $12.00 per share." Id. at Cover (emphasis added); see also 56.1 ¶ 22. In contrast, the Prospectus' references to "Macquarie" are in the third-person and merely identify Macquarie as a joint bookrunning manager and describe its role as an underwriter.[4]  Puda, not Macquarie, had the statutory obligation[5] to file the Registration Statement and Prospectus with the Securities and Exchange Commission and did so file.  Venezia Decl. Exs. A, F at MCI 002450; see also 56.1 ¶20.

The documentary evidence further shows that, contrary to Plaintiffs' allegation that Macquarie had "ultimate authority" over the Prospectus and its contents, Macquarie had an arms'-length relationship with Puda in connection with the December Offering.  See 56.1 ¶¶ 10-

---

[4]  See id.; see also id. at S-22 ("Macquarie Capital (USA) Inc. is the representative of the underwriters. **We** have entered into an underwriting agreement dated December 8, 2010 with the underwriters. Subject to the terms and conditions of the underwriting agreement, each of the underwriters have severally agreed to purchase, and **we** have agreed to sell to them, the number of shares of common stock listed next to its name in the table below at the public offering price listed on the cover page of this prospectus supplement, less the underwriting discounts and commissions, payable in cash to us against delivery of shares.") (emphasis added); see also 56.1 ¶¶ 24-25.

[5]  See 15 U.S.C. § 77e; see also 15 U.S.C. § 77f.

11.  Macquarie's engagement as underwriter, as reflected in its engagement letter, began on or around October 30, 2010, when Macquarie agreed "to act as lead bookrunner" in a "proposed public offering of common shares or equity-linked securities for" Puda, the issuer.  Venezia Decl. Ex. G at MCI 021105; see also Venezia Decl. Ex. H (Underwriting Agreement).  Not surprisingly, there is no evidence in the record from which a jury could conclude that Macquarie had the authority to either:  (i) compel Puda to move forward with the offering; or (ii) prevent Puda from going forward without it.  See 56.1 ¶¶ 6-8.  Indeed, the evidence illustrates that Macquarie had far less authority over Puda than both the investment advisor in Janus and the Vice-Chairman in Glickenhaus.  See, infra, pp. 16-17.

Consistent with the terms of the engagement letter, and as is customary in all securities offerings, Macquarie assisted Puda in preparing the Company's Prospectus.  See, e.g., Venezia Decl. Ex. I at 113:18-20, 114:2-3 ("Q: Did Macquarie participate in drafting a prospectus registration statement for the Puda Coal offering? A: My understanding is that we assisted Puda with their documents.");  see also 56.1 ¶¶ 12-13.  For example, in response to a request from Puda's counsel, Goodwin Proctor LLP ("Goodwin"), Macquarie sent along a sample prospectus supplement that one of Macquarie's earlier China-based clients, Far East Energy Corporation, used in a prior public offering.  See Venezia Decl. Ex. J; see also 56.1 ¶ 13.  Despite Macquarie having provided a sample template, it was Goodwin (Puda's counsel), who actually drafted Puda's prospectus supplement in connection with the December Offering.  See Venezia Decl. Ex. K (Goodwin sending draft Prospectus to Macquarie); see also 56.1 ¶ 12.  And, as is customary in all securities offerings, Macquarie and its counsel, Morrison & Foerster ("MoFo"), provided suggestions and comments to Goodwin's draft.  See, e.g., Venezia Decl. Ex. L (December 1, 2010 email from MoFo: "Attached are some initial comments to the draft

prospectus supplement.  These are being sent to Macquarie simultaneously, so they may have further comments."); Venezia Decl. Ex. M (December 3, 2010 email from MoFo: "[a]ttached are some Macquarie comments to the pro supp"); see also 56.1 ¶ 13.

