# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:11-CV-2598 (DLC)

_____

IN RE:


PUDA COAL SECURITIES, INC., et al.

LITIGATION

_____


Videotaped Examination Before Trial of GREGG A. JARRELL, held in the law offices of NIXON PEABODY, 1300 Clinton Square, Rochester, New York 14604, on Wednesday, September 9, 2015 at 11:47 A.M. before BARBARA BUYERS, CSR, RPR, Notary Public.



```
                                                         Page 2
 1   APPEARANCES:
 2
 3   GLANCY PRONGAY & MURRAY LLP,
       BY:  JOSHUA L. CROWELL, ESQ.,
 4     1925 Century Park East, Suite 2100,
       Los Angeles, California 90067,
 5     jcrowell@glancylaw.com,
       Appearing for the Plaintiff and Gregg Jarrell.
 6
     WEIL, GOTSHAL & MANGES LLP,
 7     BY:  GREGORY DANILOW, ESQ.,
       and CHRISTOPHER GISMONDI, ESQ.,
 8     767 Fifth Avenue,
       New York, New York 10153-0119,
 9     greg.danilow@weil.com,
       christopher.gismondi@weil.com,
10     Appearing for Macquarie Capital.
11   PRESENT:
12   THOMAS FRANK,
       Videographer.
```

```
                                                         Page 3
 1               INDEX TO WITNESSES
 2
 3   GREGG A. JARRELL                    Page
 4
 5
 6   EXAMINATION BY MR. DANILOW:           5
 7   EXAMINATION BY MR. CROWELL:          76
 8   RE-EXAMINATION BY MR. DANILOW:       77
 9
10
11               INDEX TO EXHIBITS
12
13
14   Jarrell Exhibits                    Page
15
16   Exhibit 1 - Expert report dated 1/7/14    5
17   Exhibit 2 - Expert report dated 5/1/15   14
18   Exhibit 3 - Rebuttal report dated 6/1/15  44
```

```
                                                         Page 4
 1         THE VIDEOGRAPHER:  We are now on the record.
 2   This begins videotape number one in the deposition
 3   of Gregg Jarrell in the matter of In Re:  Puda Coal
 4   Securities, Incorporated litigation, in the United
 5   States District Court, Southern District of New
 6   York, civil action number 1 colon 11 dash CV dash
 7   2598.
 8         Today is Wednesday, September 9th, 2015 and
 9   the time is 11:47 A.M.  This deposition is being
10   taken at Nixon Peabody, LLP in Rochester, New York     11:43
11   at the request of Weil, Gotshal & Manges, LLP.  The
12   videographer is Tom Frank of Magna Legal Services
13   and the court reporter is Barbara Buyers of Magna
14   Legal Services.
15         Will the counsel and all parties present
16   state their appearances and whom they represent.
17         MR. DANILOW:  Greg Danilow, Weil, Gotshal
18   for defendant Macquarie.
19         MR. GISMONDI:  Chris Gismondi, Weil, Gotshal
20   for defendant Macquarie.                              11:43
21         MR. CROWELL:  Joshua Crowell, Glancy Prongay
22   & Murray, representing plaintiffs and the witness.
23         THE VIDEOGRAPHER:  Will the court reporter
24   please swear in the witness.
25         THE REPORTER:  Are there any stipulations?
```

```
                                                         Page 5
 1         MR. CROWELL:  No.
 2         MR. DANILOW:  No.
 3
 4         G R E G G   A.  J A R R E L L, 2500 East Avenue,
 5   Apartment 7U, Rochester, New York 14610, after being
 6   duly called and sworn, testified as follows:
 7
 8   EXAMINATION BY MR. DANILOW:
 9
10   Q.  Good -- still good morning, Mr. Jarrell.  How are    11:44
11       you?
12   A.  Fine, thanks.
13   Q.  Okay.
14         MR. DANILOW:  Why don't we get started by
15   marking as Exhibit 1 the expert report of Gregg
16   Jarrell dated January 7, 2014.
17         (Whereupon, Jarrell Exhibit 1, expert report
18   dated January 7, 2014, was then received and marked
19   for identification.)
20   BY MR. DANILOW:                                         11:45
21   Q.  Sir, is this a report you prepared?
22   A.  Yes.
23   Q.  As you sit here today, is there anything in this
24       report that you think is in error or should be
25       corrected in some way?
```



```
                                              Page 10                                                  Page 12
 1      2011?                                              1       THE WITNESS:  It looks better.
 2   A. Correct.                                           2       MR. DANILOW:  You like it up here?
 3   Q. And then in essence, are you saying because when Geo 3     THE VIDEOGRAPHER: Thank you.
 4      and Little made these reports and that went into the 4  BY MR. DANILOW:
 5      market, the market reacted in this way, I'm going to 5  Q. So in the same report, you then have a discussion of
 6      assume that had the auditor defendants said what   6      the defaulted defendants.
 7      they were supposed to say earlier, the market would 7  A. Yes, sir.
 8      have reacted in the same way?                      8   Q. What conclusion did you come to with respect to the
