EXHIBIT 6



Andrew M. Calamari
Sanjay Wadhwa
George N. Stepaniuk
David Stoelting
Charu A. Chandrasekhar
New York Regional Office
SECURITIES AND EXCHANGE COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0174 (Stoelting)
Attorneys for the Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION, :

                         **Plaintiff,** :

     -against- :

MACQUARIE CAPITAL (USA), INC., :
AARON BLACK and WILLIAM FANG, :

                       **Defendants.** :

------------------------------------------------------------x

**RECEIVED**

MAR 27 2015

U.S.D.C. S.D.N.Y.
CASHIERS

15 Civ. _____ ( __ )

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendants Macquarie Capital (USA) Inc. ("Macquarie"), Aaron Black ("Black"), and

William Fang ("Fang") (collectively "Defendants"):

## SUMMARY OF ALLEGATIONS

1.    This case involves failed due diligence efforts by the Defendants in connection

with Macquarie's underwriting of a $108 million follow-on public offering by Puda Coal, Inc.

("Puda"), a U.S. issuer that purported to own a coal company located in the People's Republic of

China ("PRC" or "China"). Macquarie was the lead underwriter for Puda on the offering, and

Black and Fang were two of the Macquarie investment bankers who conducted due diligence on

Puda. In the course of their due diligence activities, Black and Fang read material information

indicating that Puda no longer owned the Chinese coal company, Puda's principal asset and sole source of revenue. Nonetheless, Macquarie proceeded to underwrite and market the offering despite the fact that the representations made to investors about Puda's purported ownership of the Chinese coal company were completely false.

2.      As underwriters, the Defendants had a well-established duty to investigate the nature and circumstances of the offering and take appropriate action in light of the information they learned through their due diligence efforts. Investors rely on underwriters to fulfill this duty. Here, the Defendants fell far short of fulfilling their duty as underwriters and investors suffered substantial losses as a result. Macquarie received $4.17 million for its work on the offering, which closed in December 2010.

3.      In the registration statement for the offering and other public documents, Puda represented that it held an indirect 90% ownership stake in the Chinese coal company, named Shanxi Puda Coal Group Co., Ltd ("Shanxi Coal"). Macquarie repeated those statements in its marketing materials for the offering. Those statements were false because the Chairman of Puda's Board of Directors, a Chinese national named Ming Zhao ("Zhao"), had recently transferred ownership of Shanxi Coal to himself and then sold nearly half of his interest to a trust managed by the largest state-owned investment firm in the PRC, known as the CITIC Group ("CITIC"). As a result, Puda no longer had an ownership stake in Shanxi Coal or any source of revenue at the time of the December 2010 offering. Zhao's transfer of Shanxi Coal's ownership away from Puda was not disclosed in any of Puda's public filings with the Commission.

4.      Macquarie proceeded with underwriting and marketing the offering even though it had obtained a document through its due diligence efforts which showed that, at the time of the offering, Puda did not own 90% -- or any part -- of Shanxi Coal. Macquarie engaged Kroll

Associates Inc. ("Kroll") to investigate and prepare a report on Puda and its officers and directors ("Kroll Report"). The Kroll Report indicated in three different places that, according to corporate registry filings in the PRC, Zhao and CITIC owned virtually all of Shanxi Coal and Puda owned none of it. Kroll obtained those records through a subcontractor in the PRC, and those same documents were obtained several months later by an investment blogger who then exposed the fraud on his website.

5.      Kroll provided its report to Fang, who read the Kroll Report, including the parts of the report which stated that Zhao and CITIC owned virtually all of Shanxi Coal, but Fang failed to act on that information. Even though Fang knew that Puda purported to own 90% of Shanxi Coal, Fang did not discuss the contents of the Kroll Report with anyone else or call anyone's attention to the information recited in the report indicating that Puda owned none of Shanxi Coal, despite a duty to do so. Instead, Fang circulated the Kroll Report to other members of the deal team via a one-line email in which Fang stated that "no red flags were identified."

6.      Black, a senior Macquarie banker who was one of the transaction directors on the Puda deal, received the Kroll Report from Fang and read portions of the report, including a bullet point in the executive summary which stated that Zhao owned 50 percent of Shanxi Coal. Black also failed to act on that information, despite a duty to do so. Without discussing the contents of the report with anyone or calling anyone's attention to the information recited in the report indicating that Puda owned none of Shanxi Coal, Black proceeded to move forward with the transaction despite knowing that Macquarie was underwriting and marketing the Puda offering based on the representation that Puda owned 90% of Shanxi Coal.

7.      Macquarie marketed the Puda offering shares to investors at a price of $12 per share. After Zhao's transfer of Shanxi Coal's ownership away from Puda was publicly revealed

3

by the investment blogger in April 2011, Puda's stock price plunged to as little as pennies per share.  Puda is now a delisted and deregistered shell company with no ongoing business operations.

