```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                        11 Civ. 2598 (DLC)(HBP)
IN RE PUDA COAL SECURITIES INC.    :
et al. LITIGATION                  :    REPORT
                                        AND RECOMMENDATION
-----------------------------------X
```

                    PITMAN, United States Magistrate Judge:

                    TO THE HONORABLE DENISE L. COTE, United States District
Judge,

## I.  Introduction

                    Class representatives Salomón Querub, Howard Pritchard,
Hotel Ventures LLC and Steven Weissmann and intervenor Trellus
Management Company LLC ("Trellus") commenced this class action
alleging various violations of the securities laws, stemming from
actions taken by defendant Puda Coal, Inc.'s ("Puda") former
Chairman of the Board of Directors, defendant Ming Zhao.  Plain-
tiffs[1] allege that defendants Puda, Zhao, Liping Zhu, Qiong Laby
Wu, Jianfei Ni, C. Mark Tang, Lawrence S. Wizel, Moore Stephens
Hong Kong, Moore Stephens, P.C., Macquarie Capital (USA) Inc.
("Macquarie") and Brean Murray, Carret & Co. ("Brean Murray")
violated various provisions of the securities law by falsely

---

        [1]"Plaintiffs" refers to the class representatives, Trellus
and the class.

representing that Puda owned 90% of an operating subsidiary, Shanxi Coal, and that Puda was a profitable company.

The claims against all of the defendants have been resolved except for the claims against defendants Puda and Zhao. The Honorable Denise L. Cote, United States District Judge, entered final judgment in favor of defendants Moore Stephens Hong Kong and Moore Stephens, P.C. in June 2015 (Order Entering Final Judgment, dated June 8, 2015 (Docket Item ("D.I.") 505)).[2]  Judge Cote dismissed all claims against defendants Zhu, Wu and Ni (Order, dated Oct. 20, 2015 (D.I. 558)).  Plaintiffs settled their claims against defendants Macquarie (Stipulation and Agreement of Settlement, dated Oct. 16, 2015 (D.I. 555); Final Order and Judgment of Dismissal, dated June 21, 2016 (D.I. 610)), Brean Murray (Amended Stipulation of Settlement, dated Oct. 16, 2015 (D.I. 556); Final Judgment and Order of Dismissal, dated June 21, 2016 (D.I. 611)), Tang and Wizel (Stipulation and

---

[2]While an appeal of Judge Cote's order was pending, Moore Stephens, P.C. settled with plaintiffs (Stipulation and Agreement of Settlement, dated Sept. 16, 2016 (D.I. 629); Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Proposed Class-Action Settlement with Moore Stephens, P.C., dated Sept. 16, 2016 (D.I. 631), at 2).  While Judge Cote had preliminarily approved that settlement on December 21, 2016 (Order Preliminarily Approving Proposed Settlement, dated Dec. 21, 2016 (D.I. 643) ¶ 2), she vacated that approval on December 30, 2016 (Order Vacating MSPC Preliminary Approval Order, dated Dec. 30, 2016 (D.I. 646)).

Agreement of Settlement, dated Dec. 1, 2015 (D.I. 574); Final

Order and Judgment of Dismissal, dated June 21, 2016 (D.I. 613)),

and all those settlements have been approved by Judge Cote.

Plaintiffs allege that Puda violated Sections 11 and

12(a)(2) of the Securities Act of 1933 (the "Securities Act") and

Section 10(b) of the Securities Exchange Act of 1934 (the "Ex-

change Act") and Rule 10b-5 promulgated thereunder.  15 U.S.C. §§

77k, 77l, 78j(b); 17 C.F.R. § 240.10b-5.  Puda has failed to

answer or move with respect to the Second Consolidated Amended

and Supplemental Complaint.  Accordingly, Judge Cote entered a

default against Puda (Order Entering Default Judgment, dated Nov.

17, 2014 (D.I. 459)).

Plaintiffs allege that Zhao violated Sections 11 and 15

of the Securities Act and Section 10(b), Rule 10b-5 and Section

20(a) of the Exchange Act.  15 U.S.C. §§ 77k, 77o, 78j(b); 17

C.F.R. § 240.10b-5.  Although Zhao answered the Second Consoli-

dated Amended and Supplemental Complaint, he later declared that

he no longer wished to defend the action (Declaration of Ming

Zhao, filed Feb. 17, 2015 (D.I. 486) ¶ 6).  Therefore, Judge Cote

also entered a default against Zhao (Order, dated Apr. 1, 2015

(D.I. 497)).

This matter was referred to me to conduct an inquest

concerning plaintiffs' entitlement to damages from the defaulting

defendants (Order of Reference, dated Nov. 17, 2014 (D.I. 462);
Order of Reference, dated Oct. 9, 2015 (D.I. 551)).  By a Sched-
uling Order dated June 23, 2016, I directed plaintiffs to serve
and file their proposed findings of fact and conclusions of law
by August 24, 2016 and directed defendants Puda and Zhao to
submit responsive materials by September 26, 2016.  The Schedul-
ing Order further provided as to each defendant:

> IF DEFENDANTS (1) FAIL TO RESPOND TO PLAINTIFFS' SUB-
> MISSIONS, OR (2) FAIL TO CONTACT MY CHAMBERS BY SEPTEM-
> BER 26, 2016 AND REQUEST AN IN-COURT HEARING, IT IS MY
> INTENTION TO ISSUE A REPORT AND RECOMMENDATION CONCERN-
> ING DAMAGES ON THE BASIS OF PLAINTIFFS' WRITTEN SUBMIS-
> SIONS ALONE WITHOUT AN IN-COURT HEARING.  See Transat-
> lantic Marine Claims Agency, Inc. v. Ace Shipping
> Corp., 109 F.3d 105, 111 (2d Cir. 1997); Fustok v.
> ContiCommodity Services Inc., 873 F.2d 38, 40 (2d Cir.
> 1989) ("[I]t [is] not necessary for the District Court
> to hold a hearing, as long as it ensured that there was
> a basis for the damages specified in a default judg-
> ment.").

(Scheduling Order, dated June 23, 2016 (D.I. 617) (emphasis in
original)).

Defaulting defendants have not made any written submis-
sions to me, nor have they contacted my chambers in any way.
Accordingly, I make the following findings of fact and conclu-
sions of law as to the defaulting defendants on the basis of
plaintiffs' written submissions alone.

II.   <u>Findings of Fact</u>

   A.   <u>The Parties</u>

      1.   Class representatives Querub, Pritchard and Hotel
Ventures LLC are individuals and a limited liability company that
purchased Puda securities on or between November 13, 2009 and
April 8, 2011 (the "Class Period") and claim to have lost,
collectively, more than $2 million (Second Consolidated Amended
and Supplemental Complaint, dated Apr. 21, 2014 (D.I. 352)
("SAC") ¶ 40; Memorandum of Law in Further Support of Motion for
Appointment as Lead Plaintiff, dated June 30, 2011 (D.I. 25), at
5).[3]

      2.   Class representative Weissmann is an individual who
purchased Puda securities, including options, during the Class
Period (SAC ¶ 41).

      3.   Intervenor Trellus is a limited liability company
that purchased or acquired Puda securities for funds under its
management during the Class Period, including 179,734 shares of

_____

      [3]As a result of the default, all of the allegations of the
SAC, except as to the amount of damages, must be taken as true as
against the defaulting defendants.  <u>Greathouse v. JHS Sec. Inc.</u>,
784 F.3d 105, 107 (2d Cir. 2015); <u>Greyhound Exhibitgroup, Inc. v.
E.L.U.L. Realty Corp.</u>, 973 F.2d 155, 158-59 (2d Cir. 1992); <u>Trans
World Airlines, Inc. v. Hughes</u>, 449 F.2d 51, 69-70 (2d Cir.
1971), <u>rev'd on other grounds sub nom.</u>, <u>Hughes Tool Co. v. Trans
World Airlines, Inc.</u>, 409 U.S. 363 (1973).

common stock purchased at $12 per share from Brean Murray on December 8, 2010, pursuant to a public offering (the "December Offering") (SAC ¶ 42).