Puda, however, was free to reject -- and did in fact reject -- comments and/or suggestions from both Macquarie and MoFo.  See, e.g., Venezia Decl. Ex. N (Dec. 3, 2010 email from Goodwin: "Attached please[] see the revised prospectus supplement based on your comments to the extent acceptable (the vast majority of them are) as well as some revisions from us.  Th[e] company is reviewing this draft and may have additional changes.") (emphasis added); Venezia Decl. Ex. O (Dec. 6, 2010 email from Goodwin: "Attached please[] see the revised prospectus supplement reflecting the comments we have received so far to the extent acceptable.") (emphasis added); see also 56.1 ¶¶ 14-15.  This evidence is dispositive as it makes clear that Puda, not Macquarie, had "ultimate authority" over the contents of the Prospectus.  As reflected in the documents cited, Puda's counsel expressly stated -- not once, but twice -- that only those comments that were deemed "acceptable" were included in the Prospectus; the remainder were rejected.  Puda's counsel also pointed out -- not surprisingly given that it was Puda's document -- that Puda might have additional comments to the Prospectus on top of MoFo's and Macquarie's suggestions.  Venezia Decl. Exs. N, O.  Thus, it is clear that Macquarie did not have "ultimate authority" over the Prospectus because, if it did, Goodwin could not have rejected any of its comments, nor would the Company have been able to make additional changes on top of Macquarie's comments.  There simply is no evidence in the record from which a jury could conclude that Macquarie, as opposed to Puda, had "ultimate authority" over the Prospectus and the statements therein.

On December 8, 2010, as contemplated by the engagement letter, Puda and Macquarie formally executed the Underwriting Agreement.  Venezia Decl. Ex. H (Underwriting Agreement); <u>see</u> <u>also</u> 56.1 ¶ 16.  The Underwriting Agreement expressly provides that Puda "proposes to sell 7,850,000 shares . . . of the Company's common stock" and "proposes to grant to the underwriters . . . an option to purchase up to 1,150,000 additional shares."  <u>See</u> Venezia Decl. Ex. H at MCI 001007; <u>see</u> <u>also</u> 56.1 ¶ 17.  Puda, among other things, represented in the Underwriting Agreement that: (i) it had "prepared" a registration statement (Venezia Decl. Ex. H at MCI 001007) which "did not . . . contain an untrue statement of a material fact" (<u>id</u>. at MCI 001009); and (ii) that the Prospectus would not "contain an untrue statement of a material fact." <u>Id</u>.; <u>see</u> <u>also</u> 56.1 ¶ 18.   Puda further represented that it "conduct[ed] substantially all of its operations and generate[d] substantially all of its revenue" through "Shanxi Puda Coal Group Co., Ltd., a foreign-invested enterprise formed under the laws of the PRC that is 90% owned by Putai[, a wholly owned subsidiary of Puda.]"   Venezia Decl. Ex. H at MCI 001011; <u>see</u> <u>also</u> 56.1 ¶ 18.

Plaintiffs' argument that the language in the Underwriting Agreement reflecting Puda's agreement "[t]o prepare the Prospectus in a form approved by" the Underwriters (Venezia Decl. Ex. H at MCI 001022), does not advance their claim.  This language does not say anything about Macquarie's "ultimate authority" over the <u>substance</u> of the Prospectus and the statements therein.   Rather, it provides the underwriters with optionality vis-à-vis <u>their</u> <u>participation</u> in the contemplated transaction.  <u>See</u>, <u>e.g.</u>, Venezia Decl. Ex. I at 181:4-8, 10-13 ("Q: How was – tell me about – Macquarie, Macquarie's decision to go forward with the Puda Coal transaction.  How was that determination made at Macquarie? . . . A: At the conclusion of the, of the process, we have an underwriting committee meeting.  There's a discussion, and a

13

decision is made whether we participate in the deal or not."); <u>see</u> <u>also</u> <u>id</u>. at 24:5-7, 10-12 ("Q: Does an underwriter of securities evaluate the subject company to determine whether it's a good investment to underwrite its securities? A: We look at it to make an assessment as to whether we'll participate as an underwriter in the offering."); <u>see</u> <u>also</u> <u>id</u>. at 195:25-196:7 ("Q: Is it fair to say that your review of prospectuses that you conducted was geared towards using, determining that Macquarie be comfortable to proceed to underwrite the offering?  A: When I did review them, they were geared towards determining whether we should participate in the transaction."); <u>see</u> <u>also</u> 56.1 ¶ 19.