 9   A. Yes.  I mean, the only word in that description I  9      damages for the defaulted defendants' conduct?
10      might quarrel with is assume as opposed to conclude. 11:52 10  A. Well, there are two differences for the defaulted   11:55
11   Q. Okay.                                             11      defendants as compared to the auditor defendants.
12   A. So with that qualification, yes.                  12      One is the class period is different.  The class
13   Q. Okay.  Fine.                                      13      period is longer for the defaulted defendant; it
14   A. That's a fair summary.                            14      starts earlier.  They both end on April the 8th,
15   Q. And then there's footnote 29 which says quote, in my 15     2011 but the defaulted defendants' class period
16      opinion a disclosure from the company's auditor that 16    starts in, I think November 2009 whereas the
17      it is resigning due to improper transfers of the  17      auditors' starts in March 2010.  That's difference
18      company's assets by its chairman may be more      18      number one.
19      credible than a similar disclosure from an unrelated 19         Difference number two is the artificial
20      third party.                            11:53     20      inflation for the auditors is three dollars and     11:55
21         What point are you making there?              21      twelve cents, a constant number.  The artificial
22   A. The point I'm making there is that this approach -- 22     inflation for the defendants is based on my
23      in this approach of mine of using the three dollars 23     conclusion that had the -- as I say here in
24      and twelve cents based upon what the short sellers 24      paragraph 23, had the defaulted defendants fully
25      disclosed is conservative in that had the same   25      disclosed the truth as they knew it at the time,

                                              Page 11                                                  Page 13
 1      information been disclosed by the auditors in a    1      then the stock price would have gone to zero.
 2      resignation letter, it could only be worse.        2      Basically it's like a sham company, has zero value.
 3         So I'm putting the reader on notice that I'm   3      And so artificial inflation was computed for the
 4      going to defend this by saying that it's           4      entire class period based on that conclusion.
 5      conservative, it could have been worse, it was at  5         In both cases, to be damaged, investors had
 6      least this bad -- it would have at least been this 6      to have been holding through the negative disclosure
 7      bad.                                               7      on April the 8th, 2011.
 8   Q. And why would it be that disclosure from the       8   Q. And the difference in the quantum of the damage is
 9      auditors would be more credible, to use your phrase, 9     because had the insiders disclosed the whole truth,
10      than a disclosure from the short sellers?  11:54  10      the stock would have gone to -- your conclusion is    11:56
11   A. Well, they're -- you know, they're -- I think it's 11     the stock would have gone to zero?
12      obvious but I'll explain it; they're hired by the 12   A. Yes.
13      company, they -- you know, it's a dramatic move for 13  Q. And why would the stock go to zero if the insiders
14      them to resign and when they put in their letter why 14    disclose the whole truth and it only dropped three
15      they're resigning, there would be a certain       15      point one two per share when the auditors made the
16      assumption that it's true.                        16      hypothetical disclosure that you had discussed?
17         Short sellers, sometimes what they say is     17   A. Well, the theory here is that the auditors'
18      true, sometimes what they say is not true.  They're 18     corrective disclosure would not have been a complete
19      making allegations from afar and they have powerful 19     full-truth disclosure.  It would have essentially
20      economic incentives to say what they're saying, so 11:54 20 been a partial disclosure.  It would have put the    11:57
21      all in all, on average, I would say that what I said 21    market on notice that there's a serious question
22      in the footnote 29.                               22      about the -- whether this company is really a bona
23         THE VIDEOGRAPHER:  Excuse me, counselor.      23      fide company or whether it's a sham, it would have
24      Could you please raise your microphone higher on  24      raised the market's assessed probability that this
25      your tie?                                         25      company was a sham but it wouldn't have raised that
```