8.     By virtue of the conduct alleged herein, Macquarie, Black and Fang, directly or indirectly, singly or in concert, violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2) and (3)].  Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

9.     The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and seeks to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein.  The Commission also seeks a final judgment:  (a) ordering Macquarie and Black to disgorge the ill-gotten gains received as a result of the violations for which they are liable and pay prejudgment interest on those amounts; and (b) ordering the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

10.    This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)].  The Defendants, directly and indirectly, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to engage in the acts, transactions, practices and courses of business alleged herein.  Many of the acts, transactions, practices and courses of business alleged in this complaint occurred within the Southern District

of New York.  For example, the Defendants engaged in the activities alleged herein at

Macquarie's principal place of business in New York, New York and Puda's common stock was

listed and traded on the NYSE Amex LLC Exchange ("NYSE") during the relevant period.

## DEFENDANTS

11.     **Macquarie** has been registered with the Commission as a broker-dealer since

1994 and has principal offices in New York, New York.  Macquarie is a wholly owned

subsidiary of Macquarie Group Limited, a global financial services firm headquartered in

Australia.  Macquarie was lead underwriter and joint "bookrunning" manager for Puda's follow-

on public stock offering.

12.     **Black**, age 40, resides in New South Wales, Australia.  He is currently a Division

Director in Macquarie Group's Sydney office and has worked with Macquarie Group or its

affiliates in different capacities since 2003.  From November 2008 to December 2011, Black was

a managing director at Macquarie in its New York City office and was a registered representative

with Series 7, 24 and 63 licenses.  As such, Black was at all times relevant hereto an agent of

Macquarie and acted in such capacity with respect to the conduct alleged herein.  Before joining

Macquarie Group, Black was employed elsewhere in the securities industry.

13.     **Fang**, age 31, resides in New York, New York.  From March 2008 to July 2011,

he was an investment banking associate at Macquarie and was a registered representative with

Series 17 and 63 licenses.  As such, Fang was at all times relevant hereto an agent of Macquarie

and acted in such capacity with respect to the conduct alleged herein.  Before joining Macquarie,

Fang was employed elsewhere in the securities industry.

## OTHER PERSONS AND ENTITIES

14.      **Puda** is a Delaware corporation whose principal offices are or were located in Taiyuan, Shanxi Province, China.  Puda entered the U.S. capital markets through a reverse merger with a pre-existing listed company on July 15, 2005.  From September 22, 2009 through August 17, 2011, Puda's common stock was listed and traded on the NYSE.

15.      **Shanxi Coal** is a Chinese coal mining company that was established under the laws of the PRC on June 7, 1995 and is located in Tiayuan, Shanxi Province, PRC.  Prior to the conduct described herein, Puda indirectly owned 90% of Shanxi Coal.

16.      **Zhao**, age 41, is a Chinese national who, upon information and belief, resides in the PRC.  He has been chairman of Puda's board of directors since July 15, 2005, and he was also Puda's CEO until June 25, 2008.  As of March 16, 2011, Zhao owned approximately 25% of the outstanding shares of Puda.  Zhao is also co-founder, chairman and CEO of Shanxi Coal.  On February 22, 2012, the Commission filed a complaint in the United States District Court for the Southern District of New York alleging that Zhao and Liping Zhu, Puda's former CEO, committed securities fraud and other violations of the Securities Exchange Act of 1934, and that they are liable for Puda's violations of various federal securities laws.  *SEC v. Ming Zhao, et al.*, 12-CV-1316 (DLC).  Zhao was recently served with the Commission's complaint through his recently retained U.S. counsel, after having long evaded the Commission's efforts to serve him in person in the PRC through protocols established by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

17.      **Kroll** is a division of Altegrity Corporation that provides corporate investigatory and due diligence services and has principal offices in New York, New York.  Kroll was engaged by Macquarie in connection with Macquarie's work on Puda's December 2010 offering.

## BACKGROUND

**Puda's Prior Business Operations And Zhao's Fraud**

18.     During the relevant period, Puda had an offshore ownership structure commonly used by public companies with operations in China.  Puda owned Puda Investment Holding Limited ("Puda BVI"), an International Business Company incorporated in the British Virgin Islands.  Prior to the fraudulent conduct alleged herein, Puda BVI owned Shanxi Putai Resources Limited ("Putai"), a company established under the laws of the PRC.  Puda's business operations were conducted exclusively through Shanxi Coal, which was owned 90% by Putai, 8% by Zhao, and 2% by Zhao's brother.

19.     Puda's primary business was originally as a supplier of premium high grade cleaned coking coal used to produce coke for steel manufacturing.  In 2009, Puda modified its business strategy to enter into the coal mining business as a result of a decision of the Shanxi provincial government to require mergers and consolidations of smaller coal mining companies in Shanxi Province.  Pursuant to the government policy, the government awarded certain selected larger coal production enterprises the opportunity to acquire, consolidate and restructure smaller coal mines through mergers, acquisitions and asset or share transfers.  Shanxi Coal was one of the entities selected by the Shanxi provincial government to become a coal mining consolidator.

20.     Puda conducted two public offerings in the U.S. ostensibly to raise capital for Shanxi Coal's mine acquisition and expansion.  On February 18, 2010, Puda completed the offering and sale of 2.86 million shares with net proceeds of approximately $14.5 million.  On December 16, 2010, Puda completed the offer and sale of 9 million shares at a price of $12 per share, for a total of $108 million.  The net proceeds to Puda were approximately $101.5 million after underwriting fees and other expenses.  By the time of the two offerings, however, Puda no

7

longer held any ownership interest in Shanxi Coal.