4.   As certified by the Honorable Katherine B. Forrest, United States District Judge, the class consists of "[a]ll purchasers of Puda stock and call options on Puda common stock and sellers of put options on Puda common stock" during the Class Period, excluding "[i]n-and-out purchasers," i.e., persons who bought Puda securities after November 13, 2009 and who liquidated their positions prior to April 8, 2011 (Opinion and Order, dated October 1, 2013 (D.I. 263), at 42).[4]

5.   As certified by Judge Cote, the subclass for claims pursuant to Section 11 of the Securities Act consists of "[t]hose persons or entities who purchased Puda shares pursuant or trace-able to the [December Offering], and who were damaged thereby." The subclass for claims pursuant to Section 12(a)(2) of the Securities Act consists of "[t]hose persons or entities who purchased Puda shares:  (a) directly in the [December Offering] from either Brean or Macquarie, or whose purchase of Puda shares was directly solicited by Puda, Zhao, Macquarie or Brean and (b)

_____

[4]A shorter class period was certified with respect to claims against defendants Moore Stephens Hong Kong and Moore Stephens, P.C. (Opinion and Order, dated Oct. 1, 2013 (D.I. 263), at 41).

who were damaged thereby" (Order Regarding Class Certification,
dated Jan. 12, 2015 (D.I. 481), at 2 (emphasis in original)).

6.   Defendant Puda is a Delaware corporation with its
principal executive offices located at 426 Xuefu Street, Taiyuan,
Shanxi Province, China (SAC ¶ 44).

7.   Defendant Zhao was, at all relevant times, the
Chairman of the Board of Directors of Puda and owned approxi-
mately 36% of Puda's outstanding common stock.  Zhao was also, at
all relevant times, Chairman of Shanxi Coal's Board of Directors.
Zhao was previously Puda's President and CEO from July 2005 to
June 2008 and Shanxi Coal's CEO from 1995 to June 2008 (SAC ¶
45).

B.   <u>The Defendants' Fraud</u>

8.   During the Class Period, Puda claimed to be a
supplier of cleaned coking coal used to produce coke for steel
manufacturing in China and a government appointee to consolidate
mining operations in Shanxi Province (SAC ¶ 44).

9.   Puda's operations are conducted exclusively through
Shanxi Coal, which owns all of Puda's mining assets, coal washing
plants, cash and receivables (SAC ¶ 44).

10.   Shanxi Coal's operations were the sole source of
Puda's revenue and profits (SAC ¶ 5).

7

11.   Before and during the Class Period, Puda repre-
sented that it indirectly "own[ed] 90% of the equity interest" in
Shanxi Coal.  Zhao owned 8% of Shanxi Coal and his brother, Y.
Zhao, owned the remaining 2% (SAC ¶ 8).

12.   On or about September 3, 2009, Zhao arranged for
his brother, Y. Zhao, to authorize improperly and cause the
transfer of Puda's 90% interest in Shanxi Coal to Zhao, adding to
the 8% interest Zhao already held.[5]  Additionally, Y. Zhao di-
vided and transferred half of his interest in Shanxi Coal to Zhao
(1%) and half to a Shanxi Coal employee named Wei Zhang (1%) (SAC
¶ 9).

13.   As a result, as of around September 3, 2009, Zhao
had increased his ownership of Shanxi Coal to 99%, thereby
leaving Puda with no ownership in Shanxi Coal (SAC ¶ 9).

14.   Puda's shareholders were not advised of this
transfer (SAC ¶ 9).

15.   Having obtained a 99% ownership interest in Shanxi
Coal in September 2009, on or around July 15, 2010, Zhao trans-
ferred 49% of his interest in Shanxi Coal to CITIC Trust Co.,
Ltd. ("CITIC"), in exchange for 100% of the ordinary shares in

---

[5]As demonstrated by the corrective disclosures in paragraphs
30 and 35, Zhao did not provide any consideration to Puda in
exchange for Puda's interest in Shanxi Coal.

8

the CITIC Juxinhuijin Trust Fund I (the "CITIC Fund I") (SAC ¶ 11).[6] CITIC had created the CITIC Fund I as an investment vehicle to hold and operate the business of Shanxi Coal (SAC ¶ 12).

16. Just days after Zhao transferred 49% of his interest in Shanxi Coal to CITIC, he pledged the remaining 51% of his interest in Shanxi Coal to CITIC as security to obtain a 2.5 billion yuan, three-year loan to Shanxi Coal at a cost of 14.5% (12.5% annual interest plus 2% annual fees). In November 2010, the loan was increased to 3.5 billion yuan (SAC ¶ 13).

17. Even though Zhao and Y. Zhao's actions effectively rendered Puda a shell company with no assets, no operations and no revenue, Puda nevertheless continued to represent to investors during the Class Period that it owned 90% of Shanxi Coal (SAC ¶¶ 10, 85-87).

18. Puda made these representations in its 10-K reports for 2009 and 2010 and in its 10-Q reports for the third quarter of 2009 through the third quarter of 2010 (SAC ¶¶ 85-87).

---

[6]Although the SAC alleges that Zhao acquired only 99% of Shanxi Coal (SAC ¶ 11), it also goes on to allege that he transferred 100% of Shanxi Coal stock to CITIC (SAC ¶ 13). Because Zhao could not transfer more stock than he owned, I interpret the SAC to allege that the percentages Zhao transferred to CITIC were percentages of the stock Zhao owned, not percentages of Shanxi Coal's issued and outstanding stock.

19.   Moreover, Puda's annual reports for 2009 and 2010 represented that "[t]he operations of Shanxi Coal are [Puda's] sole source of revenues."  At the time these statements were made, Puda did not maintain any ownership interest in Shanxi Coal after it was transferred to Zhao in September 2009 (SAC ¶ 89).

20.   Additionally, Puda continued to consolidate the operating results of Shanxi Coal into Puda's 10-K reports for 2009 and 2010 and 10-Q reports for the third quarter of 2009 through the third quarter of 2010 (SAC ¶¶ 77-79, 81, 83-84). This was a violation of generally accepted accounting principles (SAC ¶¶ 81-84).

21.   Puda conducted two separate public securities offerings in 2010 without disclosing the transfer of its interest in Shanxi Coal or that it no longer had any operating business at all (SAC ¶ 18).

22.   The registration statement and prospectus for the December Offering expressly incorporated Puda's false and misleading 10-K report for 2009 and the 10-Q reports for the first and second quarters of 2010.  Thus, Puda improperly incorporated Shanxi Coal's operating results into its own at a time when Puda had no ownership or control over Shanxi Coal (SAC ¶ 116).

23.   Moreover, the registration statement and prospectus failed to disclose that Zhao had transferred ownership of

Puda's Shanxi Coal stock to himself, that he sold 49% of his holdings in Shanxi Coal to CITIC, that he pledged the remaining 51% to CITIC as collateral for a loan and that Puda did not have any ownership interest in Shanxi Coal after September 3, 2009 (SAC ¶ 117).

24.   Puda raised $115 million from public investors by selling shares in what was effectively an empty shell company (SAC ¶ 18).

25.   Until April 2011, the defendants did not disclose to investors that Puda no longer had any ownership interest in Shanxi Coal, and hence had no operating business or revenue (SAC ¶ 19).

26.   On or around April 8, 2011, Alfred Little published a research report on Puda (the "Little Report"), accusing Zhao of improperly transferring ownership of Shanxi Coal to himself in September 2009, selling 49% of his interest in Shanxi Coal to CITIC in July 2010 and pledging the remaining 51% of his interest in Shanxi Coal to CITIC as collateral for a loan (SAC ¶ 19).