In other words, the evidence shows that Macquarie, acting as underwriter, retained the ability to say "no" only with respect to its participation in the contemplated transaction.  <u>See</u> 56.1 ¶ 19.  Macquarie did not have the ability to force Puda into conducting a public offering, nor could Macquarie stop Puda from offering stock if it so chose.  <u>See</u> 56.1 ¶¶ 7-8.  There is <u>no</u> evidence in the record from which a jury could conclude that Macquarie had final say: (i) over whether the December Offering went forward (as opposed to whether it would "participate" in the contemplated offering); or (ii) over the contents of the Prospectus.  Without such "ultimate authority," Macquarie is not a "maker" as contemplated by <u>Janus</u>.  Moreover, there is <u>no</u> evidence in the record from which a jury could conclude that the offering could not go forward if Macquarie decided not to participate.  <u>See</u> 56.1 ¶ 6.  The evidence is, in fact, to the contrary.  Puda previously issued common stock in a February 2010 offering, <u>not</u> underwritten by Macquarie, in which Puda made similar representations as to its 90% ownership of Shanxi Coal that are at issue here.  <u>See</u> Venezia Decl. Ex. B at S-3; <u>see</u> <u>also</u> 56.1 ¶¶ 2-4.  Thus, even without Macquarie, Puda could have (as it had done in the recent past) continued with its plans to issue additional common stock in a secondary offering.  Puda's independent director testified

14

that he was unaware of <u>any</u> facts that would have prevented Puda from hiring another underwriter and moving forward with an offering had Macquarie pulled out. <u>See</u> Venezia Decl. Ex. Q at 65:18-22, 24; <u>see also</u> 56.1 ¶ 6.

Finally, the evidence shows that, as is typical in any securities offering, Goodwin (as Company counsel) requested that the underwriters "sign off" on the offering documents immediately prior to launch. <u>See</u> Venezia Decl. Ex. R at MCI 000576. Having determined at that point that they would "participate" in the December Offering, both Macquarie[6] and Brean Murray "signed off" in their capacity as underwriters (<u>see</u> Venezia Decl. Ex. S at MCI 000580; <u>see also</u> Venezia Decl. Ex. T at MCI 038925), and MoFo "signed off" on behalf of the Underwriters. <u>See</u> Venezia Decl. Ex. R at MCI 000576. Contrary to Plaintiffs' allegations, however, there is no evidence from which a finder of fact could conclude that such "sign off" is the equivalent of the underwriters having "ultimate authority" over the Prospectus and its contents. <u>See</u> Venezia Decl. Ex. U at 128:17-18, 21-23 ("Q: Okay. Could you explain what you meant by 'BMC is signed off'? A: We are – we have signed off to commit capital as underwriters on the – on the transaction as contemplated."); <u>id.</u> at 184:15-18, 20, 23-25, 185:2-14. Thereafter, on December 8, 2010, after determining that it wished to continue with its plans to issue additional stock, Puda filed the Prospectus with the SEC. <u>See</u> Venezia Decl. Exs. A, F.

*       *       *

At the motion to dismiss stage, although Judge Forrest denied Macquarie's motion to dismiss, she was required to accept Plaintiffs' allegations as true: "With all well-pleaded factual allegations assumed to be true and all reasonable inferences drawn in plaintiffs' favor, plaintiffs' allegations are sufficient <u>at this stage</u>." <u>In re Puda Coal</u>, 30 F. Supp. 3d at 269

---

[6] <u>See</u>, <u>supra</u> pp. 13-14.

(emphasis added).  Judge Forrest did not have, as this Court does, the benefit of the evidence developed through discovery.  Based on this evidence, no jury could conclude, consistent with Janus, that Macquarie was the "maker" of any statement in the Prospectus, let alone a misstatement.

### B.   Under Janus, Macquarie Is Not The "Maker"

As noted above, Janus could not be clearer: (i) only a person or entity with "ultimate authority" over a statement can actually be a "maker"; and (ii) attribution within a statement or from surrounding circumstances is strong evidence of who the "maker" really is. See, supra pp. 5-8.  Here, there is no evidence from which a jury could conclude that Macquarie had "ultimate authority" over the Prospectus or its contents, nor is there evidence sufficient for a jury to conclude that the misleading statements at issue could be attributed to anyone other than Puda.