Page 50

1  And then when the market opened up, even
2  though it opened at two dollars, it went to four
3  dollars on heavy volume. Most of that volume was
4  short sellers scrambling to get shares to cover
5  their positions. We know that because the short
6  interest declined by several million shares over
7  that period of time.
8      Same thing with 9/2; it was even more extreme
9  on 9/2. They were seven or eight million shares
10 short at the time the market reopened on 9/1 -- 9/2    13:22
11 and you compare the volume to the change in short
12 interest, most of the volume there is attributable
13 to people covering their shorts.
14     So there was a short squeeze. There was
15 clearly a lot more shares that were short than
16 shares available to cover the shorts by a large
17 margin. And this is evidence that's consistent with
18 this. I mean, I don't know -- we don't have
19 testimony from Trellus, we don't have testimony from
20 the person, you know, paying the seven dollars, I    13:22
21 don't think, so I can't know but I know enough to
22 know that that would be inappropriate to use as an
23 indication of the market price as of August the 4th.
24 That's why it's so inconsistent with the other
25 numbers, the price on 4/8 was six dollars and then

Page 51

1  when it opened back up again, it opened up at two
2  dollars, so --
3  Q. If you could look at paragraph 18.
4  A. Yes, sir.
5  Q. Where it says professor Jarrell's estimates are
6     inconsistent with his own description of the most
7     common approach to estimating per-share damages. It
8     goes on to explain quote you as saying the generally
9     accepted method; have you read that?
10 A. Yes.                                              13:23
11 Q. Do you agree with the comments that are made there?
12     MR. CROWELL:  Objection to the form.
13     THE WITNESS:  I mean, he discussed this in
14 his deposition, which I've read as well. I think
15 it's unfair. I'm happy to explain why.
16 BY MR. DANILOW:
17 Q. Please.
18 A. Okay. Obviously I think it's unfair.
19 Q. And obviously you're happy to explain why.
20 A. And I'm happy to explain it, the only question is,  13:24
21    it's your deposition, would you like to hear it?
22 Q. Absolutely.
23 A. It is, as I say in my report, the most common
24    approach, the approach I typically use is based on
25    the report study, when they actually occurred, what

Page 52

1  was the stock price reaction to those actual
2  disclosures and then matching those up with the
3  hypothetical corrective disclosure.
4      That's the most common approach, that's what
5  he's referring to and I certainly agree, it's the
6  typical approach. This isn't a typical case, as
7  I've been at pains to explain, this isn't the
8  typical securities fraud case. This is -- this is,
9  you know, a sham company and also, there're very
10 serious problems with using the event study once you  13:24
11 get past 4/8 for purposes of computing anything,
12 especially something as important as artificial
13 inflation.
14     So -- and I didn't ignore it, Mr. --
15 professor Purcell is the one ignoring things. I
16 talked for many pages --
17 Q. I think you mean professor Ferrell.
18 A. Did I say Purcell?
19 Q. Yes.
20 A. What is wrong with me. I'm getting old.            13:25
21     MR. CROWELL:  We love Purcell.
22     THE WITNESS:  Yes. Why I can't remember
23 that it's professor Ferrell since it's almost my
24 name exactly, spelling and pronouncement. But
25 professor Ferrell ignored the fact that I discussed

Page 53

1  how one would employ or how one would use what he
2  calls the event study approach to compute damages in
3  this case.
4      I -- we have the Tabak report, Tabak uses my
5  event study and builds what is, in his mind, he
6  calls it a lost causation consistent estimate of
7  damages of six dollars and ninety-eight cents, and I
8  said look, if -- if for some reason the fact finder
9  says that we're not allowed to use -- you're not
10 allowed to use true value zero, that's off -- off    13:26
11 the table, now what?
12     That's my number. I adopt Tabak's number,
13 it's based on my approach, it's all of the numbers
14 come from my market model and I would -- and I would
15 then say, okay, well then, that's your next best
16 number, I think it's too low, I think it's
17 inappropriate for various reasons. One, the full
18 truth isn't out; two, it's very debatable whether
19 the market model is applicable once you get past 4/8
20 and certainly once you get past the ten per second,  13:26
21 it's very, very debatable whether the market model
22 is applicable.
23     You need an efficient market. You know, in
24 scientific theory you really need to have market
25 efficiency to use a market model. My market



```
                                                      Page 82
 1    STATE OF NEW YORK
      COUNTY OF ERIE.
 2
 3        I, Barbara Buyers, a Notary Public in and for
      the State of New York, do hereby certify:
 4        That the witness whose testimony appears herein
      before was, before the commencement of his
 5    deposition, duly sworn to testify to the truth, the
      whole truth and nothing but the truth; that such
 6    testimony was taken pursuant to notice at the time
      and place herein set forth; that said testimony was
 7    taken down in shorthand by me and thereafter under
      my supervision transcribed into the English
 8    language, and I hereby certify the foregoing
      testimony is a full, true and correct transcription
 9    of the shorthand notes so taken.
10        I further certify that I am neither counsel for
      nor related to any parties to said action, nor in
11    any way interested in the outcome thereof.
12        IN WITNESS WHEREOF, I have hereunto subscribed
      my name this 15th day of September, 2015.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