  21. In September 2009, Zhao caused Puda's 90% indirect interest in Shanxi Coal to be transferred to himself without the approval or knowledge of Puda's public shareholders or its Board of Directors.  On September 3, 2009, Zhao caused Putai, the entity through which Puda held its 90% controlling interest in Shanxi Coal, to enter into a contract with Zhao pursuant to which Putai transferred its 90% equity stake in Shanxi Coal to Zhao.  Also on September 3, 2009, Zhao caused his brother to divest himself of his 2% interest in Shanxi Coal by transferring 1% to Zhao and, because PRC law requires an entity like Shanxi Coal to have more than one owner, 1% to an administrative employee of Shanxi Coal.  As a result of these transactions and Zhao's pre-existing 8% interest in Shanxi Coal, the ownership of Shanxi Coal was restructured such that Zhao held 99% of Shanxi Coal.

  22. In July 2010, Zhao engaged in a series of transactions with CITIC Trust, a private equity fund controlled by CITIC, as a result of which CITIC Trust held a 49% interest in Shanxi Coal and a lien on the remaining 51% stake as collateral for a loan.  First, on July 14, 2010, Zhao transferred a 49% interest in Shanxi Coal to CITIC Trust.  CITIC Trust then placed these assets in a trust plan and sold interests in the trust plan to Chinese investors.  In exchange for his 49% stake in Shanxi Coal, Zhao received preferred shares in the trust plan that would be paid after the other Chinese investors received their share of the trust plan's payout.  Also in July 2010, Zhao signed agreements with CITIC Trust to obtain financing for Shanxi Coal from the CITIC trust plan.  On July 14, 2010, Zhao and the administrative employee pledged their 51% combined equity interest in Shanxi Coal to CITIC Trust as collateral for the loan provided to Shanxi Coal.

**Puda's False Public Filings**

  23. Following the transfer of Puda's interest in Shanxi Coal in September 2009, Puda

issued periodic reports that did not disclose anything about the share transfers orchestrated by Zhao. These filings were all fundamentally false because, among other things, they falsely described Shanxi Coal as Puda's "90% subsidiary" and stated falsely that the "owners of Shanxi Coal are Putai (90%), Mr. Ming Zhao (8%) and Mr. Yao Zhao (2%) [Zhao's brother]." In addition, Shanxi Coal's results were consolidated with Puda's financial results during this time period, and the consolidated financial statements were therefore completely false. Puda's annual reports state that Puda's operations were conducted "exclusively" through Shanxi Coal, and all the filings and financial statements were entirely premised on the false proposition that Puda indirectly owned 90% of Shanxi Coal. The annual report for the 2009 fiscal year also included a detailed discussion of Shanxi Coal in a section titled "Related Party Transactions," including a discussion of Puda's acquisition of a 90% ownership interest in Shanxi Coal in 2007, without disclosing that Puda no longer had an ownership interest in Shanxi Coal.

24.     Puda's annual reports also made clear that Puda's financial performance was wholly dependent on its ownership of Shanxi Coal, and that Puda's loss of its ownership stake in Shanxi Coal was therefore critical. Puda's 2009 and other annual reports stated, among other things, as follows: "Our operations are conducted exclusively through Shanxi Coal, in which we own 90% of the equity interest. The operations of Shanxi Coal are our sole source of revenues. . . . [W]e are dependent on the cash flow of our subsidiaries to meet our obligations."

25.     Puda also filed materially false registration statements, prospectuses and prospectus supplements with the Commission during the relevant time period, including for the December 2010 offering. These documents incorporated by reference the false and misleading periodic reports and did not disclose anything about the Shanxi Coal-related transactions orchestrated by Zhao.

9

26.     The annual report on Form 10-K at issue here, for the year ended December 31,

2009, was filed on March 31, 2010.  The quarterly reports on Forms 10-Q at issue were filed on

November 13, 2009, May 17, 2010, August 16, 2010, and November 15, 2010.  On August 17,

2010, Puda filed an S-3 Registration Statement for the sale of 7,850,000 shares, the offering at

issue in this action.  Amendments thereto were filed on October 14, 2010 and December 8, 2010,

with the total number of offered shares increasing to 9,000,000.  Puda filed the corresponding

prospectus supplement for this offering on December 8, 2010.

**Exposure Of The Fraud And Its Impact On Puda**

27.     On April 8, 2011, an internet report on Puda surfaced regarding Puda's ownership

of Shanxi Coal and describing some of the asset transfers and transactions between Zhao and

CITIC Trust that are detailed above.  Prior to the issuance of the report, the 52-week high for

Puda's stock price was $16.97 per share.  On April 8, 2011, the stock closed at $6.00, down

$3.10 from the prior day's closing price.  On April 11, 2011, Puda issued a press release

announcing that its audit committee had retained counsel to conduct an investigation into the

claims made in the internet report.  In the press release, Puda stated that "evidence supports the

allegation that there were transfers by Zhao in subsidiary ownership that were inconsistent with

disclosure made by the Company in its public securities filings."  The NYSE halted trading in

Puda's stock that day.