27.   Investors immediately reacted negatively to this news.  Puda's stock price promptly declined $3.10 per share, or by 34.1%, to close on Friday, April 8, 2011 at $6.00 per share, on unusually heavy trading volume (SAC ¶ 20).

11

28.   The following Monday morning, April 11, 2011, before the market opened, the NYSE Amex Exchange (the "NYSE Amex") halted trading of Puda's shares.  Trading remained halted for more than four months, rendering the stock held by Puda's shareholders immediately illiquid (SAC ¶ 20).  During these four months, the NYSE Amex delisted Puda's stock (SAC ¶ 25).

29.   Shortly after the Little Report, Puda's Audit Committee commenced an investigation into the allegations of fraud (SAC ¶¶ 21-23, 175-76).

30.   In a last minute effort to avoid liability for his transfers of Shanxi Coal stock, Zhao offered to buy Puda for $12 per share, an offer that was disclosed in a press release issued by Puda on April 29, 2011.  The press release further announced that Puda's Audit Committee intended to review and negotiate the terms of the sale and that Puda was "continu[ing] to investigate the allegations raised in a recent article alleging various unauthorized transactions in the shares of . . . Shanxi Coal, by Mr. Zhao" and that Puda intended "to provide further information when the investigation [was] complete" (SAC ¶¶ 23, 176).

31.   Zhao's promised buyout offer never materialized (SAC ¶¶ 177, 194).

32.   On August 18, 2011, after a halt of more than four months, trading of Puda's stock resumed on the OTC Pink Sheets.

12

Over the course of the next two days of trading, investors dumped their holdings en masse (SAC ¶¶ 25, 183).

33.   On August 18, 2011, Puda's shares declined $1.90 per share, nearly 32% from the April 8, 2011 closing price of $6.00 per share, to close at $4.10 per share.  On Friday, August 19, 2011, Puda's shares declined another $0.87 per share, more than 21%, to close at $3.23 per share.  During these few days, Puda's shares lost 46.17% of their value, on unusually heavy trading volume (SAC ¶¶ 26, 183-84).

34.   The decline in Puda's stock price was stopped when trading was halted for a second time prior to the start of trading on Monday, August 22, 2011 (SAC ¶ 26).

35.   On September 1, 2011, Puda's Audit Committee issued a lengthy report which disclosed, among other things, the "interim" findings of its internal investigation.[7]  The Audit Committee's findings effectively confirmed that the rumors of Zhao's improper and undisclosed transfer of Puda's ownership of Shanxi Coal to himself and then to CITIC were true, as was the rumor that 51% of Zhao's Shanxi Coal stock was pledged to CITIC as security for a loan to Shanxi Coal.  The Committee did not

---

[7]Although labeled interim, there was no further investigation of the remaining open issues because, in part, the funds available to pay counsel had run out (SAC ¶ 27).

13

resolve allegations concerning the existence of the loan itself because of conflicting evidence, including a letter from Zhao and purportedly issued by CITIC, denying that CITIC had funded the loan (the "CITIC Letter") (SAC ¶¶ 27, 185).

36.   Following this announcement, Puda's shares resumed trading and declined $1.21 per share, or by 37.46%, to close on September 2, 2011 at $2.02 per share, on unusually heavy trading volume (SAC ¶ 186).

37.   On October 3, 2011, Puda disclosed that it received a letter from CITIC confirming that the CITIC Letter was not, in fact, issued by CITIC (SAC ¶¶ 29, 190).

38.   Upon this news, Puda's stock dropped another 16.6% (SAC ¶¶ 29, 191).

39.   In the wake of the Little Report and subsequent disclosures, Puda's market capitalization has lost more than $325 million in value (SAC ¶ 192).

40.   Puda's and Zhao's wrongful conduct directly and proximately caused the economic losses suffered by plaintiffs (SAC ¶ 170).

41.   Because the trading market for Puda securities was open, well-developed and efficient at all relevant times, the market promptly digested current information regarding Puda from

all publicly available sources and reflected such information in
Puda's stock price (SAC ¶¶ 195-96).

III.   Conclusions of Law

    A.   Jurisdiction and Venue

      42.   This Court has subject matter jurisdiction over
this action pursuant to Section 22 of the Securities Act, 15
U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa,
and 28 U.S.C. § 1331.

      43.   Venue in this district is proper pursuant to
Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of
the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).
Substantial acts in furtherance of the alleged fraud or the
effects of the fraud have occurred in this District.

    B.   Determination of Liability and Damages

      1.   Standards Governing Default Motions

      44.   "'[W]hile a party's default is deemed to consti-
tute a concession of all well pleaded allegations of liability,
it is not considered an admission of damages.'"   Renaissance
Search Partners v. Renaissance Ltd. LLC, 12 Civ. 5638 (DLC), 2014
WL 4928945 at *4 (S.D.N.Y. Oct. 1, 2014) (Cote, D.J.), quoting

Cement & Concrete Workers Dist. Council Welfare Fund v. Metro
Found. Contractors Inc., 699 F.3d 230, 234 (2d Cir. 2012).

45.   Thus, even where, as here, defendants have de-
faulted, the court must "conduct an inquiry in order to ascertain
the amount of damages with reasonable certainty." Credit Lyonna-
is Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir.
1999).

46.   To determine damages, a court may rely on detailed
affidavits and documentary evidence in lieu of an evidentiary
hearing. Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d
Cir. 1991); see Fed.R.Civ.P. 55(b)(2)(B) ("The court may conduct
hearings or make referrals . . . when, to enter or effectuate
judgment, it needs to . . . determine the amount of damages."
(emphasis added)); accord Trustees of Mason Tenders Dist. Council
Welfare Fund, Pension Fund, Annuity Fund & Training Program Fund
v. Stevenson Contracting Corp., 05 Civ. 5546 (GBD)(DF), 2008 WL
3155122 at *4 (S.D.N.Y. June 19, 2008) (Freeman, M.J.) (Report &
Recommendation), adopted by, 2008 WL 2940517 (S.D.N.Y. July 29,
2008) (Daniels, D.J.).

47.   Accordingly, and in light of defendants' default,
I shall rely on the uncontradicted statements and evidence
contained in plaintiffs' affidavits and other submissions regard-
ing purchase, sale and other prices.

2.   Section 11
     of the Securities Act

48.   Trellus asserts a claim pursuant to Section 11 of
the Securities Act, 15 U.S.C. § 77k, against Puda and Zhao on
behalf of the subclass of people who acquired shares of Puda's
common stock in or traceable to the December Offering pursuant to
false offering materials issued in connection with the offering
(SAC ¶ 199).

49. The elements of a claim under Section 11 of the
Securities Act are:  (1) the purchase of a registered security,
"either directly from the issuer or in the aftermarket following
the offering"; (2) defendant's participation in the offering
"sufficient to give rise to liability under [S]ection 11,"[8] and
(3) a registration statement that "'contained an untrue statement
of a material fact or omitted to state a material fact required
to be stated therein or necessary to make the statements therein
not misleading.'"  In re Morgan Stanley Info. Fund Sec. Litig.,
592 F.3d 347, 358-59 (2d Cir. 2010), citing 15 U.S.C. § 77k(a);

---

[8]The parties who may be liable under Section 11 include
"every person who signed the registration statement."  15 U.S.C.
§ 77k(a)(1).  In addition, the issuer may be liable under Section
11.  Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.
Pension Fund, 135 S. Ct. 1318, 1323 (2015).

see also In re Fuwei Films Sec. Litig., 634 F. Supp. 2d 419, 435
(S.D.N.Y. 2009) (Sullivan, D.J.).

50.   Puda was the issuer of the securities in the
December Offering and Zhao signed the registration statement (SAC
¶¶ 114, 224-25).

51.   Because the registration statement for the Decem-
ber Offering expressly incorporated Puda's false and misleading
10-K report for 2009 and the 10-Q reports for the first and
second quarters of 2010, it was materially false; in those
filings, Puda improperly incorporated Shanxi Coal's operating
results into its own at a time when Puda had no ownership or
control over Shanxi Coal (SAC ¶ 116).