### 1.   Macquarie Was Not The Entity With Ultimate Authority

That Macquarie "approved" and "signed off" on the Prospectus does not mean that it had "ultimate authority" over the document such that it was the "maker" of any statements under Janus.   A recent Seventh Circuit case is particularly illustrative on this point.   See Glickenhaus, 787 F.3d at 425.  In Glickenhaus, the Seventh Circuit, on appeal from a jury verdict, determined that the trial judge improperly instructed the jury with respect to Janus. Specifically, the trial court instructed the jury that plaintiffs could prevail on their Rule 10b-5 claim "if they proved that the defendant 'made, approved, or furnished information to be included in a false statement."  Id. (emphasis added).  As the Seventh Circuit explained, "[t]his goes well beyond the narrow interpretation adopted in Janus" and "plainly misstated the law." Id.

Plaintiffs argued that Household's Vice-Chairman and President of Consumer Lending could be deemed to be "a 'maker' of the [statements at issue] because as a high-ranking officer, he reviewed and approved them."  Id. at 428.  The Seventh Circuit disagreed and noted that "the same could have been said for the investment advisor in Janus."  Id. at 429.  The argument rejected in Glickenhaus is exactly the argument Plaintiffs are making here.  And, for the same reason, it should be rejected.  That Household's Vice-Chairman, who reviewed and approved the Company's SEC filings and press releases, was not the "maker" as a matter of law leads ineluctably to the conclusion that Macquarie, an independent third party, was not the "maker" of the statements in Puda's offering documents.

Indeed, the fact that an independent third party is asked to "sign-off" on (or "approve") a document does not make that party the maker of the statement.  As is customary in securities offerings – and as is clear from the face of the e-mail cited by Plaintiffs (see Venezia Decl. Ex. S)[7] – Macquarie's "sign-off" was sought in its capacity as underwriter.  Even after Macquarie's "sign-off," Puda and only Puda had the authority to pull the offering.  See Stephen M. Sinaiko & Matan Koch, Janus Capital & Underwriter Liability Under Section 10 & Rule 10b-5, 246 N.Y.L.J. No. 7 (2011) ("The ultimate decisions as to whether an offering will proceed, whether to disseminate an offering document, and what the offering document will say rest with the issuer, not the underwriter.").  Macquarie could only determine whether it was willing or unwilling to participate in the offering.  See 56.1 ¶¶ 7-8, 19.  Thus, for example, if Puda was unhappy with the indications of pricing Puda – not Macquarie – had the authority to withdraw

---

[7] In any event, a non-public document like the e-mail cited by Plaintiffs cannot possibly serve to inform investors that any statement was attributed to Macquarie.  See Pac. Inv. Mgmt., 603 F.3d at 148 ("Absent attribution, plaintiffs cannot show that they relied on defendants' own false statements, and participation in the creation of those statements amounts, at most, to aiding and abetting securities fraud.") (emphasis in original).

the offering, either temporarily or permanently.  There is absolutely no evidence in the record from which a jury could conclude that, if Macquarie determined not to participate, Puda could not have moved forward, albeit with some delay, with the offering.  See also 56.1 ¶ 6.

Moreover, as set forth above, Macquarie's "sign-off" was not the only one sought. Indeed, in the same set of e-mails cited by Plaintiffs, MoFo's "sign-off" on the Prospectus, on behalf of the underwriters, was similarly sought.  See Venezia Decl. Ex. R; see also Venezia Decl. Ex. V.  And before an offering may proceed, a number of parties "sign-off" on the prospectus including, but not limited to, the Company's directors, auditors and underwriters; it is precisely because they do "sign-off" that these parties are subject to liability under Section 11. See 15 U.S.C. 77k(a); see also Stoneridge, 552 U.S. at 166 (explaining that the securities statutes "provide an express private right of action against accountants and underwriters in certain circumstances. . .").  But the notion that each party whose "sign-off" and/or "approval" is sought is a speaker who has "made" a statement sufficient to establish primary liability under Janus is simply inconsistent with the words and clear meaning of Janus and would render all professionals – underwriters, accountants and law firms alike – who worked on an offering document primarily liable under Section 10(b) because they "signed-off."  This simply is not the law.[8]

For example, it is understood in the industry that no underwriting may proceed without a 10b-5 opinion from both company counsel and underwriter's counsel.  See Negative Assurances in Securities Offerings (2008 Revision), 64 Bus. Law. 395, 396 (2009),