28.     In a later report on Form 8-K filed with the Commission, Puda presented the

findings of its audit committee's investigation, which confirmed Zhao's fraudulent transfer of

Shanxi Coal's ownership away from Puda.  That Form 8-K also stated that Zhao's U.S. counsel

at the time had provided Puda's audit committee with a letter purporting to be from CITIC Trust

disclaiming an ownership interest in Shanxi Coal, but as confirmed in a subsequent Form 8-K

filed by Puda, that letter was a forgery perpetrated by Zhao and Zhu, with Zhu taking public responsibility for forging the letter. CITIC Trust advised Puda's audit committee, in writing, that after "careful verification," CITIC Trust determined that the letter provided by Zhao's counsel had not been issued by CITIC Trust, and further confirmed that Zhao had, in fact, transferred an ownership interest in Shanxi Coal to CITIC. Zhao's U.S. counsel at the time then withdrew as counsel to Zhao and advised Puda's audit committee not to rely on any prior statements that such counsel had made regarding CITIC Trust.

29.     On July 7, 2011, Puda's auditor resigned from the engagement and stated that further reliance should no longer be placed on its previously issued audit reports for fiscal years 2009 and 2010. On August 18, 2011, the NYSE delisted Puda, and the Commission temporarily suspended trading in Puda stock on the following day. After the trading suspension expired, Puda stock has traded in the "grey" market at prices ranging from $0.01 to $2.02 per share. Puda's stock was deregistered on December 12, 2011.

## THE DEFENDANTS' VIOLATIVE CONDUCT

### Macquarie's Role In The December 2010 Offering

30.     In or about May 2010, an investment fund that was a Puda shareholder contacted Black to introduce Puda to Macquarie. As a result of that introduction, Black met with a member of Puda's senior management. Fang also attended that initial meeting. In August 2010, Black and others from Macquarie began discussions with Puda for Macquarie to serve as lead underwriter for a second follow-on public offering of Puda stock.

31.     In November 2010, Macquarie's Global Underwriting Committee ("Underwriting Committee") approved Macquarie's participation in the Puda offering. Black and others presented the transaction to the Underwriting Committee, and Black served as one of

Macquarie's transaction directors for the Puda deal. Black headed the deal team from the Equity Capital Markets group, which included Fang. The Equity Capital Markets group was the group within Macquarie that was responsible for public equity offerings and participated in conducting due diligence and marketing the Puda offering to investors. As a transaction director, Black had substantial responsibility for the Puda transaction. His responsibilities included ensuring that the due diligence process was properly completed. He was also among those responsible for marketing of the offering to potential investors, including the dissemination of offering materials to potential investors and the preparation of internal sales documents such as "sales force" memoranda provided to sales team members to assist them in soliciting investors to purchase shares in the offering. As head of the Equity Capital Markets Puda deal team, Black supervised Fang's work on the offering in these areas and was responsible for guiding the day-to-day work of the Equity Capital Markets team on the Puda transaction.

32. Macquarie's Quality Control Manual provided in relevant part that a transaction director had "overall responsibility for the delivery of the transaction or Macquarie's services," and was "responsible generally for supervising the transaction and managing quality control issues," including (a) assembling the transaction team and ensuring that it remained appropriately staffed and resourced for the transaction; (b) approving "all material decisions" regarding the transaction; (c) "approving all material pieces of advice and all material documents such as term sheets, valuations and reports"; (d) "ensuring that issues are escalated . . . as appropriate." As such, Black was also responsible for these matters on the Puda transaction.

**Kroll's Engagement Due To Heightened Due Diligence Risks**

33. At the Underwriting Committee meeting at which Macquarie's participation in the deal was approved, the Underwriting Committee directed the Puda transaction team, including

Black, to engage Kroll to provide a due diligence report for the transaction. On November 17, 2010, Kroll and Macquarie executed an engagement letter for Kroll "to perform due diligence services regarding Puda Coal, Ming Zhao, [and seven other Puda officer and directors]."

34.     The relevant members of the Macquarie deal team, including Black and Fang, understood that Macquarie hired Kroll to help Macquarie determine whether there existed information that was highly material to the transaction and adverse to Puda investors, which information a potential investor in the Puda offering would need to know before investing. The relevant Macquarie personnel, including Black and Fang, further understood that theft of corporate assets and similar matters were potential issues within the scope of Kroll's engagement. Black was an experienced investment banker and had previously worked on transactions involving companies with operations or other principal assets located in China.

35.     The relevant members of the Macquarie deal team, including Black and Fang, knew and understood that the Puda transaction posed special risks and required heightened due diligence because Puda's operations and principal assets were all located in China. The relevant Macquarie personnel, including Black and Fang, knew of prior frauds and fraudulent transactions involving other Chinese companies and the attendant challenges posed by the legal environment and other circumstances giving rise to heightened corruption risks in China. Accordingly, the relevant Macquarie personnel, including Black and Fang, understood that one of the due diligence goals on the Puda transaction was to verify that Puda was not just a shell company. Zhao's relationship with government authorities in China, as evidenced by the government's selection of Shanxi Coal as a consolidator of coal mines, and Zhao's significant ownership position in Puda were viewed within Macquarie as additional risk factors specific to Puda that required heightened due diligence on the offering.