52.   Moreover, the registration statement failed to
disclose that:  (1) Zhao transferred ownership of Shanxi Coal to
himself; (2) he sold 49% of his interest in Shanxi Coal to CITIC;
(3) he pledged the remaining 51% of his interest to CITIC as
collateral for a loan and (4) Puda did not have an ownership
interest in Shanxi Coal after September 3, 2009 (SAC ¶ 117).

53.   Puda and Zhao are liable to plaintiffs for violat-
ing Section 11 of the Securities Act.

54.   Trellus and the subclass sustained damage in that
the value of their Puda shares declined as a result of Puda's and
Zhao's violation of Section 11 (SAC ¶¶ 20, 26, 27, 29, 204).

18

    3.  Section 12(a)(2)
       of the Securities Act

    55.  Trellus also asserts a claim against Puda pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of the subclass of people or entities who purchased Puda stock directly from one of the underwriters in the December Offering or were directly solicited to make their purchases by one of the underwriters (SAC ¶ 213).

    56.  The elements of a claim under Section 12(a)(2) of the Securities Act are:  (1) a sale "'by means of a prospectus or oral communication'"; (2) "an untrue statement of a material fact [in the prospectus or oral communication or the omission of] a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading,'" and (3) the defendant's status as a "'statutory seller.'"[9]  In re Morgan Stanley Info. Fund Sec. Litig., supra,

---

[9]A "statutory seller" includes one who has "'passed title, or other interest in the security, to the buyer for value,'" or "'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'"  In re Morgan Stanley Info. Fund Sec. Litig., supra, 592 F.3d at 359 (alterations in original), citing in part Pinter v. Dahl, 486 U.S. 622, 642, 647 (1988).

592 F.3d at 359, <u>citing</u> 15 U.S.C. § 77l(a)(2); <u>see also</u> <u>In re</u>
<u>Fuwei Films Sec. Litig.</u>, <u>supra</u>, 634 F. Supp. 2d at 435.

      57.   The securities sold in the December Offering
occurred by means of a prospectus (SAC ¶ 114).  Because the
prospectus expressly incorporated Puda's false and misleading 10-
K report for 2009 and the 10-Q reports for the first and second
quarters of 2010, it was materially false because in those
filings, Puda improperly incorporated Shanxi Coal's operating
results into its own at a time when Puda had no ownership or
control over Shanxi Coal (SAC ¶ 116).

      58.   Moreover, the prospectus failed to disclose that:
(1) Zhao transferred ownership of Shanxi Coal to himself; (2) he
sold 49% of his interest in Shanxi Coal to CITIC; (3) he pledged
the remaining 51% to CITIC as collateral for a loan and (4) Puda
did not have any ownership interest in Shanxi Coal after Septem-
ber 3, 2009 (SAC ¶ 117).

      59.   Puda is a statutory seller because it sold its
common stock in the December Offering (SAC ¶¶ 114, 214).

      60.   Puda is liable to plaintiffs for violating Section
12(a)(2) of the Securities Act.

      61.   Trellus and the subclass sustained damage in that
the value of their Puda shares declined as a result of Puda's
violation of Section 12(a)(2) (SAC ¶¶ 20, 26, 27, 29).

    4.   Section 15
        of the Securities Act

62.  All plaintiffs assert a claim against Zhao pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o (SAC ¶ 222).

63.  "Section 15 establishes 'control person' liability for violations of [S]ections 11 and 12." In re Fuwei Films Sec. Litig., supra, 634 F. Supp. 2d at 435.  The elements of a claim under Section 15 are:  (1) "'a primary violation by a controlled person'" and (2) "'control by the defendant of the primary violator.'"  In re Fuwei Films Sec. Litig., supra, 634 F. Supp. 2d at 435, quoting In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) (Lynch, then D.J., now Cir. J).

64.  Although there is no definition of "control" in the Securities Act, many courts have defined it as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." E.g., Sec. & Exch. Comm'n v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996); In re: EZCorp, Inc. Sec. Litig., 181 F. Supp. 3d 197, 212 (S.D.N.Y. 2016) (Carter, D.J.); In re Virtus Inv. Partners, Inc. Sec. Litig., 15 Civ. 1249 (WHP), 2016 WL 3647959 at *8 (S.D.N.Y. July

21

1, 2016) (Pauley, D.J.); <u>In re Wachovia Equity Sec. Litig.</u>, 753 F. Supp. 2d 326, 379 (S.D.N.Y. 2011) (Sullivan, D.J.); <u>In re Refco, Inc. Sec. Litig.</u>, <u>supra</u>, 503 F. Supp. 2d at 637.

65.  As explained in paragraphs 48-61, Puda violated Sections 11 and 12 of the Securities Act.

66.  Zhao signed or authorized the signing of the registration statement issued in connection with the December Offering, participated in the process which allowed the offering to be successfully completed or participated in the offer or sale of Puda's shares (SAC ¶ 225).  As Chairman of the Board of Directors, Zhao was responsible both for the content of the registration statement and for ensuring it was not misleading (SAC ¶ 226).  Thus, Zhao was a control person and is liable pursuant to Section 15 of the Securities Act.

67.  Plaintiffs sustained damage in that the value of their Puda shares declined as a result of Puda's violation of Sections 11 and 12 of the Securities Act (SAC ¶¶ 20, 26, 27, 29, 227).

5.  Section 10(b) of the
Exchange Act and Rule 10b-5

68.  All plaintiffs assert a claim against Puda and Zhao for violating Section 10(b) of the Exchange Act, 15 U.S.C. §

22

78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §
240.10b-5 (SAC ¶ 229).

69.  The elements of a claim under Section 10(b) and
Rule 10b-5 are:  "(1) a material misrepresentation or omission by
the defendant; (2) scienter; (3) a connection between the misrep-
resentation or omission and the purchase or sale of a security;
(4) reliance upon the misrepresentation or omission; (5) economic
loss; and (6) loss causation."  Erica P. John Fund, Inc. v.
Halliburton Co., 563 U.S. 804, 809-10 (2011) (internal quotation
marks omitted).

70.  The only proper defendant in a Rule 10b-5 private
suit is the "maker" of a statement.  Janus Capital Grp. v. First
Derivative Traders, 564 U.S. 135, 142-44 (2011).  The maker of a
statement is "the person or entity with ultimate authority over
the statement, including its content and whether and how to
communicate it."  Janus Capital Grp. v. First Derivative Traders,
supra, 564 U.S. at 142.

71.  To be material, there must be "'a substantial
likelihood that a reasonable shareholder would consider [the
statement] important in deciding how to [act].'"  Basic Inc. v.
Levinson, 485 U.S. 224, 231-32 (1988) (requiring "'a substantial
likelihood that the disclosure of the omitted fact would have
been viewed by the reasonable investor as having significantly

altered the "total mix" of information made available'"), citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

72.   An inference of scienter can be supported:  "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000) (internal quotation marks omitted).

> At least four circumstances may give rise to a strong
> inference of the required scienter:  where the com-
> plaint sufficiently alleges that the defendants (1)
> benefitted in a concrete and personal way from the
> purported fraud; (2) engaged in deliberately illegal
> behavior; (3) knew facts or had access to information
> suggesting that their public statements were not accu-
> rate; or (4) failed to check information they had a
> duty to monitor.

ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 199 (2d Cir. 2009) (internal quotation marks omitted).

73.   In order to show reliance, a plaintiff must demonstrate that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction" that led to the loss.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 106 (2d Cir. 2007) (internal quotation marks omitted).

24

74.  To show causation, a plaintiff must allege that
"the <u>subject</u> of the fraudulent statement or omission was the
cause of the actual loss suffered, <u>i.e.</u>, that the misstatement or
omission concealed something from the market that, when dis-
closed, negatively affected the value of the security."  <u>Lentell</u>
<u>v. Merrill Lynch & Co.</u>, 396 F.3d 161, 173 (2d Cir. 2005) (inter-
nal quotation marks omitted; emphasis in original).