---

[8] Plaintiffs will undoubtedly point to Scott v. ZST Digital Networks, Inc., 896 F. Supp. 2d 877 (C.D. Cal. 2012), In re Allstate Life Ins. Co. Litig., 2012 WL 176497 (D. Ariz. Jan. 23, 2012) and In re Nat'l Century Fin. Enters., Inc., 846 F. Supp. 2d 828 (S.D. Ohio 2012), to suggest that Section 10(b) claims may still proceed against underwriters post-Janus. Plaintiffs are wrong. With all due respect, these holdings are inconsistent with Janus and Pacific Investment.

http://apps.americanbar.org/buslaw/tribar/materials/20090519000000.pdf   ("To help them establish the statutory 'due diligence' defense in registered offerings, underwriters have long followed the practice of underlining, as a condition to the closing, that counsel participating in the preparation of the registration statement provide negative assurance regarding the disclosures in the registration statement and prospectus.") (emphasis added).   Without these opinions an underwriter will not participate in the offering.   Does that turn those law firms into the party with ultimate authority and thus the statement maker for purposes of Rule 10b-5?   Of course not.

Janus also makes the following clear:   "significant[]" involvement in preparing the Prospectus does not equate to making the statements in the Prospectus.   Janus, 131 S. Ct. at 2299; see also Fannie Mae, 891 F. Supp. 2d at 484 ("[a]ny role [that Goldman Sachs, as underwriter,] served in the drafting process, or in preparing and publishing the offering materials is insufficient to impose primary liability under Janus").   Macquarie's "assistance, subject to the ultimate control of" Puda "does not mean that" Macquarie "'made' any statements in the [Prospectus]."   Janus, 131 S. Ct. at 2305.   "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it."   Id. at 2302; see also SEC v. Tourre, 2014 WL 61864, at *6 (S.D.N.Y. Jan. 7, 2014) (reciting jury instructions in which the Court explained that, in light of Janus, "it is not sufficient for the SEC to prove that Mr. Tourre may have been involved, even significantly involved, in the preparation of a document that may have contained a materially false statement").   Here, while Macquarie and its counsel provided Puda with comments and suggestions on the Prospectus, Puda had the ability to reject – and did in fact reject – certain of Macquarie's comments and suggestions.   See, supra pp. 11-12.   And, as in Janus, Puda, not Macquarie, filed the Registration Statement and Prospectus with the Securities and Exchange Commission.   See Venezia Decl. Exs. A, F; see also Janus, 131 S. Ct. at 2304-05

("Only Janus Investment Fund – not JCM – bears the statutory obligation to file the prospectuses with the SEC. . . .  The SEC has recorded that Janus Investment Fund filed the prospectuses. . . . [Nothing] on the face of the prospectuses indicate that any statements therein came from JCM rather than Janus Investment Fund – a legally independent entity with its own board of trustees.").[9]

Finally, Macquarie's ability to "refuse" to underwrite the offering does not mean that Puda could not still have moved forward with the issuance of additional common stock.  See 56.1 ¶ 6.  Even without Macquarie, Puda could have (as it had done in the recent past) continued with its plans to issue additional common stock in a secondary offering.  There is no evidence from which a jury could conclude that if Macquarie decided not to participate, Puda: (i) would not have been able to move forward with the offering; and (ii) would not have been able to move forward with the same offering documents containing the very same misrepresentations regarding Puda's 90% ownership of Shanxi Coal.  See 56.1 ¶¶ 7-8.  In short, the ability to say "no" vis-a-vis its own conduct – in other words, whether or not Macquarie was prepared to move forward with underwriting the offering – does not turn Macquarie into the entity with "ultimate authority" over the offering itself, nor does it mean Macquarie had "ultimate authority" over the Prospectus.  On this record, there simply is no evidence from which a jury could conclude that Macquarie had "ultimate authority" over the Prospectus and its contents.

## 2.    Not A Single Statement Is Attributed To Macquarie

As set forth above (see supra, pp. 9-10), the evidence makes clear that the statements at issue were attributed to Puda, not Macquarie.  There is no evidence to the contrary.

---

[9] Where federal law determines "which entity had a duty to file the prospectus, it would [be] anomalous for another provision of securities law, Rule 10b-5, to recognize a different entity as the maker of the statements in the prospectus."  IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC, 2015 WL 1005961, at *13 (S.D.N.Y. Mar. 3, 2015).