36.     Macquarie memorialized the heightened due diligence risks created by these factors in internal documents governing its work on the Puda transaction.  For example, the Equity Capital Markets Proposal Summary and the New Transaction Approval Form, which listed "risk factors/transaction issues/issues to be investigated," noted that "Chinese companies typically require higher levels of due diligence, given China's regulatory environment" and included Zhao's "significant ownership position [in Puda] and accumulation of wealth" as additional risk factors.  Black was one of the senior Macquarie bankers who prepared the Proposal Summary, and he and Fang both signed the New Transaction Approval Form, which Fang participated in drafting.

37.     One Macquarie banker sent an email to Black and others, which was later forwarded to Fang, in which the banker stated that "several elements of this transaction warrant a deeper dive on diligence," including the fact that Puda "went public in 2005 in a reverse merger transaction that did not include the typical [due diligence] of a US listed IPO."  The banker attached to his email a *Barrons* article discussing fraudulent activity at other U.S.-traded Chinese companies formed through reverse mergers.  That same banker separately emailed members of the Macquarie deal team, including Black and Fang, that one of the "stickiest" due diligence "issues will be around potential conflicts of interest by Ming Zhao and [his brother]."

38.     Consistent with these circumstances and objectives, Macquarie hired Kroll, a third party with no interest in the outcome of the transaction, in order to provide an additional layer of due diligence that was not being provided by other participants in the due diligence process, including by lawyers and other outside advisors.  The relevant members of the Macquarie deal team, including Black and Fang, understood that Kroll's services would include searching for information about Puda and its officers and directors "on the ground" in China.  Among other

14

things, Kroll was to conduct database and local source inquiries in China.

39.     Fang served as Macquarie's point of contact with Kroll.  Fang was the Macquarie banker who (a) contacted Kroll to discuss the scope of a potential engagement and obtain a work proposal; (b) made a recommendation to the team for which of the scope options presented by Kroll to select; and (c) co-signed the engagement letter.  Fang was also the banker (a) whom Kroll contacted with any questions; (b) who updated others on the status of Kroll's work; and (c) who was the sole person to whom Kroll transmitted its final report.

**The Kroll Report**

40.     On December 2, 2010, Kroll emailed its 40-page due diligence report to Fang.  Fang read the report when he received it.

41.     One of the Chinese databases from which Kroll obtained information, through a vendor located in China, was a database of corporate registration records maintained by the Shanxi Province Administration for Industry and Commerce ("AIC").  The AIC (or SAIC, for "State") for each province in China maintains a registry of corporate records.  In the event of an equity transfer or sale of company shares, the company or a shareholder is required by Chinese law to register the resulting change in share ownership by making an appropriate filing with the AIC.  Beginning in mid-2012, after the public exposure of Zhao's theft of Shanxi Coal, press reports circulated that the PRC had taken steps to restrict access to AIC records.  However, in 2010, when Kroll conducted its work on the Puda transaction, AIC records were generally accessible in the manner in which they were obtained by Kroll.

42.     In several places, the Kroll Report presented information taken from the AIC records showing, on its face, that Puda did not own 90%, or any portion at all, of Shanxi Coal.

43.     The Kroll Report's "Executive Summary" states that "ZHAO Ming [Chinese

characters omitted] is [Shanxi Coal's] legal representative, sole executive director, and a 50% shareholder." A few pages later, in a section titled "Chinese Corporate Registration Information [-] Shanxi Puda Coal Group Co., Ltd.," the Kroll Report states that "AIC records identified the following shareholders of Shanxi Puda Coal Group Co., Ltd." and presents the following table of Shanxi Coal shareholders:

| Name | PRC ID Number | Amount of Investment (RMB) | Percentage |
|------|---------------|----------------------------|------------|
| ZHAO Ming | 142327197209201518 | 250 million | 50% |
| [Admin. Employee] | 140102196904054017 | 5 million | 1% |
| CITIC Trust Co., Ltd. | N/A | 245 million | 49% |

44.     An Appendix to the Kroll Report contains a chart titled "Changes to Shanxi Puda Coal Group Co., Ltd's registration records," which shows that AIC registration records disclosed the following changes in Shanxi Coal's ownership:  (i) As of March 25, 2010, Zhao owned 99 percent of Shanxi Coal; and (ii) On July 22, 2010, Zhao transferred a 49 percent ownership stake to CITIC Trust, resulting in the ownership structure presented in the table above.

**Black And Fang's Failures With Respect To The Kroll Report**

45.     Fang read each of the foregoing portions of the Kroll Report showing that Puda no longer owned any part of Shanxi Coal.  Even though Fang knew that Puda claimed in the offering materials and other public documents that Puda owned 90% of Shanxi Coal, Fang took no action in light of the contrary facts presented in the Kroll Report after seeing those facts, despite a duty to do so.  Fang did not direct anyone's attention to those facts or discuss them with anyone.  Fang did not ask his contacts at Kroll or anyone else any questions, or take any steps at all, with respect to the information presented in the report showing that Puda did not own any part of Shanxi Coal.  Fang did not know what AIC records or CITIC were at that time, and he did not ask anyone what they were.  Fang did not bring the AIC information presented in the Kroll

Report to the specific attention of more experienced members of the Puda deal team or anyone outside Macquarie, and Fang did not in any way seek guidance or advice from anyone at Macquarie or its legal advisors with respect to that information.