75.  As Chairman of Puda's Board of Directors, Zhao was
privy to and participated in the creation, development and
reporting of Puda's internal reports.  He enjoyed significant
personal contact and familiarity with the other defendants and
was advised of, and had access to, other members of Puda's
management team, internal reports and other data and information
about Puda's finances, operations and sales.  Moreover, he was
aware of Puda's dissemination of information to the public which
he knew was materially false and misleading (SAC ¶ 232).

76.  Because of his position with Puda, Zhao possessed
the power and authority to control the contents of Puda's filings
with the Securities and Exchange Commissioner (the "SEC") (SAC ¶
53).

77.  There were material misrepresentations in Puda's
10-K reports for 2009 and 2010 and 10-Q reports for the third
quarter of 2009 through the third quarter of 2010 because they

25

consolidated the operating results of Shanxi Coal, even though
Puda no longer had any ownership interest in it (SAC ¶¶ 77-79,
81-84).

78.   Moreover, Puda's 10-K report for 2009 and 10-Q
reports for the third quarter of 2009 through the third quarter
of 2010 contained material misrepresentations in that they each
represented that Puda owned 90% of Shanxi, even though Puda no
longer had any ownership interest in it (SAC ¶¶ 85-87).

79.   Additionally, Puda's 10-K reports for 2009 and
2010 represented that "[t]he operations of Shanxi Coal are
[Puda's] sole source of revenue."  At the time these statements
were made, Puda did not have any ownership interest in Shanxi
Coal because its interest had been transferred to Zhao in Septem-
ber 2009 (SAC ¶ 89).

80.   Moreover, as explained in paragraphs 51-52 and 57-
58, Puda's prospectus and registration statement in connection
with the December Offering were materially false and misleading.

81.   Puda and Zhao acted with scienter because they had
actual knowledge of the falsity of the misrepresentations (SAC ¶¶
233-34).  Moreover, Zhao received copies of Puda's reports prior
to, or shortly after, their issuance and had the ability and
opportunity to prevent their issuance or cause them to be cor-
rected (SAC ¶ 53).

82.  At the time the foregoing misrepresentations were made, plaintiffs did not know of their falsity and believed them to be true.  Had plaintiffs and the marketplace known the truth regarding Puda's misrepresentation that it owned 90% of Shanxi Coal, plaintiffs would not have purchased or otherwise acquired their Puda securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially-inflated prices that they paid (SAC ¶ 237).

83.  Puda and Zhao are liable to plaintiffs for violating Section 10(b) of the Exchange Act and Rule 10b-5.

84.  When Puda's fraud was disclosed, the value of Puda's shares declined (SAC ¶¶ 20, 26, 27, 29, 239).  As a result, plaintiffs suffered damages in connection with their respective purchases and sales of Puda's securities during the Class Period.

### 6.  Section 20(a) of the Exchange Act

85.  All plaintiffs assert a claim against Zhao pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78u(a) (SAC ¶ 240).

86.  The elements of a claim under Section 20(a) are: (1) a primary violation of Section 10(b) by the controlled person

27

and (2) control of the primary violator by the defendant. <u>Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.</u>, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014) (Ramos, D.J.); <u>McIntire v. China MediaExpress Holdings, Inc.</u>, 927 F. Supp. 2d 105, 121 (S.D.N.Y. 2013) (Marrero, D.J.).

87.  Although the Exchange Act does not define "control," as noted in paragraph 64 above, most courts define it as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." <u>E.g.</u>, <u>Sec. & Exch. Comm'n v. First Jersey Sec., Inc.</u>, <u>supra</u>, 101 F.3d at 1472-73.

88.  Moreover, "the majority of district courts in this Circuit have required Section 20(a) plaintiffs to allege that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." <u>Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.</u>, <u>supra</u>, 33 F. Supp. 3d at 437 (internal quotation marks omitted) (collecting cases).  To show "culpable participation," a plaintiff must allege, with particularity, "facts giving rise to a strong inference that the defendant acted with the required state of mind, <u>i.e.</u>, scienter." <u>McIntire v. China MediaExpress Holdings, Inc.</u>, <u>supra</u>, 927 F. Supp. 2d at 122 (internal quotation marks omitted); <u>see</u> <u>In re Satyam Comput. Servs. Ltd. Sec. Litig.</u>, 915

F. Supp. 2d 450, 482 (S.D.N.Y. 2013) (Jones, D.J.) ("A plaintiff
asserting a Section 20(a) claim must allege at least particular-
ized facts of the controlling person's conscious misbehavior or
recklessness." (internal quotation marks omitted)); <u>Kalin v.
Xanboo, Inc.</u>, 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007) (Karas,
D.J.).

89.   As explained in paragraphs 68-84, Puda violated
Section 10(b) and Rule 10b-5.

90.   By virtue of his high-level position as Chairman
of the Board of Directors, as well as his ownership and contrac-
tual rights, participation in and/or awareness of Puda's opera-
tions and/or intimate knowledge of the false financial statements
filed by Puda and disseminated to the public, Zhao had the power
to influence and control, and did influence and control, Puda's
decision-making, including controlling the content and dissemina-
tion of the various statements that were false and misleading.
Zhao received, or had unlimited access to, copies of Puda's
reports, public filings and other statements that were materially
misleading and prior to and/or shortly after these statements
were issued.  Zhao had the ability to prevent the issuance of the
statements or cause them to be corrected (SAC ¶ 242).

91.   In particular, Zhao had direct and supervisory
involvement in Puda's day-to-day operations and, by virtue of his

title and involvement in the transactions, can be presumed to
have had the power to control or influence the particular trans-
actions giving rise to the securities violations (SAC ¶ 243).
Thus, Zhao was a control person and is liable pursuant to Section
15 of the Exchange Act.

        92.  As a direct and proximate result of Puda's viola-
tion of Section 10(b) and Rule 10b-5, plaintiffs suffered damages
in connection with their purchase of Puda's securities during the
Class Period (SAC ¶¶ 20, 26, 27, 29, 244).

        7.  <u>Damages</u>

        93.  Plaintiffs' inquest submissions do not expressly
or implicitly address the damages recoverable as a result of
Puda's and Zhao's violations of the Securities Act.  To the
contrary, plaintiffs' inquest submissions focus exclusively on
the damages recoverable for a violation of Section 10(b) of the
Exchange Act and the impact of Section 201 of the Private Securi-
ties Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, on
plaintiffs' damages.  By its terms, the provisions of the PSLRA
limiting damages are applicable only to claims brought under the
Exchange Act.[10]  Given plaintiffs' total failure to address the

_____

        [10]15 U.S.C. § 78u-4(e) limits damages in "any private action
                                                    (continued...)

damages recoverable under the Securities Act and their exclusive focus on the damages recoverable under the Exchange Act, I conclude that plaintiffs have abandoned any claim for damages on their claims under the Securities Act.

94.   In an action alleging a violation of Section 10(b) and Rule 10b-5, the most commonly accepted measure of damages is the out-of-pocket loss, measured by the difference between the purchase price and the true value of the security on the date of purchase.  See, e.g., Acticon AG v. China N.E. Petroleum Holdings Ltd., 692 F.3d 34, 38-41 (2d Cir. 2012); In re Barrick Gold Sec. Litig., 314 F.R.D. 91, 103 (S.D.N.Y. 2016) (Scheindlin, D.J.); Mazuma Holding Corp. v. Bethke, 21 F. Supp. 3d 221, 235 (E.D.N.Y. 2014).