The fact that Macquarie was "prominently featured on the cover of the Prospectus" (SAC ¶ 137) does not establish that the contents of the Prospectus can be attributed to Macquarie.  In fact, the Cover of the Prospectus expressly identifies Puda as the issuer and Macquarie as the underwriter/joint bookrunning manager.  See Venezia Decl. Ex. A; see also 56.1 ¶ 24; see also In re Optimal U.S. Litig., 2011 WL 4908745, at *6 (S.D.N.Y. Oct. 14, 2011) (stating "[b]ecause the cover page indicates that OIS is only the investment manager and Multiadvisors is the issuer, the cover page provides no stronger a basis for Rule 10b-5 liability in this case than in Janus").

According to Plaintiffs, "by putting [its] name on the Prospectus, [Macquarie is] communicating to investors that [it has] in fact undertaken a reasonable due diligence investigation and [is] making full disclosure of all material information in the Prospectus."  SAC ¶ 131.  But, even if true, this does not make Macquarie the "maker" of any particular misstatement and surely does not support a Section 10(b) claim.  See, e.g., SEC v. Tambone, 597 F.3d 436, 447-48 (1st Cir. 2010) (stating that "securities professionals working for underwriters have a duty to investigate the nature and circumstances of an offering" but rejecting the SEC's theory that "such securities professionals impliedly 'make' a representation to investors that the statements in a prospectus are truthful and complete."). Whatever a third-party investor may (or may not have) understood with respect to Macquarie's due diligence investigation is irrelevant to Plaintiffs' Section 10(b) claim; the fact remains that the misleading statements were not actually made by or attributed to Macquarie.  Rather, those arguments underpin Congress' decision to enact Section 11 of the 1933 Act – which, unlike Section 10(b), does not require Plaintiffs to link Macquarie's conduct to any particular misstatement – but have no relevance under Section 10(b) of the 1934 Act.

21

Nor does the following language in the Prospectus somehow indicate to investors reading the Prospectus that Macquarie and Puda were jointly responsible for the representations made therein:  "[Puda has] not, and the underwriters have not, authorized anyone to provide you with different information."  Venezia Decl. Ex. A at S-2.  This cited statement simply advises investors that, in deciding whether to buy Puda shares in the offering, they should look only to the information contained in the Prospectus.  This language says nothing about who made any of the statements actually contained in the Company's filing.  This is clear from the language surrounding the highlighted phrase.  See id. ("You should rely only on the information contained in, or incorporated by reference in, this prospectus supplement and the accompanying prospectus. We have not, and the underwriters have not, authorized anyone to provide you with different information. If anyone provides you with different or inconsistent information, you should not reply [sic] on it.").  Simply put, there is no evidence from which a jury could conclude that the cited language caused any investor to attribute even a single statement in the Prospectus to Macquarie.

**C.**     **Plaintiffs' Definition Of "Make" Impermissibly Expands Section 10(b)**

Accepting Plaintiffs' definition of "make" and allowing the question of whether Macquarie should be held liable as a primary actor under Section 10(b) go to trial is inconsistent with both Janus and Glickenhaus, one of the few post-motion to dismiss decisions on this issue post-Janus, and effectively reinstitutes aiding and abetting liability for private plaintiffs under Section 10(b).

Prior to Central Bank, federal courts "allowed private aiding and abetting actions under §10(b).  Cent. Bank, 511 U.S. at 169.  In addition to "proving that the primary violation occurred and that the defendant had knowledge of it," SEC v. Apuzzo, 689 F.3d 204, 212 (2d Cir. 2012), a critical component of aiding and abetting liability at the time was establishing

"substantial assistance" by the alleged aidor and abettor.  Id.  at 211-12.  In other words, that the defendant "'in some sort associate[d] himself with the venture, that [the defendant] participate[d] in it as something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.'"  Id. at 206 (citation omitted).[10]  Allegations that defendants "reviewed and approved the first [private placement memorandum], devised the marketing and financing scheme for [the issuer], and engaged in atypical financing transactions," were held sufficient to establish aiding and abetting liability.  In re Gas Reclamation, Inc. Sec. Litig., 659 F. Supp. 493, 504 (S.D.N.Y. 1987).  So too were allegations that defendants provided substantial assistance by "committing to provide financing for the purchase of securities," "acting as escrow agent for the holding of payment for the purchase of securities" and "placing its 'badge of approval' on the sale of securities by releasing escrow funds."  Powell v. H.E.F. P'ship, 793 F. Supp. 91, 94 (D. Vt. 1992).