46.     Instead, twenty-nine minutes after receiving the Kroll Report, Fang forwarded it to Black and nine other members of the Macquarie deal team with a cover email stating in its entirety: "Team, Attached is the report received from Kroll.  No red flags were identified. Thanks, Will."  Approximately forty minutes later, Fang emailed the Kroll Report to three other Macquarie deal team members and an associate at Macquarie's outside law firm with a cover email identical to the one quoted above.  Other than through these two perfunctory emails, Fang did not discuss or otherwise communicate about the contents of the Kroll Report in any respect with anyone at Macquarie, any of its legal or other advisors on the Puda offering, or with anyone else.

47.     Black, who was the only other person involved in the transaction (outside of Kroll's personnel) who read the Kroll Report at the time of the offering, also failed to exercise appropriate care in his review of the report.  Black read portions of the Kroll Report, including the Executive Summary, shortly after receiving the report from Fang.  Black read the statement in the Executive Summary that "ZHAO Ming [Chinese characters omitted] is [Shanxi Coal's] legal representative, sole executive director, and a 50% shareholder."  Despite reading this statement in the Executive Summary -- and even though he knew that Puda and Macquarie represented in the offering materials and other public documents that Puda owned 90% of Shanxi Coal -- Black merely skimmed portions of the rest of the Kroll Report.  He did not go on to read, among other things, the other parts of the report that addressed the information contained in the Chinese AIC records about the true ownership of Shanxi Coal, including the charts excerpted

above, one of which appeared only a few pages later, showing that Zhao and CITIC owned 99%
of Shanxi Coal and Puda owned none of it.  Black did not take any action at all after seeing the
statement in the report's Executive Summary that Zhao owned 50% of Shanxi Coal, despite a
duty to do so and despite the fact that this information contravened and rendered false the
representations being made by Puda and Macquarie that Puda owned 90% of Shanxi Coal.
Instead, Black continued to move forward with the offering.

48.     Black did not call anyone's attention to the contradictory information he read in
the Executive Summary about Zhao's ownership of Shanxi Coal or discuss it with other
members of the Puda deal team or anyone outside Macquarie.  Black did not in any way seek
guidance or advice from anyone at Macquarie or its legal advisors, ask any questions of anyone
or take any steps at all with respect to the AIC information presented in the Kroll Report's
Executive Summary indicating that Puda did not control or own any part of Shanxi Coal.  Nor
did Black take any steps at all to determine whether anyone else at Macquarie or its legal
advisors were aware of this information.  Black, like Fang, did not know what the AIC or AIC
records were at the time of Puda's December 2010 offering.

49.     The Shanxi Coal ownership information culled from AIC records and presented in
the Executive Summary and elsewhere in the Kroll Report was highly material to investors
because it went to the heart of Puda's purported investment value, as the loss of its ownership of
Shanxi Coal meant that Puda had no longer had any source of revenue.  The information about
Shanxi Coal's ownership presented in the Kroll Report would therefore have been important for
the other Macquarie deal team members -- who did not read the Kroll Report -- to know, because
it meant that Puda's representations were false and that Macquarie should not have proceeded to
underwrite and market the offering.

50.     In failing to act on the information they read in the Kroll Report about the true ownership of Shanxi Coal at the time of Puda's December 2010 stock offering, and instead moving forward with the offering while in possession of facts demonstrating that the whole deal was predicated on a fraud, Black and Fang were negligent.

**Macquarie's Broader Organizational Failures With Respect To The Kroll Report**

51.     In addition to Black and Fang's personal failures described above, which are attributable to Macquarie, Macquarie is also responsible for a broader organizational failure in its handling of the Kroll Report.  Although Black worked most closely with Fang on the Macquarie deal team and, as the transaction director for the Equity Capital Markets group, was responsible for supervising Fang, Macquarie's supervisory and control structure for the transaction was inadequate with respect to the Kroll engagement and contributed to Macquarie's failure to act on the critical ownership information in the Kroll Report.  In connection with this transaction, Macquarie did not have sufficient systems in place for ensuring that the Kroll Report was properly assessed and that appropriate action was taken in response to its contents.  While Macquarie did have written due diligence guidelines, it lacked the necessary procedures to ensure that those guidelines were implemented effectively in this instance.

52.     The Global Procedures Manual for the Equity Capital Markets group provided the relevant internal due diligence standards for the Puda transaction, including for the assessment of information obtained through third party sources such as the Kroll engagement.  That document provided, in relevant part, that while it was not necessary for every "person involved in the preparation of an offer document or with potential liability for it to personally conduct due diligence inquiries," a "proper due diligence system [must be] established" and "carried out by people reasonably believed to have appropriate competencies" and with "sufficient supervision

to ensure the system was properly carried out." In addition, as noted above, Macquarie's Quality Control Manual required transaction directors to "manag[e] quality control issues," ensure that the transaction team was "appropriately staffed and resourced," and that "issues were escalated as appropriate."