95.   The PSLRA, however, caps damages on an investment loss based on the price paid for the stock and the market price for the stock subsequent to the disclosure.  Under the PSLRA, damages may not exceed the "difference between the purchase

---

[10](...continued)
arising under this chapter."  The foregoing provision of the PSLRA is codified in Chapter 2B of Title 15.  The Securities Act is codified in Chapter 2A of Title 15.  Accordingly, the provisions of the PSLRA limiting damages are inapplicable to claims brought under the Securities Act.  See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 337-38 (S.D.N.Y. 2003) (Scheindlin, D.J.) (applying the same rationale and concluding that the heightened pleading requirements of the PSLRA do not apply to claims brought under the Securities Act).

. . . price . . . and the mean trading price of that security
during the 90-day period beginning on the date on which the
information correcting the misstatement or omission that is the
basis for the action is disseminated to the market."  15 U.S.C. §
78u-4(e)(1).

    96.  Plaintiffs have submitted the expert reports of
Professor Gregg A. Jarrell and Peter Lert, Ph.D., C.F.A. in
support of their calculation of damages (Declaration of Joshua L.
Crowell in Support of Plaintiffs' Proposed Findings of Fact and
Conclusions of Law Concerning Damages, dated Aug. 24, 2016 (D.I.
626) ("Crowell Decl."), Exs. 1, 2, 11).

    97.  Jarrell is a tenured Professor of Economics and
Finance at the University of Rochester's Simon Graduate School of
Business Administration (Crowell Decl., Ex. 1 ¶¶ 1, 4).  He holds
a Ph.D. in Business Economics from the University of Chicago,
with major concentrations in Industrial Organization and Finance,
an MBA from the University of Chicago and a B.S. in Business
Administration from the University of Delaware (Crowell Decl.,
Ex. 1 ¶ 4).

    98.  Before his current position, Jarrell was a profes-
sor at the University of Rochester's Graduate School of Manage-
ment and the George Washington University Law School (Crowell
Decl., Ex. 1 ¶¶ 5-6).  He was also a Senior Economist with

Lexecon, Inc., an economics consulting firm; Chief Economist for
the SEC, and the Senior Vice President and Director of Research
at the Alcar Group, Inc., a consulting and software firm special-
izing in financial valuations of businesses and securities
(Crowell Decl., Ex. 1 ¶¶ 5-6).  Jarrell has authored a number of
published papers in the fields of finance and economics (Ex. 1 to
Crowell Decl., Ex. 1, at 4-9).  He has also testified as an
expert in a number of securities cases (Ex. 1 to Crowell Decl.,
Ex. 1, at 9-11).

      99.  Lert is an Affiliated Expert with Crowninshield
Financial Research, Inc., a financial economics consulting firm
(Crowell Decl., Ex. 11 ¶ 7).  He is a Chartered Financial Ana-
lyst, which Lert claims is the premier credential for financial
analysts worldwide (Crowell Decl., Ex. 11 ¶¶ 12-13).  To receive
this credential, an applicant must pass a series of three exams
covering such topics as equity analysis, fixed income analysis
and financial analysis (Crowell Decl., Ex. 11 ¶ 13).  In addi-
tion, an applicant must have extensive work experience in the
investment management field in order to qualify for the creden-
tial (Crowell Decl., Ex. 11 ¶ 13).

      100.  Lert holds a Ph.D. in theoretical chemistry from
the University of California, San Diego, an M.S. in chemistry
from the University of California, San Diego and a B.S. in

chemistry from the University of Virginia (Ex. 2 to Crowell Decl., Ex. 11, at 23).

101.  Lert has more than 24 years of experience in the financial services industry (Crowell Decl., Ex. 11 ¶ 8).  He was also a quantitative analyst at the SEC (Ex. 2 to Crowell Decl., Ex. 11, at 24).  Lert has authored several published papers in the field of finance and is a member of the Boston Security Analysts Society and the Chartered Financial Analyst Institute (Ex. 2 to Crowell Decl., Ex. 11, at 25-27).

a.  Jarrell's Per
Share Damages Analysis

102.  Plaintiffs' calculation of the amount by which the value of each share of Puda stock was inflated during the Class Period, or plaintiffs' per-share damages, is based on Jarrell's conclusion that had Puda or Zhao disclosed that Puda had transferred its ownership interest in Shanxi Coal for no consideration and that it had no other assets, Puda's stock price would have gone to zero (Crowell Decl., Ex. 4, at 12:8-13:7).

103.  In performing his per-share damages analysis, Jarrell assumed Puda's and Zhao's liability.  Moreover, Jarrell assumed that at the beginning of the Class Period, Puda and Zhao disclosed that, due to the transfer of stock in Shanxi Coal, Puda

34

no longer had any ownership interest in Shanxi Coal.  Jarrell
also assumed that Puda had no other assets (Crowell Decl., Ex. 1
¶ 60).

104.  To estimate the stock-price impact of this
hypothetical full-truth disclosure, Jarrell used "basic
financial-economic theory to analyze the implications of the
disclosure" and "examine[d] the economic evidence available about
Puda Coal's value when the full truth about the fraud was public
and fully impounded [sic] in its stock price" (Crowell Decl., Ex.
1 ¶ 60).

105.  Jarrell determined that, subsequent to this
hypothetical full-truth disclosure, the value of Puda stock would
have been zero (Crowell Decl., Ex. 1 ¶¶ 60-67).

106.  According to Jarrell, "[t]he most common approach
for measuring the level of artificial inflation present in a
company's stock price is through the use of an event study
analysis which measures the stock price reactions to the relevant
'corrective' disclosures that occurred during the time period for
which investors were informed of the Defendants' misconduct and
misrepresentations" (Crowell Decl., Ex. 2 ¶ 78).

107.  However, in reaction to the corrective disclo-
sures after the market close on April 7, 2011, Puda's stock did
not immediately fall to zero.  Instead, on the next day, April 8,

2011, the stock price closed at $6 per share (Crowell Decl., Ex. 1 ¶¶ 27-39).

108.  Before the market opened on the next trading day, April 11, 2011, trading of the stock was halted and did not resume until August 18, 2011 (Crowell Decl., Ex. 1 ¶¶ 43-44).

109.  After the market closed on August 19, 2011, trading was again halted through September 1, 2011 (Crowell Decl., Ex. 2 ¶ 53).

110.  Once trading resumed on September 2, 2011, Puda's stock price did not reach zero -- or virtually zero -- until the end of 2012 (Crowell Decl., Ex. 1 ¶ 64).

111.  Notwithstanding its being a shell company with no assets or operations, Puda's stock price did not immediately reach zero in response to the corrective disclosures because of the following:  (1) the market was skeptical of the disclosures in the Little Report; (2) Zhao's offer to buy out Puda was never publicly withdrawn and (3) the true facts were not completely disclosed until October 2011, when Puda disclosed that the CITIC Letter was false and that Zhao falsely represented that CITIC failed to fund the loan (Crowell Decl., Ex. 1 ¶¶ 46, 49; Crowell Decl., Ex. 2 ¶¶ 81-82).

112.  In light of these facts, Jarrell employed a zero-value approach, rather than a traditional event study.  Under the

36

zero-value approach, damages are calculated based on the determi-
nation that, in response to a hypothetical full-truth disclosure,
the value of Puda stock would be zero (Crowell Decl., Ex. 1 ¶¶
60-62).  This approach is supported by a working paper written by
National Economic Research Associates, Inc. (Crowell Decl., Ex. 2
¶¶ 84-88).  It is also supported by common sense; if Puda owned
nothing, had no income-producing operations and no plans to
develop income-producing operations, then its stock would have no
value.

113.  Because Puda stock did not trade at all in the 90
days following the end of the Class Period on April 8, 2011,
there are no trading prices during that 90-day period.  When
trading recommenced on August 18, 2011, the closing price of Puda
stock that day was $4.10 per share (Crowell Decl., Ex. 1 ¶ 68).
For the 90 calendar days after Puda stock commenced trading after
the second trading halt, on September 2, 2011, its average price
was $0.59 per share (Crowell Decl., Ex. 1 ¶ 68).