In Central Bank, however, the Supreme Court made clear that private actions for aiding and abetting liability "extend[ed] liability beyond the scope of conduct prohibited by the statutory text."  Cent. Bank, 511 U.S. at 177.  As explained by the Court, "[t]he issue [] is not whether imposing private civil liability on aiders and abettors is good policy but whether aiding and abetting is covered by the statute."  Id.  The Court's holding – that there is no private aiding and abetting liability under §10(b) – remains undisturbed today.[11]

As explained by the Court in Janus, suits against entities "that contribute 'substantial assistance' to the making of a statement but do not actually make it – may be

---

[10] Although originally adopted in the context of a criminal case, Judge Learned Hand's standard was subsequently adopted as the governing standard in civil cases as well.  Id. at 212.

[11] Stoneridge, 552 U.S. at 164-66 ("Though it remains the law, the §10(b) private right should not be extended beyond its present boundaries.").

brought by the SEC" but "not by private parties."  Janus, 131 S. Ct. at 2302.  This distinction was

identified by the Second Circuit in Pacific Investment Management Company LLC v. Mayer

Brown LLP, 603 F.3d 144 (2d Cir. 2010).  As the Court held, "[s]econdary actors can be liable in

a private action under Rule 10b-5 for only those statements that are explicitly attributed to them.

The mere identification of a secondary actor as being involved in a transaction, or the public's

understanding that a secondary actor 'is at work behind the scenes,' are alone insufficient."  Id.

at 155 (citation omitted); see also Shapiro v. Cantor, 123 F.3d 717, 720 (2d Cir. 1997)

("[a]llegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms . . . all fall

within the prohibitive bar of Central Bank").

        Nor is there any reason to expand the breadth of liability under §10 to include

secondary actors because "[t]he securities statutes provide an express private right of action

against accountants and underwriters in certain circumstances, see 15 U.S.C. § 77k, and the

implied right of action in §10 continues to cover secondary actors who commit primary

violations."  Stoneridge, 552 U.S. at 166 (emphasis added).[12]

---

[12] See also Tambone, 597 F.3d at 449 ("We agree that underwriters have a special niche in the marketing of securities and, thus, have a special set of responsibilities.  But the duty that the dissent seeks to impose is unprecedented – and far exceeds the scope of Rule 10b-5(b).  While that rule could have been drafted to cut a wider swath, it was not.  The SEC has other, more appropriate tools that it may use to police the parade of horribilis that the dissent envisions, and it is neither necessary nor wise to attempt to expand the rule by judicial fiat. Most importantly, doing so would, as a matter of law, be wrong.").

Indeed, the focus of Janus and the concomitant inapplicability of Rule 10b-5 to reach those participating in disseminating information through offering materials was recently addressed by SEC Chair Mary Jo White.  See Chair Mary Jo White, Three Key Pressure Points in the Current Enforcement Environment, NYC Bar Association's Third Annual White Collar Crime Institute (2014), http://www.sec.gov/News/Speech/Detail/Speech/1370541858285#.U3tBTSiOR8E ("One new approach to charging individuals is to use Section 20(b) of the Exchange Act. . . . It is potentially a very powerful tool that can reach those who have participated in disseminating false or misleading information to investors through offering materials, stock promotional materials, or earnings call transcripts, but who might not be liable under Rule 10b-5(b) following the Supreme Court's decision in Janus because they may not be the 'maker' of the statement.").

In short, Plaintiffs' theory would broadly expand Section 10(b) "beyond the person or entity that ultimately has authority over a false statement" and would subject all underwriters and other professionals to primary liability under 10(b).  <u>Janus</u>, 131 S. Ct. at 2303. As explained by the Court, "[t]he decision to extend the cause of action is for Congress, not for us."  <u>Stoneridge</u>, 552 U.S. at 165.   Plaintiffs' claim, therefore, should be dismissed.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Macquarie respectfully requests that Count IV of the SAC be dismissed with prejudice as against it.

Dated:  New York, New York

July 15, 2015

Respectfully submitted,

By: *<u>/s Greg A. Danilow</u>*
Greg A. Danilow
Seth Goodchild
Stefania D. Venezia
Christopher M. Gismondi
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
*Attorneys for Defendant Macquarie Capital (USA) Inc.*