53.     Macquarie did not meet these standards with respect to the Kroll engagement. Although Macquarie obtained the Kroll Report to gain assurance that the Puda offering did not pose certain risks to investors, Macquarie failed to ensure that the Kroll Report was adequately reviewed and assessed. Macquarie's failure, as a firm, to act on the fact that the Kroll Report contained information that was highly material to the transaction and adverse to Puda investors after hiring Kroll to help Macquarie determine whether any such information existed was, at the very least, unreasonable and constituted a failure to exercise sufficient care in the due diligence process under the standard of care imposed by law on all underwriters and under Macquarie's own due diligence standards.

54.     As discussed above, Kroll was hired because of known corruption risks involving Chinese companies, including an awareness of prior frauds such as theft of corporate assets, and Zhao's relationship to the Chinese government. Macquarie's internal approval documents for the Puda deal stated that "Chinese companies typically require higher levels of due diligence." However, contrary to its own internal guidelines, Macquarie did not institute any system for (a) assessing the results of Kroll's work and ensuring that the relevant personnel took appropriate action with respect to the information presented in the Kroll Report; and (b) ensuring that bankers with more experience than Fang also reviewed the Kroll Report and properly assessed the relevance of its contents to the transaction.

55.     Neither Black nor any of the other senior bankers gave Fang any guidance on

assessing the due diligence information provided by Kroll.  More generally, none of them discussed with Fang the potential due diligence issues specific to companies based in China. They were also unaware of Fang's level of training or experience in conducting due diligence on such companies, which was limited.  Nor did Black or anyone else at Macquarie discuss the contents of the Kroll Report with Fang, either before or after it was delivered.

56.    Black knew that Fang was tasked with ensuring that the Kroll piece of the due diligence was properly carried out and the results were appropriately processed; the other senior Macquarie bankers did not know who, if anyone, supervised Fang's work with respect to Kroll. Other than Black's reading parts of the Kroll Report, they all relied on Fang to assess the relevance of the report's contents.  No one followed up on Fang's brief comment in his two cover emails circulating the Kroll Report that no "red flags were identified" or otherwise debriefed him on, or even discussed with him, the contents of the report or its impact on the offering.

57.    Although Fang also included on one of those emails an associate at the law firm that represented Macquarie on the Puda offering, neither Fang nor anyone else at Macquarie subsequently contacted the associate or anyone else at the law firm about the Kroll Report, or otherwise discussed the Kroll engagement with anyone at the law firm at any time.  The law firm had no role with respect to Kroll's work and Fang never discussed Kroll's role with the associate or with anyone else at the law firm.  No one at Macquarie ever sought or obtained guidance of any kind, much less legal advice, from the law firm about Kroll's work, its report or any of the report's contents.  Kroll's work was separate from and, as one Macquarie banker wrote, "additive" to the due diligence tasks undertaken by the law firm, as Kroll was hired to provide Macquarie with information that Macquarie did not expect to obtain elsewhere.

58.     In fact, no one at Macquarie (apart from Black and Fang) became aware of the information presented in the Kroll Report about Shanxi Coal's true ownership until after an investment blogger posted the same information online in April 2011.

59.     By underwriting and marketing Puda's December 2010 stock offering while in possession of the information in the Kroll Report disclosing Shanxi Coal's true ownership and given the circumstances described above, Macquarie was also negligent in its own right as an organization.

**The Use Of Materially False Offering Documents**

60.     As a result of the foregoing, the offering documents for Puda's December 2010 public stock offering, for which Macquarie received an underwriting fee of $4.17 million, contained numerous material misstatements.  In addition to the materially false and misleading prospectus filings described above, in which Macquarie was identified as lead underwriter, Macquarie disseminated offering materials directly to prospective investors to whom Macquarie marketed the Puda offering shares.  In addition to Macquarie's being identified by name in the prospectus filings, Macquarie's approval, as lead underwriter, was required before those documents were issued.  Macquarie granted that approval after receiving, and after Black and Fang read, the Kroll Report.

61.     For example, the Prospectus Supplement filed on December 8, 2010, on which Macquarie was listed as a joint bookrunning manager, falsely stated that Puda's operations "are conducted exclusively in China through [its] 90% owned subsidiary, Shanxi Puda Coal Group Co., Ltd., or Shanxi Coal."  The Prospectus Supplement was accompanied by an Issuer Free Writing Prospectus, which Macquarie prepared along with Puda, which falsely stated that Shanxi Coal was a "90% subsidiary of Puda Coal."  Macquarie and its personnel, including from the

Equity Capital Markets deal team, were also involved in preparing the materially false and misleading "free writing" prospectus, packaged as a "management presentation" slide show, to solicit investors in a "road show" for the offering.