114.  Based on Jarrell's opinion that Puda's true value
was zero during the Class Period, and because there were no
intervening or market events that would have independently caused
a decrease in the price of Puda stock, Jarrell concluded that

the damages per-share appropriate for the Defaulted
Defendants equals the lesser of:  i) the purchase price
minus the sales price; and ii) the purchase price minus

> the PSLRA price.  These damages apply to U.S. investors
> who purchased Puda Coal common stock on or after Novem-
> ber 13, 2009, and who held that stock at least until
> the start of trading on April 8, 2011, so that they
> suffered a stock-price drop on April 8, 2011.

(Crowell Decl., Ex. 1 ¶ 67).

115.  In calculating damages to be assessed against Puda and Zhao, Jarrell assumed that investors are not damaged unless they held their purchased Puda shares at least until the start of trading on April 8, 2011.  Thus, investors who liqui-dated their Puda stock before that date have no damages (Crowell Decl., Ex. 1 ¶ 67).

116.  Because the application of the PSLRA lookback provision is a legal issue, see infra paragraphs 129-35, Jarrell calculated per-share damages based on two alternatives for the PSLRA lookback price:  "i) the closing price of $4.10 per share when trading resumed on August 18, 2011; or ii) the 90-day average price of $0.59 after trading ultimately resumed on September 2, 2011" (Crowell Decl., Ex. 1 ¶ 69).

117.  Thus, per-share damages for Puda common stock equals the lesser of:  (1) the purchase price minus the sales price or (2) the purchase price minus the PSLRA lookback price of either $4.10 or $0.59.

118.  Jarrell also calculated the damages for Puda call and put options.  For call options, Jarrell concluded that "[i]f

the value of the underlying stock is zero, a call option will
also have no value."  Thus, for purchasers of call options,
damages are "equal to the price paid to initiate the call posi-
tion less the proceeds received on closing the position," pro-
vided that the position was held at least until April 8, 2011
(Crowell Decl., Ex. 1 ¶ 85).  For put options, Jarrell concluded
that "[i]f the value of the underlying stock is zero, the value
of the put option will be its exercise price."  Thus, for sellers
of put options, damages are "equal to:  i) the exercise price on
the date of sale less the proceeds received from the initiating
sale; less ii) the exercise price on the date the position was
closed less the cost of closing the position" (Crowell Decl., Ex.
1 ¶ 86).

> b.  Number of Damaged
>     <u>Shares and Aggregate Damages</u>

119.  Lert calculated the number of damaged shares and
aggregate damages against Puda and Zhao (Crowell Decl., Ex. 11 ¶
36).

120.  Lert adopted Jarrell's per-share and per-contract
damages analysis and then aggregated damages using a two-trader
proportional trading model, which is discussed in more detail
below (Crowell Decl., Ex. 11 ¶¶ 2-3, 24-38).  Lert then estimated

aggregate damages based on the two alternative PSLRA lookback
prices calculated by Jarrell (Crowell Decl., Ex. 11 ¶ 3).

i.  Two-Trader
Proportional Trading Model

121.   To aggregate damages, Lert concluded it was
necessary to estimate how many Puda shares and options were
bought on each day of the Class Period and to estimate if and
when those same shares and options were subsequently sold (Crowe-
ll Decl., Ex. 11 ¶ 36).   The two-trader proportional trading
model estimates the requisite purchase and sale dates for all
shares of common stock traded during the Class Period (Crowell
Decl., Ex. 11 ¶ 37).

122.   Proportional trading models are generally ac-
cepted in finance and economics research and are widely used by
experts for calculating aggregate damages in the course of
litigation, settlement discussions and in drafting plans of
allocation for settlement (Crowell Decl., Ex. 11 ¶¶ 42-44).
Additionally, such models have been empirically tested in pub-
lished peer-reviewed research studies and have been shown to
produce reliable estimates of aggregate damages in securities
litigation (Crowell Decl., Ex. 11 ¶¶ 45-48).

123.   Aggregated damages models, such as the propor-
tional trading model Lert employed, have been accepted in this
District for estimating aggregate damages under Section 10(b).
See, e.g., In re Worldcom, Inc. Sec. Litig., 02 Civ. 3288 (DLC),
2005 WL 517331 at *4-*5 (S.D.N.Y. Mar. 4, 2005) (Cote, D.J.); In
re Blech Sec. Litig., 94 Civ. 7696 (RWS), 2003 WL 1610775 at *26-
*27 (S.D.N.Y. Mar. 26, 2003) (Sweet, D.J.).

### ii.   Lert's Conclusions
### on Aggregate Damages

124.   To calculate aggregate damages using the two-
trader proportional trading model, Lert applied the same parame-
ters utilized in a published empirical study, William H. Beaver,
James K. Malernee and Michael C. Keeley, Stock Trading Behavior
and Damage Estimation in Securities Cases, Cornerstone Research
(1997) (Crowell Decl., Ex. 11 ¶¶ 48, 52).

125.   Lert estimated damages only for Puda shares
purchased during the Class Period and held until at least the
final day of the Class Period, April 8, 2011.  He did not include
in-and-out traders in his calculation of aggregate damages
because such traders are not included in the class certified by
Judge Forrest in her Order dated October 1, 2013 (Crowell Decl.,
Ex. 11 ¶ 25).

41

126.   Based on a PSLRA lookback price of $0.59, Lert estimated that aggregate class-wide damages for purchasers of Puda stock were $197.1 million.  Based on a PSLRA lookback price of $4.10, Lert estimated that aggregate class-wide damages were $144.2 million (Crowell Decl., Ex. 11 ¶ 21).

127.   Lert also estimated the aggregate damages to holders of Puda call options and writers of Puda put options based on options market trading data and Jarrell's per-contract damages calculations (Crowell Decl., Ex. 11 ¶¶ 65-72).  Based on a PSLRA lookback price of $0.59, Lert estimated that aggregate class-wide damages to holders of call options and writers of put options were $39.6 million (Crowell Decl., Ex. 11 ¶ 22).  Based on a PSLRA lookback price of $4.10, he estimated that aggregate class-wide damages to holders of call options and writers of put options were $27.8 million (Crowell Decl., Ex. 11 ¶ 22).

128.   Thus, based on a PSLRA lookback price of $0.59, total estimated damages equal $236.7 million.  Based on a PSLRA lookback price of $4.10, total estimated damages equal $172.0 million.

c.   Application of the
PSLRA Lookback Provision

129.   While Jarrell and Lert performed their calcula-
tions applying both potentially applicable PSLRA lookback prices,
I conclude that the lookback price of $0.59 per share should be
used.   This is consistent with the purpose of the PSLRA's lookba-
ck provision and Second Circuit precedent applying the lookback
provision.

130.   Under the PSLRA, damages are not calculated based
upon a single-day decline in price, but instead are given a 90-
day opportunity to recover after the misrepresentations or
omissions are corrected.   See Acticon AG v. China N.E. Petroleum
Holdings Ltd., supra, 692 F.3d at 38-39.

131.   The legislative history of the PSLRA indicates
that the purpose of the 90-day lookback is to prevent an overes-
timation of plaintiffs' damages by looking at the price only on
the day following the corrective disclosure.   Acticon AG v. China
N.E. Petroleum Holdings, Ltd., supra, 692 F.3d at 39.

132.   Due to the first trading halt on April 11, 2011,
Puda stock did not trade on any of the 90 days following the
initial, incomplete corrective disclosures on April 8, 2011.
Thus, it would not be appropriate to use the price ($4.10) on the
first trading day, August 18, 2011, after that 90-day period

43

elapsed.  Because trading had been halted throughout the previous 90 days, Puda's stock price did not have the requisite number of trading days to reach an equilibrium price following the partial disclosure of the fraud on April 8, 2011.