62.     As described above, Black and Fang were involved in the process of bringing the December 2010 Puda offering to market from the very outset of the transaction.  Throughout the process, including after they reviewed the Kroll Report, Black and Fang were among those at Macquarie to whom drafts of offering documents with the false representations about Puda's ownership of Shanxi Coal were circulated for review and/or who participated in, or oversaw, the preparation and dissemination of such documents.  Each of the offering documents at issue, including drafts thereof, were materially false and misleading because each of them contained representations that Puda held a 90% ownership interest in Shanxi Coal and, based on that interest, derived all of the substantial revenue reported in Puda's financial statements from Shanxi Coal's coal operations.  In fact, as Kroll's due diligence report showed, Zhao and CITIC owned Shanxi Coal.  Throughout the offering process, including after they reviewed the Kroll Report, Black and Fang knew that the documents being used to market the offering to investors represented that Puda held a 90% ownership interest in Shanxi Coal.  Black and Fang further knew that the entire offering, including the sales and marketing efforts of Black's Equity Capital Markets team and others at Macquarie, was premised on Puda's purported ownership of Shanxi Coal.

63.     Both Black and Fang failed to act on the Shanxi Coal ownership information in their possession showing that each of the statements at issue made to investors were materially false and misleading and that the offering, which was premised on Puda's ownership of Shanxi Coal, constituted and operated as a fraud on investors.  In failing to do so, Black and Fang

obtained money for Macquarie, in the form of the $4.17 million underwriting fee, by means of those materially false and misleading statements.  The Puda transaction was part of the investment banking work for which Black and Fang, in turn, were compensated by Macquarie. In addition to his salary, Black received a substantial cash bonus attributable, in part, to his work on the Puda offering.

**Additional Steps Taken To Underwrite And Launch The Offering**

64.    In addition, Black and Fang continued to work on and advance the transaction, and thereby enabled Macquarie to proceed with underwriting and marketing the Puda offering, while in possession of facts demonstrating that Puda had lost its principal asset and sole source of revenue, and Black and Fang themselves engaged in marketing and underwriting the Puda transaction while in possession of those facts.

65.    Despite reading the portion of the Kroll Report's Executive Summary showing that Puda Coal did not own or control Shanxi Coal, Black continued to move forward with the offering in his role as a transaction director and to lead the work of the Equity Capital Markets team on the offering by, among other things:  (a) tracking the ongoing due diligence efforts of deal team members and participating in discussions concerning the status of due diligence; (b) advancing efforts to launch the offering by participating in meetings and teleconferences concerning outstanding steps needed to close the deal; (c) confirming the terms of Macquarie's compensation as lead underwriter with Puda's senior management; and (d) directing members of the team on marketing strategy for the sale of the offering to investors.

66.    After Black and Fang read the relevant portions of the Kroll Report, Fang and other members of Black's Equity Capital Markets team, acting under Black's supervision, also took multiple steps toward launching the offering by, among other things:  (a) finalizing key

24

offering materials such as the Prospectus Supplement, the "management presentation" package used to directly solicit investors through a "road show," and the press release announcing the offering; (b) coordinating the "road show" event at which the "management presentation" slides were presented to investors; (c) conducting conference calls to assess and conclude the final stages of the due diligence process, known as "bring-down" due diligence calls, prior to the launch of the offering; (d) preparing the "sales force memo" outlining the key details of the transaction and the strategic marketing plan for use by the internal sales team to market the offering to investors; and (e) performing other types of transaction support functions needed to execute the launch of the offering and sales to investors.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act
### (All Defendants)

67.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 66.

68.     Defendants, directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, have obtained money or property by means of untrue statements of a material fact or by means of omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.     By reason of the foregoing, Defendants, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)(3) of the Securities Act
### (All Defendants)

70.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 66.

71.     Defendants, directly or indirectly, singly or in concert, in the offer and sale of

securities, by the use of the means or instruments of transportation or communication in

interstate commerce, or by use of the mails, have engaged in transactions, practices, or courses of

business which operated or would operate as a fraud or deceit upon the purchaser.

72.     By reason of the foregoing, Defendants, singly or in concert, directly or indirectly,

have violated, and unless enjoined will again violate, Section 17(a)(3) of the Securities Act [15

U.S.C. § 77q(a)(3)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining each of the Defendants, their agents, servants, employees and

attorneys and all persons in active concert or participation with them who receive actual notice of

the injunction by personal service or otherwise, and each of them, from violating, directly or

indirectly, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

### II.

Ordering Macquarie and Black to each disgorge the ill-gotten gains they received as a

result of the violations alleged above, and ordering Macquarie and Black to each pay

prejudgment interest thereon.

## III.

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)].

## IV.

Granting such other and further relief as the Court may deem just and proper.


Dated:  March 27, 2015
       New York, New York


                                 SECURITIES AND EXCHANGE COMMISSION

                                 By: _____

                                      Andrew M. Calamari
                                      Sanjay Wadhwa
                                      George N. Stepaniuk
                                      David Stoelting
                                      Charu A. Chandrasekhar
                                      New York Regional Office
                                      SECURITIES AND EXCHANGE
                                      COMMISSION
                                      200 Vesey Street, Suite 400
                                      New York, New York 10281-1022
                                      (212) 336-0174 (Stoelting)
                                      Attorneys for the Plaintiff