133.  Moreover, the full truth was not disclosed until October 2011, when Puda's Audit Committee confirmed Zhao's theft of the entirety of Puda's holdings in Shanxi Coal and confirmed the falsity of Zhao's denials, through a series of disclosures that continued well after August 18, 2011 (SAC ¶¶ 24, 27, 185). See In re LDK Solar Sec. Litig., 255 F.R.D. 519, 528-29 (N.D. Cal. 2009) ("If some tentative or partial disclosure of fraud is published but the truth is not fully revealed, there would be no reason to assume that the market fully recovered from the impact of misrepresentation or omission." (emphasis in original)).

134.  Instead, the full effect of the disclosure of the fraud on Puda's stock price is more accurately reflected in the mean closing price, $0.59, for the 90-day period after Puda began trading again, on September 2, 2011.

135.  While plaintiffs would ordinarily be entitled to a total of $236.7 million in damages, that amount must be reduced because plaintiffs settled with certain defendants.

8.  <u>Settlement Reduction</u>

136.  Section 21D(f) of the Exchange Act contains a settlement reduction provision:

> If a covered person enters into a settlement with the plaintiff prior to final verdict or judgment, the verdict or judgment shall be reduced by the greater of -- (i) an amount that corresponds to the percentage of responsibility of that covered person; or (ii) the amount paid to the plaintiff by that covered person.

15 U.S.C. § 78u-4(f)(7)(B).

137.  A "covered person" is defined to mean a defendant in any Exchange Act private action or an outside-director who is a defendant in a private action arising under Section 11 of the Securities Act.  15 U.S.C. § 78u-4(f)(10)(C).

138.  Prior to final verdict or judgment, plaintiffs settled with Macquarie and Brean Murray.  Since both were Exchange Act defendants (SAC ¶¶ 229-39), they are "covered persons."

139.  Prior to final verdict or judgment, plaintiffs also settled with Tang and Wizel.  Since both are independent directors (SAC, Ex. 1, at 19, 24) and both were Section 11 defendants (SAC ¶¶ 197-210), they are "covered persons" as well.

140.  Plaintiffs settled with Macquarie for $7.4 million (Stipulation and Agreement of Settlement, dated Oct. 16, 2015 (D.I. 555) ¶ 1.41).

45

141.   Plaintiffs settled with Brean Murray for $1.2 million (Amended Stipulation of Settlement, dated Oct. 16, 2015 (D.I. 556) ¶ 1.18).

142.   Plaintiffs settled with Tang and Wizel for $100,000 (Stipulation and Agreement of Settlement, dated Dec. 1, 2015 (D.I. 574) ¶ 2.1).[11]

143.   The total amount of plaintiffs' settlement with covered persons equals $8.7 million.

144.   Subtracting the total of these four settlements from plaintiffs' damages of $236.7 million, plaintiffs are entitled to damages of $228 million.[12]

---

[11]The "Settlement Amount," as defined in plaintiffs' settle-ment agreement with Tang and Wizel, is $100,000, to be paid by Tang and Wizel, plus a stipulated judgment for $1.2 million, which plaintiffs "shall not attempt to enforce or execute . . . against [Tang and Wizel], and shall attempt to enforce or execute . . . only against [the People's Insurance Company of China ("PICC")] (Stipulation and Agreement of Settlement, dated Dec. 1, 2015 (D.I. 574) ¶¶ 1.41, 2.1).  In the absence of proof that plaintiffs have been able to enforce the stipulated judgment against PICC, or that they will be able to enforce the judgment, I shall not include it in the total amount of the settlement between plaintiffs and Tang and Wizel.

[12]While plaintiffs also settled with Moore Stephens, P.C., an Exchange Act defendant, Judge Cote has not yet entered an order of final approval of that settlement.  Thus, I shall not subtract the amount of that settlement from plaintiffs' damages.

9.  <u>Joint and Several Liability</u>

145.  Section 21D(f) of the Exchange Act provides for
proportionate liability for covered persons.  Under this provi-
sion, covered persons "shall be liable solely for the portion of
the judgment that corresponds to the percentage of responsibility
of that covered person," 15 U.S.C. § 78u-4(f)(2)(B)(i), unless
the covered person "knowingly committed a violation of the
securities laws."  15 U.S.C. § 78u-4(f)(2)(A).

146.  In the case of a knowing violation, covered
persons are jointly and severally liable.  15 U.S.C. § 78u-
4(f)(2)(A).

147.  A defendant knowingly violates the securities
laws in an action based on an untrue or misleading statement of
material fact if the defendant:  (1) "ma[d]e an untrue statement
of a material fact, with actual knowledge that the representation
is false," or (2) made a statement that was misleading because of
an omission "with actual knowledge that, as a result of the
omission, one of the material misrepresentations" made by the
defendant was false.  15 U.S.C. § 78u-4(f)(10)(A)(i)(I).  In
either instance, investors must be "likely to reasonably rely on
that misrepresentation or omission."  15 U.S.C. § 78u-
4(f)(10)(A)(i)(II).

148.   Puda and Zhao are covered persons because they are Exchange Act defendants (SAC ¶¶ 229-39).  They made the material misrepresentations[13] with actual knowledge that they were false (SAC ¶¶ 233-34).  Moreover, plaintiffs reasonably relied on those misrepresentations (SAC ¶ 237).

149.   Therefore, Puda and Zhao are jointly and severally liable for plaintiffs' damages.

10.   Post-Judgment Interest

150.   Plaintiffs are entitled to post-judgment interest as a matter of right.  Schipani v. McLeod, 541 F.3d 158, 165 (2d Cir. 2008) ("[W]e have consistently held that an award of postjudgment interest is mandatory."), citing Westinghouse Credit Corp. v. D'Urso, 371 F.3d 96, 100 (2d Cir. 2004).  Accordingly, I respectfully recommend that plaintiff be awarded post-judgment interest on all sums awarded.

---

[13]Although Zhao did not personally make the misrepresentations, the drafters of Section 21D(f) could not have intended to limit the provision to individuals who personally make the statements in issue; otherwise, outside-directors could not be jointly and severally liable under Section 11.  2 Harold S. Bloomenthal & Samuel Wolff, Securities Law Handbook § 37:5 (2016).

IV.  Conclusion

         Accordingly, for all the foregoing reasons, I respect-
fully recommend that judgment be entered for plaintiffs against
Puda and Zhao, jointly and severally, in the amount of $228
million, plus post-judgment interest, with costs to be taxed by
the Clerk of the Court.[14]

V.  Objections

         Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties shall have
fourteen (14) days from receipt of this Report to file written
objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and
responses thereto) shall be filed with the Clerk of the Court,
with courtesy copies delivered to the Chambers of the Honorable
Denise L. Cote, United States District Judge, 500 Pearl Street,
Room 1610, New York, New York 10007, and to the Chambers of the
undersigned, 500 Pearl Street, Room 1670, New York, New York
10007.  Any requests for an extension of time for filing objec-

---

         [14]While plaintiffs demanded an award of costs and fees in
their Second Consolidated Amended and Supplemental Complaint
(SAC, at 87), their inquest submissions do not address either.
Costs are ordinarily taxed by the Clerk of the Court.  With
respect to fees, neither the Securities Act nor the Exchange Act
contains a provision that permits recovery of attorneys' fees.

tions must be directed to Judge Cote.   FAILURE TO OBJECT WITHIN
FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL**
PRECLUDE APPELLATE REVIEW.   Thomas v. Arn, 474 U.S. 140, 155
(1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir.
1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054
(2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.
1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir.
1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983)
(per curiam).

Dated:   New York, New York
         January 6, 2017

                                   Respectfully submitted,


                                   _____
                                   HENRY PITMAN
                                   United States Magistrate Judge


Copies sent to:

Counsel for plaintiffs

For Ming Zhao:
Juan P. Morillo, Lauren Dickie,
Michael Carlinsky, Minyao Wang
Quinn Emanuel Urquhart & Sullivan LLP

For Puda Coal, Inc:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
         AND
Shanxi Puda Coal Group, Ltd.

```
426 Xuefu Street
Taiyuan, 030006
China
```